2:40 HWB SEA
4/22/21 NOON

| SUMMONS AND ORDER OF NOTICE | DOCKET NUMBER<br>2173CV00292 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|
| CASE NAME:<br>Shamrock Fisheries LLC et al vs. Mark C Manning Member of Arbitration Panel et al | | Marc J. Santos, Clerk of Court<br>Bristol County |
| To:<br>Robert J Bocko Member of Arbitration Panel | | COURT NAME & ADDRESS<br>Bristol County Superior Court - New Bedford<br>441 County Street, 1st floor<br>New Bedford, MA 02740 |

To the above named defendant(s):

You are hereby summoned and required to serve upon:

**Paul Thomas Muniz, Esq.**
**Donovan and Hatem LLP**
**53 State St 8th Floor**
**Boston, MA 02109**

an answer to the complaint which is herewith served upon you. This must be done within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, Judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this Court at New Bedford either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

**WE ALSO NOTIFY YOU** that application for a Preliminary Injunction has been made in said action, as it appears in the complaint. A hearing on this matter has been scheduled for:

This hearing will be conducted via Zoom, NOT IN PERSON.

MEETING ID: 160 852 7519
OR
Dial in to participate by phone at 1-646-828-7666

**Date:** **04/27/2021**
**Time:** **10:00 AM**
**Event:** **Hearing on Preliminary Injunction**
**Session Location:** **Civil A (New Bedford) / Lower Courtroom**

at which time you may appear and show cause why such application should not be granted.

| DATE ISSUED | CHIEF JUSTICE OF THE SUPERIOR COURT Witness: | ASSOCIATE JUSTICE | ASSISTANT CLERK |
|---|---|---|---|
| **04/21/2021** | **Hon. Judith Fabricant** | **Hon. Susan E Sullivan** | X [signature] |

**RETURN OF SERVICE**

I hereby certify and return that on ________________, I served a copy of this summons, together with a copy of the Complaint.

PARTY NAME:

X ____________________

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS. CIVIL ACTION NO. 2173CV00292

**SHAMROCK FISHERIES LLC, KINEO FISHERIES LLC, MARINER FISHERIES LLC, SEAFARER FISHERIES LLC, CYNBEL FISHERIES LLC, TORBAY FISHERIES LLC, GALWAY FISHERIES LLC, QUINN FISHERIES, INC., BLUE HARVEST FISHERIES, LLC,**

Plaintiffs,

v.

**MARK C. MANNING**
**ROBERT J. BOCKO**
**STEVENSON L. WEEKS**
**as PANELIST**

Defendants, and

**HON. LLOYD MACDONALD, as TRUSTEE of the RAFAEL SETTLEMENT TRUST**

Nominal Defendant

**PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

NOW COME, Shamrock Fisheries LLC, Kineo Fisheries LLC, Mariner Fisheries LLC, Seafarer Fisheries LLC, Cynbel Fisheries LLC, Torbay Fisheries LLC, Galway Fisheries LLC, Quinn Fisheries, Inc. (the "Quinn Entities"), Blue Harvest Fisheries, LLC and certain of its affiliates ("Blue Harvest"), (collectively, the "Plaintiffs") and, pursuant to Superior Court Rule 9A(e)(1) and Mass. R. Civ. P. 65, respectfully request this Court to issue a temporary restraining

order and preliminary injunction prohibiting the AAA Arbitration Panel, Carlos Rafael and his affiliated entities[1] ("the Rafaels") and BASE, Inc. from interfering with the Nominal Defendant Trustee's exercise of his fiduciary duties or issuing any Order or Award that interferes with the transfer of vessels and permits or the substitution of collateral by the Plaintiffs, and instructing the Trustee that he is authorized to execute any documents necessary to affect the sale of vessels and permits described in the Verified Complaint. In support of this motion, the Plaintiffs rely upon the Verified Complaint for Declaratory and Injunctive Relief filed contemporaneously herewith and incorporated fully herein by reference, as well as the following:

1. The Quinn Entities and Blue Harvest are the verge of consummating a multimillion-dollar commercial transaction pursuant to which Quinn Entities will transfer and convey certain fishing vessels and permits to Blue Harvest and, in exchange, Quinn Entities will purchase certain fishing vessels and permits from Blue Harvest.

2. The commercial fishery permits are for the current fishing year and include both limited access Atlantic sea scallop permits the season for which is set to commence on June 1, 2021 and multi-species permits the season for which is set to commence on May 1, 2021. As such, if the transaction cannot be immediately finalized, it will result in serious and irreparable financial harm to both the Quinn Entities and Blue Harvest.

3. The assets to be conveyed by the Quinn Entities are subject to existing senior and perfected first-priority mortgages and security interests in favor of a non-party Bank, and existing and perfected junior mortgages and security interests in favor of the Rafael Trust, of which Hon. MacDonald is Trustee.

---

1 Carlos Rafael's affiliated entities include Apollo Fishing LLC, Athena Fishing Corp., C&C Fishing Corp., Ivonilde Fishing Corp., S&S Fishing LLC, Tyler Fishing LLC, Vila Fishing Corp., and Vila Nova Do Corvo II, Inc.

4.   The proposed substitution of assets as part of the transaction between the Quinn Entities and Blue Harvest would not significantly dilute or otherwise jeopardize the security and resources of the Rafael Trust. In other words, after the proposed transaction is complete, the mortgages held by the Bank and Trust will continue to be adequately secured by permits and vessels, albeit different permits and vessels than before the transaction.

5.   The transaction at issue was scheduled to close on April 16, 2021.

6.   Pursuant to the mortgages and security interests held by the Bank and the Trust encumbering the assets to be conveyed, the ownership of those assets cannot be transferred or conveyed absent express agreement by the Bank and Trust. The Bank has given its consent to the substitution of collateral.

7.   As a result of a motion pending before an AAA Arbitration Panel (AAA Case No. 01-19-0003-2608) and an Interim Award of the Panel dated October 28, 2019, relating to assets formerly owned by Carlos Rafael and his related entities, the Trustee is reticent to give his consent without the Court's intervention and instruction as to whether he can be restricted from exercising his fiduciary duties.

8.   Prior to the closing of the transaction, the Trustee received from the Rafael's attorney, a letter enclosing two Orders from the Arbitration Panel purporting to impose restrictions on the Trustee's exercise of his fiduciary duties. A copy of the letter and orders is attached to the Verified Complaint as Exhibit C.

9.   As set forth in the attached Verified Complaint, neither the Plaintiffs nor the Trustee are parties to the underlying Arbitration and are not bound by the Arbitration Panel's rulings and Interim Award.

10. Notwithstanding the fact that the Trustee is not a party to the Arbitration. and the Panel has no authority to direct the Trustee, the Claimant in the Arbitration alleges that "[s]uch a swap would be in violation of **paragraphs 3(a)** and **3(b)** of the Panel's Interim Award." (emphasis added).

11. Paragraphs 3(a) and 3(b) of the Panel's Interim Award instructs the Rafaels as follows:

> 3. The Rafael Respondents are enjoined from and instructed to take certain actions immediately as follows:
>
> a. from taking any further action to effectuate the sales, transfer or assignments of any of the permits at issue;
>
> b. to immediately instruct, verbally and in writing, all escrow and other agents engaged on behalf of any one or more of them to take no further action to effectuate the sales, transfer or assignments of any of the permits at issue, with copies of the writings to be emailed immediately to Claimant, Sector VII and all arbitrators:

12. This Court (Buckley, J.), previously called the Panel's Interim Award "specious" because it "states in conclusory fashion, without any analysis that [the Petitioners] have a 'likelihood of success on the merits'" and "does not set forth any legal basis other than a reference to portions of the Sector Agreement, as to how it came to that finding." See Exhibit D to Verified Complaint.

13. The letter from the Rafaels directing the Trustee to take certain action also constitutes a violation of the 2019 Settlement Agreement between the Rafaels and NOAA following a federal Civil Enforcement Action Case No. NE1707582. See Exhibit E to Verified Complaint.

14. To save them from irreparably harm, the Plaintiffs respectfully request that this Honorable Court issue an order restraining the AAA Arbitration Panel from interfering with the Trustee's exercise of his fiduciary duties or issuing any Order or Award that interferes with the transfer of vessels and permits or the substitution of collateral by the Plaintiffs, and instructing

the Trustee that he is authorized to execute any documents necessary to effectuate the

contemplated substitution of collateral so that the underlying transaction can close.

WHEREFORE. Plaintiffs respectfully request that this Honorable Court GRANT this

Motion and issue a temporary restraining order and a preliminary injunction as set forth above.

A proposed Order is also being filed contemporaneously with this Motion.

Respectfully submitted,
SHAMROCK FISHERIES LLC, KINEOS
FISHERIES LLC, MARINER FISHERIES LLC,
SEAFARER FISHERIES LLC, CYNBEL
FISHERIES LLC, TORBAY FISHERIES LLC,
GALWAY FISHERIES LLC, QUINN FISHERIES,
Inc., and BLUE HARVEST FISHERIES, LLC.
By their attorneys,

Paul T. Muniz (BBO No.: 564786)
pmuniz@donovanhatem.com
**DONOVAN HATEM LLP**
53 State Street, 8th Floor
Boston. MA 02109
(617) 406-4500 *tel*
(617) 406-4500 *fax*

Andrew E. Minkiewicz (BBO No.: 651209)
aminkiewicz@kelleydrye.com
**KELLEY DRYE & WARREN**
Washington Harbour, Suite 400
3050 K Street, NW
Washington, DC 20007
(202) 342-8400 *tel*
(202) 342-8451 *fax*

Date: April _____. 2021

**CERTIFICATE OF SERVICE**

I, Paul T. Muniz, hereby certify that on April 21, 2021, I served a copy of the foregoing document, via electronic mail, on all parties or their representatives in the above captioned action.

Paul T, Muniz

4842-9088-1766, v. 1

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS. CIVIL ACTION NO.

**SHAMROCK FISHERIES LLC,
KINEO FISHERIES LLC,
MARINER FISHERIES LLC, SEAFARER FISHERIES LLC, CYNBEL FISHERIES LLC, TORBAY FISHERIES LLC,
GALWAY FISHERIES LLC,
QUINN FISHERIES, INC.,
BLUE HARVEST FISHERIES, LLC,**

Plaintiffs,

**v.**

**MARK C. MANNING
ROBERT J. BOCKO
STEVENSON L. WEEKS
as PANELIST**

Defendants, and

**HON. LLOYD MACDONALD, as TRUSTEE of the RAFAEL SETTLEMENT TRUST**

Nominal Defendant

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

NOW COME, Shamrock Fisheries LLC, Kineo Fisheries LLC, Mariner Fisheries LLC, Seafarer Fisheries LLC, Cynbel Fisheries LLC, Torbay Fisheries LLC, Galway Fisheries LLC, Quinn Fisheries, Inc. (the "Quinn Entities"), Blue Harvest Fisheries, LLC and certain of its affiliates ("Blue Harvest"), (collectively, the "Plaintiffs"), seeking certain declaratory relief and

instructions to the Trustee in connection with a pending substitution of collateral and allege as follows:

## PARTIES

1. Shamrock Fisheries LLC is a limited liability company organized under the laws of the Commonwealth of Massachusetts with a principal place of business of 137 Popes Island, New Bedford, MA 02740.

2. Kineo Fisheries LLC is a limited liability company organized under the laws of the Commonwealth of Massachusetts with a principal place of business of 137 Popes Island, New Bedford, MA 02740.

3. Mariner Fisheries LLC is a limited liability company organized under the laws of the Commonwealth of Massachusetts with a principal place of business of 137 Popes Island, New Bedford, MA 02740.

4. Seafarer Fisheries LLC is a limited liability company organized under the laws of the Commonwealth of Massachusetts with a principal place of business of 137 Popes Island, New Bedford, MA 02740.

5. Cynbel Fisheries LLC is a limited liability company organized under the laws of the Commonwealth of Massachusetts with a principal place of business of 137 Popes Island, New Bedford, MA 02740.

6. Torbay Fisheries LLC is a limited liability company organized under the laws of the Commonwealth of Massachusetts with a principal place of business of 137 Popes Island, New Bedford, MA 02740.

7. Galway Fisheries LLC is a limited liability company organized under the laws of the Commonwealth of Massachusetts with a principal place of business of 137 Popes Island, New Bedford, MA 02740.

8. Blue Harvest Fisheries, LLC, is a limited liability company organized under the laws of the Delaware, registered to do business in Massachusetts, with a principal place of business of 40 Herman Melville Boulevard, New Bedford, Massachusetts 02740.

9. Defendant, Mark C. Manning, Arbitrator, has a principal place of business at 1000 O'Malley Road, Suite 202, Anchorage, AK 99515-3083.

10. Defendant, Robert J. Bocko, Arbitrator, has a principal place of business at Holmes, Weddle & Barcott, 3101 Western Avenue, Suite 500, Seattle, WA 98121.

11. Defendant, Stevenson L. Weeks, Arbitrator, has a principal place of business at Wheatley Law Group, 710 Cedar Street, Beaufort, North Carolina, 29516.

12. Nominal Defendant, Honorable Lloyd MacDonald (Ret.), is Trustee of the Rafael Settlement Trust established under agreement dated August 1, 2019 (the "Trust"), having a principal address of 115 Orchard Street, New Bedford, Massachusetts 02740.

**THE UNDERLYING TRANSACTION**

13. The Quinn Entities and Blue Harvest are the verge of consummating a multimillion-dollar commercial transaction pursuant to which Quinn Entities will transfer and convey certain fishing vessels and permits to Blue Harvest and, in exchange, Quinn Entities will purchase certain fishing vessels and permits from Blue Harvest. The transaction also involves other confidential valuable consideration not pertinent to the issue before the Court.

14. The transaction, which involved the substitution of certain collateral, was originally scheduled to close on April 16, 2021.

15. The Plaintiffs were prepared to close on April 16th.

16. The transaction did not close on April 16th because of the Trustee's refusal to execute the necessary documents as a result of the actions of the Defendants.

17. The commercial fishery permits are for the current fishing year and include both limited access Atlantic sea scallop permits the season for which is set to commence on June 1, 2021 and multi-species permits the season for which is set to commence on May 1, 2021. As such, if the transaction cannot be immediately finalized, it will result in serious and irreparable financial harm to both the Quinn Entities and Blue Harvest.

18. The assets to be conveyed by the Quinn Entities are subject to existing senior and perfected first-priority mortgages and security interests in favor of a non-party Bank, and existing and perfected junior mortgages and security interests in favor of the Rafael Trust, of which Hon. MacDonald is Trustee.  A true and accurate copy of the Trust instrument is attached hereto as Exhibit A.

19. The proposed substitution of assets as part of the arm's length transaction between the Plaintiffs would not significantly dilute or otherwise jeopardize the security and resources of the Rafael Trust. In other words, after the proposed transaction is complete, the mortgages held by the Bank and Trust will continue to be adequately secured by permits and vessels, just different permits and vessels than before the transaction. Attached as **Exhibit B** is a copy of the vessel and permit appraisals submitted to the lenders.

20. Pursuant to the mortgages and security interests held by the Bank and the Trust encumbering the assets to be conveyed, the ownership of those assets cannot be transferred or conveyed absent express agreement by the Bank and Trust.

21. The Bank has given its consent to the substitution of collateral.

22. The Trustee seeks guidance from this Court before approving the substitution of collateral as a result of a motion pending before an AAA arbitration panel and Interim Award of the Panel dated October 28, 2019 (generally referred to as the "Arbitration" and specifically the "Interim Award"), relating to assets formerly owned by Carlos Rafael and his related entities, (the "Rafael Entities") sold to certain Plaintiffs, purchasers in good faith, on or about September 24, 2019 for more than $45 million.

23. The Plaintiffs are not parties to the Arbitration involving the Rafael Entities.

24. Prior to the closing of the instant transaction, the Trustee received from the Rafael's attorney, a letter enclosing two Orders from an Arbitration Panel (AAA Case No. 01-19-0003-2608) purporting to impose restrictions on the Trustee's exercise of his fiduciary duties. A copy of the letter and orders is attached as **Exhibit C**.

25. Notwithstanding the fact that the Trustee is not a party to the Arbitration and the Panel has no jurisdiction or authority to direct the Trustee, the Claimant in the Arbitration alleges that "[s]uch a swap would be in violation of **paragraphs 3(a) and 3(b)** of the Panel's Interim Award." (emphasis added).

26. The Interim Award at paragraphs 3(a) and 3(b), which is directed to the Rafael Entities in the Arbitration, and not the Trustee, provides as follows:

> 3. The Rafael Respondents are enjoined from and instructed to take certain actions immediately as follows:
>
> a. from taking any further action to effectuate the sales, transfer or assignments of any of the permits at issue;
>
> b. to immediately instruct, verbally and in writing, all escrow and other agents engaged on behalf of any one or more of them to take no further action to effectuate the sales, transfer or assignments of any of the permits at issue, with copies of the writings to be emailed immediately to Claimant, Sector VII and all arbitrators;

27. When previously confronted with this Interim Award, this Court (Buckley, J.) stated as

follows:

> This court held hearing on February 4, 2020. All parties and counsel were present and the court heard lengthily arguments. For the reasons set forth below, the plaintiff's motion is **DENIED.**
>
> Here, the finding of the arbitration panel is an Interim Award which states in a conclusory fashion, without any analysis that the plaintiffs have a "likelihood of success on the merits of their action." The "Interim Award" is does not set forth any legal basis other than a reference to portions of the Sector Agreement, as to how it came to that finding. This court finds that finding specious especially in light of the fact that the parties have not engaged in discovery. Indeed, it appears that the Interim Award was issued before the discovery order in the arbitration matter. Given the complexities in the Sector Agreement this court wonders how a likelihood of success on the merits by the AAA panel could be made where discovery surrounding Base's membership in the Sector have not been determined. Equally, the Interim Award is not a final determination made after a full adjudication of the merits of this action. Counsel for the defendant informs this

See attached **Exhibit D.**

28. The Plaintiffs further assert that the letter from Mr. Rafael directing the Trustee to take certain action constitutes a violation of the 2019 Settlement Agreement between the Rafaels and NOAA following a federal Civil Enforcement Action. A copy of the Settlement Agreement and Trust is attached as **Exhibit E.**

29. As outlined below, 1) neither the Plaintiffs nor the Trustee are parties to the Arbitration Agreement that purports to form the basis for the Arbitration, 2) neither the Plaintiffs nor the Trustee are parties to the underlying Arbitration, and 3) they are not bound by the Arbitration Panel's rulings and Interim Award.

30. The Plaintiffs hereby request declaratory and injunctive relief that would permit the Trustee to execute those documents, including but not limited to amended mortgages, necessary to effectuate the substitution of collateral sought by Plaintiffs by on or before April 30, 2021.

**<u>SECTORS AND FEDERAL GROUNDFISH MANAGEMENT</u>**

31. Pursuant to Federal Regulations set forth in 50 C.F.R. 648 § F, the National Marine Fisheries Service ("NMFS") manages the Northeast multispecies (also known as "groundfish") fishery through the use of, *inter alia*, what are known as "Sectors."

32. Federal groundfish permit holders enrolled in a Sector can buy and sell both their federal fishing permits and vessel fishing history and ACE associated with their permit, subject to conditions in their Sector Membership and/or Operating Agreements.

33. VII Northeast Fishery Sector, Inc. ("Sector VII"), is and was at all material times a "sector" approved by the National Oceanic and Atmospheric Administration ("NOAA") within the meaning of 50 C.F.R. Part 648, Subpart F. Sector VII encompasses certain fishing permits local to the New Bedford, Massachusetts area.

34. Sector VII members, including the Rafael Parties, are parties to both the Sector VII Membership Agreement (the "Membership Agreement") and Sector VII Operations Plan ("Operations Agreement"), copies of which are attached hereto as **Exhibits F** and **G** respectively.

35. Sector VII members, including the Rafael parties and BASE, but not the Plaintiffs, are also parties to an Arbitration provision set forth in Section 9 of the Membership Agreement, and Section 18 of the Operations Plan.

36. The Arbitration Provision of Section 18 of the Sector VII Operations Plan governs breaches of the Sector VII Operations Plan and by reference the Sector Membership Agreement and provides:

18. Binding Arbitration. Each Member and the Sector agree to exercise their best good faith commercially reasonable efforts to resolve any disputes arising under this Agreement through direct negotiations. Breaches of this Agreement which are not resolved through direct negotiation shall be submitted to binding arbitration upon the request of any party at interest. Any person nominated as an arbitrator hereunder by any person shall be a person of mature, sound and reasonable business judgment and experience and either have (a) held a federal fishing master license for at least ten (10) years, or (b) been an attorney at law practicing in the area of fisheries for at least ten (10) years.

37. Upon information and belief, BASE, claimant in the Arbitration, never signed the Sector VII Membership Agreement.

**ONLY "ACTIVE MEMBERS" ARE ENTITLED TO POTENTIALLY EXERCISE A RIGHT OF FIRST REFUSAL ("ROFR") IN CONNECTION WITH A SALE OF MULTISPECIES PERMITS**

38. Pursuant to Section VII of the Membership Agreement, Sector VII members are classified as either "Active" or "Non-Active."

39. BASE is listed as an "Inactive Member" of Sector VII in the Sector VII Operations Plan.

40. Active Members are defined within that section as "those individuals who intend to fish in Sector ACE accountable fisheries during the Fishing Year and have been approved to enroll as Active Members in accordance with the Sector[']s annual enrollment process as establish[ed] by each NESSN Member Sector's Board of Directors."

41. Sectors authority and jurisdiction regarding transfer and sale is limited to multispecies groundfish permits and does not extend to the commercial fishing vessel, limited access Atlantic sea scallop permits or any other state or federal fishing permit.

42. Specifically, Sectors have no authority or jurisdiction when it comes to the sale of more lucrative and expensive scallop vessels and permits.

**CARLOS RAFAEL'S VESSELS AND PERMITS**

43. At all material times, non-party Carlos Rafael and his affiliated entities[1] (collectively, the "Rafaels") were members of Sector VII.

44. In 2016, NOAA's Office of General Counsel initiated a Civil Enforcement Action against Carlos Rafael.

45. The Rafaels always wanted to ensure that its fishing assets remained in the New Bedford community, and by extension, Sector VII, if they were sold. **See Affidavit of Stephanie Rafael-DeMello, attached as Exhibit H.**

46. After months of negotiations and the Rafaels' offer, BASE communicated not only that it was not interested in purchasing the assets, but it found the assets to be overpriced.

47. However, in 2018, BASE communicated renewed interest in purchasing the assets with the support of a large Canadian Company as a co-buyer, but again eventually walked away from the negotiations.

48. Later in 2018, BASE again communicated renewed interest in purchasing the assets, this time with a Native American tribe as a co-buyer, but in the end ultimately walked away from the negotiations for a third time.

49. During this period of negotiations, NOAA directly expressed concerns to the Rafaels regarding BASE as a potential buyer.

50. Upon information and belief, NOAA's concerns were grounded in the fact that all of the illegal groundfish landed by Rafael, for which he was criminally convicted and sanctioned by NOAA, occurred at the BASE facility. In essence, BASE and its owners were co-conspirators with Rafael. See **Exhibit I**, Declarations of former BASE employees.

[1] Carlos Rafael's affiliated entities include Apollo Fishing LLC, Athena Fishing Corp., C&C Fishing Corp., Ivonilde Fishing Corp., S&S Fishing LLC, Tyler Fishing LLC, Vila Fishing Corp., and Vila Nova Do Corvo II, Inc.

51. Despite BASE's continuing display of interest in a potential purchase of the assets with the Rafaels throughout 2018, no formal offer was ever made.

52. The Rafaels and NOAA reached a settlement agreement for the Civil Enforcement Action in August 2019.

53. As part of the terms of the settlement agreement, the Rafaels agreed to divest all of their commercial fishing vessels and permits by December 31, 2020, in a sale required to be approved by NOAA, and carried out by Rafael-DeMello on behalf of her father.

54. An integral part of the Settlement Agreement required a substantial monetary payment from the Rafaels to the US Department of Commerce, which was predetermined to be paid from the proceeds of the sale of the Vessels and Permits.

55. Given the pressure put on the Rafaels by this requirement, it became no longer feasible to continue engaging in dead-end negotiations with BASE, which, upon information and belief, is incapable of independently closing the transaction.

**PURCHASE AND SALE OF CARLOS RAFAEL'S VESSELS AND PERMITS**

56. Upon information and belief, Section 3.4 of the Membership Agreement provides a Right of First Offer ("ROFO") and Right of First Refusal ("ROFR") to **Active** Members within Sector VII before a member can transfer its multi-species groundfish fishing permit/history to a non-member.

57. The ROFR does not apply to transfers of commercial fishing vessels themselves or transfers of scallop permits or state commercial fishing permits.

58. At all material times, Sao Jacinto/ Karen Maria Trawling Co. was the only Active Member of Sector VII and, therefore, the only Member of Sector VII entitled to exercise a ROFO and ROFR relative to transfer of the Rafael's multi-species groundfish fishing permit/history.

59. Four conditions are required to be an Active Member namely, a multi-species permit, a commercial fishing vessel and a Letter of Authorization from NOAA authorizing the vessel to engage in the fishery and approval by the Sector VII Board.

60. Base owned a multi-species permit satisfying only one of the four requirements to become an Active member. (See. https://www.regulations.gov/document/NOAA-NMFS-2018-0069-0001

61. BASE did not own a commercial fishing vessel until after the transfer of the vessels and permits from Rafael to Quinn Entities was completed.

62. BASE did not have a Letter of Authorization from NOAA/NMFS until after the transfer of the vessels and permits from Rafael to Quinn Entities was completed.

63. Upon information and belief based on a review of Sector VII board minutes, the Sector VII Board did not vote to designate BASE as an Active Member of Sector VII for the relevant fishing year.

64. In November of 2019, after the Plaintiffs purchased the vessel and permits at issue, BASE purchased a vessel and requested the requisite Letter of Authorization (LOA) to fish from the National Marine Fisheries Service, without which the newly acquired vessel would not be allowed to engage in the multi-species fishery. See **Exhibit J.**

65. In December of 2019, BASE was added as an Active Member to the Sector VII Operations Plan at the request of Sector VII.

66. At all material times, BASE was therefore a **Non-Active** Member, and not entitled to exercise the ROFO or ROFR. BASE only became an Active member of Sector VII after the sale of the vessels and permits at issue was consummated.

67. In 2019, the Rafaels entered into discussions and a subsequent contingency agreement with the Quinns Entities regarding the sale of seven commercial fishing vessels and related permits.

68. As the Quinns are longstanding and well-respected members of New Bedford's "local fishing community" as defined in the Sector Membership Agreement, the Rafaels relied on this express Exemption Provision to sell to the Quinns and further avoid the ROFR process,

69. To close on the sale, the Rafael's relied on the Section 3.4.4.3 Exemption Provision.

70. Judge Hopkins agreed with the position taken by the Rafaels and ruled that BASE has no reasonable likelihood of success on the merits of BASE's claim that it was entitled to a Right of First Refusal. **Exhibit K,** pages 5-8.

**SUPERIOR COURT ACTIONS**

71. On September 11, 2019, BASE, a **Non-Active** member of Sector VII without any legitimate legal basis, initiated an action against the Rafaels in Bristol County Superior Court, Civil Action No. 1973CV00839, wherein BASE sought arbitration and injunctive and declaratory relief pursuant to the Membership Agreement and Operations Plan, as well as damages pursuant to M.G.L. c. 93A §11. See Complaint, attached as **Exhibit L.**

72. Along with the Complaint, BASE also filed an *ex parte* Motion for Temporary Restraining Order in order to intentionally and in bad faith delay and disrupt the sale of the Vessels and Permits to the Quinns. *See* Motion for Temporary Restraining Order, **Exhibit M.**

73. As grounds for its Motion, BASE incorrectly and falsely alleged that the contemplated transaction constituted a violation and material breach of the Membership Agreement and Operations Plan.

74. BASE falsely claimed in an Affidavit of Richard Canastra that BASE was an Active Member of Sector VII and entitled to exercise the ROFO and ROFR.

75. BASE, despite having actual knowledge, failed to inform the Court that the transfer of Vessels and Permits by the Rafaels was being done pursuant to an express exemption to the ROFO and ROFR requirement set forth in Section 3.4.4.3 of the Membership Agreement that covers the Purchase and Sale Agreement.

76. BASE also averred that the Quinns were not members of Sector VII in its Complaint.

> **28. Prior to on or about August 29, 2019, the Defendants received an offer to purchase the Rafael Vessels and the Rafael Permits from outside of the Sector 7 membership, to wit: certain companies owned and/or controlled by individuals named Charles and Michael Quinn (collectively, the "Quinns"), who are not parties to the above-captioned Civil Action.**

77. On September 11, 2019, a Temporary Restraining Order, obtained ex parte, was issued by the Hon. Merita Hopkins, halting the transaction contemplated by the Purchase and Sale Agreement based on the demonstrably false and misleading statements of BASE.

78. After notice to the Rafaels, on September 13, 2019, a two-hour hearing was held before Judge Hopkins regarding the preliminary injunction.

79. After hearing arguments and reviewing the filings from both parties, Judge Hopkins cited an inability to find any likelihood of success on behalf of BASE:

> After arguments today and having a fuller discussion of the Sector Membership Agreement, a fuller understanding of the Northeast Fishing Sector 7 Operation Plan and Agreement, and after reviewing the affidavit of Stephanie Rafael-DeMello and reviewing the complaint again and some of the attachments, I'm persuaded that I cannot make a finding of likelihood of success on the merits.

Transcript p.4, **Exhibit** N.

80. Thus, Judge Hopkins vacated the temporary restraining order and denied BASE's Motion.

81. Given that Judge Hopkins vacated the Temporary Restraining Order, and there was no reason to delay, the Plaintiffs (good faith purchasers) and the Rafaels closed on the purchase and sale of the Vessels and Permits on September 24, 2019, and title to all Vessels and Permits vested in the Plaintiffs.

82. Pursuant to business interests, and with no legal impediment, the Plaintiffs subsequently conveyed one of the subject Permits (NMFS Permit No.: 410564).

83. While the Arbitration described below was pending, BASE initiated a separate action in Bristol Superior Court, seeking a Temporary Restraining Order attempting to attach proceeds from the sale of the Rafael's vessels and permits.

84. BASE was unsuccessful.

85. In support of its Motion, BASE relied on the Interim Award issued by the Arbitration Panel that was inconsistent with Judge Hopkins' prior ruling.

86. As note previously, when confronted with the Interim Award, Superior Court Judge Buckley stated as follows:

> This court held hearing on February 4, 2020. All parties and counsel were present and the court heard lengthily arguments. For the reasons set forth below, the plaintiff's motion is DENIED.
>
> Here, the finding of the arbitration panel is an Interim Award which states in a conclusory fashion, without any analysis that the plaintiffs have a "likelihood of success on the merits of their action." The "Interim Award" is does not set forth any legal basis other than a reference to portions of the Sector Agreement, as to how it came to that finding. **This court finds that finding specious especially in light of the fact** that the parties have not engaged in discovery. Indeed, it appears that the Interim Award was issued before the discovery order in the arbitration matter. Given the complexities in the Sector Agreement this court wonders how a likelihood of success on the merits by the AAA panel could be made where discovery surrounding Base's membership in the Sector have not been determined. Equally, the Interim Award is not a final determination made after a full adjudication of the merits of this action. Counsel for the defendant informs this

See **Exhibit D.**

## ARBITRATION PROCEEDING

87. On September 18, 2019, BASE initiated the Arbitration Docket No. 01-19-0003-2608, against the Rafaels in an effort to further interfere with the Purchase and Sale Agreement.
88. Since BASE is not actually an Active member under the Membership Agreement, it lacks standing to assert any ROFR, and as a result, lacks standing to bring such a claim in Arbitration.
89. In the Arbitration, BASE asserted the very same arguments that Judge Hopkins found lacked merit and lacked any reasonable likelihood of success. See Arbitration Demand, **Exhibit O.**
90. Significantly, BASE never alleges that it is an *Active* Member of Sector VII in the Demand or in its Amended Demand.
91. Notably, BASE also again correctly refers to the Plaintiffs as non-members of Sector VII in the Demand and Amended Demand.

92. In fact, in the original Demand, BASE requested that the Panel:

3. Issue a Declaratory Award confirming the Sector 7 Board's denial of the Quinn's request to enter Sector 7.

93. Despite bringing Sector VII into the Arbitration, BASE has yet to add necessary party NOAA, which is responsible for overseeing and approving all permit transfers.

**INTERFERENCE WITH THE QUINNS ENTITIES/BLUE HARVEST TRANSACTION**

94. On or about March 4, 2021, counsel for the Rafael's sent a letter to the Trustee and attached the Arbitration Panel's orders of February 25, 2021 and October 25, 2020. The letter states, "[p]er the Arbitration Panel's Order, please 'do not transfer, spend, distribute, invest, or otherwise change the present status' of the Note and any principle payments towards the Note" held by the Trust.

95. The Trustee has interpreted the February 25, 2021 Panel Order as prohibiting him from acting on the proposed substitution of collateral as part of the transaction between the Quinn Entities and Blue Harvest. See L. MacDonald Email of April 14, 2021, attached as **Exhibit P**.

**COUNT 1:**
**DECLARATORY JUDGMENT**

96. The Plaintiffs reiterate and reallege the allegations contained in Paragraphs Nos. 1- as if fully set forth herein.

97. None of the Plaintiffs are parties to the Sector VII Membership Agreement or the Sector VII Operations Plan containing the relevant agreement to arbitrate.

98. Accordingly, the Plaintiffs seek declaratory and injunctive relief as follows:

a. The Plaintiffs are not parties to the Membership Agreement, nor the Operations Plan;

    b. Thus, the Plaintiffs are not parties to the Arbitration Agreement;

c. The Plaintiffs and the Trustee are not subject to the jurisdiction of AAA or its Panel

d. The Plaintiffs and the Trustee are thus not bound by the Arbitration Panel's Orders;

e. The AAA Panel has no jurisdiction to direct or restrain the Trustee in the exercise of his fiduciary duties; and

f. Any further relief this Court deems just and proper.

WHEREFORE, the Plaintiffs respectfully pray that the Honorable Court enter Judgment in its favor on Count 1, and issue any such further relief it deems just and proper.

**COUNT 2:**
**<u>INJUNCTIVE RELIEF</u>**

99. The Plaintiffs reiterate and reallege the allegations contained in Paragraphs Nos. 1- as if fully set forth herein.

100. Permitting the AAA Arbitration Panel to issue rulings and orders purporting to direct or impose restrictions on the Trustee's exercise of his fiduciary duty as Trustee will manifest irreparable harm to the Plaintiffs.

101. Permitting the AAA Arbitration Panel to issue rulings and orders directing the Rafael's to provide instructions to the Trustee as to what actions the Trustee may take in the exercise of his fiduciary duty violates the terms of the Rafael's Settlement Agreement with NOAA and will manifest irreparable harm to the Plaintiffs.

WHEREFORE, the Plaintiffs respectfully pray that the Honorable Court enter Judgment in its favor on Count II and issue the following preliminary and injunctive relief:

(a) Enter a temporary restraining order and preliminary injunction prohibiting the AAA Arbitration Panel, the Rafael's and BASE from interfering with the Trustee's exercise of his fiduciary duties;

(b) Instruct the Trustee on the contemplated substitution of collateral; and

(c) Enter any such further relief the Court deems just and proper.

Respectfully submitted,
SHAMROCK GROUP, SHAMROCK FISHERIES LLC, KINEOS FISHERIES LLC, MARINER FISHERIES LLC, SEAFARER FISHERIES LLC, CYNBEL FISHERIES LLC, TORBAY FISHERIES LLC, GALWAY FISHERIES LLC, , AND BILL & EILEEN LLC
By their attorneys,

Paul T. Muniz (BBO No.: 564786)
pmuniz@donovanhatem.com
**DONOVAN HATEM LLP**
53 State Street, 8th Floor
Boston, MA 02109
(617) 406-4500 *tel*
(617) 406-4500 *fax*

Andrew E. Minkiewicz (BBO No.: 651209)
aminkiewicz@kelleydrye.com
**KELLEY DRYE & WARREN**
Washington Harbour, Suite 400
3050 K Street, NW
Washington, DC 20007
(202) 342-8400 *tel*
(202) 342-8451 *fax*

**VERIFICATION**

I, the undersigned, hereby verify the foregoing recitation of facts, other than the allegations made on information and belief, are true based on my personal knowledge, and on the documents, I have reviewed for purpose of preparing this Verfied Complaint.

Signed under the penalties of perjury this 19th day of April 2021:

| CIVIL ACTION COVER SHEET | DOCKET NUMBER | Trial Court of Massachusetts<br>The Superior Court<br>COUNTY Bristol Superior Court (New Bedford) |
|---|---|---|

| | |
|---|---|
| **Plaintiff** Shamrock Fisheries LLC | **Defendant:** Robert J. Bocko |
| ADDRESS: 137 Popes Island | ADDRESS: Holmes, Weddle & Barcott |
| New Bedford, MA 02740 | 3101 Western Avenue, Suite 500 |
| | Seattle, WA 98121 |
| **Plaintiff:** Kineo Fisheries LLC | **Defendant:** Stevenson L. Weeks |
| ADDRESS: 137 Popes Island | ADDRESS: Wheatley Law Group |
| New Bedford, MA 02740 | 710 Cedar Street |
| | Beaufort, North Carolina, 29516 |
| **Plaintiff:** Mariner Fisheries LLC | **Defendant:** Honorable Lloyd MacDonald (Ret.) |
| ADDRESS: 137 Popes Island | ADDRESS: 115 Orchard Street |
| New Bedford, MA 02740 | New Bedford, Massachusetts 02740 |
| | |
| **Plaintiff:** Seafarer Fisheries LLC | **Defendant:** Mark C. Manning |
| ADDRESS: 137 Popes Island | ADDRESS: 1000 O'Malley Road, Suite 202 |
| | Anchorage, AK 99515-3083 |
| | |
| **Plaintiff:** Cynbel Fisheries LLC | **Defendant Attorney:** |
| ADDRESS: 137 Popes Island | ADDRESS: |
| New Bedford, MA 02740 | |
| | |
| | BBO: |
| **Plaintiff:** Torbay Fisheries LLC | **Defendant Attorney:** |
| ADDRESS: 137 Popes Island | ADDRESS: |
| New Bedford, MA 02740 | |
| | |
| | BBO: |
| **Plaintiff:** Galway Fisheries LLC | **Defendant Attorney:** |
| ADDRESS: 137 Popes Island | ADDRESS: |
| New Bedford, MA 02740 | |
| | |
| | BBO: |
| **Plaintiff:** Blue Harvest Fisheries, LLC | **Defendant Attorney:** |
| ADDRESS: 40 Herman Melville Boulevard | ADDRESS: |
| New Bedford, Massachusetts 02740 | |
| | |
| | BBO: |
| **Plaintiff Attorney:** Paul T. Muniz | **Defendant Attorney:** |
| ADDRESS: 53 State Street, 6th Floor | ADDRESS: |
| Boston, MA 02109 | |
| | |
| BBO: 564786 | BBO: |

**TYPE OF ACTION AND TRACK DESIGNATION (see instructions section below)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| D01/D03 | Declaratory Judgment/Injunction | | ☐ YES ☒ NO |

***If "Other" please describe:**

Is there a claim under G.L. c. 93A? ☐ YES ☒ NO

Is there a class action under Mass. R. Civ. P. 23? ☐ YES ☒ NO

**STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A**

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**

A. Documented medical expenses to date

1. Total hospital expenses ____________
2. Total doctor expenses ____________
3. Total chiropractic expenses ____________
4. Total physical therapy expenses ____________
5. Total other expenses (describe below) ____________

Subtotal (1-5): **$0.00**

B. Documented lost wages and compensation to date ____________

C. Documented property damages to date ____________

D. Reasonably anticipated future medical and hospital expenses ____________

E. Reasonably anticipated lost wages ____________

F. Other documented items of damages (describe below) ____________

TOTAL (A-F): **$0.00**

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

**CONTRACT CLAIMS**

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

| Item # | Detailed Description of Each Claim | Amount |
|---|---|---|
| 1. | | |
| | Total | |

Signature of Attorney/Unrepresented Plaintiff: X ____________ Date: ____________

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

**CERTIFICATION PURSUANT TO SJC RULE 1:18**

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney/Unrepresented Plaintiff: X ____________ Date: ____________

# EXHIBIT A

Attachment 6
Case No. NE1707582, Carlos Rafael, et al.

DECLARATION OF TRUST
ESTABLISHING
RAFAEL SETTLEMENT TRUST

CARLOS RAFAEL and CONCEICAO RAFAEL, both of Dartmouth, Bristol County, Massachusetts (the "Grantors") and The Honorable Lloyd Macdonald with a current business address of 115 Orchard Street, New Bedford, Massachusetts (the "Trustee"), hereby declare that Ten ($10) Dollars is held in trust hereunder and any and all additional property and interest in property, real and personal, that may be acquired hereunder (the "Trust Fund") shall be held in trust, for the sole benefit of the individuals or entities listed in the Schedule of Beneficiaries in the proportions stated in said Schedule, which Schedule has this day been executed by the Beneficiaries and filed with the Trustee with receipt acknowledged by at least one Trustee (hereafter, as it may be amended, "Schedule of Beneficiaries").

SECTION ONE
Name and Purpose

1.1     This Trust shall be known as **RAFAEL SETTLEMENT TRUST** and is intended to hold certain assets which, if not for a settlement agreement between CARLOS RAFAEL and the United States Department of Commerce, National Oceanic and Atmospheric Administration ("NOAA"), would be held in the names of CARLOS RAFAEL and/or CONCEICAO RAFAEL.

SECTION TWO
Beneficiaries

2.1     The term "Beneficiaries" shall mean the persons and entities listed as Beneficiaries in the Schedule of Beneficiaries and in such revised Schedules of Beneficiaries, from time to time hereafter executed and delivered as provided herein and the respective Beneficial Interests of each Beneficiaries shall be as therein stated.

2.2     Any Beneficiary may at any time, without the consent of the Trustee, transfer any part or all of such Beneficiary's beneficial interest in the Trust by delivery to the Trustee of an instrument in writing, signed and acknowledged by such Beneficiary, setting forth such transfer.

2.3     No Beneficiary shall have the right to demand or receive any distribution from the Trust Fund unless specifically authorized hereunder.

SECTION THREE
Distributions

3.1 Divestiture of Vessels and Permits. The Trustee shall be bound by the restriction pertaining to the Rafaels described in paragraphs 19-27 of that certain Settlement Agreement executed by CARLOS RAFAEL, CONCEICAO RAFAEL, their affiliated entities, certain fishing vessel operators and NOAA, executed by the Grantors on August 1, 2019, which requires the prompt and efficient divestment of commercial fishing vessels and their related licensure and permits (all such vessels, licensure and permits are hereinafter referred as either the "Vessels" and the "Permits" or "Licensure"). If any Vessels or Licensures are transferred to the Trust, whether via foreclosure or transfer from time to time the Trustee shall have the duty to promptly list for sale such Vessels and Licensure for fair market value and divest the Trust of these assets within seven (7) months of the receipt of such assets by the Trustee as further described in the attached "Terms of the Schedule of Sale of Trust Commercial Vessels and Licensure", which includes but is not limited to, the procedure for the appraisal of the Vessels and Licensure. Per the terms of the attached, to the extent that no fair market value offers are received by the Trustee within such seven (7) month period, the Trustee shall cause the sale of such Vessels and Licensure through a public auction process which must be completed within nine (9) months of receipt of such assets by the Trustee. Any proceeds received by the Trustee shall be distributed in the following manner.

3.2 Required Distributions. Both the income and principal of any regularly scheduled payments received by the Trustee on any debt owed in relation to the sale of any Vessels or Licensure formerly owned by CARLOS RAFAEL and/or CONCEICAO RAFAEL or owned by entities controlled by them, shall be promptly distributed to the Beneficiaries, provided, however, the Trustee may retain such portion of any distribution as is in his/her opinion necessary to discharge any expense or liability, determined or contingent, of the Trust, including for the payment of state or federal income tax or any other purpose.

3.3 Other Income. The Trustee shall pay any other income of the Trust Fund to the beneficiaries at least quarter annually, provided, however, the Trustee may retain such portion of any distribution as is in his/her opinion necessary to discharge any expense or liability, determined or contingent, of the Trust.

3.4 Specially Designated Assets. The Trustee may not, under any circumstances, distribute to the Beneficiaries any promissory note(s) or collateral securing such promissory note(s) held by the Trustee derived from the sale of any Vessels or Licensure formerly owned by CARLOS RAFAEL and/or CONCEICAO RAFAEL or owned by entities controlled by them.

3.5 Other Principal: Except as otherwise previously provided, the Trustee shall pay the principal of the Trust Fund to the extent it consists of cash or cash equivalents to the beneficiaries at least quarter annually provided, however, the Trustee may retain such portion of any distribution as is in their opinion necessary to discharge any expense or liability, determined or contingent, of the Trust.

    3.6 Proportional Equality. All distributions made hereunder shall be made to each Beneficiary in proportion to each Beneficiary's Beneficial Interest as set forth the schedule attached hereto and all beneficiaries are required to accept any distributions that are authorized in order to maintain each Beneficiary's Beneficial Interest, unless all of the Beneficiaries agree otherwise.

SECTION FOUR
Amendments and Terminations

4.1 This Declaration of Trust may be amended from time to time by an instrument in writing signed by the Trustee, but only with the written approval of NOAA, and shall be designated as a "Grantor Trust" for income tax and estate tax treatment purposes.

4.2 This Trust may be terminated by an instrument in writing signed by the Trustee and the Beneficiaries, but only if assented to by NOAA in writing. Notwithstanding anything herein to the contrary, this Trust shall terminate in any event twenty (20) years from the date of the death of the last surviving person who is specifically named in this Declaration as a trustee or as a successor trustee.

4.3 In the case of any termination of the Trust, the Trustee shall transfer and convey the specific assets constituting the Trust Fund, subject to any leases, mortgages, contracts or other encumbrances on the Trust Fund, to the Beneficiaries as tenants in common or to Revocable Trusts created by the Beneficiaries during their lifetime, in proportion to their respective Beneficial Interests as shown in the then most current Schedule of Beneficial Interest, or as otherwise directed by all of the Beneficiaries, provided, however, the Trustee may retain such portion thereof as is in their opinion necessary to discharge any expense or liability, determined or contingent, of the Trust, provided nevertheless that such distributions shall be subject to the restrictions set forth in the previous Section Three such that the Grantors may not reacquire an ownership interest in those Vessels and Licensures described in Section Three.

SECTION FIVE
Powers of Trustee

5.1 Investments: Subject to the limitations of Section Three, the Trustee, in addition to and not in limitation of all common law and statutory authority, shall have the following powers exercisable without resort to or order of any court or without the need to obtain direction from the Beneficiaries, and such powers shall continue after the date of the termination of this Trust until final distribution:

(a) to invest and reinvest the Trust Fund from time to time in any property, including but not limited to, bank accounts, savings accounts, checking accounts, NOW accounts, Money Market accounts, certificates of deposit, term certificates, securities of domestic and foreign corporations, investment trusts, bonds, preferred stocks, common stocks (including mutual funds or investment companies) and mortgages, even though such investments by reason of character, amount or lack of diversification would not, in the absence

of this authority, be considered appropriate for a trust investment, the Trustee not being restricted to investments which are generally lawful for trustees or by any rules or principles of diversification of investments and for reasonable periods to hold cash uninvested; and

(b) to vote in person or by general or limited proxy or to refrain from voting any corporate stock for any purpose; to participate in, consent to or carry out any plan of reorganization, consolidation, merger, liquidation or readjustment of the financial structure of any corporation or other organization, to deposit any property of the Trust Fund under any such plan or with any protective or reorganization committee (even though under the terms of such deposit such securities may remain deposited beyond the time when they may become distributable), to delegate to such committee discretionary power with relation thereto, to pay a proportionate part of the expenses of such committee and any assessments levied under any such plan and to accept and retain new securities received in pursuance of any such plan; to exercise all conversion, subscription, voting and other rights of whatsoever nature pertaining to the property of the Trust Fund and to pay such sums as may be deemed advisable in connection therewith; and

(c) to rent, mortgage, lease (even for a period longer than the duration of the Trust), sell (at private or public sale either for cash or for credit or partly for cash and partly for credit), alter, renovate, operate, give options with respect to and otherwise deal with any property, real or personal, which may at any time constitute a part of any trust hereunder, as the Trustee in the Trustee's sole discretion may deem advisable, and to sign, seal, execute, acknowledge and deliver any and all deeds, mortgages, leases, releases, assignments, discharges, and partial releases of mortgages and all other instruments of conveyance and contracts or agreements of whatever kind or nature; and

(d) to pay, abandon, settle, compromise, extend, renew, modify, release, adjust or submit to arbitration in whole or in part and without the order or decree of any court any and all claims whether such claims shall increase or decrease the assets held hereunder; and

(e) to cause any securities or other properties comprising a part of the Trust Fund to be issued, held, and/or registered in the name of the Trustee without disclosing a fiduciary relationship or in the name of a nominee or in such other form that title will pass by delivery, and to invest and reinvest the Trust Fund in any Common Trust Fund maintained by any Trustee hereunder or otherwise without the necessity of notice to any beneficiary hereof; and

(f) to accept as additions to the principal of the Trust Fund (or any specified part thereof) any property, real or personal, hereafter conveyed, transferred, devised or bequeathed to the Trustee by any person; to retain and continue any investments, either real or personal, transferred to the Trustee by any person, although the same may be of a nature regarded as not suitable for trust investments or constitute a larger portion of the Trust Fund than should ordinarily be held in one investment, and for which the Trustee shall not be liable on account of any loss or decrease in value of any such investment but shall be liable only for the Trustees' own willful default.

5.2 Division: Whenever the Trustee shall have occasion to divide or distribute the principal of any trust created by this instrument, the Trustee shall have full power to effect such division or distribution in cash, securities, or other property of the Trust, or undivided interests therein, or in any combination of them, at the then current values, and all determinations of value made by the Trustee in good faith shall be conclusive and binding on all parties interested hereunder.

5.3 Definitions. The term "Trustee" shall be taken to refer to the trustee for the time being in office and shall include a successor trustee, whether so expressed or not. The masculine, feminine, or neuter pronoun shall be taken to refer to the person or persons intended regardless of the number or gender, and a singular may be taken to express a plural and a plural may be taken to express a singular when the facts require it.

5.4 Accounting: The Trustee shall render to the Beneficiaries, annually, an account of income and principal. The Beneficiaries' written approval of said account shall, as to all matters and transactions covered by said account, be binding upon all who are then or who may thereafter become entitled to the income or principal. The written approval of such account by such beneficiary or beneficiaries or failure to object to the same within ninety (90) days after the rendering thereof shall, as to all matters and transactions stated therein or shown thereby, be final and binding upon all persons (whether in being or not) who are then or may thereafter become interested in, or entitled to share in, either the income or the principal of such trust.

5.5 Trustees' Liability: No Trustee or successor Trustee shall be required to give any bond or other security for the faithful performance of such Trustee's duties in any jurisdiction whatsoever, or if any such bond shall be required, no surety shall be required thereon. The Trustee shall be liable only for the Trustee's own willful default and shall not be liable or responsible in any way for any act or failure to act of any other Trustee. Any Trustee or successor Trustee hereunder may accept any account rendered and the assets and property delivered to the Trustee by the executors, administrators or personal representatives of the estate of any person, by any prior Trustee hereunder, or by any other fiduciary as a full and complete discharge of such executor, administrator, personal representative, trustee, or other fiduciary, and shall incur no liability or responsibility to any beneficiary under this instrument by reason of so doing. Notwithstanding any provisions contained herein, no Trustee shall be required to take any action which will, in the opinion of such Trustee, involve the Trustee in any personal liability. Any persons extending credit to, contracting with or having any claim against the Trustee shall look only to the funds and property of this Trust for payment of any contract, or claim, or for the payment of any debt, damage, judgment, or decree, or for any money that may otherwise become due or payable to them from the Trustee, so that neither the Trustee nor the Beneficiaries shall be personally liable therefor. If any Trustee shall at any time for any reason (other than for willful breach of trust) be held to be under any personal liability as such Trustee, then such Trustee shall be held harmless and indemnified by the Beneficiaries, jointly and severally, against all loss, costs, damage, or expense by reason of such liability.

5.6 Certified Copies and Certificate of Trustee: Anyone may rely upon a copy hereof certified by a Notary Public to be a true copy of this instrument and of the writing, if any, endorsed or attached hereto. Any certificate in writing executed and acknowledged by any

Trustee hereunder setting forth the existence of any facts, the existence of which is necessary or proper to authorize the execution of any instrument or the taking of any action by any Trustee shall, as to all persons acting in good faith in reliance thereon, be conclusive evidence of the truth of the statements made in such certificate and of the existence of the facts therein stated to exist. Any person may without liability accept the writings of any Trustee hereunder as conclusive evidence as to whether the trust has been revoked or amended, and as to the extent of any revocation and the form and text of any modification or amendment. No mortgagee, pledgee or purchaser or other person dealing with the Trustee shall be bound to see to the application of any money paid by, or property transferred to the Trustee.

5.7 Spendthrift: Neither the income nor the principal of any beneficial interest created by this instrument, shall be assignable, anticipated or alienated in any manner by any beneficiary, nor shall it be subject to the control or claims of creditors or subject to any process of law.

5.8 Ordinary Expenses. The Trustee shall have the authority to pay the ordinary expenses of this Trust without need to consult the Beneficiaries. Such Ordinary Expenses shall include, but shall not be limited to (1) taxes, (2) operating expenses associated with the assets held as part of the Trust Fund including the fees of the Trustee, and (3) the costs to engage professionals the Trustee deem proper to facilitate the purpose of the Trusts, including attorneys, accountants, and investment advisors.

SECTION SIX
Provisions Related to Trustee

6.1 Number of Trustee: At all times hereunder, there shall be only one Trustee being an individual who is not related or subordinate to CARLOS RAFAEL and/or CONCEICAO RAFAEL in accordance with Internal Revenue Code §672(c). Neither CARLOS RAFAEL nor CONCEICAO RAFAEL shall be eligible to serve as a Trustee hereunder. The legal title to the Trust estate shall, without necessity of any instrument of conveyance or transfer, be vested in a succeeding Trustee, in the event of the death, resignation, or incapacity of the Trustee. Each succeeding Trustee shall have all the rights, powers, authority, privileges and immunities as the original Trustee hereunder. No bond shall be required of any trustee hereunder, or if a bond is required by law, no surety on such bond shall be required

6.2 Resignation: Any Trustee may resign at any time by an instrument in writing signed and acknowledged before a Notary Public delivered to the succeeding Trustee by registered or certified mail sent to their last known address. Any such resignation shall become effective only when the appointment of a successor Trustee becomes effective hereunder.

6.3 Removal: Any Trustee may be removed by a written instrument executed by the Beneficiaries representing at least sixty (60%) percent of the outstanding Beneficial Interest, but only with the written approval of NOAA.

6.4 Successor Trustee: In the event of the death, resignation, or incapacity of the named Trustee, Attorney William Harrington of 738 Main Street, Hingham, Massachusetts shall become a Trustee hereunder in his place and stead. If neither Lloyd Macdonald nor William Harrington is able to serve as Trustee, then the Beneficiaries shall nominate a Trustee, who may serve as Trustee, only if NOAA consents in writing. Incapacity of an individual Trustee as a result of illness or accident shall be evidenced by a certificate from a licensed physician that such a disability exists. Any successor Trustee shall hold office as a Trustee hereunder upon written acceptance of said office (without any further act, stipulation, or agreement) and shall, upon such acceptance of the Trust in writing, be vested with the title, powers, immunities and discretions conferred upon Trustee hereunder.

6.5 Trustee Compensation: An individual serving as Trustee, other than Grantors, shall be entitled to fair and reasonable compensation for the services rendered as a fiduciary. Any Trustee shall be compensated by agreement, or in the absence of an agreement, in accordance with the corporate fiduciary's published schedule of fees in effect at the time the services are rendered (if any). A Trustee may charge additional fees for services it provides that are not comprised within its duties as Trustee such as fees for legal services, tax return preparation and corporate finance or investment banking services. In addition to receiving compensation, a Trustee may be reimbursed for reasonable costs and expenses incurred in carrying out its duties under this agreement.

## SECTION SEVEN
## Governing Law

7.1 This Declaration of Trust shall be construed in accordance with the laws of the Commonwealth of Massachusetts.

Signature Page to Follow

Executed as a sealed instrument this 1st day of August, 2019.

TRUSTEE:

GRANTORS:

CARLOS RAFAEL

CONCEICAO RAFAEL

COMMONWEALTH OF MASSACHUSETTS

Bristol, ss.

On this 1st day of August, 2019, before me, the undersigned notary public, personally appeared Stephanie Rafael Demello, acting as Power of Attorney and Lloyd MacDonald whose identities are known to me through personal knowledge are the persons whose names are signed on the preceding or attached document, and acknowledged to me that the signatories signed it voluntarily for its stated purpose.

______________________________, Notary Public
My Commission Expires:

RAFAEL SETTLEMENT TRUST
Schedule of Beneficial Interests

| Beneficiary | Beneficial Interest |
|---|---|
| The Carlos A. Rafael Revocable Trust, dated October 20, 2017 | 50% |
| The Conceicao Rafael Revocable Trust, dated October 20, 2017 | 50% |

The terms of **RAFAEL SETTLEMENT TRUST** ("Trust") are hereby approved and the above-named beneficiaries, in consideration of the execution at the request of said beneficiaries of said **RAFAEL SETTLEMENT TRUST** by the Trustee therein named, for themselves and their heirs and assigns, said beneficiaries agree with said Trustee of the Trust (a) to be bound by said Trust, (b) to save said Trustee of the Trust and their successors and assigns harmless and indemnified from and against all claims and demands of every name and nature which they may suffer or incur by reason of this Trusteeship, unless caused by their willful act or default, and (c) to reimburse said Trustee of the Trust promptly upon request for all costs and expenses, including their reasonable compensation, incurred or suffered by them.

WITNESS the execution hereof under seal as of the 1st day of August, 2019.

CARLOS A. RAFAEL

CONCEICAO RAFAEL

RECEIPT

The undersigned hereby certifies that they are the Trustee under **RAFAEL SETTLEMENT TRUST** and that the foregoing Schedule of Beneficial Interests was filed with ~~her~~ him as of the 1st day of August, 2019.

Lloyd MacDonald

RAFAEL SETTLEMENT TRUST

Terms of the Schedule of Sale of Trust Commercial Vessels and Licensure

Upon receipt of ownership of any commercial fishing Vessels and Licensure, or the controlling interests in any entity owning such assets under an ASSET PURCHASE AGREEMENT, dated May 31, 2019 between Shamrock Fisheries, LLC and various entities currently owned by Carlos Rafael and Conceicao Rafael and further described in Exhibit A of that agreement, the Trustee shall have the duty to promptly list for sale and/or market such Vessels and associated Licensure for fair market value within seven (7) months of the receipt of each such asset by the Trustee.

The assets, upon receipt may be listed for sale either directly by the Trustee or through a broker who has experience with the sale of commercial fishing Vessels and Licensures in the sole and absolute discretion of the Trustee. The Trustee or the broker shall have the Vessels and associated Licensure appraised by a qualified industry appraiser. Upon receipt of any such appraisal, NOAA shall have 14 days from the receipt of the appraisal of any Vessel to object to the appraisal and shall provide the same to the Trustee within 14 days. If there is a dispute relative to the fair market value of any Vessel, then NOAA shall obtain an appraisal from a qualified appraiser. If the difference of the appraised values is less than ten percent (10%) of the higher appraisal, then the fair market value of the Vessel and its Licensure shall be the average of the two appraisals. If the difference of the appraised values is equal to or more than ten percent (10%) of the higher appraisal, then the two appraisers will select a third appraiser who shall appraise the Vessel and its Licensure independently, and the fair market value shall be the average of the three appraisals, which will be final and binding. The parties shall split the costs associated with obtaining the third appraisal.

To the extent that no fair market value offers are received by the Trustee within such seven (7) month period, the Trustee shall cause the sale of such Vessels and Licensure through a public auction process and must make all efforts in a fiduciary capacity using a standard of prudence to effectuate the public auction process within two (2) months of the conclusion of the seven (7) month marketing period. Such auction shall be conducted in a reasonably prudent manner.

Notwithstanding the forgoing, no Grantor or Beneficiary of the Trust shall be deemed as having constructive ownership of any fishing Vessels or related Licensure owned by the Trust and no joint tenancy or tenancy in common shall exist as between the Beneficiaries of the trust and the commercial Vessels and Licensures owned by the Trust, provided Carlos Rafael, Conceicao Rafael, and their affiliated entities are in compliance with the terms of their Settlement Agreement with NOAA, executed by Grantors on August 1, 2019.

# Exhibit B



Marine Safety Consultants, Inc.
26 Water Street, P.O. Box 615, Fairhaven, MA 02719-0615
Phone: 508-996-4110 • Fax: 508- 990-2094
www.marinesafetyconsultants.com

# Shamrock Fisheries
# Fleet Survey
# 2021

Taunton Office: 128 Dean Street. Front-1st Floor. Taunton. MA 02780 • Phone:508-884-5055 • Fax: 508-884-5056
Maine/NH Office: 400 Commercial St. Suite 201. Portland. ME 04101 • Phone: 207-775-7933 • Fax: 207-775 7471

## Table of Contents

INTRODUCTION / VESSEL VALUES .......... 3
QUALIFICATIONS AND EXPERIENCE OF SURVEYOR .......... 5
VESSEL AND PERMIT VALUE SUMMARY .......... 6
DISCLAIMER .......... 7
VESSEL : F/V MARINER .......... 8
VESSEL : F/V SEAFARER .......... 27
VESSEL : F/V TORBAY .......... 48
VESSEL : F/V GALWAY .......... 66
VESSEL : KINEO .......... 69

# Marine Safety Consultants, Inc.

26 Water Street. P.O. Box 615. Fairhaven. MA 02719-0615
Phone: 508-996-4110 • Fax: 508- 990-2094
www.marinesafetyconsultants.com

April 7, 2021
File No.: 21-0180

BayCoast Bank
One BayCoast Place
330 Swansea Mall Drive
Swansea, MA 02777

Attn: Ann Auger

## INTRODUCTION / VESSEL VALUES

THIS WILL CERTIFY THAT the undersigned surveyor completed surveys of vessels owned by Shamrock Fisheries. The purpose of these surveys, conducted at your request, was to ascertain the overall condition and fair market value. Our individual appraisal reports. along with representative photographs, are attached.

### METHODOLOGY

In determining the market value of the Shamrock Fisheries assets. it is understood that vessel appraisals include the hull. structure. furnishings. all appurtenances. equipment. materials. machinery. tools. anchors, and other apparel pertaining to the vessel as found aboard on the date of survey.

Given the available information we have determined our opinion of the fair market value of each vessel.

**Fair market value** is defined as an opinion expressed in terms of money. at which the property would change hands between a willing buyer and a willing seller. neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts. as of a specific date. Six to eight months of exposure may be required to realize this value.

In determining the fair market value. two (2) methodologies were utilized. the cost approach and sales comparison. These are two of the three methodologies required by the Uniform Standards of Professional Appraisal Practice (USPAP) that a surveyor should consider in estimating the fair market value of a marine vessel.

The third method, not considered for this purpose, is the income approach. We chose not to use the income approach in this analysis, as we do not believe it to be appropriate because it represents more of a business evaluation, and that is beyond the scope of this appraisal.

The cost approach involves determining the current cost to replicate the vessel and equipment. Builders of the particular type of vessel were contacted. In barge line construction, the weight of the completed structure can be used as a calculator for predicting the anticipated price per pound of steel necessary to build a sister vessel. A depreciation factor of between 2% and 2.5% per year is customarily applied to arrive at a current fair market value.

In conducting the sales comparison approach, we analyze sales and offerings of vessels similar to those assets described herein as a means for providing a validation of the cost approach. The current market for inland marine construction vessels is considered strong. This factor enhances the value of well-constructed, well maintained, vessels.

In presenting the appraised values for these assets we assume that each vessel is a stand-alone entity, and would be sold and marketed individually. Any wholesale marketing of similar vessels in a particular region will result in a lower realized value.

## QUALIFICATIONS AND EXPERIENCE OF SURVEYOR

Michael L. Collyer has been engaged in the practice of surveying marine equipment. vessels, and facilities as a fulltime occupation for thirty-four (34) years. His clients include lenders, owners. equity partners, insurance underwriters and buyers, both corporate and private.

He is currently the President and Principal Surveyor of Marine Safety Consultants, Inc. and in that role has been supervising other full-time maritime professionals conducting similar types of surveys for condition and valuation since 1992. He is a 1971 graduate of the Massachusetts Maritime Academy with a Bachelor of Science Degree in Nautical Science and Marine Transportation. Before joining Marine Safety Consultants in 1985, he attained commercial seagoing experience with Military Sea Lift Command, as a fisherman, as well as serving as a Marine Law Enforcement Officer for the Commonwealth of Massachusetts.

Having worked extensively in the management of vessel loss claims and appraisals, he is often called upon to testify as an expert in matters relating to vessel construction, repair and valuation appraisals. In his professional career he has conducted over 4,000 appraisals, comprising fishing vessels, passenger vessels, barges, tugs and marine equipment, with market experience on the Inland Rivers, as well as the Gulf and East Coasts of the United States.

He subscribes to the High Ethical Standard and Professional Integrity of the American Society of Appraisers. and performs appraisals to USPAP standards.

## VESSEL AND PERMIT VALUE SUMMARY

| **Shamrock Fisheries** | | |
|---|---|---|
| | Hull Value | Permit Value |
| | | |
| F/V SEAFARER | $1,300,000.00 | $6,450,000.00 |
| F/V TORBAY | $1,300,000.00 | $6,200,000.00 |
| F/V MARINER* | $850,000.00 | $6,320,000.00 |
| F/V KINEO | | $6,182,500.00 |
| F/V GALWAY | | $6,120,000.00 |
| | | |
| | $3,450,000.00 | $31,272,500.00 |
| | | |
| * does not include $50K VA fluke permit | | |

## DISCLAIMER

In accepting this report, it is understood that the surveys were performed without warranties as to the condition, seaworthiness or marketability of the vessel and without a title search to determine whether or not there are any liens or encumbrances.

To the best of our knowledge and belief, the statements contained in this report are true and accurate.

The report, analysis, opinions and conclusions are limited only by limiting conditions and represents our personal unbiased professional analysis, opinion and conclusion. The undersigned has no present or prospective interest in the vessels that is the subject of this report, and we have no personal interest or bias with respect to any of the parties involved.

Compensation for this survey is not contingent upon the reporting of a pre-determined value that favors anyone using this report, and the amount of the value estimated in the attainment of the conditions reported have not been pre-determined and are not based on the fee associated with this assignment.

This report is based on examination of the vessels, and of those parts, spaces and equipment that could be sighted without removals or operation and is rendered without bias or prejudice. In accepting same, it is agreed that the extent of obligation of this surveyor, with respect thereto, is limited to furnishing a competent survey, and in the making of this report this surveyor is acting on behalf of the person or firm requesting same and no liability shall attach to this surveyor for the accuracy, errors and/or omissions therefore.

Naval architecture and marine engineering analysis as usually performed in the design stage of the vessel's construction were not part of this survey and typical subjects such as adequacy of stability and seakeeping were not within the scope of this survey.

Submitted without prejudice.
MARINE SAFETY CONSULTANTS, INC.

Michael L. Collyer
Principal Surveyor

# Marine Safety Consultants, Inc.

26 Water Street, P.O. Box 615, Fairhaven, MA 02719-0615
Phone: 508-996-4110 • Fax: 508- 990-2094
www.marinesafetyconsultants.com

April 9, 2021
File No.: 21-0180

## CONDITION & VALUATION SURVEY REPORT

| | |
|---|---|
| **VESSEL** | **: F/V MARINER** (ex: APOLLO, WAR CRY) |
| OFFICIAL NO. | : 614462 |
| OWNER | : Mariner Fisheries, LLC<br>137 Popes Island<br>New Bedford, MA 02740 |
| LENGTH | : 76.3' |
| BREADTH | : 23.9' |
| DEPTH | : 11.9' |
| GROSS TONS | : 178 |
| NET TONS | : 121 |
| PROPULSION | : Single oil screw |
| FUEL CAPACITY | : 12,000 gals approx. |
| BUILT | : 1979 at Steiner Fabricators/Bayou, LaBatre, AL |

THIS IS TO CERTIFY THAT the undersigned surveyor did, on or about April 5, 2021, at the request of BayCoast Bank, conduct a survey of the F/V MARINER while afloat at New Bedford, MA, in order to ascertain the general overall condition and valuation of the vessel and attaching permits for financial underwriting purposes.

The survey was conducted aboard the vessel afloat at New Bedford, MA in company with the vessel's port engineer Gary Dumoulin.

## DESCRIPTION/GENERAL ARRANGEMENT

The F/V MARINER is a typical western rigged stern dragger/scalloper of all steel welded construction fitted with a full main deck and a raised pilothouse deck. It has a raked stem and near perpendicular stern with a model hull with hard chines. The pilothouse is located forward on top of the upper deck and the superstructure contains the crew's berthing and galley spaces.

The superstructure is followed by the after working deck configured with scallop shucking areas, port and starboard trawl winches, a full fish hold with raised hatch and scallop dredge landing areas. The transom area has been fitted with a single open ramp. There are gallows and a single net drum over the stern ramp.

The vessel is fitted with 8" diameter "H" type mast constructed of what appears to be scheduled 40 pipe and two (2) 40' (approximate) port and starboard outriggers for stability purposes.

The hull is constructed of mild steel and although structural blueprints are not available it appears that the transom is fitted with heavy plate (approximate ½"), and the side shell plating appears to be 3/8" and 5/16" and it is reported that the decking is 5/16". Frames are of transverse type measuring approximately 3 x 3 angle iron with some deck beams measuring 5" x 5".

The vessel is fitted with numerous watertight transverse bulkheads providing subdivision below decks consisting of a forepeak water tank, next aft is an auxiliary machinery space, the main engine room with port and starboard wing fuel tanks, lube oil and hydraulic tanks followed next aft by a full width fish hold insulated with foam and next aft are port and starboard fuel tanks just forward of the lazarette compartment which houses the steering gear at the stern.

The vessel is documented at the National Vessel Documentation Center and is federally permitted to operate in the offshore scallop fisheries and ground fisheries trade and operates primarily with a Captain and six (6) additional crewmen.

## UNDERWATER BODY

An examination of the underwater body was not made, inasmuch as the survey was conducted aboard the vessel afloat.

It was reported that the vessel was last hauled on or about July, 2020, at J. Goodison Shipyard in N. Kingstown, RI, where routine underwater body maintenance was performed including fresh coat of anti-fouling bottom paint and new zinc sacrificial anodes.

## HULL ABOVE WATERLINE AND WEATHER DECKS

The topside of the vessel above the waterline includes a cargo work deck aft and a raised forecastle deck forward. The cargo deck working area is fitted with doubler plates port and starboard for dredge landing areas.

The foredeck on the forecastle is fitted with a raised pipe guard rail all around and the deck is coated with non-skid paint and a wave break. After the pilothouse is a deck containing auxiliary winches for cargo handling equipment and the outriggers.

Also, it is noted that the portholes originally installed in the hull on the main deck level have been removed which included extensive work to replace deteriorated steel on tank tops beneath the galley deck.

The topside area of the deck and the cargo work area is considered to be good with paint coatings intact and well maintained.

## SUPERSTRUCTURE/PILOTHOUSE

The pilothouse located above the superstructure deck is fitted with windows all around non opening type bolted to the front and sides of the pilothouse. Located on the port and starboard sides are watertight door with quick acting dogs. The starboard side exit has been fitted with a weather shelter constructed of steel frame and plating, being the captain's shucking box.

The forward end of the pilothouse is fitted with a control panel with storage compartments below. This is fitted with an array of navigation electronics equipment along with the steering station and engine control and monitoring console. Also, provided are two (2) helmsmen chairs. The electronic equipment is also mounted on the overhead directly above the console.

The interior of the pilothouse was refitted and reconfigured by the former owner. The pilothouse includes a cargo handling control station on the port side aft of the pilothouse, jutting out onto the O1 deck. This provides good visibility for the captain to operate cargo machinery, with visibility to the work deck.

The interior of the pilothouse is sheathed with plexiglass/Formica type paneling with wood molding.

A ladder well descends to the galley on the starboard side. The pilothouse is centrally heated and air-conditioned.

## NAVIGATION AND ELECTRONICS

The vessel is fitted with navigation and communications electronics equipment which appear to be in good working order. The owner reports that all the equipment is operating satisfactorily.

The following is a list of the equipment aboard this vessel:

| | |
|---|---|
| RADAR | : (1) Furuno 1942 Mk II<br>: (1) Furuno 1832 Mk II (at cargo control station) |
| LORAN/GPS | : (1) Furuno Model GP-32<br>: (1) Furuno Model GP-32 (at cargo control station) |
| VHF COMMS | : (1) Horizon GX 2150 AIS / VHF with DSC |

| | |
|---|---|
| | : (1) Icom IC-M504 (aft cargo station) |
| | : (1) Icom IC-M330 VHF |
| SSB RADIO | : (1) Sat TV C Tracvision |
| SOUNDER / PLOTTER | : (1) Sitex Color Max |
| | : (1) Furuno FVC 292 Color video sounder |
| AUTOPILOT | : (1) Simrad AP 50 |
| COMPASSES | : (1) Wagner 7" Magnetic Compass (*deviation card dated 11/26/10*) |
| LOUD HAILER | : (1) Standard Horizon VLH 3000 S (aft cargo station) |
| NMFS MONITOR | : (1) Qualcomm Omnitracs |
| COMPUTER | : (3) Zotac computers with Winplot II |
| | : (1) Dell monitor |
| MISC | : (1) Simrad jog stick lever (at cargo control station) |
| | : (1) R13S+ roller indicator at helm |
| | : (1) Caterpillar engine control panel |
| | : (1) Sat TV C Tracvision |
| | : (1) 32" Sharp monitor |
| | : (2) Samsung 19" LCD P2250 for dragging door sensors |
| | : (1) Global Star Qualcomm sat phone |
| | : (1) ZF micro-command helm |
| | : (1) ZF micro-command at cargo station |
| | : (1) Fusion MS-RA205 Satellite radio |
| | : (2) Marport sensors for dragging doors |
| | : (1) Barometer and clock |
| | : (1) Black & Decker mini fridge |

Additional equipment provided for the navigation of the vessel includes an appropriate handheld horn, bell, navigation and fishing lights, charts, documents and publications required for navigation in the Atlantic Ocean.

A segregated 12V DC power supply for emergency communications was noted during the survey and appears to be in compliance with the Commercial Fishing Vessel Safety Act.

The navigation station is fitted with bilge alarms for below deck spaces including the engine room, gurry pumping station, shaft alley and lazarette. The alarm is visible and audible in the pilothouse. The alarms are activated by float switches located in each bilge space.

## FIRE PROTECTION AND LIFE SAVING

The vessel is fitted with hand held portable fire extinguishers installed as follows:

| | *Type* | *Location* | *Date Tagged* |
|---|---|---|---|
| 2 - | BC Size I | Pilothouse | 4/2020 |
| 2 - | BC Size I | Crew berthing | 4/2020 |
| 2 - | BC Size II C02 | Galley | 4/2020 |
| 3.- | BC Size II C02 | Engine Room | 4/2020 |

Installed portable hand held fire extinguishers are fitted with pressure gauges that show proper charge and were found to be in the green at the time of survey.

The vessel is equipped with a deck washdown system as part of the bilge pumping system, and said deck washdown hose can be used for fire fighting purposes in an emergency.

Life saving equipment consists of the following:

Life raft : (1) Revere eight (8) man Coast Guard approved inflatable raft with SOLAS A Pack. The raft is stowed in a float free rack on the foredeck forward of the pilothouse which is fitted with a hydrostatic release unit. The raft is due for inspection in 04/2021. The hydrostatic release unit expires 04/2021.

EPIRB : (1) ACR Category I Global-fix device. Reg. No.: 2DCC9F8006FFBFF, mounted in hydrostatic release unit on top of pilothouse. The EPIRB battery is up to date and the hydrostatic release unit was also current. Battery expires 05/2029. registration expires 11/27/2021, HRU expires 11/2021.

Survival suits : (6) Coast Guard approved immersion suits

Distress signal kits : (3) Orange smoke signals, expire 11/22
(6) handheld flares, expire 11/22
(3) Parachute flares, expire 11/22

Life ring buoys : (2) 30" orange buoys

First aid kit : (2) Industrial Size

## MAIN PROPULSION

Main propulsion is provided by a Caterpillar diesel model 3508e air start and freshwater keel cooled rated at approximately 1,000 HP. The engine was not operated for the purpose of this survey and therefore the electronic work/control panel that provides information such as operating pressures and temperatures and hours of operation since installation were not observed.

On the front of the main engine is a power take off system driving hydraulic pumps providing power to the cargo handling gear and winches. The engine room was found to be neat in general with only a small amount of oily water collected in the bilge.

The engine provides power output through a ZF reduction gear with a 5:1 ratio

## ELECTRICAL

Electrical power consists of 240V AC generators driven by Cummins diesel engines each 4 cylinder. The generators are rated at approximately 32 KW and are freshwater keel cooled. There are various electrical control and distribution panels in the engine room.

There are four (4) 8D heavy duty marine starting batteries secured in a non-covered box on the portside of the machine area. There is a disconnect switch installed on the positive side of the battery rack mounted on the forward bulkhead. Battery charging is maintained by a LaMarche 32V automatic battery charger.

There are also two (2) 12V heavy duty marine starting batteries one for each generator. These are also maintained by a Phase 3 automatic 12V battery charger.

The electrical system was found neat and organized and well labeled.

## AUXILIARY MACHINERY

Miscellaneous equipment located in the machinery spaces consists of the following:

2 - 240 V Teal high capacity bilge/seawater pumps piped to manifold
2 - 240 V Champion air compressors with accumulator tanks fitted in machinery space forward
1 - 120 V AC freshwater system with accumulator tank fitted in machinery space forepeak
1 - 240 V AC hot water heater
1 - High bilge water sensor reporting to helm station
1 - Activation hydro-electric dual steering pumps
1 - Lincoln welder
2 - Miller welders

## TANKAGE/FUEL SYSTEM

Fuel storage currently consists of two (2) tanks port and starboard outboard of the engine room with a total capacity of about 12,000 gallons. There are two (2) tanks at the stern which were previously used for fuel storage but are now for freshwater storage. Each tank is filled and vented on the main deck area.

Additional tankage consists of a freshwater tank forward and two (2) freshwater tanks aft with a total capacity of about 3,200 gallons. The port and starboard outboard of the engine room and just aft of the fuel oil storage tanks are integral lube oil tank and hydraulic tank each of approximately 400 gallons.

## BILGE PUMPING/ALARMS

Bilge pumping is provided through a single 8" steel pipe manifold fitted with valves and serviced by two (2) electrically powered 1 ½" centrifugal pumps driven by electric motors. The bilge pump discharges through an overboard discharge and/or a deck hose providing deck wash down capacity.

Subsequent to purchase of this vessel, and during the recent refit, the owner contracted with marine plumbers to rebuild the bilge pumping system in its entirety, including two (2) new centrifugal pumps, stainless steel piping, a new manifold with valves and check valve systems, providing suction to all spaces, including lazarette, fish hold and engine room.

The vessel is fitted with bilge alarms in the lazarette: fish hold and engine room which was not tested for the purposes of this survey.

The alarm panel is visible and audible in the pilothouse. The vessel is also fitted with the required general alarm system with a flashing red light in the engine room and an audible alarm in the crew's berthing spaces.

## ACCOMMODATION SPACES

Crew accommodations are in the main deck superstructure below the pilothouse and forward of the cargo work deck. Directly below the pilothouse is the living quarters arranged with a forepeak storage space forward followed by a forepeak two (2) bunk crew berthing stateroom with ample storage lockers.

Aft of this foredeck compartment is a centerline passageway which on each side are two four (4) man bunkrooms. There is total berthing capacity on the main deck for ten (10). On the starboard side in the galley area is a crew's head which is fitted with a shower, toilet and sink.

On the portside aft of the superstructure is the galley fitted with a table with bench seats and storage below. The galley area is fitted with a large stainless-steel sink and cabinets all around. LG 48" television, four (4) burner electric range, Whirlpool stainless refrigerator/freezer and Frigidaire chest freezer.

The accommodation spaces have been rebuilt with new paneling in some areas where access was provided to the hull structure for removal of portholes. The galley decking has been rebuilt with new plywood underlayment and deck tiles. The entire space is fitted with a central heating and 2017 ThermoZone air conditioning system.

## DECK, CARGO AND MOORING EQUIPMENT

The main trawl winches, being Pullmaster H30s, are fitted onto the upper deck behind the pilothouse. These are fitted on doubler plates and the overhang reinforced to accommodate the weight of the winches.

The upper deck is fitted with two (2) cargo handling booms and (2) smaller H12 Pullmaster winches for cargo handling capacity.

The crew shucking stations on the main deck are enclosed in with a watertight bulkhead with doors on the port and starboard side leading from the cargo handling deck. This protects the cargo handling/shucking station from weather and also provides additional weathertight subdivision. The lower portion of the weathertight doors swivels out and aft to allow sliding cargo on deck into the shucking station area.

Forward on the foredeck is a 6" steel crucifix bitt with horns. there are four (4) 18" cleats mounted aft. there are two (2) approximately 40' long steel box tubing outriggers powered by PL5 hydraulic winches and control system. The fish hold access is through a raised hatch measuring approximately 54" x 48" x 36" high fitted with a weathertight cover with access cover on top. The fish hold is fully insulated and subdivided by pens and is fitted with a centerline shaft alley with non-watertight boards on top of the shaft alley.

A scallop chute is built into the deck from the scallop shucking station on the main deck.

There are sufficient cleats and bitts around the periphery of the vessel for mooring and handling of lines.

## COMMERCIAL FISHING VESSEL INDUSTRY SAFETY ACT

The Fishing Vessel Safety Act of 1988 and subsequent federal regulations outline safety practices that have been employed by the commercial fishing fleet in this region for many years. This law and the regulations have served to bring regulatory force to the industry in order to enhance and protect property and lives aboard commercial fishing vessels.

The regulations apply to all U.S. uninspected commercial fishing, fish tender, and fish processing vessels, whether documented or state registered. Compliance with specific regulations is based upon a combination of type and length of vessel, length of operations, seasonal conditions, number of persons on board, whether documented or state registered, and the date the vessel was built or converted.

As of October 15, 2015, the inspection conducted to determine compliance with the regulations is no longer a voluntary but, in fact, is mandatory. The US Coast Guard requires that the inspections be conducted at least once every five (5) years, unless a change of service or a change of ownership occurs during that five-year period. In addition, there are regulations promulgated by the National Marine Fisheries Service that requires the inspection decals to be renewed every two (2) years if the vessel is required to be registered with the National Marine Fisheries Service Observer program.

Once an examination has been conducted and the vessel owner complies with all of the Coast Guard's recommendations, they will issue a sticker to be placed in a prominent location in the pilothouse, confirming that the vessel meets the U.S. Coast Guard's Commercial Fishing Industry Safety Act requirements.

The undersigned surveyor conducted this survey using generally accepted surveying practices using the contents of the new federal regulations as a guideline. Our opinions stated herein do not carry the same force as the U.S. Coast Guard's and should not be construed as regulatory force.

The undersigned surveyor is of the opinion that this vessel **is** in compliance with the federal regulations pertaining to commercial fishing vessel safety. During the course of our survey we ascertained that this vessel **has** been inspected by the Coast Guard and **has** been issued a compliance sticker, # 270119 which expires October 24, 2021.

## STABILITY

As a result of the previous owner's refit, he consulted with naval architects for stability evaluation. On or about March 20, 2008, Norton Marine Design conducted an incline study of the vessel and has issued a stability letter dated March 24, 2008, which confirms that the vessel met the U. S. Coast Guard stability criteria at that time for a double dredge scalloper combination dragger, with the following comment:

- The aft fuel and water tanks may not be used when winter icing conditions may be encountered.

No stability letter was available at the time of survey.

## VALUATION / RATIONALE

Fair market value is the most probable price that a vessel would bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgably, and assuming the price is not affected by undue stimulus.

Implied in this definition is the completion of a sale as of a specified date and the passing of title from seller to buyer under certain conditions. The buyer and seller are typically motivated and each party is well informed and well advised, acting on what they consider to be their individual best interests. A reasonable time should be allowed for exposure in the open market, and payment is made without liens or encumbrances remaining on the vessel.

Fair market value is determined by researching sales comparables, researching trade journals and contacting boat brokers in the region. Fair market value can also be calculated by using the replacement cost less depreciation method. This is used in such instances where sales comparables may be limited due to the size of the market and number of vessels of this type that have been purchased or sold in recent history. Typical sources for determining fair market value is the Marine Safety Consultants, Inc. database as well as trade journals such as Boats & Harbors Magazine, National Marine Fisherman, various marine websites that post sales listings, and interviews with marine brokers familiar with similar vessel and permit sales.

Replacement cost is the estimated cost necessary to build and outfit a new vessel in 2021. Replacement cost is based on research with various shipyards currently building commercial fishing vessels for the northeast fisheries. We usually use a depreciation factor of 2 - 3% per year from the original date of construction. We then compare the estimation of fair market value based on the original, using the traditional method of sales comparables, etc. as to the calculation of the replacement cost less depreciation.

We comment that scallopers in good condition have maintained a high value. This is due to the limited number of scallop permits available, coupled with consistent product price and the experience that scallops is a sustainable resource under the current Federal Fisheries Management Plan.

Since 2019, Limited Access Full-Time Scallop permits have enjoyed a comparable sales average of $6,000,000.00. Adjustments up or down may be appropriate for permits with larger or smaller baselines.

Each permit is limited to the vessel characteristics assigned to the permit, limited by vessel length and horsepower. Larger vessels and larger horsepower are able to fish more efficiently in open bottom using their Days at Sea.

From 2013 to 2019, the percentage of catch harvested from Access Areas increased from 25% to 70%, which has effectively dropped the value premium for larger vessels with more horsepower. However, with lower quotas now in place for 2021 through 2023, the fishery is experiencing greater demand for longer length and higher horsepower again.

The scallop fishery is well managed, is not overfished, and there is no evidence that overfishing has occurred. Scallop availability levels, as witnessed by annual landings, have recently come off a cyclical peak, with annual landings ranging from 51,000,000 to 60,000,000 pounds from 2017 to 2019. Although the fishery is healthy, the biomass and landings have dipped in 2020 and 2021 and are expected to fall further in 2022.

This should result in stable but lower production, with annual landings more in the range of 35,000,000 to 45,000,000 pounds.

New England fishermen have been harvesting a population of scallops that were produced 8 or 9 years ago, when an extremely high number of new "recruits", or baby scallops, encountered in the assessments. Large scale recruitment events are typical in the fishery, but there has not been an exceptional year class since 2013.

Price-wise, the scallop market has been stable, with prices inversely tracking landing volumes, meaning that with higher abundance prices are lower, but in recent years with lower abundance, prices tend higher. Domestic demand for sea scallops is high with the United States able to absorb the majority of the scallops caught each year.

Scallop ex-vessel prices have been strong since the fall of 2020, and market analysts predict high and stable prices to continue through 2022.

The vessel has a permit with a New England Multi-Species Combination endorsement, that allows the vessel to catch groundfish, such as cod, haddock and flounder. Annual quotas attributed to each permit as described in a PSC (Percentage Share Contribution) letter that is sent to all permit holders by the National Marine Fisheries Service in the preceding fishing year.
The fishing year commences on May 1.

The PSC for a permit does not change from year to year and the NMFS uses the best available science to set the groundfish annual catch limits each year. Thus each year, a permit's PSC is multiplied by the annual catch limit to generate the annual catch entitlement (ACE).

| | |
|---|---|
| Limited Access Full-Time Scallop | $6,000,000.00 |
| Annual Catch Entitlement (qualifier only) | $100,000.00 |
| NJ & NC State Flounder permits | $100,000.00 |
| NJ Black Sea Bass | 120,000.00 |
| Total | **$6,320,000.00** |

Recently, the New England Fishery Management Council has approved measures to increase observer coverage to 100% of the groundfish fleet. The increase in coverage levels has increased buying activity in the groundfish quota/permit market. With increased observer coverage many fisherman are anticipating higher leasing rates. Higher leasing rates may increase the value of groundfish permits and quotas in the future.

The vessel is rigged for combination fishing, either trawling or scallop dredging. The trawling and scallop dredging permits cannot be separated.

In determining the market value of the F/V MARINER, it is understood that this appraisal includes the hull, structure, furnishings, all appurtenances, equipment, materials, machinery, tools, anchors, and other apparel pertaining to the vessel as found aboard on the date of survey.

Subject to consideration of the preceding remarks, and considering the age of the vessel, its condition in comparison to vessels of like size, age and service, and in consideration of the current market, the following estimated values are considered appropriate:

| | |
|---|---|
| **FAIR MARKET VALUE:** | **$850,000.00** |
| **FISHERY PERMIT VALUE:** | **$6,320,000.00** |
| **REPLACEMENT COST:** | **$3,300,000.00** |

Submitted without prejudice,
MARINE SAFETY CONSULTANTS, INC.

Michael E. Collyer
Principal Surveyor

## SURVEYOR'S RECOMMENDATIONS

| | | | |
|---|---|---|---|
| VESSEL | : F/V MARINER | FILE NO. | : 21-0180 |
| OFFICIAL NO. | : 614462 | DATE OF SURVEY | : 4/5/2021 |

1. The dogs on the pilothouse doors are frozen. Free up and ensure watertight closure.
2. The dogs on the main deck entry into the accommodation are frozen. Free up and ensure watertight closure.
3. The watertight door between the engine room and forward storeroom is obstructed. Arrange so it can be maintained closed at sea.
4. Ensure that the forward storeroom escape hatch is usable. Carpet is glued over the hatch.
5. Provide covers for batteries mounted outboard the port generator.
6. Starboard generator has an oil leak that requires repair.

Michael L. Collyer
Principal Surveyor

UNITED STATES DEPARTMENT OF COMMERCE
National Oceanic and Atmospheric Administration
NATIONAL MARINE FISHERIES SERVICE
[illegible]
55 [illegible]
[illegible]

March 15, 2019

Jason Davis
Vessel Documentation Service
136 Jordan Road
Plymouth Ma, 02360

Re: F/V *Apollo*, Permit # 410275, O.N. 614462

Dear Mr. Davis:

You requested the baseline specifications for the above referenced vessel which is eligible for the following limited access permits: Atlantic scallop, Northeast (NE) multispecies, monkfish, summer flounder, black sea bass, scup, longfin squid, butterfish, Limited Access General Category (LAGC-IC) scallop, and American lobster.

The current regulations for limited access American lobster permits, LAGC scallop permits and NE multispecies Handgear A do not require the establishment of a vessel baseline, which means there are no size or horsepower limitations for these permits. For an American lobster, LAGC scallop, or Northeast multispecies Handgear A vessel to be replaced by a vessel that is larger than allowed under the replacement provisions, other limited access permits must be permanently relinquished in writing.

On August 26, 2015, new regulations became effective that eliminated the one-time upgrade provision and the gross and net tonnage baseline specifications. This means that as of August 26, 2015, the baseline specifications now only consist of length overall (LOA) and horsepower. Also, you will now be able to do a vessel replacement up to your full 10 percent in length and 20 percent for horsepower. The once a year vessel replacement provision, however still stands. This means if you do a vessel replacement in fishing year 2018 then you may not do another vessel replacement until the [illegible] fishing year. Your baseline information is provided below.

This vessel's baseline for the above listed permits was established on the F/V *Apollo*, Permit #410275; O.N. 614462.

Based on NOAA's National Marine Fisheries Service (NMFS) historical records and all vessel documentation the owner has submitted to NMFS, the baseline specifications for the permits currently on the F/V *Apollo* are:

LENGTH OVERALL (LOA) [illegible]
ENGINE HORSEPOWER (HP): [illegible]



The maximum allowable upgrades for the permits currently on the F/V *Apollo* are

| | |
|---|---|
| MAXIMUM LENGTH OVERALL: | 84' |
| MAXIMUM HORSEPOWER | 874 |

In the event of a fraction, it is our policy to round up the calculated maximum allowable upgrade to the next whole number. Therefore, all maximum values calculated for this letter have been rounded up to the next whole number

This letter is intended only as a summary of this vessel's permit information as of this date. The information provided above does not reflect agreements of which NMFS has no knowledge regarding any reservation of permit rights by the current or previous owners upon sale of the vessel. Nor does this letter guarantee that these permits can be renewed or applied for in the future. This information is advisory only. We reserve the right to make final determinations regarding this vessel's eligibility for any permit.

Sincerely,

Susan Johnson
Industry Services Specialist

cc: Permit file #410275

## PHOTOGRAPHS - F/V MARINER

| | |
|---|---|
|  Bow view at New Bedford, MA. |  Stern view. |
|  Pilothouse navigation console. |  Winch control station. |

**PHOTOGRAPHS - F/V MARINER**

Cargo deck aft.

Cargo deck forward.

Galley and crew mess.

Crew cabin, typical.

**PHOTOGRAPHS - F/V MARINER**

Shucking box under 2nd deck shelter.

Forward storage, ahead engine room

Engine room, looking aft.

One (1) of two 32 KW diesel generator sets.

## PHOTOGRAPHS - F/V MARINER

1,000 HP diesel propulsion engine.

Fish hold.

Lazarette.

# Marine Safety Consultants, Inc.

26 Water Street, P.O. Box 615, Fairhaven, MA 02719-0615
Phone: 508-996-4110 • Fax: 508- 990-2094
www.marinesafetyconsultants.com

March 31, 2021
File No.: 21-0180

## CONDITION & VALUATION SURVEY REPORT

**VESSEL** : **F/V SEAFARER**
(ex ATHENA, HERA, ex, FIVE PRINCESSES)

OFFICIAL NO. : 1122803
OWNER : Seafarer Fisheries, LLC
137 Popes Island
New Bedford, MA 02740
LENGTH : 88.4
BREADTH : 25'
DEPTH : 12.5'
GROSS TONS : 199
NET TONS : 136
PROPULSION : Single oil screw
BUILT : 2002 / Bayou La Batre, AL.

THIS IS TO CERTIFY THAT the undersigned surveyor did, on March 31, 2021 and other dates, at the request of BayCoast Bank, conduct a survey of the F/V SEAFARER while afloat at New Bedford, MA in order to ascertain the general overall condition and valuation of the vessel and attaching permits for financial underwriting purposes.

The survey was conducted accompanied by Gary Dumoulin, port engineer.

## DESCRIPTION/GENERAL ARRANGEMENT

This vessel is an all welded steel commercial fishing vessel, originally built as a Gulf coast style shrimping vessel. It underwent an extensive retrofitting from shrimper style vessel to a combination raised forecastle North Atlantic scallop and ground fish trawler by the former owners in 2009.

The F/V SEAFARER has a raised forecastle with pilothouse atop and open work deck aft. The work deck is surrounded by a 36" high double walled bulwarks with a dual net reels situated over two net ramps built into the transom. Set forward of the net reels the vessel has an "A" frame gallows system, with manually articulated port and starboard gallows arms fitted with trawl blocks and safety chains.

Aft of the pilothouse structure on the raised foredeck, the vessel is fitted with an "A" frame style main mast structure with a single crosstree, which is stayed forward to the pilothouse top with pipe stays and cross frame member supports. Outboard of either side of the main mast trunk are two (2) square box tubing outriggers, approx. 30ft in length, mounted by a clevis and pin attachment at the base mounted doubler plates. Each outrigger is raised and lowered by Pullmaster PL5 hydraulic winches mounted to the main mast trunk.

Abaft the main mast structure, two (2) 10" OD tubular cargo booms, fitted with ladder rungs and safety hoops at the tops are pedestal mounted to the aft foredeck. Each cargo boom is clevis and pin mounted to the raised pedestals, which are through-deck supported to the main deck with 10" steel tube stanchions.

The vessel was built in 2002 at Bayou LaBatre, AL and is laid out and configured typical for vessels of this class, having been reconfigured to a raised forecastle style vessel. Below the main deck is a water tank at the forepeak, followed by an auxiliary machinery space/storage compartment. Next aft is the main propulsion engine room with port and starboard integral fuel tanks. Aft of the engine room is the fish hold, followed aft by the steering compartment/lazarette at the stern.

The hull is constructed with internal angle iron frames with fully welded steel plating. Transverse frames measure 3" x 4" x ¼" and are approximately 19" on center throughout. Hull plating on the deck and the superstructure is ¼" plate. The reported hull plate thickness from the keel out to the chine is 3/8" plate and from the chine to the rails. 5/16" plate.

The vessel is currently documented at the National Vessel Documentation Center and is federally permitted to engage in the offshore scallop and ground fisheries trades.

As a scalloper, the vessel will operate with a Captain and six (6) additional crewmembers.

## UNDERWATER BODY

As examination of the underwater body was not made inasmuch as the vessel was afloat at time of survey. The vessel was reportedly last hauled at J. Goodison Shipyard in N. Kingstown, RI in 2020 for routine maintenance including hull and bottom paint and new zincs attached.

## HULL ABOVE WATERLINE AND WEATHER DECKS

The vessel's forward bulwarks are at the bow, continuing aft along the sheer to the forward portion of the work deck, with 3" x 2" x 3/8" angle iron frame members and 3" x ½" flat bar stiffeners. The reported hull plate thickness is 3/8" in the area of the raised forecastle.

A shelter deck extends aft eleven (11) feet from the deckhouse to provide an enclosed port and starboard shucking station. The after bulkhead of the shucking house is provided with two (2) weather tight doors leading to the main deck.
From the aft shuck house, a watertight door offset to port provides access to the interior accommodations spaces. Out board to starboard, an enclosed aircastle leads forward to a quick-acting watertight door, with access to the forepeak accommodations. Out board to port from the shucking house space is a gear locker and gear stowage location, fitted with a Miller arc welder and oxygen and acetylene bottles.

The vessel's raised foredeck features a 30" two-tier handrail around the periphery, with a 24" wave break installed forward of two accommodations spaces vents. Forward on centerline is a single 8" OD steel cruciform bitt. The vessel's foredecks are treated with a non-skid paint application.

## SUPERSTRUCTURE/PILOTHOUSE

Atop the raised foredeck, a newly constructed pilothouse, of 3" x 2" x ¼" angle iron frames and 3" x ½" flat bar stock stiffeners with ¼" steel plate was utilized in the construction of the pilothouse. The pilothouse features seven (7) forward facing Lexan windows, with two (2) oblique mounted windows at the forward corners.

Along the starboard side, there are eight (8) 3/8" Lexan windows. To port of the main helm console are three (3) Lexan windows. Along the aft bulkhead of the pilothouse are two (2) large Lexan windows. Built into the pilothouse port quarter is a shucking station for the captain.

The station is fitted with one (1) large Lexan window forward, providing views into the pilothouse controls and navigation forward, along with a large Lexan window facing inboard to the pilothouse, affording the captain very good all-round visibility. All pilothouse windows are bedded in compound and through bolted to the pilothouse superstructure.

The interior of the structure contains the navigation bridge, with winch control station aft, with an interior ladder well to the main deck living quarters on the port side.

The interior is a birch faux wood, Formica finish, with mahogany trim. A rubber anti-fatigue and anti slip matting is applied over steel decks. The pilothouse overhead panels are of white Formica with mahogany trim. All pilothouse lighting is incandescent.

Access to the pilothouse structure is through a watertight door, located on the starboard side aft bulkhead of the pilothouse and through the previously mentioned port side shuck house and accommodations ladder.

Visibility is considered very good for the vessel's operator. with exception to directly aft where the vessels exhaust stacks and aft gallows and dual net drums partially obscure vision.

The forward console provides for navigation, fishing and steering control, engine controls, engine monitoring and control panels. The forward console, fitted with dual helm seats either side of centerline.

Atop the pilothouse, a 24" two-tier handrail system has been installed around the periphery, along with an access ladder to the rigging crosstree.

## NAVIGATION AND ELECTRONICS

The vessel is fitted with all new navigation and communications electronics equipment which appear to be in good working order. The owner reports that all the equipment is operating satisfactorily.

The following is a list of the equipment aboard this vessel:

| | |
|---|---|
| RADAR | : (1) Furuno 1832 radar<br>: (1) Furuno RPU 015 radar (*Navnet linked*) |
| LORAN / GPS | : (1) Northstar 6000i GPS/plotter<br>: (1) Northstar 6100i GPS/plotter (*NavNet linked*) |
| VHF COMMS | : (1) Icom M 502 VHF-FM transceiver with DSC<br>: (1) Standard Horizon GX3000S VHF-FM transceiver<br>: (1) Standard Horizon GX1500S VHF/Hailer at aft station |
| SSB RADIO | : (1) Icom 700 PRO |
| SOUNDER / PLOTTER | : (1) Northstar 6000i GPS/Plotter (*NavNet linked*)<br>: (1) Simrad EQ 60 sounder |
| AUTOPILOT | : (1) Simrad AP 50 |
| NMFS MONITOR | : (1) Qualcomm Boatracs |
| COMPASSES | : (1) 6" Dirigo magnetic compass (*No deviation card*)<br>: (1) Koden KGC-222 GPS Compass |
| LOUD HAILER | : (1) Standard Horizon VLH-3000 |
| MISCELLANEOUS | : (8) Dell flat screen computer monitors<br>: (3) Computer towers<br>: (2) Samsung LCD Monitors |

: (1) CCTV vessel monitoring system
: (1) Direct TV Satellite TV receiver
: (1) XM Satellite stereo radio receiver
: (2) ZF Micro Commander throttle controls
: (3) Rexroth winch and brake pneumatic controls
: (2) Simrad jog lever steering stations
: (1) General alarm activation station
: (1) Ice maker

Additional equipment provided for the navigation of the vessel includes an appropriate ships pneumatic horn, bell, navigation and fishing lights, charts, documents and publications required for navigation in the Atlantic Ocean.

A segregated 12V DC power supply for emergency communications was noted during the survey and appears to be in compliance with the Commercial Fishing Vessel Safety Act.

The navigation station is fitted with a Murphy bilge alarm panel for below deck spaces including the engine room, shaft alley and lazarette. The alarm is visible and audible in the pilothouse. The alarms are activated by float switches located in each bilge space. The alarms were not tested as part of this survey. There is also a Murphy engine alarm panel at the aft pilothouse cargo control station and a full Caterpillar engine management display at the helm station.

## FIRE PROTECTION AND LIFE SAVING

The vessel is fitted with handheld portable fire extinguishers installed as follows:

| *No.* | *Type* | *Location* | *Date Tagged* |
|---|---|---|---|
| 2 - | ABC Size I Dry chemical | Pilothouse | April 2019 |
| 1 - | ABC Size II Dry chemical | Forward storage | April 2019 |
| 2 - | ABC Size II Dry chemical | Forward passageway | April 2019 |
| 1 - | ABC Size II Dry chemical | Crews mess | April 2019 |
| 1 - | ABC Size II Dry chemical | Galley | April 2019 |
| 1 - | ABC Size II Dry chemical | Shucking area | April 2019 |
| 1 - | ABC Size I Dry chemical | Engine room access trunk | April 2019 |
| 3 - | ABC Size III Dry chemical | Engine room | April 2019 |
| 1 - | ABC Size III Dry chemical | Forward machinery space | April 2019 |

Installed portable handheld fire extinguishers are fitted with pressure gauges that show proper charge and were found to be in the green at the time of survey. All extinguishers are currently located in the pilothouse.

The vessel is equipped with a deck wash down system as part of the bilge pumping system, and said deck wash down hose can be used for fire fighting purposes in an emergency.

Life saving equipment consists of the following:

Life raft : (1) Survitec eight (8) person life raft with SOLAS "A" pack, stowed on foredeck behind the wave break. DOM 10/2014. Last inspected 4/2019 HRU expires 4/2021.

EPIRB : (1) McMurdo Smartfind Category I EPIRB. Registration No.: ADCD04E4B142001. Registration expires 7/1/2010. Battery expires 10/2020, HRU expires 4/2021

Survival suits : (8) US Coast Guard approved immersion suits, with the vessels name, retro-reflective material, whistles and strobe lights.

PFDs : (7) US Coast Guard approved Type III life jackets.

Distress signal kits : (1) Off shore flare kit with:
3 Orange smoke flares, expire 6/22
6 Handheld flares, expire 3/22
3 Parachute flares, expire 7/22

Life ring buoys : (3) 30" Life rings with retro-reflective material and vessels name stenciled. Each is fitted with floating line and floating strobe marker light attached.

First aid kit : (2) Southeastern Fire commercial first aid kits (galley and pilothouse).

## MAIN PROPULSION

The main engine is a Caterpillar model 3508 diesel engine which is air started. fresh water. keel cooled with Fernstrum type keel coolers. and fitted with a dry exhaust. The engine is rated at 855HP @ 1.800 RPMS. This engine turns a Twin Disc model MG520 hydraulic reverse/reduction gear with a 7:1 ratio. This gear turns a 5" cold rolled jack shaft and a 5" stainless steel tail shaft. Current engine hours are unknown.

## ELECTRICAL

Forward of the main engine are two (2) Isuzu model 6GBIT six (6) cylinder diesel engines driving 60KW electrical generators. These supply power for the vessel through a distribution system mounted in the engine room with sub panels in the galley and pilothouse. Each engine is 12V DC start. keel cooled and fitted with a dry vertical exhaust and fitted with a 50-amp alternator for battery charging.

On the starboard bulkhead of the engine room is a generator switch panel and a Lewco battery charger. A NewMar HDM24-35 24V DC battery charger for the auxiliary hydraulic pump engine and NewMar RM-8 12V DC chargers for the diesel generators are installed outboard of each engine.

## AUXILIARY MACHINERY

Installed forward of the main engine on centerline, the owners installed a Caterpillar model 3406, six (6) cylinder engine, serial number 4TB09563. This engine is rated at 580HP @ 2,300 RPM's. The engine is pneumatically started, turbo charged, after cooled and fitted with a Murphy expansion tank. The engine is keel cooled with Fernstrum type grid coolers. This engine serves as the prime mover for the vessels hydraulic service needs for the trawl winches, net reels, cargo boom operations and other auxiliary systems.

Additional equipment includes the following;

1 – Gulf Coast hydraulics steering pumps
1 – Marathon Power Washer
1 – 208/230V 3HP hydraulic charge pump with a Baldor electric drive motor
1 – 208/230V 15HP hydraulic charge pump with a Leeson electric drive motor
1 – Miller XMT 304CC DC inverter arc welder
1 – Miller Gold star 300 SSDC arc welder
1 – Dayton 115V 1/3 Hp freshwater pump
2 – 50-gallon air flask receivers with electric compressor motors
1 – GE 50-gallon hot water heater

## TANKAGE/FUEL SYSTEM

The vessel is fitted with two (2) integral saddle fuel tanks of approximately 6,000 gallons each. Each tank is located outboard either side of the engine room and feature 18" access plates, sight glasses and bottom draw. Each engine is fitted with Racor dual filtration systems.

The water tank is located forward of the forepeak with a total reported capacity of 6,500 gallons. The lube oil tank is located inboard of the starboard fuel tank bulkhead in the engine room with an approximated total capacity of 250 gallons. All tanks are filled and vented from the main deck.

## BILGE PUMPING/ALARMS

Two (2) 2" bilge pumps are piped to a common manifold on the after-engine room bulkhead. A third pump is separate of the system; however, it can be utilized to the common manifold the way the system is plumbed. All bilge suction and discharge line were noted to be made of stainless steel and fitted with check valves and isolation valves. Also noted was that each bilge suction line was fitted with a baske, strainer.

Bilge float switches for the engine room; shaft alley and lazarette were sighted during the course of the survey, but were not tested as part of this survey.

## ACCOMMODATION SPACES

Accommodation spaces for crew consists of a two (2) person berthing area located forward and to port, abaft the forepeak storage space. This state room is fitted with two bunk beds with drawers beneath and lockers. The interior finish is a Formica paneling with mahogany trim.

Opposite the forward berthing area is a crew's head with shower, sink and head. A vestibule aft of the forward crew's berthing and head space leads to a quick acting watertight door to starboard aircastle.

Immediately aft of the vestibule on centerline is a four (4) person state room, fitted with port and starboard bunk beds, each with drawers beneath and suitable hanging lockers.

The amidships passageway leads from the forepeak accommodations aft to the crew's messing area, offset to starboard and includes a large pedestal table with wraparound settee. Immediately aft of the crew's messing area is the vessel's galley. The galley finish is of birch finished plywood, with Formica overhead paneling and mahogany trim.

The cabinetry work installed aboard the vessel is considered in very good condition. A Hi-Velocity model HE-100 BU 115/230V AC single phase air handler system is installed opposite the crew's mess. Serial no. 421088F. Also noted were emergency lighting systems for all passageways.

Galley equipment consists of:

(1) Amana stainless steel four (4) burner range and oven
(1) Broan exhaust hood
(1) Amana stainless steel refrigerator/freezer
(1) Magic Chef Microwave
(1) Chest freezer (forward storage)

The mess area also features 42" Samsung HDTV with Direct TV satellite receiver.

## CARGO SPACES

The fish hold is divided into a total of twelve (12) individual pens, with six (6) pens per side.

Each pen is separated by a steel stanchion, from hull to deck, with wood penboards providing divisions between each.

The cargo system includes an onboard Kaeling EhF ice system with chiller unit, slush generator barrels and large ice storage barrel.

## DECK, CARGO AND MOORING EQUIPMENT

Two (2) 10" OD clevis and pin steel cargo/scallop booms mounted atop pedestal bases atop ¾" doubler plates on the aftermost portion of the raised foredeck; each is installed with 8" OD steel stanchion support braces to doubler plates on the main deck. Each cargo boom is fitted with a Pullmaster H 10 rapid-reverse hydraulic hoist.

Outboard of the cargo booms at the aft corners of the raised foredeck, the vessel has two (2) Pine Hill, seven-piston radial trawl winches. The winch beds foundations appeared in very good condition and suitable in size. Each trawl winch wire is fairled aft to a single 20", 20 BCM trawl block on the gallast arm. Each trawl block was found to have suitable safety chains attached. At each cargo boom top, a pair of 14', 15-ton McKissick blocks are utilized in deck and cargo movement operations.

There are sufficient cleats and bitts around the periphery of the vessel for mooring and handling of lines.

## COMMERCIAL FISHING VESSEL INDUSTRY SAFETY ACT

The Fishing Vessel Safety Act of 1988 and subsequent federal regulations outline safety practices that have been employed by the commercial fishing fleet in this region for many years. This law and the regulations have served to bring regulatory force to the industry in order to enhance and protect property and lives aboard commercial fishing vessels.

The regulations apply to all U.S. uninspected commercial fishing, fish tender, and fish processing vessels, whether documented or state registered. Compliance with specific regulations is based upon a combination of type and length of vessel, length of operations, seasonal conditions, number of persons on board, whether documented or state registered, and the date the vessel was built or converted.

As of October 15, 2015, the inspection conducted to determine compliance with the regulations is no longer voluntary but is mandatory. The US Coast Guard requires that the inspections be conducted at least once every five (5) years, unless a change of service or ownership occurs during that five-year period. In addition, there are regulations promulgated by the National Marine Fisheries Service that requires the inspection decals to be renewed every two (2) years if the vessel is required to be registered with the National Marine Fisheries Service Observer program.

Once an examination has been conducted and the vessel owner complies with all of the Coast Guard's regulations, they will issue a sticker to be placed in a prominent location in the pilothouse, confirming that the vessel meets the U.S. Coast Guard's Commercial Fishing Industry Safety Act requirements.

The undersigned surveyor conducted this survey using generally accepted surveying practices using the contents of the new federal regulations as a guideline. Our opinions stated herein do not carry the same force as the U.S. Coast Guard's and should not be construed as regulatory force.

The undersigned surveyor is of the opinion that this vessel **is** in compliance with the federal regulations pertaining to commercial fishing vessel safety. During the course of our survey we ascertained that this vessel **has** been inspected by the Coast Guard and **has** been issued a compliance sticker #263357 which expires March 2020.

## STABILITY

An incline stability test was performed on May 16, 2009, and a satisfactory report was issued, with no operating restrictions. A copy of that stability letter is retained onboard the vessel for reference.

## RECOMMENDATIONS/REMARKS

These 2009 upgrades have greatly added service life and value to the vessel. The addition of a bulbous bow enhances the seakeeping characteristics and value.

The vessel's interior accommodations spaces were found in very good condition, spacious and well kept, well lit and well ventilated with central air conditioning and heating. The engine room and machinery spaces were found clean, neat, well lit and well laid out.

From a general examination of the vessel while afloat, as far as practical, without making removal to expose concealed parts at the time of survey and without witnessing operation of the vessel, it is the opinion of the undersigned surveyor that the vessel **is** in satisfactory condition for operation in the fisheries trade.

## VALUATION / RATIONALE

Fair market value is the most probable price that a vessel would bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgably, and assuming the price is not affected by undue stimulus.

Implied in this definition is the completion of a sale as of a specified date and the passing of title from seller to buyer under certain conditions. The buyer and seller are typically motivated and each party is well informed and well advised, acting on what they consider to be their individual best interests. A reasonable time should be allowed for exposure in the open market, and payment is made without liens or encumbrances remaining on the vessel.

Fair market value is determined by researching sales comparables, researching trade journals and contacting boat brokers in the region. Fair market value can also be calculated by using the replacement cost less depreciation method. This is used in such instances where sales comparables may be limited due to the size of the market and number of vessels of this type that have been purchased or sold in recent history. Typical sources for determining fair market value is the Marine Safety Consultants, Inc. database as well as trade journals such as Boats & Harbors Magazine, National Marine Fisherman, various marine websites that post sales listings, and interviews with marine brokers familiar with similar vessel and permit sales.

Replacement cost is the estimated cost necessary to build and outfit a new vessel in 2021. Replacement cost is based on research with various shipyards currently building commercial fishing vessels for the northeast fisheries. We usually use a depreciation factor of 2 - 3% per year from the original date of construction. We then compare the estimation of fair market value based on the original, using the traditional method of sales comparables, etc. as to the calculation of the replacement cost less depreciation.

We comment that scallopers in good condition have maintained a high value. This is due to the limited number of scallop permits available, coupled with consistent product price and the experience that scallops is a sustainable resource under the current Federal Fisheries Management Plan.

Since 2019, Limited Access Full-Time Scallop permits have enjoyed a comparable sales average of $6,000,000.00. Adjustments up or down may be appropriate for permits with larger or smaller baselines.

Each permit is limited to the vessel characteristics assigned to the permit, limited by vessel length and horsepower. Larger vessels and larger horsepower are able to fish more efficiently in open bottom using their Days at Sea.

From 2013 to 2019, the percentage of catch harvested from Access Areas increased from 25% to 70%, which has effectively dropped the value premium for larger vessels with more horsepower. However, with lower quotas now in place for 2021 through 2023, the fishery is experiencing greater demand for longer length and higher horsepower again.

The scallop fishery is well managed, is not overfished, and there is no evidence that overfishing has occurred. Scallop availability levels, as witnessed by annual landings, have recently come off a cyclical peak, with annual landings ranging from 51,000,000 to 60,000,000 pounds from 2017 to 2019. Although the fishery is healthy, the biomass and landings have dipped in 2020 and 2021 and are expected to fall further in 2022.

This should result in stable but lower production, with annual landings more in the range of 35.000.000 to 45.000.000 pounds.

New England fishermen have been harvesting a population of scallops that were produced 8 or 9 years ago, when an extremely high number of new "recruits", or baby scallops, encountered in the assessments. Large scale recruitment events are typical in the fishery, but there has not been an exceptional year class since 2013.

Price-wise, the scallop market has been stable, with prices inversely tracking landing volumes, meaning that with higher abundance prices are lower, but in recent years with lower abundance, prices tend higher. Domestic demand for sea scallops is high with the United States able to absorb the majority of the scallops caught each year.

Scallop ex-vessel prices have been strong since the fall of 2020, and market analysts predict high and stable prices to continue through 2022.

The vessel has a permit with a New England Multi-Species Combination endorsement, that allows the vessel to catch groundfish, such as cod, haddock and flounder. Annual quotas attributed to each permit as described in a PSC (Percentage Share Contribution) letter that is sent to all permit holders by the National Marine Fisheries Service in the preceding fishing year.
The fishing year commences on May 1.

The PSC for a permit does not change from year to year and the NMFS uses the best available science to set the groundfish annual catch limits each year. Thus each year, a permit's PSC is multiplied by the annual catch limit to generate the annual catch entitlement (ACE).

Recently, the New England Fishery Management Council has approved measures to increase observer coverage to 100% of the groundfish fleet. The increase in coverage levels has increased buying activity in the groundfish quota/permit market. With increased observer coverage many fisherman are anticipating higher leasing rates. Higher leasing rates may increase the value of groundfish permits and quotas in the future.

The vessel is rigged for combination fishing, either trawling or scallop dredging. The trawling and scallop dredging permits cannot be separated.

| | |
|---|---|
| Limited Access Full-Time Scallop | $6,050,000.00 |
| Annual Catch Entitlement | $200,000.00 |
| All Areas Herring | $200,000.00 |
| Total | **$6,450,000.00** |

In determining the market value of the F/V SEAFARER, it is understood that this appraisal includes the hull, structure, furnishings, all appurtenances, equipment, materials, machinery, tools, anchors, and other apparel pertaining to the vessel as found aboard on the date of survey.

Subject to consideration of the preceding remarks, and considering the age of the vessel, its condition in comparison to vessels of like size, age and service, and in consideration of the current market, the following estimated values are considered appropriate:

**FAIR MARKET VALUE:** **$1,300,000.00**

**FISHERY PERMIT VALUE:** **$6,450,000.00**

**REPLACEMENT COST:** **$3,700,000.00**

Submitted without prejudice,
MARINE SAFETY CONSULTANTS, INC.

Michael L. Collyer
Principal Surveyor

## SURVEYOR'S RECOMMENDATIONS

| | | | |
|---|---|---|---|
| VESSEL | : F/V SEAFARER | FILE NO. | : 21-0180 |
| OFFICIAL NO. | : 1122803 | DATE OF SURVEY | : 3/31/2021 |

1. Repair the oil leak in the starboard generator engine.

2. Replace missing/broken/work asphalt deck tiles in shucking boxes and on aft deck

3. Free up dogs main deck door to accommodations.

Michael L. Collyer
Principal Surveyor

UNITED STATES DEPARTMENT OF COMMERCE
National Oceanic and Atmospheric Administration
Greater Atlantic Regional Fisheries Office
[illegible]
[illegible]

March 15, 2019

Jason Davis
Vessel Documentation Service
136 Jordan Road
Plymouth, MA 02360

RE: F/V *Athena*, Permit # 410604, O.N. 1122803

Dear Mr. Davis:

You requested the baseline specifications for the above referenced vessel which is eligible for the following limited access permits: Northeast (NE) multispecies, Atlantic sea scallop, monkfish, summer flounder, Atlantic herring, American lobster, Limited Access General Category (LAGC-IC) scallop, and Atlantic mackerel (Tier 1).

The current regulations for limited access American lobster and LAGC scallop permits do not require the establishment of a vessel baseline, which means there are no size or horsepower limitations for these permits. For an American lobster and LAGC scallop vessel to be replaced by a vessel that is larger than allowed under the replacement provisions, other limited access permits must be permanently relinquished in writing.

On August 26, 2015, new regulations became effective that eliminated the one-time upgrade provision and the gross and net tonnage baseline specifications. This means that as of August 26, 2015, the baseline specifications now only consist of length overall (LOA) and horsepower. Also, you will now be able to do a vessel replacement up to your full 10 percent in length and 20 percent for horsepower. The once a year vessel replacement provision, however still stands. This means if you do a vessel replacement in fishing year 2018 then you may not do another vessel replacement until the following 2019 fishing year. Your baseline information is provided below.

[illegible]

[illegible] *Athena*, Permit # 410604, O.N. 1122803.

Based on NOAA's National Marine Fisheries Service (NMFS) historical records and all vessel documentation the owner has submitted to NMFS, the baseline specifications for the Northeast (NE) multispecies, Atlantic sea scallop, monkfish, summer flounder, and Atlantic herring permits currently on the F/V *Athena* are:

| | |
|---|---|
| LENGTH OVERALL (LOA) | 82 ft |
| ENGINE HORSEPOWER (HP) | 850 |



The maximum allowable upgrades for the permits currently on the F/V *Athena* are:

| | |
|---|---|
| MAXIMUM LENGTH OVERALL: | 91' |
| MAXIMUM HORSEPOWER | 1020 |

The baseline specifications for the Atlantic mackerel (Tier 3) permits currently on the F/V *Athena* are:

| | |
|---|---|
| LENGTH OVERALL (LOA): | 88.4' |
| ENGINE HORSEPOWER (HP): | 850 |
| FISH HOLD CAPACITY: | 4834.15 cu ft |

The maximum allowable upgrades for the permits currently on the F/V *Athena* are:

| | |
|---|---|
| MAXIMUM LENGTH OVERALL: | 98' |
| MAXIMUM HORSEPOWER: | 1020 |
| MAXIMUM FISH HOLD CAPACITY: | 5318 cu ft |

All of the limited access permits issued to a specific vessel must remain together as a bundle when the vessel is upgraded or replaced by another vessel. Therefore, any future upgrade or replacement of the F/V *Athena* would be governed by the most restrictive allowable upgrade outlined above, unless the owner permanently relinquishes the associated limited access eligibilities.

The maximum allowable upgrades for the complete suite of permits currently on the F/V *Athena* are:

| | |
|---|---|
| MAXIMUM LENGTH OVERALL: | 91' |
| MAXIMUM HORSEPOWER: | 1020 |
| MAXIMUM FISH HOLD CAPACITY: | 5318 cu ft |

*** This would be a combined maximum with the most restrictive (i.e., smallest) from each of the two specifications ***

In the event of a fraction, it is our policy to round up the calculated maximum allowable upgrade to the next whole number. Therefore, all maximum values calculated for this letter have been rounded up to the next whole number.

[illegible] summarizes the vessel's permit information as of the date [illegible] provided above does not reflect agreements of which NMFS has no knowledge regarding any reservation of permit rights by the current or previous owners upon sale of the vessel. Nor does this letter guarantee that these permits can be renewed or applied for in the future. This information is advisory only. We reserve the right to make final determinations regarding this vessel's eligibility for any permit.

SHAMROCK FISHERIES
File No.: 21-0180

Page 43 of 71

Sincerely,

Diana Johnson
Industry Services Specialist

cc: Permit file # 410504

SHAMROCK FISHERIES
File No.: 21-0180
Page 44 of 71

PHOTOGRAPHS - F/V SEAFARER

SEAFARER

Bow view at New Bedford, MA.

Foredeck.

Pilothouse navigation console.

Pilothouse winch control station.

PHOTOGRAPHS - F/V SEAFARER

| | |
|---|---|
|  |  |
| Cargo deck aft. | Cargo deck forward. |
|  |  |
| Galley. | Crew berth, typical. |

SHAMROCK FISHERIES
File No.: 21-0180

Page 46 of 71

PHOTOGRAPHS - F/V SEAFARER

Shucking box, under 2nd deck shelter.

Forward machinery room.

Engine room.

One (1) of two 60 KW diesel generator sets.

**PHOTOGRAPHS - F/V SEAFARER**

855 HP diesel propulsion engine.

Fish hold.

Lazarette.

# Marine Safety Consultants, Inc.

26 Water Street. P.O. Box 615. Fairhaven, MA 02719-0615
Phone: 508-996-4110 • Fax: 508- 990-2094
www.marinesafetyconsultants.com

March 30, 2021
File No.: 21-0180

## CONDITION & VALUATION SURVEY REPORT

| | |
|---|---|
| **VESSEL** | **: F/V TORBAY** (ex: HERA II. CAPTAIN RICHARD) |
| OFFICIAL NO. | : 1113613 |
| OWNER | : S&S Fishing, LLC |
| LENGTH | : 81.0' |
| BREADTH | : 25' |
| DEPTH | : 12.5' |
| GROSS TONS | : 185 |
| NET TONS | : 126 |
| PROPULSION | : Single oil screw |
| FUEL CAPACITY | : 12,000 gallons (estimated) |
| BUILT | : 2001 at Bayou LaBatre. AL |

THIS IS TO CERTIFY THAT the undersigned surveyor did, on March 26. 2021, at the request of BayCoast Bank, conduct a survey of the F/V TORBAY while afloat at New Bedford, MA in order to ascertain the general overall condition and valuation of the vessel and its suitability for service in fisheries for financial underwriting purposes.

The survey was conducted aboard the vessel afloat at New Bedford, MA in company with the vessel's owner. Charles Quinn.

## DESCRIPTION/GENERAL ARRANGEMENT

This vessel is an all welded steel commercial fishing vessel, rigged for dual fisheries, scallop dredging and groundfish trawling, originally built as a shrimper. It was purchased by the former owners about ten years ago and converted from a flush-deck shrimper-style to a raised forecastle vessel, which resulted in moving the pilothouse to a higher level.

The vessel was built in 2001 at Bayou LaBatre, AL and is laid out and configured typical for vessels of this class. Below the main deck is a water tank at the forepeak, followed by an auxiliary machinery space/storage compartment.

Next aft is the main propulsion engine room with port and starboard integral fuel tanks. Aft of the engine room is the fish hold, followed aft by athwartship fuel tanks and the steering compartment or lazarette at the stern.

The hull is constructed with internal angle iron frames with fully welded steel plating. Frames measure 3" x 4" x ¼" and are approximately 19" on center throughout. Hull plating on the deck and the superstructure is ¼" plate and the bottom plating appears to be 5/16" with reported plating of 3/8" in selected locations.

The vessel is documented at the U.S. National Vessel Documentation Center and is holds a combination scallop and groundfish permit issued by the National Marine Fisheries Service.

## UNDERWATER BODY

An examination of the underwater body was not made at the time of this survey inasmuch as the vessel was afloat at time of survey.

It was reported that the vessel was last hauled on or about September 2020, at J. Goodison Shipyard in N. Kingstown, RI. where routine underwater body maintenance was performed including anti-fouling bottom paint and new zinc sacrificial anodes.

## HULL ABOVE WATERLINE AND WEATHER DECKS

The hull above the waterline has been reconfigured so that the pilothouse is atop a superstructure, creating a raised forecastle western-rigged style vessel typical for vessels fishing in this area.

The cargo work deck has a raised hatch forward leading to the fish hold. The vessel has been outfitted as a dual dredge scalloper, with the trawl winches installed on the upper deck behind the pilothouse, and A-frame gallows with dual net drums fitted at the stern over twin net ramps.

The standing rigging consists of a mast constructed of 8" pipe with 4" cross members with pipe stays forward. The outriggers are constructed of 4" boxed tube steel, stepped to the 01 deck and are fitted with Pullmaster winches.

There is a Bayer flush-deck hatch to the lazarette on the port side aft at the stern.

## SUPERSTRUCTURE / PILOTHOUSE

The superstructure/pilothouse of this vessel is considered in overall very good condition. All coating systems are intact. The structure is raised on the foredeck and is accessed through aft facing weathertight doors and an internal ladder on the port side aft leading to the main deck accommodation spaces below.

The interior of the superstructure contains the vessel's navigation control station, which is fitted on the centerline forward. The navigation control station is fitted with a helm forward at which is located the main engine controls, gauges, and alarm panel. There is a remote helm at the vessel's centerline cargo control station aft and a chart table on the starboard side.

The pilothouse is fitted with seven (7) safety glass forward facing window panels. These panels are through-bolted in compound to the superstructure. The balance of the pilothouse area is fitted with large windows offering the vessel's navigator good visibility.

The space, which was found in very good condition, is finished in wood paneling with wood trim and fiberglass panels overhead. The deck features anti-fatigue mats. Wall mounted electric bus heaters provide heating for the pilothouse area.

The navigation control station is fitted with electronics equipment easily accessible to the operator.

## NAVIGATION AND ELECTRONICS

The vessel is fitted with navigation and communications electronics equipment which appear to be in good working order.

The following is a list of the equipment aboard this vessel:

| | |
|---|---|
| RADAR | : (2) Furuno RDP-149 NavNet radars |
| GPS | : (2) Furuno GP-32 |
| VHF COMMS | : (1) Standard Horizon Quantum GX5000S<br>: (1) Standard Horizon GX2100 Matrix AIS<br>: (2) Standard Horizon GX5500S |
| SSB RADIO | : (1) Icom IC-M710 |
| SOUNDER / PLOTTER | : (1) Furuno FCV-295 |
| AUTOPILOT | : (1) Simrad AP50 |
| COMPASSES | : (1) Dirigo 6" magnetic with deviation card dated 7/31/2015 |

LOUD HAILER : (1) Standard Horizon VLH 3000

N.M.F.S. MONITORING : (1) Qualcomm Boatracs

COMPUTER : (2) LG computers with two (5) Dell flat screen monitors

MISCELLANEOUS : (1) laptop computer
: (1) CCTV Security/Safety camera with Dell monitor
: (1) Qualcomm Globalstar Satellite phone
: (1) Simrad RI-35 Rudder Indicator (Aft station)
: (1) Simrad S35 jog lever (Aft station)
: Fusion music systems
: Phillips LCD Monitor with DirectTv satellite service

Additional equipment provided for the navigation of the vessel includes an appropriate air horn, bell, navigation and fishing lights, charts, documents and publications required for navigation in the Atlantic Ocean.

A segregated 12V DC power supply for emergency communications with a phase 3 charger was noted during the survey and appears to be in compliance with the Commercial Fishing Vessel Safety Act.

The navigation station is fitted with ZF micro-command engine controls and Murphy electronic bilge alarms for below deck spaces including the engine room, gurry pumping station, shaft alley and lazarette. The alarm is visible and audible in the pilothouse. The alarms are activated by float switches located in each bilge space.

The aft pilothouse cargo control station is fitting with navigation and cargo controls including ZF micro-command engine controls and afford the operator excellent visibility of the work deck.

## FIRE PROTECTION AND LIFE SAVING

The vessel is fitted with hand held portable fire extinguishers installed as follows:

| *No.* | *Size* | *Location* | *Date Tagged* |
|---|---|---|---|
| 2 - | DC 10# | Pilothouse | 11/2020 |
| 1 | DC 10# | Galley | 11/2020 |
| 1 | DC 10# | Galley | 11/2020 |
| 1 | DC 10# | Mud Room | 11/2020 |
| 1 | DC 10# | Accommodations passageway | 11/2020 |
| 3 | DC 10# | Engine Room | 11/2020 |

Installed portable hand held fire extinguishers are fitted with pressure gauges that show proper charge and were found to be in the green at the time of survey. Extinguishers are gathered in the pilothouse at this time.

The vessel is equipped with a deck washdown system as part of the bilge pumping system. and said deck washdown hose can be used for firefighting purposes in an emergency.

Lifesaving equipment consists of the following:

| | |
|---|---|
| Life raft | : (1) Survitec 8 man raft, float free on forecastle: expires 08/2022; HRU expires 09/2022 |
| EPIRB | : (1) ACR, Reg. No. ADCD0208C543401, reg. exp. 10/08/2021, battery expires 5/2022, HRU expires 5/2022 |
| Survival suits | : (7) US Coast Guard approved four (4) located in pilothouse, three (3) located in accommodation space, two (2) of the jumbo type (green). |
| Distress signal kits | : Ocean Service<br>(6) red, expire 1/2023<br>(3) smoke, expire 11/2022 |
| Life ring buoys | : (4 total) two with line attached, one with light |
| First aid kit | : (2) Southeastern Fire Equip., Inc. in pilothouse |

## MAIN PROPULSION

Main propulsion is provided by a Caterpillar model 3508 diesel engine which is air started. keel cooled. and vertical dry exhaust. The engine turns a ZF model 3610 reduction gear with a 6.16:1 gear ratio. It turns a 5" intermediate shaft fitted to a 5" stainless steel tailshaft.

Current engine hours on the main propulsion engine were reported to be 45,000. It was reported that this engine went through a complete rebuild in 2017.

## ELECTRICAL

Primary electrical service is provided by two (2) generator engines. One is a Caterpillar 3304 diesel engine. driving a 65 KW generator, and the other is a John Deere 4045 4-cylinder diesel engine. driving a Newage 64 kW gen set.

On the starboard bulkhead of the engine room is a generator switch panel and battery charger. and a Phase Three battery charger.

## AUXILIARY MACHINERY

Miscellaneous equipment located in the vessel consists of:

- 40 gallon hot water tank
- Dynex dual pump hydraulic steering system
- (2) 135 PSI/60 gallon Porter Cable air compressors
- Flex2 potable water system
- (2) Miller arc welders
- Oxy/Acetylene welding equipment
- (2) Hydraulic pump motors, Baldor 20 HP and 7.5 HP

## TANKAGE/FUEL SYSTEM

The vessel is fitted with two (2) fuel tanks with one (1) each port and starboard wing tanks in the engine room. The reported fuel capacity is 12,000 gallons, as confirmed through stability blueprints.

The fresh water tank is located forward of the peak with a reported capacity of 6500 gallons.

The lube oil tank is located in the engine room with a capacity of 250 gallons and there is a hydraulic tank also in the engine room, with unknown capacity.

## BILGE PUMPING/ALARMS

Primary bilge pumping is accomplished by two (2) 2" Flomax8 bilge pumps fitted to 3 HP Baldor electric motors. The pumps are piped to dual manifolds in the after engine room bulkhead. There is also a 3" Flomax 15 pump which appears to provide saltwater service and may be used as a bilge pump in an emergency.

The bilge alarm system consists of separate alarms, audible and visible in the pilothouse for the lazarette, fish hold and engine room. Each bilge alarm is fitted with an individual switch providing visible and audible alarms in the pilothouse. Alarms were not tested during the course of the survey.

## ACCOMMODATION SPACES

The crew's accommodation consists of two heads, bunk rooms and galley. Furthest forward are port and starboard heads, the starboard side containing a commode and sink, with a shower and sink on the port side.

Two small storage rooms follow port and starboard, with the captain's bunk room next on the port side aft with a double bunk and a large locker. The crew's bunk room is opposite on the starboard side with bunks for four.

The dining area, followed by the galley, is located on the starboard side, just aft of the wheelhouse on the main deck and is fitted with a pedestal table and wraparound padded bench seating.

Galley equipment consists of:

- Kenmore four (4) burner electric range and stove
- Air King range hood
- Frigidaire stainless steel refrigerator/freezer
- GE microwave oven
- Keurig coffeemaker
- Black and Decker mini-fridge
- Dual-basin stainless steel sink
- Chest freezer (forward storage)
- Vizio 32" monitor & DVD Player

The accommodation spaces are finished with fiberglass paneling and wood trim and a padded deck. The galley counters feature stainless steel countertops. The accommodation spaces were found to be in very good condition.


## CARGO SPACE

The fish hold is accessed via a raised centerline coaming forward on the work deck. The hatch is fitted with wooden plugs and a stainless steel weathertight cover. The space is divided into 7 port and starboard pens with a centerline slaughterhouse. The space is subdivided by the use of pen boards. The space was found in overall good condition.


## DECK, CARGO AND MOORING EQUIPMENT

Primary hydraulic service is provided by a Caterpillar 3406 keel-cooled marine diesel engine located forward of the main engine in the engine room. It is fitted with a power takeoff with twin hydraulic pumps for deck machinery. Hydraulic system components throughout the vessel appear in excellent condition.

There are two port and starboard cargo booms stepped to the pilothouse aft deck extension. They are of box-steel construction and fitted with Pullmaster winches.

The aft gallows frame consists of approximately 12" diameter steel stanchions with an approximate 8" cross member. Each stanchion is equipped with a cargo block equipped with safety chains, with large trawl doors secured outboard. The port and starboard net reels are mounted on stands above individual stern ramps.

The vessel was outfitted with a MARPLOT dragging sensor system for (2) door sensors and a net sensor. all of which communicate with (2) transducers port and starboard. The equipment is stowed and charged on the port side bulkhead interior cargo space.

There is a Captains shucking station on the starboard side of the pilothouse with access via weathertight aluminum doors inside the pilothouse or on the weatherdeck aft. The station is serviced by a cargo lift centerline forward on the work deck. Additionally, the superstructure extends aft to form an enclosed shuckhouse providing shelter from the weather, with port and starboard cargo washing stations. The shuckhouse combines with the enclosed port and starboard air castles to create considerable storage space and room for gear.

**STABILITY**

After refit modifications, the vessel was issued a Stability Letter dated January 19, 2012.

**COMMERCIAL FISHING VESSEL INDUSTRY SAFETY ACT**

The Fishing Vessel Safety Act of 1988 and subsequent federal regulations outline safety practices that have been employed by the commercial fishing fleet in this region for many years. This law and the regulations have served to bring regulatory force to the industry in order to enhance and protect property and lives aboard commercial fishing vessels.

The regulations apply to all U.S. uninspected commercial fishing. fish tender. and fish processing vessels. whether documented or state registered. Compliance with specific regulations is based upon a combination of type and length of vessel. length of operations. seasonal conditions. number of persons on board. whether documented or state registered. and the date the vessel was built or converted.

As of October 15. 2015. the inspection conducted to determine compliance with the regulations is no longer a voluntary but. in fact. is mandatory. The US Coast Guard requires that the inspections be conducted at least once every five (5) years, unless a change of service or a change of ownership occurs during that five year period. In addition, there are regulations promulgated by the National Marine Fisheries Service that requires the inspection decals to be renewed every two (2) years if the vessel is required to be registered with the National Marine Fisheries Service Observer program.

Once an examination has been conducted and the vessel owner complies with all of the Coast Guard's recommendations. they will issue a sticker to be placed in a prominent location in the pilothouse. confirming that the vessel meets the U.S. Coast Guard's Commercial Fishing Industry Safety Act requirements.

The undersigned surveyor conducted this survey using generally accepted surveying practices using the contents of the new federal regulations as a guideline. Our opinions stated herein do not carry the same force as the U.S. Coast Guard's and should not be construed as regulatory force.

The undersigned surveyor is of the opinion that this vessel **is** in compliance with the federal regulations pertaining to commercial fishing vessel safety. During the course of our survey we ascertained that this vessel **has** been inspected by the Coast Guard and was issued a compliance sticker.

## REMARKS

The general overall condition of this vessel is considered very good. The vessel underwent a major refit and modification ten years ago, converting it from a flush deck shrimper vessel to a raised forecastle scalloper. Current ownership is committed to the continued maintenance and upkeep of the vessel.

Interior spaces were found in like very good condition, engine and machinery spaces were found neat, clean and well laid out.

With continued care, maintenance and overhauls on a routine basis, this vessel should realize many years of useful service life.

## VALUATION / RATIONALE

Fair market value is the most probable price that a vessel would bring in a competitive and open market under all conditions requisite to a fair sale. the buyer and seller each acting prudently and knowledgably. and assuming the price is not affected by undue stimulus.

Implied in this definition is the completion of a sale as of a specified date and the passing of title from seller to buyer under certain conditions. The buyer and seller are typically motivated and each party is well informed and well advised. acting on what they consider to be their individual best interests. A reasonable time should be allowed for exposure in the open market, and payment is made without liens or encumbrances remaining on the vessel.

Fair market value is determined by researching sales comparables. researching trade journals and contacting boat brokers in the region. Fair market value can also be calculated by using the replacement cost less depreciation method. This is used in such instances where sales comparables may be limited due to the size of the market and number of vessels of this type that have been purchased or sold in recent history. Typical sources for determining fair market value is the Marine Safety Consultants. Inc. database as well as trade journals such as Boats & Harbors Magazine. National Marine Fisherman. various marine websites that post sales listings. and interviews with marine brokers familiar with similar vessel and permit sales.

Replacement cost is the estimated cost necessary to build and outfit a new vessel in 2021. Replacement cost is based on research with various shipyards currently building commercial fishing vessels for the northeast fisheries. We usually use a depreciation factor of 2 - 3% per year from the original date of construction. We then compare the estimation of fair market value based on the original, using the traditional method of sales comparables, etc. as to the calculation of the replacement cost less depreciation.

We comment that scallopers in good condition have maintained a high value. This is due to the limited number of scallop permits available, coupled with consistent product price and the experience that scallops is a sustainable resource under the current Federal Fisheries Management Plan.

Since 2019, Limited Access Full-Time Scallop permits have enjoyed a comparable sales average of $6,000.000.00. Adjustments up or down may be appropriate for permits with larger or smaller baselines.

Each permit is limited to the vessel characteristics assigned to the permit, limited by vessel length and horsepower. Larger vessels and larger horsepower are able to fish more efficiently in open bottom using their Days at Sea.

From 2013 to 2019, the percentage of catch harvested from Access Areas increased from 25% to 70%, which has effectively dropped the value premium for larger vessels with more horsepower. However, with lower quotas now in place for 2021 through 2023, the fishery is experiencing greater demand for longer length and higher horsepower again.

The scallop fishery is well managed. is not overfished, and there is no evidence that overfishing has occurred. Scallop availability levels. as witnessed by annual landings, have recently come off a cyclical peak. with annual landings ranging from 51.000.000 to 60.000.000 pounds from 2017 to 2019. Although the fishery is healthy. the biomass and landings have dipped in 2020 and 2021 and are expected to fall further in 2022.

This should result in stable but lower production. with annual landings more in the range of 35.000.000 to 45.000.000 pounds.

New England fishermen have been harvesting a population of scallops that were produced 8 or 9 years ago, when an extremely high number of new "recruits", or baby scallops, encountered in the assessments. Large scale recruitment events are typical in the fishery, but there has not been an exceptional year class since 2013.

Price-wise, the scallop market has been stable. with prices inversely tracking landing volumes. meaning that with higher abundance prices are lower. but in recent years with lower abundance. prices tend higher. Domestic demand for sea scallops is high with the United States able to absorb the majority of the scallops caught each year.

Scallop ex-vessel prices have been strong since the fall of 2020. and market analysts predict high and stable prices to continue through 2022.

The vessel has a permit with a New England Multi-Species Combination endorsement, that allows the vessel to catch groundfish, such as cod, haddock and flounder. Annual quotas attributed to each permit as described in a PSC (Percentage Share Contribution) letter that is sent to all permit holders by the National Marine Fisheries Service in the preceding fishing year.
The fishing year commences on May 1.

The PSC for a permit does not change from year to year and the NMFS uses the best available science to set the groundfish annual catch limits each year. Thus each year, a permit's PSC is multiplied by the annual catch limit to generate the annual catch entitlement (ACE).

Recently, the New England Fishery Management Council has approved measures to increase observer coverage to 100% of the groundfish fleet. The increase in coverage levels has increased buying activity in the groundfish quota/permit market. With increased observer coverage many fisherman are anticipating higher leasing rates. Higher leasing rates may increase the value of groundfish permits and quotas in the future.

The vessel is rigged for combination fishing, either trawling or scallop dredging. The trawling and scallop dredging permits cannot be separated.

| | |
|---|---|
| Limited Access Full-Time Scallop | $6,050,000.00 |
| Annual Catch Entitlement | $150,000.00 |
| Total | **$6,200,000.00** |

In determining the market value of the F/V TORBAY, it is understood that this appraisal includes the hull, structure, furnishings, all appurtenances, equipment, materials, machinery, tools, anchors, and other apparel pertaining to the vessel as found aboard on the date of survey.

Subject to consideration of the preceding remarks, and considering the age of the vessel, its condition in comparison to vessels of like size, age and service, and in consideration of the current market, the following estimated values are considered appropriate:

| | |
|---|---|
| **FAIR MARKET VALUE:** | **$1,300,000.00** |
| **FISHERY PERMIT VALUE:** | **$6,447,000.00** |
| **REPLACEMENT COST:** | **$3,700,000.00** |

SHAMROCK FISHERIES
File No.: 21-0180

Page 59 of 71

Sincerely,
MARINE SAFETY CONSULTANTS, INC.

Michael L. Collyer
Principal Surveyor

PERMIT - F/V TORBAY

UNITED STATES DEPARTMENT OF COMMERCE
National Oceanic and Atmospheric Administration
NATIONAL MARINE FISHERIES SERVICE
Greater Atlantic Regional Fisheries Office
55 Great Republic Drive
Gloucester, MA 01930-2276

March 15, 2019

Jason Davis
Vessel Documentation Services
136 Jordan Road
Plymouth Ma, 02360

Re: F/V *Hera II*, Permit # 410612, O.N. 1113613

Dear Mr. Davis:

**You requested the baseline specifications for the above referenced vessel which is eligible for the following limited access permits: Atlantic scallop, Northeast (NE) multispecies, monkfish, summer flounder, and American lobster.**

**The current regulations for limited access American lobster permits, LAGC scallop permits and NE multispecies Handgear A do not require** the establishment of a vessel baseline, which means there are no size or horsepower limitations for these permits. For an American lobster, LAGC scallop, or Northeast multispecies Handgear A vessel to be replaced by a vessel that is larger than allowed under the replacement provisions, other limited access permits must be permanently relinquished in writing.

On August 26, 2015, new regulations became effective that eliminated the one-time upgrade provision and the gross and net tonnage baseline specifications. This means that as of August 26, 2015 the baseline specifications now only consist of length overall (LOA) and horsepower. Also, you will now be able to do a vessel replacement up to 10 percent in length and 20 percent for horsepower. The once a year vessel replacement provision however still stands. This means if you do a vessel replacement in fishing year 2018 then you may not do another vessel replacement until the following [illegible]

This vessel's baseline for the above listed permits was established on the F/V *Tyler n Noah*, Permit #410444, O.N. 930728.

Based on NOAA's National Marine Fisheries Service (NMFS) historical records and all vessel documentation the owner has submitted to NMFS, the baseline specifications for the permits currently on the F/V *Hera II* are:

| | |
|---|---|
| LENGTH OVERALL (LOA) | 84.2' |
| ENGINE HORSEPOWER (HP) | 855 |



† This specification was corrected in December [illegible]. No further correction to this vessel's specifications will be allowed.

The maximum allowable upgrades for the permits currently on the F/V *Hera II* are

| | |
|---|---|
| MAXIMUM LENGTH OVERALL: | 93' |
| MAXIMUM HORSEPOWER: | 1026 |

In the event of a fraction, it is our policy to round up the calculated maximum allowable upgrade to the next whole number. Therefore, all maximum values calculated for this letter have been rounded up to the next whole number.

This letter is intended only as a summary of this vessel's permit information as of this date. The information provided above does not reflect agreements of which NMFS has no knowledge regarding any reservation of permit rights by the current or previous owners upon sale of the vessel. Nor does this letter guarantee that these permits can be renewed or applied for in the future. This information is advisory only. We reserve the right to make final determinations regarding this vessel's eligibility for any permit.

Sincerely,

Susan Johnson
Industry Services Specialist

cc: Permit file #410612

PHOTOGRAPHS - F/V TORBAY

| | |
|---|---|
|  Bow view at New Bedford, MA. |  Stern view. |
|  Pilothouse navigation console. |  Pilothouse winch control station. |

PHOTOGRAPHS - F/V TORBAY

Cargo deck aft.

Cargo deck forward.

Galley.

Crew berth. typical.

PHOTOGRAPHS - F/V TORBAY

Forward machinery room.

Engine room.

855 HP diesel propulsion engine.

One (1) of two 65 KW diesel generator sets.

SHAMROCK FISHERIES
File No.: 21-0180

Page 65 of 71

PHOTOGRAPHS - F/V TORBAY

Hydraulic pump engine.

Fish hold.

| | |
|---|---|
| **VESSEL** | **: F/V GALWAY** |
| OFFICIAL NO. | : 110087 |
| OWNER | : Galway Fisheries, LLC<br>137 Popes Island<br>New Bedford, MA 02740 |
| LENGTH | : 85.2' |
| BREADTH | : 25' |
| DEPTH | : 12.5' |
| GROSS TONS | : 164 |
| NET TONS | : 49 |
| PROPULSION | : Single oil screw |
| FUEL CAPACITY | : 12,000 gallons (approximately) |
| BUILT | : 2000 / Bayou LaBatre, AL / Rodriguez Boat Building, Inc. |

**PERMIT VALUE**

| | |
|---|---|
| Limited Access Full-Time Scallop | $6,050,000.00 |
| Annual Catch Entitlement | $120,000.00 |
| Total | **$6,170,000.00** |

SHAMROCK FISHERIES
File No.: 21-0180

PERMIT - GALWAY

UNITED STATES DEPARTMENT OF COMMERCE
National Oceanic and Atmospheric Administration

October 16, 2019

Jason Davis
Vessel Documentation Service
136 Jordan Road
Plymouth, MA 02360

RE: F/V *Gypsy Girl*, Permit # 410613, O.N. 1100877

Dear Mr. Davis:

You requested the baseline specifications for the above referenced vessel which is eligible for the following limited access permits: Northeast (NE) multispecies, Atlantic sea scallop, monkfish, summer flounder, American lobster, and Limited Access General Category (LAGC-IC) scallop.

The current regulations for limited access American lobster and LAGC scallop permits do not require the establishment of a vessel baseline, which means there are no size or horsepower limitations for these permits. For an American lobster and LAGC scallop vessel to be replaced by a vessel that is larger than allowed under the replacement provisions, other limited access permits must be permanently relinquished in writing.

On August 26, 2015, new regulations became effective that eliminated the one-time upgrade provision and the gross and net tonnage baseline specifications. This means that as of August 26, 2015, the baseline specifications now only consist of length overall (LOA) and horsepower. Also, you will now be able to do a vessel replacement up to your full 10 percent in length and 20 percent for horsepower. The once a year vessel replacement provision, however still stands. This means if you do a vessel replacement in fishing year 2019 then you may not do another vessel replacement until the following 2020 fishing year. Your baseline information is provided below.

This vessel's baseline for the above listed permits was established on the F/V [illegible], Permit # 410161, O.N. 597464.

Based on NOAA's National Marine Fisheries Service (NMFS) historical records and all vessel documentation the owner has submitted to NMFS, the baseline specifications for the permits currently on the F/V *Gypsy Girl* are:

| | |
|---|---|
| LENGTH OVERALL (LOA) | 81.6' |
| ENGINE HORSEPOWER (HP) | 725 * |

*This specification was corrected on October 15, 1998. No further correction to this vessel's specifications will be allowed.



The maximum allowable upgrades for the permits currently on the F/V *Gypsy Girl* are:

| | |
|---|---|
| MAXIMUM LENGTH OVERALL | 90' |
| MAXIMUM HORSEPOWER: | 870 |

In the event of a fraction, it is our policy to round up the calculated maximum allowable upgrade to the next whole number. Therefore, all maximum values calculated for this letter have been rounded up to the next whole number.

This letter is intended only as a summary of this vessel's permit information as of this date. Further, the information provided above does not reflect agreements of which NMFS has no knowledge regarding any reservation of permit rights by the current or previous owners upon sale of the vessel. Nor does this letter guarantee that these permits can be renewed or applied for in the future. This information is advisory only. We reserve the right to make final determinations regarding this vessel's eligibility for any permit.

Sincerely,

Susan Johnson
Industry Service Specialist

cc: Permit file # 410613

**VESSEL** : **KINEO**

OFFICIAL NO. : 618384
OWNER : Kineo Fisheries, LLC
137 Popes Island
New Bedford, MA 02740
LENGTH : 93.9'
BREADTH : 26.5'
DEPTH : 13.8'
GROSS TONS : 163
NET TONS : 111
PROPULSION : Twin oil screw
FUEL CAPACITY : 28,000 gallons
BUILT : 1980 / Marine Building, Inc. / Mobile, AL (Hull # 122)

**PERMIT VALUE**

| | |
|---|---|
| Limited Access Full-Time Scallop | $6,000,000.00 |
| Annual Catch Entitlement | $175,000.00 |
| Gulf of Mexico shrimp | $7.500.00 |
| Total | **$6,182,500.00** |

UNITED STATES DEPARTMENT OF COMMERCE
National Oceanic and Atmospheric Administration
Greater Atlantic Regional Fisheries Office
55 Great Republic Drive
Gloucester, MA 01930-2276

March 15, 2019

Jason Davis
Vessel Documentation Service
136 Jordan Road
Plymouth, MA 02360

RE: F/V *Vila Nova Do Corvo I*, Permit # 410590, O.N. 1110463

Dear Mr. Davis:

You requested the baseline specifications for the above referenced vessel which is eligible for the following limited access permits: Northeast (NE) multispecies, Atlantic sea scallop, monkfish, summer flounder, American lobster, and Limited Access General Category (LAGC-IC) scallop.

The current regulations for limited access American lobster and LAGC scallop permits do not require the establishment of a vessel baseline, which means there are no size or horsepower limitations for these permits. For an American lobster and LAGC scallop vessel to be replaced by a vessel that is larger than allowed under the replacement provisions, other limited access permits must be permanently relinquished in writing

On August 26, 2015, new regulations became effective that eliminated the one-time upgrade provision and the gross and net tonnage baseline specifications. This means that as of August 26, 2015, the baseline specifications now only consist of length overall (LOA) and horsepower. Also, you will now be able to do a vessel replacement up to your full 10 percent in length and 20 percent for horsepower. The once-a-year vessel replacement provision, however still stands. This means if you do a vessel replacement in fishing year 2018 then you may not do another vessel replacement until the following 2019 fishing year. Your baseline information is provided below

[illegible]

Based on NOAA's National Marine Fisheries Service (NMFS) historical records and all vessel documentation the owner has submitted to NMFS, the baseline specifications for the permits currently on the F/V *Vila Nova Do Corvo I* are

| | |
|---|---|
| LENGTH OVERALL (LOA) | 89.9' † |
| ENGINE HORSEPOWER (HP) | 530 |

† This specification was corrected on October 26, 1998. No further correction to this vessel's specifications will be allowed



The maximum allowable upgrades for the permits currently on the F/V [illegible] are

MAXIMUM LENGTH OVERALL: [illegible]
MAXIMUM HORSEPOWER: [illegible]

In the event of a fraction, it is our policy to round up the calculated maximum allowable upgrade to the next whole number. Therefore, all maximum values calculated for this letter have been rounded up to the next whole number.

This letter is intended only as a summary of this vessel's permit information as of this date. Further, the information provided above does not reflect agreements of which NMFS has no knowledge regarding any reservation of permit rights by the current or previous owners upon sale of the vessel. Nor does this letter guarantee that these permits can be renewed or applied for in the future. This information is advisory only. We reserve the right to make final determinations regarding this vessel's eligibility for any permit.

Sincerely,

Susan Johnson
Industry Service Specialist

cc. Permit file # 410590



**Marine Safety Consultants, Inc.**
26 Water Street. P.O. Box 615, Fairhaven, MA 02719-0615
Phone: 508-996-4110 • Fax: 508- 990-2094
www.marinesafetyconsultants.com

# Blue Harvest Fisheries
# Fleet Survey
# 2021

Taunton Office: 128 Dean Street. Front-1st Floor. Taunton. MA 02780 • Phone:508-884-5055 • Fax: 508-884-5056
Maine/NH Office: 400 Commercial St. Suite 201. Portland. ME 04101 • Phone: 207-775-7933 • Fax: 207-775-7471

## Table of Contents

INTRODUCTION / VESSEL VALUES ..... 3
QUALIFICATIONS AND EXPERIENCE OF SURVEYOR ..... 4
VESSEL AND PERMIT VALUE SUMMARY ..... 5
DISCLAIMER ..... 6
VESSEL : F/V BLUE DELTA ..... 7
VESSEL : F/V BLUE EASTERN ..... 27
VESSEL : F/V BLUE NORTH ..... 47
VESSEL : F/V BLUE STREAM ..... 66
VESSEL : BLUE WESTERN ..... 68

# Marine Safety Consultants, Inc.

26 Water Street, P.O. Box 615, Fairhaven, MA 02719-0615
Phone: 508-996-4110 • Fax: 508- 990-2094
www.marinesafetyconsultants.com

April 7, 2021
File No.: 21-0181

BayCoast Bank
One BayCoast Place
330 Swansea Mall Drive
Swansea, MA 02777

Attn: Ann Auger

## INTRODUCTION / VESSEL VALUES

THIS WILL CERTIFY THAT the undersigned surveyor completed surveys of vessels owned by Blue Harvest Fisheries. The purpose of these surveys, conducted at your request, was to ascertain the overall condition and fair market value. Our individual appraisal reports, along with representative photographs, are attached.

## METHODOLOGY

In determining the market value of the Blue Harvest Fisheries assets, it is understood that vessel appraisals include the hull, structure, furnishings, all appurtenances, equipment, materials, machinery, tools, anchors, and other apparel pertaining to the vessel as found aboard on the date of survey.

Given the available information we have determined our opinion of the fair market value of each vessel.

**Fair market value** is defined as an opinion expressed in terms of money, at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts, as of a specific date. Six to eight months of exposure may be required to realize this value.

In determining the fair market value, two (2) methodologies were utilized, the cost approach and sales comparison. These are two of the three methodologies required by the Uniform Standards of Professional Appraisal Practice (USPAP) that a surveyor should consider in estimating the fair market value of a marine vessel.

The third method, not considered for this purpose, is the income approach. We chose not to use the income approach in this analysis, as we do not believe it to be appropriate because it represents more of a business evaluation, and that is beyond the scope of this appraisal.

The cost approach involves determining the current cost to replicate the vessel and equipment. Builders of the particular type of vessel were contacted. A depreciation factor of between 2% and 2.5% per year is customarily applied to arrive at a current fair market value.

In conducting the sales comparison approach, we analyze sales and offerings of vessels similar to those assets described herein as a means for providing a validation of the cost approach. The current market for inland marine construction vessels is considered strong. This factor enhances the value of well-constructed, well maintained, vessels.

In presenting the appraised values for these assets we assume that each vessel is a stand-alone entity, and would be sold and marketed individually. Any wholesale marketing of similar vessels in a particular region will result in a lower realized value.

## QUALIFICATIONS AND EXPERIENCE OF SURVEYOR

Michael L. Collyer has been engaged in the practice of surveying marine equipment, vessels, and facilities as a fulltime occupation for thirty-four (34) years. His clients include lenders, owners, equity partners, insurance underwriters and buyers, both corporate and private.

He is currently the President and Principal Surveyor of Marine Safety Consultants, Inc. and in that role has been supervising other full-time maritime professionals conducting similar types of surveys for condition and valuation since 1992. He is a 1971 graduate of the Massachusetts Maritime Academy with a Bachelor of Science Degree in Nautical Science and Marine Transportation. Before joining Marine Safety Consultants in 1985, he attained commercial seagoing experience with Military Sea Lift Command, as a fisherman, as well as serving as a Marine Law Enforcement Officer for the Commonwealth of Massachusetts.

Having worked extensively in the management of vessel loss claims and appraisals, he is often called upon to testify as an expert in matters relating to vessel construction, repair and valuation appraisals. In his professional career he has conducted over 4,000 appraisals, comprising fishing vessels, passenger vessels, barges, tugs and marine equipment, with market experience on the Inland Rivers, as well as the Gulf and East Coasts of the United States.

He subscribes to the High Ethical Standard and Professional Integrity of the American Society of Appraisers, and performs appraisals to USPAP standards.

# VESSEL AND PERMIT VALUE SUMMARY

| Blue Harvest Fisheries | Hull Value | Permit Value |
|---|---|---|
| F/V BLUE EASTERN | $1,100,000.00 | $6,050,000.00 |
| F/V BLUE DELTA | $1,200,000.00 | $6,125,000.00 |
| F/V BLUE NORTH | $1,000,000.00 | $6,125,000.00 |
| F/V BLUE STREAM | | $6,000,000.00 |
| F/V BLUE WESTERN | | $6,050,000.00 |
| | $3,300,000.00 | $30,350,000.00 |

## DISCLAIMER

In accepting this report, it is understood that the surveys were performed without warranties as to the condition. seaworthiness or marketability of the vessel and without a title search to determine whether or not there are any liens or encumbrances.

To the best of our knowledge and belief, the statements contained in this report are true and accurate.

The report, analysis, opinions and conclusions are limited only by limiting conditions and represents our personal unbiased professional analysis, opinion and conclusion. The undersigned has no present or prospective interest in the vessels that is the subject of this report, and we have no personal interest or bias with respect to any of the parties involved.

Compensation for this survey is not contingent upon the reporting of a pre-determined value that favors anyone using this report, and the amount of the value estimated in the attainment of the conditions reported have not been pre-determined and are not based on the fee associated with this assignment.

This report is based on examination of the vessels, and of those parts, spaces and equipment that could be sighted without removals or operation and is rendered without bias or prejudice. In accepting same, it is agreed that the extent of obligation of this surveyor. with respect thereto, is limited to furnishing a competent survey, and in the making of this report this surveyor is acting on behalf of the person or firm requesting same and no liability shall attach to this surveyor for the accuracy. errors and/or omissions therefore.

Naval architecture and marine engineering analysis as usually performed in the design stage of the vessel's construction were not part of this survey and typical subjects such as adequacy of stability and seakeeping were not within the scope of this survey.

Submitted without prejudice.
MARINE SAFETY CONSULTANTS, INC.

Michael L. Collyer
Principal Surveyor

**Marine Safety Consultants, Inc.**
26 Water Street. P.O. Box 615. Fairhaven. MA 02719-0615
Phone: 508-996-4110 • Fax: 508- 990-2094
www.marinesafetyconsultants.com

March 25, 2021
File No.: 21-0181

## CONDITION & VALUATION SURVEY REPORT

| | |
|---|---|
| **VESSEL** | **: F/V BLUE DELTA** |
| OFFICIAL NO. | : 693499 |
| OWNER | : Blue Harvest Fisheries |
| LENGTH | : 92.0 (overall, reported) |
| LENGTH | : 84.0' (registered) |
| BREADTH | : 25.0' |
| DEPTH | : 11.6' |
| GROSS TONS | : 137 |
| NET TONS | : 101 |
| PROPULSION | : Marine Diesel |
| BUILT | : 1985 / Panama City. FL |

THIS IS TO CERTIFY THAT the undersigned surveyor conducted a Condition and Value survey of the F/V BLUE DELTA on March 25. 2021. while the vessel was afloat at Blue Harvest Fisheries in Fairhaven, MA. Survey was requested by Gene Bergson at Blue Harvest Fisheries for insurance underwriting purposes only.

The F/V BLUE DELTA is a single oil screw, all welded steel constructed, raised foc'sle, western rigged, combination scalloper/purse seiner that was built in 1985 in Panama City, FL. Vessel underwent significant modifications in 2003 to convert the vessel to RSW purse seining. At time of survey, the vessel was undergoing maintenance and was not rigged.

Vessel features a raked stem with raised foc'sle and pilothouse, and an open work deck aft with closed transom-type stern.

## DESCRIPTION/GENERAL ARRANGEMENT

The vessel is constructed of mild steel plate of undetermined thickness, butt welded on a transverse framing system. The vessel is subdivided into seven (7) compartments by six (6) transverse steel bulkheads.

Compartmentalization from forward to aft is as follows:
- Forward water tank
- Tool room/lower crew berthing
- Engine room
- RSW tanks with centerline shaft alley
- Ice hold
- Lazarette
- Stern fuel oil tank

All the vessel's bulkheads are watertight with the exception of the after-engine room. The engine room is open to the fish hold through the shaft alley, beneath the RSW tanks.


## DECKS

The vessel's foredeck is protected by a low steel bulwark with steel safety rails atop providing an overall rail height of 40". The deck is finished with a fair condition, painted, non-skid coating. There are two (2) closed fairlead chocks installed forward, along with a 25" steel cruciform bitt. The 26" wave break and 22" foc'sle escape hatch are installed forward of the pilothouse. The foc'sle escape hatch sits on an 18" steel coaming.

The aft end of the raised foredeck is fitted out with port and starboard main trawl winches and a centerline boom tabernacle. A Pullmaster topping lift winch for the scallop booms is installed on this deck and forward on centerline is the air conditioning unit and a vertical ladder allowing access to and from the main work deck. An aluminum scallop shucking house has been installed on the starboard side of the pilothouse for the captain. There are two (2) led lighting units mounted atop the aft pilothouse, port and starboard sides facing aft to illuminate the raised trawl winch deck.

The forward 12' of the main work deck is fully enclosed and makes up the vessel's shucking house. The deck in this space is finished with painted steel and satisfactory condition asphalt bridge tiles and is provided with good lighting.

The open work deck aft is protected by a 39" box steel bulwark with five (5) 17" x 26" freeing ports installed on either side, all fitted with sliding closures. The work deck is painted steel with steel doubler plates outboard. Work deck lighting is provided by two (2) mercury vapor lamps as well as two (2) 115v quartz lights mounted to the gallows frame facing forward down to the work deck.

Forward on either side of centerline is a 66" x 56" RSW tank hatch with 24" steel coamings and heavy steel covers and were not available for inspection during this survey. A 30" quick acting scuttle is installed on a 7" coaming between the RSW tank hatches which allows access to the alley way between the RSW tanks and the engine compartment. The vessel's ice hold is accessed by a 36" x 36" hatch aft on centerline on the work deck with a 19" steel coaming and heavy steel cover. Tie downs for the cover are provided. The lazarette is accessed by a 21" x 48" four dog watertight door aft in the starboard work deck doghouse/gallows frame (see recommendations).

## PILOTHOUSE FITTINGS AND EQUIPMENT

The vessel's pilothouse is constructed of welded steel plate on an angle steel frame and is located aft on the raised foredeck. The pilothouse is finished out with a Marlite panel overhead, wood panel sides, and a painted concrete deck with added removable rubber non-skid matting installed. Access to the pilothouse is through a hinged aluminum watertight door aft on the starboard side from the foredeck weather deck, and an internal ladder well with good condition tread with safety and handrails. This space is provided with central heat and air conditioning and 115v luminescent lighting as well as mounted emergency lighting within. There are seven (7) forward-facing 22" x 22" good condition safety plate ports installed in bolted frames.

Forward in the pilothouse is an athwartships helm station and aft on the port side is a bench with chart table. Aft on centerline is a work deck cargo control station and a second chart table. Outboard on the starboard side is bench locker seating as well as a provisions freezer. There is a padded pedestal seat to starboard as well as port and starboard bench seat forward in the space.

Pilothouse outfitting includes:

- Jensen Marine stereo
- Furuno mod 1100L color LCD sounder
- Furuno model FA-150 AIS
- Dirigo 8" compass with quadrantal spheres
- Icom model 125 VHF radio
- Simrad AP50 autopilot
- Icom IC M700 Pro SSB radio
- ICOM IC-M402 VHF radio
- Furuno RDP-150 radar
- Furuno 1832 Radar
- Furuno GPS/WAAS Navigator mod GP 37
- Northstar 800 Loran unit
- Standard Horizon VLH 3000 loud hailer
- Wagner jog lever and rudder angle indicator
- Murphy Selectronic alarm panel
- ASUS desktop navigation CPU (not on board) with Sansui computer monitor
- Triton satellite communications system
- Bronze bell
- Motorola Iridium Satellite cellphone

- AT&T internal phone system
- APC computer backup

The vessel's aft control station is fitted with full deck and engine controls, a Wagner jog lever with rudder angle indicator, Digital Marine Northstar 800 Loran C, Furuno model 1932 radar, Icom model ICM402 VHF radio, Simrad AP-51 autopilot controller, Samsung tablet and Vizio color flatscreen monitor.

## MAST & RIGGING

The vessel is fitted with an approximately 13" OD steel mast, main deck stepped, up through the 01 deck. The mast is approximately 45' in height above the main deck. The mast features two (2) crosstrees with support lights, antennas, and provides cradles for the vessel's outriggers. The mast is supported by two (2) 5" OD steel struts to the raised foredeck and a single 1" wire rope stay to the stem.

Vessel is fitted with two (2) approximately 9" OD reinforced steel outriggers; one stepped aft on deck doubler plates, on either side of the raised foredeck. Pullmaster dedicated outrigger winches are installed. Outriggers are stayed forward, amidships and aft with 1" wire rope stays.

There are two approx. 9" OD scallop booms stepped port and starboard of centerline aft on the pilothouse deck. Booms are provided with good condition ladders and top safety hoops. Dredge blocks were being serviced and not safety strapped. (See recommendations).

## SAFETY EQUIPMENT

- Off-shore flare kit (exp dates: handheld 1/2023. parachute 7/2022 & smoke 11/2022)
- Affasco industrial type First-Aid kit
- One (1) 30" life ring with line (main deck aft ring without light), noted one empty bracket on pilothouse deck (see recommendations).
- McMurdo Smartfind 406 Category I EPIRB (reported). EPIRB was not accessible at time of survey. In our 2020 survey we noted registration was current until January 2022, the battery will be due for replacement in March 2021 and the releasing device will be due for replacement in January 2022. (See recommendations)
- Four (4) survival suit (see recommendations)
- General alarm system (not tested)
- Revere Oceanmaster 8-person inflatable life raft. The raft will be due for inspection in August 2021 and the Hammar hydrostatic releasing device will be due for replacement in January 2022. (See recommendations).

## FIRE EQUIPMENT

- Two (2) BCII dry chemical fire extinguishers mounted in the pilothouse
- One (1) BCI dry chemical fire extinguisher mounted in the forward crew stateroom.
- One (1) BCII dry chemical fire extinguisher mounted in the engine room access ladder well.
- Two (2) BCII dry chemical fire extinguishers mounted in the galley.
- One (1) BCII dry chemical fire extinguisher mounted in the lazarette.
- One (1) BCII dry chemical fire extinguisher mounted in the forward engine room tool room.
- One (1) BCII Co2 fire extinguisher mounted in the engine room.
- DSPA 5 portable fire suppression device (see recommendations)

All fire extinguishers except for the one located in the lazarette compartment were last inspected in May 2020 (Lazarette extinguisher is due to be inspected by the end of June 2020).

## GALLEY AND ACCOMMODATIONS

The vessel's galley and some of the crew accommodations are located on the main deck level, below the raised foredeck and pilothouse. Forward on centerline is a small unfinished gear locker and just aft of that gear locker is a six-man stateroom with six bunks and six hanging lockers. Aft of the six-man stateroom on the port side is the captain's stateroom with single bunk, two hanging lockers and a small head with toilet, vanity, and shower stall. The galley area is located aft on the starboard side with an 8-man dinette forward and counter and appliances aft. Forward of the galley on the starboard side is the crew's head with toilet, vanity, and shower stall.

Galley outfitting includes:

- Vizio color TV and DVD player
- Black and Decker Spacemaker can opener
- Coffee maker
- Microwave oven
- GE 220v range with oven
- Cospolich commercial refrigerator model RF30
- Kenmore upright provisions freezer
- Cuisinart four slice toaster
- Chest freezer in pilothouse

There is a lower crew berthing area located forward of the engine compartment which is accessed by a ladder well forward on centerline in the galley area.

Ladder well features good condition handrails and very good condition non-skid tread. The lower crew berthing area features six (6) bunks and hanging lockers.

Aft of the main deck crew accommodation spaces on the port side is a mudroom with small crew's head, captain's stateroom with head, gear storage locker, and the engine room access ladder well. The mudroom is accessed by a watertight door from the main work deck.

## GENERAL OUTFITTING

- Oxygen/acetylene cutting outfit
- Two (2) Ingersoll Rand model 30T air compressors
- Two (2) Goulds pressure water systems
- Bench grinder
- Miller Dialarc model 250 arc welder
- Lincoln AC/DC arc welder
- Bradford White 40-gallon hot water heater
- Approx. 300# Northill anchor
- Upright provisions freezer
- Two (2) stainless steel air horns

## FISHING EQUIPMENT

There are two (2) Pullmaster model H25 rapid reverse main trawl winches; one installed aft on either side of the foredeck with pilothouse control. Trawl wires fairlead directly aft to 17" towing bollards suspended from swing arm davits on the vessel's port and starboard gallows frames. The starboard gallows frame also makes up a portion of the lazarette access doghouse.

Two Pullmaster scallop dredge winches, one located on each boom.

There are two (2) RSW tanks installed forward below the main deck just aft of the engine compartments which are utilized for the carrying of tuna fish during that season. The vessel's ice hold is located aft of the RSW tanks and measures approximately 15' x 24' with an 8' overhead. The hold was undergoing maintenance at time of survey and was not inspected. The space reportedly features a concrete wash overhead and sides and a poured concrete deck with steel plate access to the vessel's shaft alley and stuffing box. Three (3) light fixtures are installed in the hold and the hold is accessed by a well-secured steel ladder.

The shucking house is enclosed on the forward end of the work deck and features port and starboard stainless-steel cutting troughs and a stainless-steel wash box forward on the port side.

A stainless-steel scallop sorter and washer is installed, along with a hydraulic lift to carry scallops from the main work deck to the Captains shucking station located on the pilothouse deck.

A hydraulic scallop basket lift is installed forward on the starboard side of the work deck.

## MAIN PROPULSION

This vessel is powered by a single Caterpillar model 3512, 12-cylinder Marine diesel engine which is rated at approximately 1,125hp. Engine features air start, vertical dry stack exhaust and a fresh

water, keel cooled, cooling system with expansion tank and Murphy low water alarm. The engine's Serial Number is 50Y00652.

Power is transmitted through a Caterpillar model 7241 reverse reduction gear with a 5.88:1 reduction ratio. There is a 6" shaft which turns a 71" x 71" four blade, bronze propeller inside a Kort nozzle. The propeller was not sighted, as vessel was surveyed in the water.

The forward end of the main engine is fitted with a Marco model DC38 hydraulic power take-off which is the prime mover for four (4) deck service hydraulic pumps.

## AUXILIARY MACHINERY:

There is a three-cylinder Deutz auxiliary diesel engine installed in the lazarette. Engine features 12v start, vertical dry stack exhaust, and a fresh water, keel cooled, cooling system. This engine is the prime mover for a 25kW Lima AC generator.

There is a Detroit Diesel 4-71 auxiliary diesel engine installed forward on the starboard side of the engine room. Engine features 12v start, vertical dry stack exhaust, and a fresh water, keel cooled, cooling system. This engine is the prime mover for an approximately 80kW AC generator.

There is a Detroit Diesel 6-71 auxiliary diesel engine installed outboard on the starboard side of the engine room. Engine features 12v start, vertical dry stack exhaust, and a fresh water, keel cooled, cooling system. This engine is the prime mover for a 75kW Delco AC generator.

There is a Detroit Diesel 8V 71 auxiliary diesel engine installed on the port side of the engine room. This engine features air start, vertical dry stack exhaust, and a fresh water, keel cooled, cooling system. This engine is the prime mover for a 125 kW International Electric AC generator.

There is a Vilter ammonia refrigeration RSW compressor installed aft on the starboard side of the engine room with a Pacemaker 75hp AC drive motor. The heat exchanger and RSW chiller tank is installed in the shaft alley, along with three (3) 3" Kirst RSW tank pumps with Baldor AC drive motors and a 2-½ "chill water circulation pump. Three (3) Kirst tank circulation pumps with Baldor AC drive motors are installed with schedule 80 PVC circulation piping.

## TANKAGE AND FUEL SYSTEM

The vessel is fitted with six (6) integral steel fuel oil tanks: one (1) wing tank located outboard on either side of the engine room, two (2) located at the stern, and two (2) located forward of the lazarette. Fuel tanks fill and vent above main deck level and feature bottom draw. Fuel supply lines are 1 ¼" steel with a supply and return manifold installed aft on the port side of the engine compartment lower level. Dual Racor water separators are installed for the main engine and single unit Racors are installed for each of the auxiliary diesel engines.

## PUMPING SYSTEM

There is a 2" bilge pump installed aft on the port side of the engine room, upper level. with an electric AC drive motor. This pump is connected to a small bilge manifold aft on the port side of the engine compartment lower level. The pump is also plumbed to the port side sea chest. This small 5" manifold provides pumping service to the shaft alley and engine compartment. Check valves are installed. A 2" centrifugal pump with Marathon AC drive motor is installed aft on the port side of the engine compartment, upper level. This pump is utilized for deck wash down only.

There are two 2" MP pumps installed aft on the starboard side of the engine compartment upper level with AC drive motors. Both these pumps are plumbed to the approximately 3- ½" OD starboard side bilge pumping manifold which provides pumping service to the lazarette, engine room, shaft alley, and fish hold.

High water level bilge alarms are installed in the lazarette, fish hold, shaft alley, and engine compartment. These alarms were not tested as part of this survey.

## ELECTRICAL SYSTEM

The vessel is provided with 12v DC and a 115-220/460v AC electrical systems. A/C power is provided by the four (4) onboard generator sets and a shore power circuit. One AC switching panel and one AC switching and generator control panel is installed forward on the starboard side of the engine room. along with two (2) 208 VAC breaker panels. A rubber deck mat is provided.

Two 12v 8D batteries are boxed and covered in the lazarette and provide starting service for the auxiliary diesel engine. A master disconnect switch was installed.

A 12v 8D battery is boxed and covered in the pilothouse and provides emergency communications service. Charging is provided by a Newmar Phase Three 12V battery charger.

There are also three 12v. 8D batteries. boxed and covered. forward on the starboard side of the engine room. These batteries provide starting service for the two (2) starboard side auxiliary diesel engines and charging for these batteries is provided by a LaMarche model A40-40-24B-A1 Constavolt. Master disconnect switches are installed in the auxiliary diesel engine starting circuits.

All of the vessel's electrical wiring appeared to be in satisfactory condition.

## COMMENTS

The vessel was reportedly last hauled in September of 2017 at Goodison's Shipyard in N. Kingstown Rhode Island where the hull was water blasted from the keel to the rail in preparation for the new paint coating. During this haul-out period it was also reported that maintenance work was performed on the keel coolers, fuel tanks and sea chest.

The vessel was issued U. S. Coast Guard inspection sticker # 274714 which will expire in May 2022.

The lazarette was found to be clean and in overall good condition (see recommendations).

A good condition boarding ladder mounted pier side was provided to access the vessel.

The overall condition of the F/V BLUE DELTA continues to be good with every indication of a good maintenance program with good shore support.

From a general examination of the vessel while afloat, as far as practical, without making removal to expose concealed parts at the time of survey and without witnessing operation of the vessel, it is the opinion of the undersigned surveyor that the vessel is in satisfactory condition for operation in the fisheries trade, provided the attached list of recommendations are complied with.

## VALUATION / RATIONALE

Fair market value is the most probable price that a vessel would bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgably, and assuming the price is not affected by undue stimulus.

Implied in this definition is the completion of a sale as of a specified date and the passing of title from seller to buyer under certain conditions. The buyer and seller are typically motivated and each party is well informed and well advised, acting on what they consider to be their individual best interests. A reasonable time should be allowed for exposure in the open market, and payment is made without liens or encumbrances remaining on the vessel.

Fair market value is determined by researching sales comparables, researching trade journals and contacting boat brokers in the region. Fair market value can also be calculated by using the replacement cost less depreciation method. This is used in such instances where sales comparables may be limited due to the size of the market and number of vessels of this type that have been purchased or sold in recent history. Typical sources for determining fair market value is the Marine Safety Consultants, Inc. database as well as trade journals such as Boats & Harbors Magazine, National Marine Fisherman, various marine websites that post sales listings, and interviews with marine brokers familiar with similar vessel and permit sales.

Replacement cost is the estimated cost necessary to build and outfit a new vessel in 2021. Replacement cost is based on research with various shipyards currently building commercial

fishing vessels for the northeast fisheries. We usually use a depreciation factor of 2 - 3% per year from the original date of construction. We then compare the estimation of fair market value based on the original. using the traditional method of sales comparables. etc. as to the calculation of the replacement cost less depreciation.

We comment that scallopers in good condition have maintained a high value. This is due to the limited number of scallop permits available. coupled with consistent product price and the experience that scallops is a sustainable resource under the current Federal Fisheries Management Plan.

Since 2019, Limited Access Full-Time Scallop permits have enjoyed a comparable sales average of $6,000,000.00. Adjustments up or down may be appropriate for permits with larger or smaller baselines.

Each permit is limited to the vessel characteristics assigned to the permit, limited by vessel length and horsepower. Larger vessels and larger horsepower are able to fish more efficiently in open bottom using their Days at Sea.

From 2013 to 2019, the fraction of catch harvested from access areas increased from 25% to 70%, which has effectively dropped the value premium for larger vessels with more horsepower. However, with lower quotas now in place for 2021 through 2023, the fishery is experiencing greater demand for longer length and higher horsepower again.

The scallop fishery is well managed, is not overfished, and there is no evidence that overfishing has occurred. Scallop availability levels. as witnessed by annual landings, have recently come off a cyclical peak, with annual landings ranging from 51,000,000 to 60,000,000 pounds from 2017 to 2019. Although the fishery is healthy. the biomass and landings have dipped in 2020 and 2021 and are expected to fall further in 2022.

This should result in stable but lower production. with annual landings more in the range of 35,000,000 to 45,000,000 pounds.

New England fishermen have been harvesting a population of scallops that were produced 8 or 9 years ago, when an extremely high number of new "recruits", or baby scallops, encountered in the assessments. Large scale recruitment events are typical in the fishery but there has not been an exceptional year class since 2013.

Price-wise, the scallop market has been stable. with prices inversely tracking landing volumes. meaning that with higher abundance prices are lower. but in recent years with lower abundance. prices tend higher. Domestic demand for sea scallops is high with the United States able to absorb the majority of the scallops caught each year.

Scallop ex-vessel prices have been strong since the fall of 2020, and market analysts predict high and stable prices to continue through 2022.

| | |
|---|---|
| Limited Access Full-Time Scallop | $6,125,000.00 |
| Total | **$6,125,000.00** |

In determining the market value of the F/V BLUE DELTA, it is understood that this appraisal includes the hull, structure, furnishings, all appurtenances, equipment, materials, machinery, tools, anchors, and other apparel pertaining to the vessel, as found aboard on the date of survey.

Subject to consideration of the preceding remarks, and considering the age of the vessel, its condition in comparison to vessels of like size, age and service, and in consideration of the current market, the following estimated values are considered appropriate:

| | |
|---|---|
| **FAIR MARKET VALUE:** | **$ 1,200,000.00** |
| **PERMIT VALUE** | **$6,125,000.00** |
| **REPLACEMENT VALUE** | **$4,200,000.00** |

Submitted without prejudice,
MARINE SAFETY CONSULTANTS

Mark A. Bisnette

MARK A. BISNETTE
Marine Surveyor

## SURVEYOR'S RECOMMENDATIONS

VESSEL : F/V BLUE DELTA
OFFICIAL NO. : 693499

FILE NO. : 21-0181
DATE OF SURVEY : 3/25/2021

1. Ensure all required lifesaving and firefighting equipment is on board and properly inspected/serviced (EPIRB, ring buoys, etc., survival suits, etc.)

2. DSPA-5 fire protection unit's ignitor mechanism expired on 4/30/19 and should be replaced to ensure proper operation.

3. Lazarette portable fire extinguisher needs servicing.

4. The lazarette watertight hatch cannot properly be closed/secured and should be repaired to ensure its watertight integrity.

5. We noted a small amount of fuel in the lazarette directly under the bilge piping that should be removed.

Mark A. Bisnette

MARK A. BISNETTE
Marine Surveyor

UNITED STATES DEPARTMENT OF COMMERCE
National Oceanic and Atmospheric Administration
NATIONAL MARINE FISHERIES SERVICE
Greater Atlantic Regional Fisheries Office
[illegible]

February 01, 2021

Jason Davis
Vessel Documentation Service
136 Jordan Road
Plymouth, MA 02360

**Re: F/V *Blue Delta*, Permit # 410393, O.N. 693499**

Dear Mr. Davis:

You requested the baseline specifications for the above referenced vessel which is eligible for the following limited access permits: Atlantic sea scallops, monkfish, summer flounder, limited access General Category (LAGC) scallop, and American lobster.

The current regulations for limited access American lobster permits, LAGC scallop permits and NE multispecies Handgear A do not require the establishment of a vessel baseline, which means there are no size or horsepower limitations for these permits. For an American lobster, LAGC scallop, or Northeast multispecies Handgear A vessel to be replaced by a vessel that is larger than allowed under the replacement provisions, other limited access permits must be permanently relinquished in writing.

On August 26, 2015, new regulations became effective that eliminated the one-time upgrade provision and the gross and net tonnage baseline specifications. This means that as of August 26, 2015, the baseline specifications now only [illegible] length overall (LOA) and horsepower. Also, you will now be able to [illegible] vessel [illegible] percent in length and 20 percent for horsepower [illegible]

This vessel's baseline for the Atlantic sea scallops, monkfish, and summer flounder permits was established on F/V [illegible] Permit [illegible], O.N. 693499.

[illegible] documentation the owner has submitted to NMFS, the baseline specifications for the Atlantic sea scallops, monkfish, and summer flounder permits currently on the F/V *Blue Delta* are:

| | |
|---|---|
| LENGTH OVERALL (LOA): | 84 |
| ENGINE HORSEPOWER (HP) | 1055 |

[illegible]



[illegible] policy [illegible] round up the calculated maximum allowable upgrade to the next whole number. [illegible] maximum values calculated for this letter have been rounded up to [illegible] whole number.

This letter is intended only as a summary of this vessel's permit information as of this date. The information provided above does not reflect agreements of which NMFS has no knowledge regarding any reservation of permit rights by the current or previous owners upon sale of the vessel. Nor does this letter guarantee that these permits can be renewed or applied for in the future. This information is advisory only. We reserve the right to make final determinations regarding this vessel's eligibility for any permit.

Sincerely,

Susan Johnson
Industry Services Specialist

cc: Permit file # 410393

BLUE HARVEST FISHERIES
File No.: 21-0181

United States Department of Commerce

NOAA Form 88-15GA

# 2021 Fishing Year Permit

BHF BLUE DELTA LLC
PO BOX 6918 ATTN KELLY
NEW BEDFORD MA 02740

F/V BLUE DELTA
*Greater Atlantic Federal Permit Number:* 410393
*Documentation Registration Number:* 593499
*Principal Port State:* NEW BEDFORD MA
*Home Port State:* NEW BEDFORD MA

| **Fisheries Permitted** *Date Issued:* 01/12/2021 | **Effective Date** | **Expiration Date** |
|---|---|---|
| SCALLOP - LIMITED ACCESS - FULL-TIME - 2021 | 04/01/2021 | 03/31/2022 |
| SCALLOP - LAGC - INCIDENTAL - 2021 | 04/01/2021 | 03/31/2022 |
| NE MULTISPECIES - SCALLOP POSSESSION LIMIT - 2021 | 05/01/2021 | 04/30/2022 |
| MONKFISH - CATEGORY C - 2021 | 05/01/2021 | 04/30/2022 |
| SURF CLAM - 2021 | 05/01/2021 | 04/30/2022 |
| OCEAN QUAHOG - 2021 | 05/01/2021 | 04/30/2022 |
| SUMMER FLOUNDER - COMMERCIAL MORATORIUM - 2021 | 05/01/2021 | 04/30/2022 |
| SQUID/BUTTERFISH - INCIDENTAL - 2021 | 05/01/2021 | 04/30/2022 |
| ATLANTIC MACKEREL - 2021 | 05/01/2021 | 04/30/2022 |
| SPINY DOGFISH - COMMERCIAL - 2021 | 05/01/2021 | 04/30/2022 |
| BLUEFISH - COMMERCIAL - 2021 | 05/01/2021 | 04/30/2022 |
| TILEFISH - COMMERCIAL INCIDENTAL - 2021 | 05/01/2021 | 04/30/2022 |
| HERRING - OPEN ACCESS - POSSESSION LIMIT - 2021 | 05/01/2021 | 04/30/2022 |
| AMERICAN LOBSTER - NON -TRAP - 2021 | 05/01/2021 | 04/30/2022 |
| RED CRAB - OPEN ACCESS - INCIDENTAL BYCATCH - 2021 | 03/01/2021 | 02/28/2022 |
| SKATE - 2021 | 05/01/2021 | 04/30/2022 |

Maximum Trap Allocation (if applicable)

This permit is not valid unless signed. Knowingly and willfully falsifying material facts on this form may result in criminal liability (18 U.S.C. 1001)

Authorized Signature

Permit Conditions and Information

1. This permit authorizes fishing operations for the vessel named on the permit and such vessel's owner as named. This permit must be maintained upon such vessel at all times. Federal Greater Atlantic fishing permit(s) cannot be assigned or leased to another fishing vessel. This permit supersedes any federal Greater Atlantic fishing permit previously issued to the vessel named. This permit may be suspended or revoked if the vessel named is not operated in accordance with federal fisheries laws and regulations.
2. The permit(s) listed are effective on the effective date(s) shown. Each permit continues in effect until the expiration date, unless otherwise suspended, sanctioned, or revoked. Any change in the vessel's information, including but not limited to, vessel ownership must be reported to the Regional Administrator within fifteen (15) days of such change(s). Failure to report change(s) in permit application information within this time period shall render this permit null and void. Application for a new permit must be made if the permit expires, ownership changes, or the permit is rendered null and void for any reason including revocation.
3. Note to American Lobster trap permit holders: Your maximum trap allocation listed is the most restrictive (lowest) of the historical participation trap areas for which your vessel is eligible and that you selected, and any open access trap areas you designated for the particular permit year listed. The maximum trap limit listed does not preempt more restrictive state trap limits. Inquiries regarding federal lobster regulations should be directed to the Sustainable Fisheries Division at (978) 281-9315.
4. Note to Limited Access permit holders: Limited access permits must be renewed annually by the last day of the permit year unless a Confirmation of Permit History has been issued. Failure to renew a limited access permit in any permit year bars the renewal of the permit in subsequent years. If a vessel's limited access permit for a particular fishery is voluntarily relinquished, no limited access permit for that fishery may be reissued or renewed based on that vessel's history or to any other vessel relying on that vessel's history. If the vessel named is lawfully replaced by another vessel that meets the criteria set forth at 50 CFR 648.4, all limited access permits for which the replacement vessel qualifies will be issued to the replacement vessel and this permit will be rendered null and void.
5. As a condition of the issuance of this permit, the vessel owner agrees not to fish for, catch, possess, or land any fish for which the vessel would be authorized under this permit, from any waters (including state waters), in any subsequent fishing year unless the limited access permit(s) has been lawfully renewed, relinquished, or otherwise removed from the vessel. This condition does not apply to American lobster permits.
6. Inquiries regarding reporting loss of permit or submission of other information required to support a permit application should be directed to the GARFO Permit Office at (978) 282-8438. Inquiries regarding pertinent federal fishing regulations should be directed to the Sustainable Fisheries Division at (978) 281-9315.
7. The fishing and permit history of a vessel is presumed to transfer with the vessel whenever it is bought, sold, or otherwise transferred, unless there is a written agreement, signed by the transferor/seller and transferee/buyer, or other credible written evidence, verifying that the transferor/seller is retaining the vessel's fishing and permit history for purposes of replacing the vessel. Access to confidential data or catch records from any previous owner will not be granted to the buyer unless there is written evidence specifying that the seller has authorized that the buyer has been given access to that vessel's landings and catch records.
8. The NMFS Greater Atlantic Regional Administrator may request that you carry a Fisheries Observer Program certified observer. If you have been contacted by NMFS to request or be assigned to carry an observer, it is illegal to engage in fishing activities without the observer on board. Minimum safety standards must be met and a valid US Coast Guard Commercial Fishing Vessel Safety Examination decal is required to carry an observer. For more information about the observer program, contact the Fisheries Sampling Branch at (508) 495-2130.

Note: These are only a summary of some of the regulations and conditions that pertain to the vessel and permit(s).

## PHOTOGRAPHS - F/V BLUE DELTA

Port bow view.

Stern view.

Work deck looking forward.

Work deck looking aft.

## PHOTOGRAPHS - F/V BLUE DELTA

Foredeck.

Pilothouse helm station.

Aft pilothouse cargo control station.

Galley.

## PHOTOGRAPHS - F/V BLUE DELTA

Forward berthing area.

Main diesel engine.

Detroit genset starboard side forward in engine room.

Starboard bilge manifold.

## PHOTOGRAPHS - F/V BLUE DELTA

RSW system in shaft alley.

Steering gear in lazarette.

**Marine Safety Consultants, Inc.**
26 Water Street, P.O. Box 615, Fairhaven, MA 02719-0615
Phone: 508-996-4110 • Fax: 508- 990-2094
www.marinesafetyconsultants.com

March 29, 2021
File No.: 21-0181

## CONDITION & VALUATION SURVEY REPORT

| | |
|---|---|
| **VESSEL** | **: F/V BLUE EASTERN** |
| OFFICIAL NO. | : 930009 |
| OWNER | : Blue Harvest Fisheries |
| LENGTH | : 90.0' (overall, approx.) |
| LENGTH | : 83.7' (registered) |
| BREADTH | : 25.0' |
| DEPTH | : 11.6' |
| GROSS TONS | : 139 |
| NET TONS | : 103 |
| PROPULSION | : Marine Diesel |
| BUILT | : 1989 / Panama City. FL |

THIS IS TO CERTIFY THAT the undersigned surveyor conducted an Appraisal Survey of the F/V BLUE EASTERN on March 25. 2021 while the vessel was afloat at Blue Harvest Seafood. in Fairhaven. MA. Survey was requested by Baycoast Bank for appraisal and financing purposes only.

The F/V BLUE EASTERN is a single oil screw. all welded steel constructed. raised foc'sle, western rigged offshore scalloper. The vessel's hull was built in 1989 in Panama City, FL and the vessel was finished out that same year in Tarpon Springs. FL. Vessel features a rake stem with raised foredeck with pilothouse and an open work deck aft with transom type stern in after house located forward of transom.

## VESSEL DESCRIPTION

The vessel is reportedly constructed of 5/16 and 3/8" mild steel plate. butt welded. on a transverse framing system. Frames are 3" x 4" by 3/8" angle steel located on approx. 23" centers throughout the vessel.

The vessel is subdivided into seven (7) watertight spaces/compartments by six (6) transverse steel watertight bulkheads. Compartmentalization from forward to aft is as follows:

- Forward void
- Lower crew berthing
- Engine room
- Fish hold
- Port & starboard fuel tanks
- Lazarette

**DECKS**

The vessel's foredeck is protected by a tapered steel bulwark and two-tier steel safety railing system approximately 40" in height. There are port and starboard closed fairlead chocks installed forward. There is an approx. 26" steel cruciform bitt installed forward on centerline and the deck is finished with a good condition, painted non-skid coating. There is an 18" steel wave break located forward of the deck house with a 20" Freeman foc'sle escape deck plate mounted just aft on a 24" raised steel trunk. This deck is also fitted with a bracket for the vessel's anchor. A well-constructed captain's cutting shack has been installed on the starboard side of the pilothouse.

The vessel's aft foredeck is also protected by a 40" high steel safety rail and is provided with good condition, painted non-skid coating. Outboard on the port and starboard side are steps for the vessel's outriggers. Inboard on centerline is the vessel's main mast, along with two (2) Pullmaster cargo hoists. Forward of the main mast is a work deck access ladder well with good condition, grated steel treads, hand, and safety rails.

The vessel's work deck is protected by a 38" boxed steel bulwark with four (4) 24" x 15" freeing ports installed on either side. The work deck, fore and aft, is finished with a good condition paint application, with steel doubler plates outboard on either side. Aft on centerline, just forward of the fully enclosed transom, is a steel deck storage house accessed by a six-dog steel watertight door.

Work deck lighting is provided by two (2) mercury vapor lights located aft on the foredeck facing aft as well as two (2) LED style lights, one positioned athwartship on either side of the work deck's aft deckhouse, facing forward. Forward on the work deck is the raised foredeck overhang under which is located the enclosed shucking house with port and starboard scallop shucking stations.

The vessel's fish hold is accessed by a 46" x 53" hatch with 25" steel coaming and hinged, steel cover followed by an approximately 15" steel dredge stop on centerline. Aft on the port side of the work deck is a 22" x 22" lazarette access hatch set on a 27" high steel coaming fitted with a hinged, steel cover quick-acting dogging mechanism.

## PILOTHOUSE FITTINGS AND EQUIPMENT

The vessel's pilothouse is constructed of mild steel plate on an angle steel frame and is located aft on the raised foredeck. Pilothouse is finished out with a Marlite panel overhead, wood paneled side, and a commercial rubber non-skid floor covering over steel decking. Access to the pilothouse is provided by a hinged, aluminum, four-dog watertight door aft on the starboard side from the vessel's aft foredeck and by an internal ladder well outboard on the starboard side from the vessel's galley area. Ladderwell is provided with good, conditioned rubber treads and wooden handrail.

The pilothouse is provided with central heat and air conditioning, and overhead 115V lighting fixtures.

There are seven (7) forward-facing, good condition, 18" x 24" safety plate ports installed in aluminum frames. Ports outboard on the port and starboard side, have safety plate and rubber gaskets with bolted Lexan.

Pilothouse outfitting includes:

- Furuno FCV-295 color sounder/plotter
- Furuno RDP-154 radar unit
- Dirigo 6" compass with quadrantal spheres (deviation card posted in pilothouse)
- Simrad AP 50 autopilot
- SG desktop CPU navigation computer
- Simrad RI-35 rudder angle indicator
- YAESU mod FT212RH FM transceiver
- Cushioned helm chair
- General alarm system (not tested)
- Murphy high water alarm panel
- Motorola Iridium satellite phone
- Uniden internal phone system
- Vizio flat panel computer monitor
- Icom mod IC-M802 VHF radio
- Cyberpower computer backup
- Furuno GPS/WAAS GPS receiver mod GP-32
- Simrad A 150 AIS
- Furuno Satellite compass
- JVC Marine Stereo
- Northstar 951X GPS chart plotter
- Icom IC-M59 VHF radio
- Simrad NSS EVO3 chart plotter

The vessel's deck machinery control station is located aft on centerline in the pilothouse. Control station features full deck and helm control. Additional outfitting includes:

- Standard Horizon VLH 3000-A loudhailer

- ICOM icm506 VHF radio
- Furuno radar 1831
- Deck and navigation light controls
- Furuno Radar
- Triton CLS vessel monitoring system
- Simrad AP-51 auto pilot
- Simrad RI 35 rudder angle indicator
- Samsung tablet
- Sansui flatscreen monitor

## MAST AND RIGGING

The vessel is fitted with a 14" OD steel mast, which is main deck step, through the aft foredeck and integral to the enclosed shucking house aft enclosure wall. Mast is supported by two (2) 4" OD steel struts to the foredeck and a single 1 ¼" wire rope stay to the stem. The mast is fitted with a mast head access ladder, a single cross tree which provides cradles for the vessel's outriggers and a top platform for navigational lights and antennas.

There are two (2) approx. 12" OD steel scallop booms stepped on main mast at the level of the raised foredeck. Boom head access ladders are installed, and safety hoops are installed at the boom heads. Boom head blocks are safety strapped.

There are two (2) 6 x 6" reinforced steel outriggers installed onboard. Outriggers are stayed forward, amidships, and aft with 1-1/8" wire rope stays and operated by dedicated Pullmaster outrigger winches mounted on the mast.

The mast is also fitted with a 3" OD steel take out boom.

## SAFETY EQUIPMENT

- U.S. Coast Guard approved flare kit
  - Six (6) handheld (expire 12/2021)
  - Three (3) parachute (12/2021)
  - Three (3) smoke (expire 11/2021)
- Four (4) immersion suits
- Three (3) 30" life rings with line, light, and vessel name.
- ACR Global Fix Pro Category I EPIRB (registration # 2DCC8 153CE FFBFF). The EPIRB was tested with test indicator light found to be operational. Expiration dates are as follows: Release 9/2022, Battery 6/2022, and registration 3/2022.
- Vessels life raft was not aboard at the time of survey **(see recommendations)**.
- Approx. eight (8) Type I PFD's
- General Alarm System (not tested)
- Affasco Industrial First Aid kit
- First Aid, CPR & AED manuals (posted in crew dining area)

- Lifesling rescue system
- Portable steel boarding ladder
- Damage control kit

## FIRE FIGHTING EQUIPMENT

- One (1) ABCI dry chemical fire extinguisher located in the pilothouse.
- One (1) ABCII dry chemical fire extinguisher located in the pilothouse.
- One (1) ABCII dry chemical fire extinguisher located in the galley.
- One (1) ABCII dry chemical fire extinguisher located in the berthing area companionway.
- One (1) ABCI dry chemical fire extinguisher locate in the lower berthing unit forward.
- One (1) ABCII dry chemical fire extinguisher located at the top of the engine room ladder well.
- Two (2) ABCII dry chemical fire extinguishers located forward in the engine room.

All fire extinguishers were found in their appropriate brackets and last inspected in January 2020 **(see recommendations).**

-DSPA fire suppression device

## GALLEY AND CREW ACCOMMODATIONS

The vessel's galley and most of its crew accommodations are located on the main deck level forward. below the raised foredeck. Space is finished out with a Marlite panel overhead. wood panel sides, and commercial grade. non-skid rubber matting over steel decking.

Forward in the bow V is an unfinished gear locker. Just aft of the gear locker is a four (4) man crew stateroom with four (4) bunks and eight (8) storage lockers. Aft of the four (4) man stateroom is the centerline companionway running aft to the galley area. At the forward end of the companionway on the starboard side is the crew's head which features a Thetford Aquamagic toilet. steel shower stall. and vanity with sink. Opposite the crew's head on the port side of the companionway is an aluminum access ladder providing access to the vessel's foc'sle escape hatch. Just aft of the escape ladder on the port side is a two (2) man stateroom with two (2) bunks, desk, and four (4) storage lockers.

Aft in the finished-out area of the foc'sle is the galley area. Outboard on the starboard side is an eight (8) man dinette with cushioned bench locker seating. On the port side is the galley area with forward and aft counters and appliances.

Galley outfitting includes:

- Frigidaire upright provisions freezer
- GE Spectra cooktop range with oven
- Broan range exhaust hood
- Panasonic microwave oven

- Proctor Silex four (4) slice toaster
- Dual stainless-steel sink
- Whirlpool refrigerator/freezer
- Hanspree color TV
- Sherwood DVD player
- Keurig coffee maker

Just aft of the dinette area on the starboard side is the vessel's second head with toilet and vanity, and the engine room access ladder well. Aft of the galley area on centerline and to port is the vessel's mud room and tool room.

There is a lower crew berthing area located forward of the engine compartment. The space is finished out with four (4) bunks and eight (8) storage lockers and accessed by a steel ladder with good condition tread and handrails. A freshly painted tool/storage room is located aft on the starboard side

All crew accommodation spaces are provided with good condition commercial grade rubber non-skid deck covering.

## GENERAL OUTFITTING

- Central air conditioning unit
- Pullmaster mod H12 cargo hoist (spare)
- Lincoln AC DC arc welder (portable)
- Miller mod SR300S DC arc welder
- Two (2) air compressors
- Ryobi 10" drill press
- Craftsman two-tier tool chest
- Bench grinder
- Bench vise
- Whirlpool hot water heater
- Whirlpool Flip-top freezer

## FISHING EQUIPMENT

The vessel is fitted with split, Pine Hill Equip. Co. hydraulic trawl winches: one installed forward on either side of the main work deck. Winches feature seven (7) piston Hydrostar radial hydraulic motors with local and pilothouse control. Safety bars are installed forward and aft of the winches.

Trawl wires fairlead aft to approx. 16" Hancock towing bollards suspended by the vessel's approx. 18" OD steel gallows frames. Towing bollards are safety wired. The gallows frames are braced athwartship to one another.

There is a Pullmaster H12, rapid reverse, deck cargo hoist mounted on either side of the main mast on the 01 deck.

Forward on the work deck, below the foredeck overhang, is an enclosed, scallop shucking house featuring 8' stainless steel scallop shucking boxes on either side with good condition 115V luminescent lighting is installed over each of the boxes. The space is accessed from the work deck through port and starboard sliding wooden doors.

The vessel's fish hold measures approx. 30' x 23' with an 8 ½' overhead. There are four (4) double, scallop holding pens installed forward on either side with three (3) single pens installed aft on either side and a large after slaughterhouse. On centerline in the fish hold is a steel plate access to the vessel's shaft alley and port and starboard fish hold sumps. There's a 20" flush Freeman deck plate installed aft in the shaft alley allowing access to the main stuffing box. There is a stainless-steel scallop wash box forward and an upright provisions freezer aft.

The fish hold is accessed through a 52" x 52" hatch with hinged stainless cover set on an approximately 27" steel coaming fitted with a well secured steel ladder. The fish hold is provided with eight (8) protected light fixtures. The hold was found to be neat and clean with very good condition pen boards and stanchions.

There is a RJP Freelance Fabricators scallop wash and sort machine with down chute to the fish hold bagging station.

A scallop basket lift is installed forward on the starboard side of the work deck.

## MAIN PROPULSION

The vessel is powered by a single Caterpillar mod D398 (SN 67B2122) turbo charged after cooled marine diesel engine rated at 850 HP. Engine features air start, vertical dry stack exhaust, and a fresh water, keel cooled cooling system with expansion tank and Murphy low water alarm.

The power is transmitted through a Caterpillar model 3102 reverse reduction gear with a 3.86:1 ratio with a 6" steel jack shaft and 6" stainless steel tail shaft supported by an engine room stuffing box, one (1) intermediate line bearing rear stuffing box, and cutlass bearing. The vessel's propeller is reportedly a 71" x 71" 4-blade and it turns inside a 72" ID kort nozzle. The propeller was not sighted as the vessel was surveyed in the water.

The forward end of the main engine is fitted with a Funk power take off and pump drive, which is the prime mover for two (2) single deck service hydraulic pumps and one (1) double deck service hydraulic pump. PTO features pneumatic engagement.

## AUXILIARY MACHINERY

There is a Detroit Diesel mod 6-71 auxiliary engine installed on the port side of the engine compartment. upper level. Engine features 12V start, vertical dry stack exhaust, and a fresh water, keel cooled cooling system. This engine is the prime mover for a Lima 60 KW AC generator. There is a Caterpillar mod 3304B auxiliary engine installed on the starboard side of the engine compartment, upper level, Serial No. 11W3884. Engine features 12V start, vertical dry stack exhaust, and a fresh water, keel cooled cooling system. This engine is the prime mover for a Caterpillar 60 KW AC generator.

There is a 440V, 7.5 HP, AC drive motor with small hydraulic pump installed on the port side of the engine compartment, upper level. This pump is utilized as an emergency back up deck service pump.

Two (2) air compressors with Marathon AC drive motors are installed; one aft on either side of the engine compartment.

There is a hydraulic power unit installed forward on the port side of the engine compartment, upper level, which features one (1) Ajax 7.5 HP AC drive motor, One (1) Baldor AC drive motor, small hydraulic pumps, a directional valve atop, and approx. twenty (20) gallon hydraulic reservoir. This system provides fluid power for the vessel's steering system.

There is a General Electric 3/4 HP potable water pump with a Well-X-Trol pressure water accumulator installed on the port side of the engine compartment, upper level. A Reliance mod 805. forty (40) gallon hot water heater is installed forward on the starboard side of the engine compartment.

## TANKAGE AND FUEL SYSTEM

The vessel is fitted with four (4) integral steel fuel oil tanks. one (1) wing tank installed outboard on either side of the engine compartment. and two (2) tanks installed aft of the fish hold. The total reported capacity is approx. 12.000 gallons. Fuel tanks fill and vent above main deck level and feature bottom draw. 1 1/8" OD steel fuel supply lines are installed with rubber jumpers. A dual Racor water separator is installed for the main engine and individual Racor separators are installed for the auxiliary diesel engines. The fuel system was found to be in good condition.

## PUMPING SYSTEM

There is one (1) 2" Pacer bilge pump with Baldor AC drive motor and one (1) 2" bilge pump with Leeson drive motor installed aft on the starboard side of the engine room. upper level. Both pumps are plumbed to the bilge pumping manifold and main sea chest.

There's a 4" OD steel tube manifold installed on the starboard side of the engine compartment, lower level. This manifold provides pumping service to all compartments and is also connected to the vessel's main sea chest which is located aft on the starboard side of the engine compartment. Check valves and ball valves are installed on all bilge section lines and the manifold is labeled for each compartment being serviced.

High water bilge alarms are installed in watertight compartments and all bilge manifold valves are labeled to function and are installed with a proper check valves for each suction line.

## ELECTRICAL SYSTEM

The vessel is provided with a 12 and 24V DC and 115-230/460V AC electrical system.

There are two (2) banks of two (2) 12V, 8D batteries; one located in way of each of the auxiliary diesel engines and are utilized for engine starting. Batteries are boxed and covered, and charging is provided by 12V alternators on each of the auxiliary diesel engines and by New-Mar Phase Three model PT-24-45U battery charger and a LaMarche mod CD40-20/30-12/32 charge divider. Perko master disconnect/series parallel switches are also installed.

AC power is provided by the two (2) onboard 60 KW AC generators and the vessel's shore power circuit. An I-T-E 3 phase power transformer is installed from the main switching panel.

There is an AC switching and generator control panel installed outboard on the starboard side of the engine compartment, along with a 220V and 115V load center. A rubber deck mat is installed.

There are two 12V. 8D emergency communications batteries boxed and covered. in the pilothouse. Charging is provided by a Newmar mod PT 40 CE battery charger.

## COMMENTS

The vessel was reportedly last hauled out in December 2015 when it underwent basic bottom maintenance and some hull work. The vessel's maintenance and upgrades over the past two years included new electronics, generator rebuild, replacement of hydraulics and the addition of a new scallop lift along with topside painting of the superstructure.

The lazarette was found to be in good condition with good paint coating. The rudder tube and shaft are well supported. Hydraulic hoses were noted to be in good condition with appropriate chaffing gear used where needed.

It should be noted that the berthing area's companionway escape hatch was lashed from the inside. presumable for security purposes while the vessel is unmanned in port. The escape hatch's gasketing material should be inspected, and the hatch tested for proper operation prior to the vessel's next departure.

The vessel has been issues US Coast Guard dockside examination sticker # 278562 which will expire in September 2022.

From a general examination of the vessel while afloat, as far as practical, without making removal to expose concealed parts, at the time of survey, and without witnessing operation of the vessel, it is the opinion of the undersigned surveyor that the vessel is in satisfactory condition for operation in the fisheries trade.

## VALUATION / RATIONALE

Fair market value is the most probable price that a vessel would bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgably, and assuming the price is not affected by undue stimulus.

Implied in this definition is the completion of a sale as of a specified date and the passing of title from seller to buyer under certain conditions. The buyer and seller are typically motivated and each party is well informed and well advised, acting on what they consider to be their individual best interests. A reasonable time should be allowed for exposure in the open market, and payment is made without liens or encumbrances remaining on the vessel.

Fair market value is determined by researching sales comparables, researching trade journals and contacting boat brokers in the region. Fair market value can also be calculated by using the replacement cost less depreciation method. This is used in such instances where sales comparables may be limited due to the size of the market and number of vessels of this type that have been purchased or sold in recent history. Typical sources for determining fair market value is the Marine Safety Consultants, Inc. database as well as trade journals such as Boats & Harbors Magazine, National Marine Fisherman, various marine websites that post sales listings, and interviews with marine brokers familiar with similar vessel and permit sales.

Replacement cost is the estimated cost necessary to build and outfit a new vessel in 2021. Replacement cost is based on research with various shipyards currently building commercial fishing vessels for the northeast fisheries. We usually use a depreciation factor of 2 - 3% per year from the original date of construction. We then compare the estimation of fair market value based on the original, using the traditional method of sales comparables, etc. as to the calculation of the replacement cost less depreciation.

We comment that scallopers in good condition have maintained a high value. This is due to the limited number of scallop permits available, coupled with consistent product price and the experience that scallops is a sustainable resource under the current Federal Fisheries Management Plan.

Since 2019, Limited Access Full-Time Scallop permits have enjoyed a comparable sales average of $6,000,000.00. Adjustments up or down may be appropriate for permits with larger or smaller baselines.

Each permit is limited to the vessel characteristics assigned to the permit, limited by vessel length and horsepower. Larger vessels and larger horsepower are able to fish more efficiently in open bottom using their Days at Sea. .

From 2013 to 2019, the fraction of catch harvested from access areas increased from 25% to 70%, which has effectively dropped the value premium for larger vessels with more horsepower. However, with lower quotas now in place for 2021 through 2023, the fishery is experiencing greater demand for longer length and higher horsepower again.

The scallop fishery is well managed, is not overfished, and there is no evidence that overfishing has occurred. Scallop availability levels, as witnessed by annual landings, have recently come off a cyclical peak, with annual landings ranging from 51,000,000 to 60,000,000 pounds from 2017 to 2019. Although the fishery is healthy, the biomass and landings have dipped in 2020 and 2021 and are expected to fall further in 2022.

This should result in stable but lower production, with annual landings more in the range of 35,000,000 to 45,000,000 pounds.

New England fishermen have been harvesting a population of scallops that were produced 8 or 9 years ago, when an extremely high number of new "recruits", or baby scallops, encountered in the assessments. Large scale recruitment events are typical in the fishery but there has not been an exceptional year class since 2013.

Price-wise, the scallop market has been stable, with prices inversely tracking landing volumes, meaning that with higher abundance prices are lower, but in recent years with lower abundance, prices tend higher. Domestic demand for sea scallops is high with the United States able to absorb the majority of the scallops caught each year.

Scallop ex-vessel prices have been strong since the fall of 2020, and market analysts predict high and stable prices to continue through 2022.

| | |
|---|---|
| Limited Access Full-Time Scallop | $6,050,000.00 |
| Total | **$6,050,000.00** |

In determining the market value of the F/V BLUE EASTERN, it is understood that this appraisal includes the hull, structure, furnishings, all appurtenances, equipment, materials, machinery, tools, anchors, and other apparel pertaining to the vessel as found aboard on the date of survey.

Subject to consideration of the preceding remarks, and considering the age of the vessel, its condition in comparison to vessels of like size, age, and service, and in consideration of the current market, the following values are considered appropriate:

| | |
|---|---|
| **ESTIMATED FAIR MARKET (HULL) VALUE:** | **$1,100,000.00** |
| **PERMIT VALUE** | **$6,050,000.00** |
| **ESTIMATED REPLACEMENT VALUE** | **$3,700,000.00** |

Submitted without prejudice,
MARINE SAFETY CONSULTANTS, INC.

J.P. Veiga
Marine Surveyor

Enclosures: 1) Recommendations
2) Photographs

## SURVEYOR'S RECOMMENDATIONS

VESSEL : F/V BLUE EASTERN FILE NO. : 21-0181
OFFICIAL NO. : 930009 DATE OF SURVEY : 3/25/2021

1. Repair dogs on hatchway door leading from the main deck shucking house to the interior accommodation space to ensure proper watertight integrity.

2. Install nonskid tape to fish hold ladder rungs.

3. Provide an updated U.S. Coast Guard Certificate of Documentation (previous one expired January 2021).

4. Install life raft associated hydrostatic releasing device and on float-free mount located on the vessel's foredeck.

5. Provide master disconnect switches and covers for the batteries under the helm station.

6. Test the foc'sle escape hatch for proper operation (currently tied off during vessel lay-down period).

7. Have all fire extinguishers reinspected (current tags expired in January 2021).

8. Free up frozen dogging mechanisms and repair broken dogging mechanism on aft work deck deckhouse.

9. Remove fuel-oil from engine room bilge.

10. Repair or replace wasted welded ladder rung inside lazarette coaming.

J.P. Veiga
Marine Surveyor



UNITED STATES DEPARTMENT OF COMMERCE
National Oceanic and Atmospheric Administration
NATIONAL MARINE FISHERIES SERVICE
Greater Atlantic Regional Fisheries Office
55 Great Republic Drive
Gloucester, MA [illegible]

February 01 2021

Jason Davis
Vessel Documentation Service
136 Jordan Road
Plymouth, MA 02360

**Re: F/V *Blue Eastern*, Permit # 330720, O.N. 930009**

Dear Mr Davis:

You requested the baseline specifications for the above referenced vessel which is eligible for the following limited access permits: Atlantic sea scallops, monkfish, summer flounder, limited access General Category (LAGC) scallop, and American lobster.

The current regulations for limited access American lobster permits, LAGC scallop permits and NE multispecies Handgear A do not require the establishment of a vessel baseline, which means there are no size or horsepower limitations for these permits. For an American lobster, LAGC scallop, or Northeast multispecies Handgear A vessel to be replaced by a vessel that is larger than allowed under the replacement provisions, other limited access permits must be permanently relinquished in writing.

On August 26, 2015, new regulations became effective that eliminated the one-time upgrade provision and the gross and net tonnage baseline specifications. This means that as of August 26, 2015, the baseline specifications now only consist of length overall (LOA) and horsepower. Also, you will now be able to do a vessel replacement up to your full 10 percent in length and 20 percent for horsepower. The once a year vessel replacement provision, however, still stands. This means if you do a vessel replacement in fishing year 2020 then you may not do another vessel replacement until the following 2021 fishing year. Your baseline information is provided below.

This vessel's baseline for the Atlantic sea scallops, monkfish, and summer flounder permits was established on F/V [illegible], Permit # [illegible], O.N. 930009.

Based on NOAA's National Marine Fisheries Service (NMFS) historical records and all vessel documentation the owner has submitted to NMFS, the baseline specifications for the Atlantic sea scallops, monkfish, and summer flounder permits currently on the F/V *Blue Eastern* are:

| | |
|---|---|
| LENGTH OVERALL (LOA): | 83.7' |
| ENGINE HORSEPOWER (HP): | 850 |

Based on NOAA's National Marine Fisheries Service (NMFS) historical records and all vessel documentation the owner has submitted to NMFS, the baseline specifications for the Atlantic sea scallops, monkfish, and summer flounder permits currently on the F/V *Blue Eastern* are:

| | |
|---|---|
| LENGTH OVERALL (LOA): | 93' |
| ENGINE HORSEPOWER (HP): | 1020 |



In the event of a fraction, it is our policy to round up the calculated [illegible] to the [illegible]. Therefore, all [illegible] calculated for this [illegible] rounded up to the next whole number.

This letter is intended only as a summary of this vessel's permit information as of this date. The information provided above does not reflect agreements of which NMFS has no knowledge regarding any reservation of permit rights by the current or previous owners upon sale of the vessel. Nor does this letter guarantee that these permits can be renewed or applied for in the future. This information is advisory only. We reserve the right to make final determinations regarding this vessel's eligibility for any permit.

Sincerely,

Susan Johnson
Industry Services Specialist

cc: Permit file #330720

Issued pursuant to 16 U.S.C. 1801 et seq. and 5101

United States Department of Commerce
National Oceanic and Atmospheric Administration
National Marine Fisheries Service
Greater Atlantic Regional Fisheries Office
55 Great Republic Drive
Gloucester, MA 01930-2276
Telephone (978) 282-8438

NOAA Form

# 2021 Fishing Year Permit

BHF BLUE EASTERN LLC
PO BOX 6918 ATTN KELLY
NEW BEDFORD MA 02740

F/V BLUE EASTERN
*Greater Atlantic Federal Permit Number* 330720
*Documentation Registration Number* 930009
*Principal Port State:* NEW BEDFORD MA
*Home Port State:* NEW BEDFORD MA

| Fisheries Permitted *Date Issued:* 01/12/2021 | Effective Date | Expiration Date |
|---|---|---|
| SCALLOP - LIMITED ACCESS - FULL TIME - 2021 | 04/01/2021 | 03/31/2022 |
| SCALLOP - LAGC - INCIDENTAL - 2021 | 04/01/2021 | 03/31/2022 |
| NE MULTISPECIES - SCALLOP POSSESSION LIMIT - 2021 | 05/01/2021 | 04/30/2022 |
| MONKFISH - CATEGORY C - 2021 | 05/01/2021 | 04/30/2022 |
| SURF CLAM - 2021 | 05/01/2021 | 04/30/2022 |
| OCEAN QUAHOG - 2021 | 05/01/2021 | 04/30/2022 |
| SUMMER FLOUNDER - COMMERCIAL MORATORIUM - 2021 | 05/01/2021 | 04/30/2022 |
| SQUID/BUTTERFISH - INCIDENTAL - 2021 | 05/01/2021 | 04/30/2022 |
| ATLANTIC MACKEREL - 2021 | 05/01/2021 | 04/30/2022 |
| SPINY DOGFISH - COMMERCIAL - 2021 | 05/01/2021 | 04/30/2022 |
| BLUEFISH - COMMERCIAL - 2021 | 05/01/2021 | 04/30/2022 |
| TILEFISH - COMMERCIAL/INCIDENTAL - 2021 | 05/01/2021 | 04/30/2022 |
| HERRING - OPEN ACCESS - POSSESSION LIMIT - 2021 | 05/01/2021 | 04/30/2022 |
| AMERICAN LOBSTER - NON-TRAP - 2021 | 05/01/2021 | 04/30/2022 |
| RED CRAB - OPEN ACCESS - INCIDENTAL BYCATCH - 2021 | 03/01/2021 | 02/28/2022 |
| SKATE - 2021 | 05/01/2021 | 04/30/2022 |

Maximum Trap Allocation (if applicable)

This permit is not valid unless signed. Knowingly and willfully falsifying material facts on this form may result in criminal liability.

Authorized Signature

PHOTOGRAPHS - F/V BLUE EASTERN

Vessel overview in Fairhaven, MA.

Stern view.

Foredeck bow.

Workdeck facing forward.

BLUE HARVEST FISHERIES Page 44 of 68
File No.: 21-0181

PHOTOGRAPHS - F/V BLUE EASTERN

Workdeck facing aft.

Pilothouse.

Pilothouse aft hauling station.

Forward berthing area and forepeak storage closet.

PHOTOGRAPHS - F/V BLUE EASTERN

Galley.

Crew dining area.

Enclosed shucking house (starboard side).

Engine room.

BLUE HARVEST FISHERIES
File No.: 21-0181
Page 46 of 68

## PHOTOGRAPHS - F/V BLUE EASTERN

Fish hold.

Lazarette/steering equipment.

**Marine Safety Consultants, Inc.**
26 Water Street, P.O. Box 615, Fairhaven, MA 02719-0615
Phone: 508-996-4110 • Fax: 508- 990-2094
www.marinesafetyconsultants.com

March 25, 2021
File No.: 21-0181

# CONDITION & VALUATION SURVEY REPORT

| | |
|---|---|
| **VESSEL** | **: F/V BLUE NORTH** |
| OFFICIAL NO. | : 670742 |
| OWNER | : Blue Harvest Fisheries |
| LENGTH | : 101.0' (overall) |
| LENGTH | : 88.1' (registered) |
| BREADTH | : 25.0' |
| DEPTH | : 13.6' |
| GROSS TONS | : 190 |
| NET TONS | : 129 |
| PROPULSION | : Marine Diesel |
| BUILT | : 1984 / Mobile. AL |

THIS IS TO CERTIFY THAT the undersigned surveyor conducted an appraisal survey on the F/V BLUE NORTH on March 25. 2021 while the vessel was afloat at Harbor Blue Seafood in Fairhaven. MA. Survey was requested by Baycoast Bank for appraisal and financing purposes only.

## VESSEL DESCRIPTION

The F/V BLUE NORTH is a single oil screw. all welded steel constructed, raised foc'sle, western rigged scalloper that was built by Bender Ship Building Co. in Mobile. AL in 1984. Vessel features a raised foredeck with pilothouse. open work deck amidships. and an enclosed aft deckhouse.

The vessel is reportedly constructed of 3/8" mild steel plate. butt welded on a transverse framing system. The vessel is subdivided into five (5) watertight compartments by four (4) transverse steel watertight bulkheads. Compartmentalization from forward to aft is as follows:

- Forward water tank/forward crew berthing.
- Engine room.
- Fish hold.
- Lazarette.

## DECKS

The vessel's foredeck is protected by a 41" high, two-tier, steel safety rail, and coated with a good condition non-skid paint application. Just aft of the stem is a 27" mooring bitt on centerline with port and starboard closed lead fairlead chocks. A 23" wave break is installed just forward of the pilothouse followed by a 22" round Baier foc'sle escape hatch is set on a 4" steel coaming.

Aft of the pilothouse, the foredeck deck is also protected by a 41" rail and finished with good condition painted nonskid coating. A stainless-steel basket landing plate is installed on the starboard side of the mast and the captains shucking house is located on the starboard side of the pilothouse and accessed by wooden sliding doors fore and aft.

A work deck access ladder is located aft of the pilothouse on the port side and is provided with good condition treads and handrail.

The vessel's work deck is protected by a 36" box steel bulwark with six (6) 23" x 16" freeing ports installed on either side. The deck is finished with fair condition. asphalt bridge tiles forward (please note that various bridge tiles are missing and should be replaced). and aft with steel doubler plates in the dredge recovery areas.

The vessel's fish hold is accessed by a 37" X 37" hatch located on centerline on the work deck set on a 29" steel coaming and fitted with an insulated plywood plug covers. The 24" high. approximately 12' long deck stop is located on centerline aft of the fish hold hatch. Forward on the port side of the work deck is a 25" x 25" engine room four-dog escape hatch set on an 8" steel coaming and heavy. hinged watertight cover. This hatch is located below the foredeck access ladder. A watertight door is installed outboard accessing a gear storage locker.

The vessel's split hydraulic trawl winches are located aft on either side of centerline just forward of the aft deckhouse/cutting shack and winch engine compartment. There are deck fairlead blocks and hydraulically operated. swing arm gallows frames located forward on the port and starboard side.

Work deck illumination is provided by two (2) 220V Quartz lights atop the aft deckhouse facing forward and two (2) mercury vapor lamps atop the pilothouse facing aft.

The aft deckhouse top is protected by a two-tier steel railing system measuring approximately 40" in height. On centerline is the winch engine exhaust and forward of that are two (2) Pullmaster scallop dredge winches.

Access to the lazarette is located inside the deckhouse on the starboard side through a 24" x 24" hatch set on a 15" high steel coaming fitted with a hinged two-dog stainless-steel cover.

## PILOTHOUSE FITTINGS & EQUIPMENT

The vessel's pilothouse is constructed of mild steel plate on an angle steel frame and is located aft on the raised foredeck. Pilothouse is finished out with a drop panel overhead, wood panel sides, and a good condition, non-skid linoleum deck covering. Access is by a centerline ladderwell from the galley area with good condition non-skid tread and stainless handrail. The pilothouse is also accessed by a hinged, two-dog aluminum watertight door aft on centerline. There is an additional hinged, aluminum watertight door outboard on the starboard side; however, it has been sealed shut.

The helm console is located athwartships forward with a full deck control station aft on the starboard side. Just forward of the deck control station is a center console for electronics and chart table. Outboard on the port side is bench locker seating and aft on the port side is a small desk. Lighting in the pilothouse is 115V luminescent and heating is provided by a central heat and air conditioning system.

There are five (5) forward-facing 36" x 30" 1/2" good condition, safety plate ports in aluminum frames. All around the pilothouse are good condition, 1/2" safety plate ports. Centerline forward port is fitted with a Cornell-Carr Clearview screen.

Pilothouse outfitting includes:

- Two (2) Wagner jog levers (port side jog is missing jog handle)
- One (1) Simrad jog lever with rudder angle indicator (aft station)
- Dirigo compass with quadrantal spheres w/ deviation card (adj. 11/2004)
- Furuno model 1832 radar
- Northstar 951 GPS (aft station)
- Iridium satellite phone
- Triton CLS vessel monitoring system
- Four (4) Murphy Selectronic alarm panels.
- Simrad AP 50 autopilot.
- Furuno radar.
- Furuno chrome scope.
- Simrad RI35 rudder angle indicator
- e Machines monitor.
- Asus computer.
- ICOM MA 500 TR AIS
- Danforth Compass
- Standard Horizon VLH 3000 loudhailer.
- Icom IC-M506 VHF radio
- Icom M 5506 and IC59 (aft station)
- Koden Echo Sounder
- ICOM ICM59 VHF radio

- Kenwood mod TKM 707 SSB Radio
- Amana upright provisions freezer
- Northstar 6100i plotter
- APC back-up battery unit
- Samsung tablet
- Last Watch II watch alarm

The deck control station features full deck hydraulic and engine controls.

## SAFETY EQUIPMENT

- Three (3) 30" life rings mounted with line, light, and vessel name
- ACR Sat 2, 406 Category I EPIRB (registration # ADCD0 21A31 43401). The releasing device will be due for replacement in April 2022, the registration will be due for renewal in January 2022, and the battery will be due for replacement in July 2023 (EPIRB tested and test indicator light was operational).
- Eight (8) survival suits (see recommendations)
- 10-man Elliot IBA raft due for inspection January 2022 (releasing device exp. 1/2022)
- Zee Industrial type First Aid kit.
- U.S. Coast Guard approved off-shore flare kit:
    - Six (6) handheld (expire 11/2023)
    - Three (3) parachute (expire 3/2024)
    - Three (3) smoke (expire 2/2024)
- Lifesling overboard recovery sling.
- Damage control kit
- General alarm system

## FIRE EQUIPMENT

- One (1) ABC I dry chemical fire extinguisher mounted in the pilothouse.
- One (1) ABC II dry chemical fire extinguisher mounted in the pilothouse.
- One (1) ABC II dry chemical fire extinguisher mounted forward in the galley.
- One (1) ABC II dry chemical fire extinguisher mounted in the lower crew ladderwell.
- Two (2) ABC II dry chemical fire extinguishers mounted in the engine room.
- One (1) ABC II dry chemical fire extinguisher mounted in the mud room.
- One (1) ABC II dry chemical fire extinguisher in the winch engine room
- DSPA 5 fire suppression device (expires 6/2024)

All fire extinguishers were last inspected in March 2020 and will be due for reinspection by the end of the month.

## MAST & RIGGING

The vessel is fitted with a 13" OD steel mast, main work deck stepped, forward on centerline up through the after end of the 01 deck. The mast is stayed forward to the stem with one (1) 1" wire rope stay and one (1) 3/4" wire rope stay, in addition to two (2) 4" x 4" steel struts to the pilothouse top and two (2) 1" wire rope shrouds. The mast is accessed by a short catwalk with safety rail; from the pilothouse top, and the masthead is accessed by a well-constructed and secured, steel masthead access ladder. The mast supports navigational lights and antennas and provides cradles for the vessel's new fluted steel outriggers which are stepped outboard aft on either side of the raised foredeck. Outriggers are stayed forward, amidships, and aft, with 1" wire rope stays and 3" steel struts to the foredeck. Outriggers are raised and lowered by dedicated Pullmaster mod PL5 hydraulic winches.

The mast is fitted with two (2) approx. 12" fluted steel booms, gooseneck-stepped just above foredeck level on the main mast. Booms are provided with boom head access ladders and personal safety hoops at the top. The boom supports scallop dredge blocks which are safety strapped.

## GALLEY & ACCOMMODATIONS

Some of the crew accommodations and the galley are located on the main deck level, below the raised foredeck with additional bunk space located in the lower forward compartment. The space is finished-out with a vinyl panel overhead, wood panel sides, and a good condition, non-skid rubber matting covering a steel deck.

The foc'sle is accessed by a six (6) dog watertight door, aft on centerline, from the work deck. Forward on centerline in the bow stem is an unfinished gear locker with storage shelves and an upright provision freezer. Next aft, is a finished crew V berth with two (2) port and starboard bunks and an aft foc'sle escape hatch access ladder (see recommendations).

The galley dinette area is located aft on the starboard side of the foc'sle. There is a ten (10) man dinette forward with bench locker seating. Aft is a counter area with appliances.

Galley outfitting includes:

- Proctor Silex toaster.
- Stainless steel commercial range with oven.
- Emerson microwave oven.
- Hamilton Beach coffeemaker.
- Kenmore stainless steel stove exhaust hood.
- Norlake commercial refrigerator.
- Dual stainless-steel sink.
- Insignia 32" flatscreen tv
- VCR/DVD player

Opposite the galley area to port is the lower berthing area access ladderwell. pilothouse access ladderwell. and a captain's stateroom which features a single bunk. vanity with sink. and a forward storage locker.

Aft on the port side of the foc'sle is a mudroom with watertight door access from work deck and the crew's head, which features a Thetford Aquamagic toilet. vanity with sink. and a shower stall.

The lower crew berthing area is accessed by a seven (7) step steel ladder with good tread and handrails. There are four (4) bunks located on either side of this space.

## GENERAL OUTFITTING

- Carrier mod 50VW008510 air conditioner/heat pump.
- Anchor.
- Lincoln Ideal Arc 220 arc welder.
- Amana deep freeze provisions freezer
- Oxygen-acetylene cutting outfit
- Bradford White 40-gallon hot water heater
- Craftsman two-tier tool chest
- Bench grinder
- Bench vise

## FISHING EQUIPMENT

There are two (2) Pullmaster mod H25 rapid reverse main winches located aft on centerline on the work deck just forward of the aft deckhouse. Winches are protected by good condition. all around safety bars.

Trawl wires fairlead directly forward to 16" inboard deck bollards. 16" outboard deck bollards. and 16" towing bollards suspended by the vessel's heavy steel weldment. hydraulically-controlled gallows frames.

The vessel's single ice hold measures approx. 24' x 20' with an 8' overhead and features six (6) double product holding pens on either side of the centerline shaft alley. The shaft alley is covered by steel plate with one large deck plate. The fish hold is finished out with a blown foam overhead, fiberglass over foam sides. and a poured concrete floor. The hold is accessed by a secured stainless-steel ladder leading down to an elevated grated platform with an additional steel ladder leading to the centerline slaughterhouse.

The vessel's cutting shacks are located outboard on either side of the aft deckhouse house. There are 10' stainless steel cutting boxes installed on either side. and a stainless-steel wash box is installed aft on centerline with a stainless-steel sorting and washing machine. Good lighting and asphalt deck tiles are installed.

There are two (2) Pullmaster H12 rapid reverse cargo hoists. dredge winches installed forward on centerline on the whaleback deck. These winches feature aft work deck control valves.

A hydraulic basket lift is installed forward on the work deck's starboard side to lift baskets of scallops to the captain's shucking house on the aft foredeck.

## MAIN PROPULSION

This vessel is powered by a Caterpillar 16-cylinder, turbo charged marine diesel engine S/N 72Z00319. Engine features air start vertical dry stack exhaust and a fresh water, keeled-cooled cooling system with expansion tank and Murphy low water alarm. The hours gauge indicated 8,251.2 engine hours at the time of survey.

Power is transmitted through a Caterpillar mod 7261 reverse reduction gear with a 3.34:1 reduction ratio. There is a 6" stainless steel jack shaft with a 6" stainless steel tail shaft installed and supported by an engine room stuffing box, two (2) intermediate line bearings, the rear stuffing box, and the after cutlass bearing. The vessel's propeller was not sighted, as the vessel was surveyed in the water.

## AUXILIARY MACHINERY

There is a Detroit diesel mod 8V71 auxiliary winch engine installed in the centerline compartment of the aft deck house. Engine features 24V start. vertical dry stack exhaust and a fresh water. keeled-cooled cooling system. This engine is fitted with a Funk pump drive and four (4) deck service hydraulic pumps.

Aft on the starboard side of the winch engines space is a 3HP and 10HP AC motor which drives small hydraulic pumps to provide back-up deck service hydraulics.

There is a Caterpillar mod 3304 auxiliary diesel engine installed aft on the port side of the engine compartment. Engine features 12V start, vertical dry stack exhaust and a fresh water, keeled-cooled cooling system with expansion tank and Murphy low water alarm. This engine is the prime mover for a 60KW AC generator.

There is an additional Caterpillar mod 3304 auxiliary diesel engine installed aft on the starboard side of the engine compartment. This engine also features 12V start, vertical dry stack and a fresh water. keeled-cooled cooling system with expansion tank and Murphy low water alarm, and is also the prime mover for a 60KW AC generator.

There are two (2) air compressors installed forward on the starboard side of the engine compartment with 3HP AC drive motors.

There is a hydraulic power unit installed aft on the starboard side of the engine compartment which features two (2) 7 ½ HP Baldor AC drive motors and Vickers hydraulic pumps. and Sperry directional valves. This system is utilized for the vessel's steering system.

There is a hydraulic power unit also installed aft on the port side of the engine room with a 30HP Toshiba 230/460 AC drive motor and hydraulic pump. This system is utilized for the vessel's gallows frames and back-up hydraulics.

There is a 1" Gould's potable water pump with a Gould's 1 1/2 HP AC drive motor installed forward on the port side of the engine compartment along with a pressure water accumulator and a 30-gallon hot water heater.

## TANKAGE & FUEL SYSTEM

It was reported that the vessel was fitted with two (2) fuel oil tanks; one located outboard on either side of the engine compartment with a total reported capacity of 11,000 gallons. Fuel tanks fill and vent above main deck level and feature bottom draw. Fuel supply lines are 1-1/4" steel with rubber jumpers and there is a fuel manifold located aft on the port side of the engine compartment. A Dual Racor water separator is installed for each of the auxiliary diesel engines and a dual unit Dahl water separator is installed for the main engine in addition to the primary and secondary fuel filters.

## PUMPING SYSTEM

There are two (2) Baldor electric motors coupled to two (2) 2" FloMax bilge pumps installed forward on centerline in the engine compartment with AC drive motors. These pumps are connected to the vessel's manifold system and provide pumping service to all compartments. There is a 2-1/2" steel pump manifold installed on the port side of the engine compartment. lower level. All manifold valves are labeled. and check valves are installed in line.

There are two (2) 2" Teel pumps installed forward on the port side of the lazarette compartment with AC drive motors which provide sea water to the vessels shucking boxes.

A 2"MP pump is installed forward on the starboard side of the lazarette which provides pumping service to the compartment.

High water level alarms are installed in all compartments. The alarms were not tested as part of this survey.

## ELECTRICAL SYSTEM

The vessel is provided with a 12 and 24V. DC and a 115-230/460V. AC electrical system. There are two (2) 12V. 8D batteries located aft on the port side of the engine compartment which provides

starting service for both auxiliary diesel engines. Charging is provided by a 12V alternator on each of the auxiliary diesel engines and a Phase Three model PT-24-45U battery charger.

There are two (2) 12V, 8D batteries mounted in a shallow steel tray forward on the starboard side of the winch engine compartment. Charging is provided by a Newmar model HDM24-80 battery charger mounted within that space.

There are two (2) 12V, 8D batteries, boxed and covered, in the pilothouse which are utilized for emergency communications and electronic purposes. These batteries are charged by a Newmar mod Universal 1270, 12V battery charger.

Onboard AC power is provided by two (2) 60KW, AC generators and a shore power circuit. There is a Power Panel's, Inc. AC switching, and generator control panel installed forward on the port side of the engine compartment. Additional engine room electrical outfitting includes:

- Two (2) 220V, AC load centers.
- Square D engine room fan control.
- Nine (9) Square D motor controls.
- 3 phase power transformer

## COMMENTS

The vessel was reportedly last hauled out in September 2018 for routine bottom maintenance which included washing and painting of the hull as well as replacement of sacrificial zinc anodes. The vessel's superstructure was also painted after the yard period in November of 2018.

It was also reported that over the past several years, both generators as well as the vessel's steering system were completely rebuilt. The first generator rebuild took place in 2016 while the other was completed in 2020. The steering gear was rebuilt in 2019.

At the time of the survey there was an excessive amount of gear in the lazarette space, so a complete examination was not possible though it should be noted that numerous steel objects, such as boom block and chain gear, were laying on the hull between the framing and should be removed to prevent accelerated wastage of the bottom plate.

There was a noticeable accumulation of water and oil in the aft engine room bilge area as well as various tools and debris that had fallen or been left behind.

The vessel was issued U.S. Coast Guard dockside examination sticker # 270202 which will expire in December 2022.

Housekeeping and maintenance on this vessel is satisfactory to good, though some basic housekeeping measures should be taken to avoid cluttering in the lazarette as well as the work deck space aft of the foredeck bulkhead on the starboard side, where the anchor was partially hidden and blocked by excessive gear.

From a general examination of the vessel while afloat, as far as practical, without making removal to expose concealed parts at the time of survey and without witnessing operation of the vessel, it is the opinion of the undersigned surveyor that the vessel is in satisfactory condition for operation in the fisheries trade provided that the attached recommendations are completed.

## VALUATION / RATIONALE

Fair market value is the most probable price that a vessel would bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgably, and assuming the price is not affected by undue stimulus.

Implied in this definition is the completion of a sale as of a specified date and the passing of title from seller to buyer under certain conditions. The buyer and seller are typically motivated and each party is well informed and well advised, acting on what they consider to be their individual best interests. A reasonable time should be allowed for exposure in the open market, and payment is made without liens or encumbrances remaining on the vessel.

Fair market value is determined by researching sales comparables, researching trade journals and contacting boat brokers in the region. Fair market value can also be calculated by using the replacement cost less depreciation method. This is used in such instances where sales comparables may be limited due to the size of the market and number of vessels of this type that have been purchased or sold in recent history. Typical sources for determining fair market value is the Marine Safety Consultants, Inc. database as well as trade journals such as Boats & Harbors Magazine, National Marine Fisherman, various marine websites that post sales listings, and interviews with marine brokers familiar with similar vessel and permit sales.

Replacement cost is the estimated cost necessary to build and outfit a new vessel in 2021. Replacement cost is based on research with various shipyards currently building commercial fishing vessels for the northeast fisheries. We usually use a depreciation factor of 2 - 3% per year from the original date of construction. We then compare the estimation of fair market value based on the original, using the traditional method of sales comparables, etc. as to the calculation of the replacement cost less depreciation.

We comment that scallopers in good condition have maintained a high value. This is due to the limited number of scallop permits available, coupled with consistent product price and the experience that scallops is a sustainable resource under the current Federal Fisheries Management Plan.

Since 2019, Limited Access Full-Time Scallop permits have enjoyed a comparable sales average of $6,000,000.00. Adjustments up or down may be appropriate for permits with larger or smaller baselines.

Each permit is limited to the vessel characteristics assigned to the permit, limited by vessel length and horsepower. Larger vessels and larger horsepower are able to fish more efficiently in open bottom using their Days at Sea.

From 2013 to 2019, the fraction of catch harvested from access areas increased from 25% to 70%, which has effectively dropped the value premium for larger vessels with more horsepower. However, with lower quotas now in place for 2021 through 2023, the fishery is experiencing greater demand for longer length and higher horsepower again.

The scallop fishery is well managed, is not overfished, and there is no evidence that overfishing has occurred. Scallop availability levels, as witnessed by annual landings, have recently come off a cyclical peak, with annual landings ranging from 51,000,000 to 60,000,000 pounds from 2017 to 2019. Although the fishery is healthy, the biomass and landings have dipped in 2020 and 2021 and are expected to fall further in 2022.

This should result in stable but lower production, with annual landings more in the range of 35,000,000 to 45,000,000 pounds.

New England fishermen have been harvesting a population of scallops that were produced 8 or 9 years ago, when an extremely high number of new "recruits", or baby scallops, encountered in the assessments. Large scale recruitment events are typical in the fishery but there has not been an exceptional year class since 2013.

Price-wise, the scallop market has been stable, with prices inversely tracking landing volumes, meaning that with higher abundance prices are lower, but in recent years with lower abundance, prices tend higher. Domestic demand for sea scallops is high with the United States able to absorb the majority of the scallops caught each year.

Scallop ex-vessel prices have been strong since the fall of 2020, and market analysts predict high and stable prices to continue through 2022.

| | |
|---|---|
| Limited Access Full-Time Scallop | $6,125,000.00 |
| Total | **$6,125,000.00** |

In determining the market value of the F/V BLUE NORTH it is understood that this appraisal includes the hull, structure, furnishings, all appurtenances, equipment, materials, machinery, tools, anchors, and other apparel pertaining to the vessel as found aboard on the date of survey.

Subject to consideration of the preceding remarks, and considering the age of the vessel, its condition in comparison to vessels of like size, age, and service, and in consideration of the current market, the following values are considered appropriate:

| | |
|---|---|
| **FAIR MARKET VALUE:** | **$1,000,000.00** |
| **PERMIT VALUE** | **$6,125,000.00** |
| **REPLACEMENT VALUE** | **$4,000,000.00** |

Submitted without prejudice,
MARINE SAFETY CONSULTANTS, INC.

J.P. Veiga
Marine Surveyor

## SURVEYOR'S RECOMMENDATIONS

VESSEL : F/V BLUE NORTH
OFFICIAL NO. : 670742

FILE NO. : 21-0181
DATE OF SURVEY : 3/25/2021

1. Repair the topside foc'sle escape hatch handle which was broken off. Once completed, ensure that the hatch is operational to properly provide egress from the interior space.

2. Free up all dogs on the work deck to interior accommodation watertight door as to ensure a full watertight seal of the hatchway.

3. Provide covers for the overhead 24" fluorescent lighting in the lower crew berthing space.

4. Test operations for all high-water level bilge alarms prior to getting underway.

5. All survival suits over ten years of age should be professionals inspected and certified. Several were found to be manufactured between 2005 and 2008.

6. Replace or reaffix emergency lighting in galley area as the bulbs are currently hanging by wires and test all the emergency lighting throughout the vessel.

7. Grease and exercise dogs on engine room emergency escape hatch and test for proper operation and ease of egress from that space.

8. Have all fire extinguishers reinspected prior to getting underway.

9. Remove excessive oil and water in engine room bilge.

10. Remove excessive water in lazarette bilge.

11. Renew U.S. Coast Guard Vessel Certificate of Documentation (previous certificate expired January 2021).

J.P. Veiga
Marine Surveyor

UNITED STATES DEPARTMENT OF COMMERCE
National Oceanic and Atmospheric Administration

January 21, 2021

Jason Davis
Vessel Documentation Service
136 Jordan Road
Plymouth, MA 02360

RE: F/V *Blue North*, Permit # 410343, O.N. 670742

Dear Mr. Davis:

You requested the baseline specifications for the above referenced vessel which is eligible for the following limited access permits: Atlantic sea scallop, monkfish, summer flounder, American lobster, and Limited Access General Category (LAGC-IC) scallop.

The current regulations for limited access American lobster, LAGC scallop, longfin Tier 3, and NE multispecies Handgear A permits do not require the establishment of a vessel baseline, which means there are no size or horsepower limitations for these permits. For an American lobster, LAGC scallop, longfin Tier 3, or NE multispecies Handgear A vessel to be replaced by a vessel that is larger than allowed under the replacement provisions, other limited access permits must be permanently relinquished in writing.

On August 26, 2015, new regulations became effective that eliminated the one-time upgrade provision and the gross and net tonnage baseline specifications. This means that as of August 26, 2015, the baseline specifications now only consist of length overall (LOA) and horsepower. Also, you will now be able to do a vessel replacement up to your full 10 percent in length and 20 percent for horsepower. The once a year vessel replacement provision, however still stands. This means if you do a vessel replacement in fishing year 2020 then you may not do another vessel replacement until the following 2021 fishing year. Your baseline information is provided below.

This vessel's baseline for the above listed permits was established on the F/V *Blue North*, (formerly named *Eileen Marie and Traveler*), Permit # 410343, O.N. 670742.

Based on NOAA's National Marine Fisheries Service (NMFS) historical records and all vessel documentation the owner has submitted to NMFS, the baseline specifications for the permits currently on the F/V *Blue North* are:

| | |
|---|---|
| LENGTH OVERALL (LOA): | 88.3' |
| ENGINE HORSEPOWER (HP): | 1125 |

The maximum allowable upgrades for the permits currently on the F/V *Blue North* are:

| | |
|---|---|
| MAXIMUM LENGTH OVERALL | 97' |
| MAXIMUM HORSEPOWER: | 1350 |



In the event of a fraction, it is our policy to round up the calculated maximum allowable upgrade to the next whole number. Therefore, all maximum values calculated for this letter have been rounded up to the next whole number.

This letter is intended only as a summary of this vessel's permit information as of this date. Further, the information provided above does not reflect agreements of which NMFS has no knowledge regarding any reservation of permit rights by the current or previous owners upon sale of the vessel. Nor does this letter guarantee that these permits can be renewed or applied for in the future. This information is advisory only. We reserve the right to make final determinations regarding this vessel's eligibility for any permit.

Sincerely,

Diana Johnson
Industry Service Specialist

cc: Permit file # 410343

## PHOTOGRAPHS - F/V BLUE NORTH

Vessel overview (facing aft).

Vessel overview (facing forward).

Aft workdeck (facing forward).

Aft workdeck (facing aft).

## PHOTOGRAPHS - F/V BLUE NORTH

Bow foredeck.

Pilothouse helm station.

Aft hauling station.

Forward berthing space.

PHOTOGRAPHS - F/V BLUE NORTH

Lower berthing area.

Aft dekhouse shucking area (port side).

Galley and dining area.

Engine room.

PHOTOGRAPHS - F/V BLUE NORTH

| | |
|---|---|
|  Fish hold. |  Detroit model 8V71 auxiliary deck hydraulic service engine. |
|  Lazarette. | |

| | |
|---|---|
| **VESSEL** | **: F/V BLUE STREAM** |
| OFFICIAL NO. | : 631743 |
| OWNER | : Blue Stream LLC<br>40 Herman Melville Blvd.<br>New Bedford, MA 02742 |
| LENGTH | : 77.3' |
| BREADTH | : 22.0' |
| DEPTH | : 11.1' |
| GROSS TONS | : 135 |
| NET TONS | : 92 |
| PROPULSION | : Diesel / single screw |
| FUEL CAPACITY | : 20,000 gallons (approximately) |
| BUILT | : 1980 / Bayou LaBatre, AL |

**PERMIT VALUE**

| | |
|---|---|
| Limited Access Full-Time Scallop | $6,000.000.00 |
| Total | **$6,000,000.00** |

BLUE HARVEST FISHERIES
File No.: 21-0181

United States Department of Commerce
National Oceanic and Atmospheric Administration
National Marine Fisheries Service
Greater Atlantic Regional Fisheries Office
[illegible] Great Republic Drive
Gloucester, MA [illegible]
Telephone [illegible]

NOAA Form [illegible]

# 2021 Fishing Year Permit

BHF BLUE STREAM LLC
PO BOX 6918 ATTN KELLY
NEW BEDFORD MA 02740

F/V BLUE STREAM
*Greater Atlantic Federal Permit Number* 330578
*Documentation/Registration Number* 631743
*Principal Port/State* NEWPORT NEWS VA
*Home Port/State* NEWPORT NEWS VA

| Fisheries Permitted *Date Issued: 01/12/2021* | Effective Date | Expiration Date |
|---|---|---|
| SCALLOP - LIMITED ACCESS - FULL-TIME - 2021 | 04/01/2021 | 03/31/2022 |
| SCALLOP - LAGC - INCIDENTAL - 2021 | 04/01/2021 | 03/31/2022 |
| NE MULTISPECIES - SCALLOP POSSESSION LIMIT - 2021 | 05/01/2021 | 04/30/2022 |
| MONKFISH - CATEGORY C - 2021 | 05/01/2021 | 04/30/2022 |
| SURF CLAM - 2021 | 05/01/2021 | 04/30/2022 |
| OCEAN QUAHOG - 2021 | 05/01/2021 | 04/30/2022 |
| SUMMER FLOUNDER - COMMERCIAL MORATORIUM - 2021 | 05/01/2021 | 04/30/2022 |
| SCUP - COMMERCIAL MORATORIUM - 2021 | 05/01/2021 | 04/30/2022 |
| BLACK SEA BASS - COMMERCIAL MORATORIUM - 2021 | 05/01/2021 | 04/30/2022 |
| LONGFIN SQUID - TIER 2 MORATORIUM PERMIT - 2021 | 05/01/2021 | 04/30/2022 |
| SQUID BUTTERFISH - INCIDENTAL - 2021 | 05/01/2021 | 04/30/2022 |
| ATLANTIC MACKEREL - 2021 | 05/01/2021 | 04/30/2022 |
| BUTTERFISH - COMMERCIAL MORATORIUM PERMIT - 2021 | 05/01/2021 | 04/30/2022 |
| SPINY DOGFISH - COMMERCIAL - 2021 | 05/01/2021 | 04/30/2022 |
| BLUEFISH - COMMERCIAL - 2021 | 05/01/2021 | 04/30/2022 |
| TILEFISH - COMMERCIAL INCIDENTAL - 2021 | 05/01/2021 | 04/30/2022 |
| HERRING - OPEN ACCESS - POSSESSION LIMIT - 2021 | 05/01/2021 | 04/30/2022 |
| RED CRAB - OPEN ACCESS - INCIDENTAL BYCATCH - 2021 | 03/01/2021 | 02/28/2022 |
| SKATE - 2021 | 05/01/2021 | 04/30/2022 |

Maximum Trap Allocation (if applicable)

This permit is not valid unless signed. Knowingly and willfully falsifying material facts on this form may result in criminal liability [illegible]

Authorized Signature

BLUE HARVEST FISHERIES Page 68 of 68
File No.: 21-0181

| | |
|---|---|
| **VESSEL** | **: BLUE WESTERN** |
| OFFICIAL NO. | : 638372 |
| OWNER | : BHF Blue Western, LLC<br>PO Box 619<br>New Bedford, MA 02740 |
| LENGTH | : 88.4' |
| BREADTH | : 25.0' |
| DEPTH | : 13.3' |
| GROSS TONS | : 153 |
| NET TONS | : 104 |
| BUILT | : 1981 / Panama City, FL |

**PERMIT VALUE**

| | |
|---|---|
| Limited Access Full-Time Scallop | $6,050,000.00 |
| Total | **$6,050,000.00** |

\\msc local\mscdata\company\00 active vessels\blue harvest fisheries fleet svy 21-0181\blue harvest fisheries master document 21-0181.docx

EXHIBIT C



MARKEY WALSH
ATTORNEYS AT LAW

March 4, 2021

*Via Email and*
  *First Class Mail*

Hon. Lloyd MacDonald
Lang, Xifaris & Bullard
115 Orchard Street
New Bedford, MA 02110

**Re: Rafael Settlement Trust**

Dear Judge MacDonald:

As you know, this office represents Conceicao Rafael and Carlos Rafael and several of their corporations in litigation and a related arbitration. I am following up on my previous correspondence and our conversations over the past eighteen months about these cases.

Per the attached February 25th Order of the AAA Arbitration Panel [Exhibit A], I have been instructed to formally remind you of October 2019 Order of the Arbitration Panel [Exhibit B] previously brought to your attention.

As you know, you are holding a Twenty-Three Million ($23,000,000) Promissory Note that was received as consideration in the transaction. That Note is presently in your possession. Per the Arbitration Panel's Order, please "do not transfer, spend, distribute, invest, or otherwise change the present status" of the Note and any principal payments toward the Note.

It is my understanding that no principal payments have been made toward the Note and the full amount of Twenty-Three Million Dollars is owed by the Purchasers to the Rafaels. Until further order / clarification from the Arbitration Panel, please retain the Twenty-Three Million ($23,000,000) Dollar Note in its present state. If you receive any principal payments toward the Note, please set them aside and "do not transfer, spend, distribute, invest, or otherwise change the status" of any such principal payments.

Further, if you are contacted by any party seeking to make a principal payment or suggesting that they would like to acquire a mortgage discharge in connection with any of the vessels involved in the transaction and which secure the Promissory Note, please notify me immediately so that I can inform the Arbitration Panel.

Hon. Lloyd MacDonald
March 4, 2021
Page Two

Please call me if you have any questions regarding this letter or the Order.

Sincerely,

John A. Markey, Jr.

# EXHIBIT A

ARBITRATION

BASL, INC.,
Claimant

vs

CARLOS RAFAEL, *et al.*,
Respondents

and

VII NORTHEAST FISHERY SECTOR, INC.,
Respondent.

AAA Case no. 01-19-0003-2608

ORDER CONCERNING PARTIAL NON-COMPLIANCE WITH PARAGRAPH 3 OF THE PANEL'S OCTOBER 25, 2019, INTERIM AWARD

Additional papers filed by the Rafael Respondents, dated February 12, 2021, do not remedy incomplete compliance with paragraph 3 of the Panel's October 25, 2019, Interim Award, and the requirements of the Panel's Order of January 22, 2021. Consequently,

1. As required by paragraph 3.d. of the Panel's October 25, 2019, Interim Award, each and every Rafael Respondent is ordered "to immediately instruct ... in writing, all trusts, trustees, financial institutions and other entities that presently hold or control any funds or other consideration paid, promised or otherwise given for any of the permits at issue not to transfer, spend, distribute, invest or otherwise change the present status of any such consideration with copies of the writings to be emailed immediately to Claimant, Sector VII counsel and all arbitrators." If there has been any change in or addition to the recipients contemplated by the October 25, 2019, Order, the writing is to be transmitted to the new persons and entities also. The instruction is to be contained in the body of the writing; mere transmittal of the Panel's Interim Award will not suffice, though a copy of the Interim Award must accompany the writing. The writing is to be signed personally by personal Respondents and by the appropriate corporate officer or member for Respondents that are corporations or limited liability companies. The writing may not be signed by legal counsel or any other representative. Acknowledgement of

receipt of all writings are to be obtained from every addressee. Copies of all writings and receipts are to be emailed to Claimant, Sector VII counsel and all arbitrators by 5:00 p.m Eastern, March 4, 2021.

2. A sanction of $5,000.00 will be imposed on Respondents for each day or part of a day of delay in the complete satisfaction of all the requirements of the preceding paragraph.

3. Respondents will email the following to the AAA and the Panel for *in camera* review by March 5, 2021:

a. the "Declaration of Trust Establishing Rafael Settlement Trust" and all amendments to that document, if any;

b. any other documents relating to how the Rafael Settlement Trust is administered;

c. documents showing any and all payments made on the Note identified in clause 1.6 of the purchase and sale agreement; and

d. every monthly financial institution account statement for all accounts where Note payments have been deposited.

4. The Panel reserves consideration of sanctions and fees, inclusive of BASE's MOTION FOR DEFAULT SANCTIONS, until compliance with the foregoing requirements can be considered.

February 25, 2021

for Stevenson L. Weeks, Arbitrator

for Robert J. Bocko, Arbitrator

Mark C. Manning, Arbitrator

# EXHIBIT B

ARBITRATION

R.S.I., INC.,
Claimant,

vs

CARLOS RAFAEL, CONCEICAO RAFAEL, APOLLO FISHING, LLC, ATHENA FISHING CORP., C&C FISHING CORP., IVONILDE FISHING CORP., S&S FISHING, LLC, TYLER FISHING, LLC, VILA FISHING CORP., and VILA NOVA DO CORVO II, INC.,
Respondents,

and

AAA Case no. 01-19-0003-2608

VII NORTHEAST FISHERY SECTOR, INC.,
Respondent.

# INTERIM AWARD

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with paragraph 9 of the parties' Sector Membership Agreement entered into on March 8, 2019, and having been duly sworn and having duly read and heard the allegations, briefs, proofs and argument of the parties, issue this decision on Claimant's MOTION FOR EMERGENCY MEASURES as follows:

1. The issues raised by the motion were properly submitted to arbitration as provided by paragraph 9 of the parties' Sector Membership Agreement entered into on March 8, 2019

2. Claimant has shown a likelihood of success in securing a Final Award that the Rafael Respondents erred in asserting they, rather than the Sector Board, had the power to make the "local fishing community" determination under paragraph 3.4.4.3 of the Sector Membership Agreement, that Claimant was as a result wrongfully deprived of its Right of First Refusal as provided for by paragraph 3.4.1 of the Agreement, and that the sales of the permits at issue were null and void, as provided by paragraph 3 of the Agreement. Claimant is otherwise entitled to interim relief as provided below.

3. The Rafael Respondents are enjoined from and instructed to take certain actions immediately as follows:

a. from taking any further action to effectuate the sales, transfer or assignments of any of the permits at issue;

b. to immediately instruct, verbally and in writing, all escrow and other agents engaged on behalf of any one or more of them to take no further action to effectuate the sales, transfers or assignments of any of the permits at issue, with copies of the writings to be emailed immediately to Claimant, Sector VII and all arbitrators;

c. from transferring, spending, distributing, investing or otherwise changing the present status of any funds or other consideration paid, promised or otherwise given for any sales, assignments and/or transfers of any one or more of the permits at issue;

d. to immediately instruct, verbally and in writing, all trusts, trustees, financial institutions and other entities that presently hold or control any funds or other consideration paid, promised or otherwise given for any of the permits at issue not to transfer, spend, distribute, invest or otherwise change the present status of any such consideration, with copies of the writings to be emailed immediately to Claimant, Sector VII counsel and all arbitrators;

e. to immediately inform in writing all NOAA and NMFS offices and agencies that regulate or administer the permits and/or the transfer of the permits at issue, as well as all other entities that have or had an interest in these permits and/or the transactions at issue, of this decision, with copies of the writings to be emailed immediately to Claimant, Sector VII counsel and all arbitrators; and

f. to immediately inform, verbally and in writing, the Panel, Sector VII counsel and Claimant of the names, with contact information, of any and all escrow agents and other third parties that are holding any transfer documents and/or funds or other consideration to effectuate the transfer of any or all of the vessels and permits at issue.

4. The Panel intends to issue an order to the Rafael Respondents to produce to Claimant and Sector VII all agreements between Rafael Respondents and Shamrock Group unless the Rafael Respondents serve on the other parties and the arbitrators by email no later than 5:00 p.m. ET October 30, 2019, briefing showing cause why that order should not issue. The other parties may have until 5:00 p.m. November 1, 2019, to file a response. A reply may be filed by 5:00 p.m. November 5. Brief page limit exclusive of exhibits and attachments is 7 pages. The Panel may schedule argument on this issue.

5. The Panel declines to award any other interim relief at this time without prejudice to Claimant's right to request any relief it seeks in further proceedings herein.

6. This Decision may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

[illegible] J. Bo[illegible], Arbitrator — Date

Mark C. Manning, Arbitrator — Date

Stevenson L. Weeks, Arbitrator — Date

EXHIBIT D

COPIES MAILED
2 / 7 / 2020 JL

#22

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS SUPERIOR COURT NO.: 1973CV00839

BASE, INC.

Plaintiff,

v.

CARLOS RAFAEL, et als.,

Defendants

AND

C&D FISHING CORP., et. als.

Reach and Apply Defendants

AND

MICHAEL QUINN, et. als.

DEFENDANT-INTERVENORS

BRISTOL SS SUPERIOR COURT
FILED

FEB 7 2020

MARC J SANTOS, ESQ.
CLERK/MAGISTRATE

ORDER ON PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

Buckley, E.M., Justice

This is the plaintiff's second motion seeking a Temporary Restraining Order seeking to attach the proceeds from the pending sale between the defendant, Carlos Rafael and his various companies and Blue Harvest Fisheries, LLC. It has been reported to the court that the sale price is approximately Nineteen Million ( $19,000,000) Dollars and that the transaction is set to close during the week of February 10, 2020.

The plaintiff's prior motion for a Temporary Restraining Order was **DENIED** by Hopkins, J. on September 13, 2019 after lengthily hearing. Before the court at that time were many of the same arguments relative to plaintiff's alleged Right of First Refusal ("ROFR") which forms the basis of the pending legal action. In her decision, Judge Hopkins made specific findings relative to the plaintiff's claim of a ROFR as well as the interplay with the "Sector Membership Agreement", specifically Section 7 of that Agreement. In her decision, Judge Hopkins found that the sale which the plaintiff was attempting to enjoin at that time, fell within an exception to the

Sector Membership Agreement[1]and determined that the plaintiff could not establish a likelihood of success on the merits of its claims against the defendants and DENIED the motion. This court adopts all of the reasons given by Judge Hopkins in her prior ruling in deciding the pending motion. Of note, the plaintiff only days after the Hopkins filed "emergency motions" with AAA seeking to undo the Hopkins ruling (which allowed the sale to the Intervenors). The AAA board was unable to reach that issue and no decision was made.

Now, four (4) months later, based upon an "interim ruling" of the three (3) member arbitration panel[2], the plaintiff files this second Motion for Preliminary Injunction. Counsel presents the motion as an "emergency" as there is a pending sale between Blue Harvest Fisheries and the defendant during the week of 2/10//2020. This court notes that the plaintiff has been aware of this sale since November 25, 2019.

The arguments presented by the plaintiff in this second motion are substantially the same as those rejected previously by Judge Hopkins, with the exception that now counsel argues that the Interim Award by the Arbitration panel, which found a "likelihood of success on the merits" that plaintiff's ROFR was "wrongfully deprived" mandates a this court adopt that finding and issue a preliminary injunction. Further, counsel posits that, unlike the first hearing, they now have additional information, not present in the first hearing, consisting of a valuation of the economic damages they believe they will recover which exceeds Forty Six Million ($46,000,000) Dollars[3]. Because of the issue raised involving the interim award, this court treats the pending motion as a "second" motion, not a reconsideration of the prior ruling by Judge Hopkins.

This court held hearing on February 4, 2020. All parties and counsel were present and the court heard lengthily arguments. For the reasons set forth below, the plaintiff's motion is **DENIED.**

Here, the finding of the arbitration panel is an Interim Award which states in a conclusory fashion, without any analysis that the plaintiffs have a "likelihood of success on the merits of their action." The "Interim Award" is does not set forth any legal basis other than a reference to portions of the Sector Agreement, as to how it came to that finding. This court finds that finding specious especially in light of the fact that the parties have not engaged in discovery. Indeed, it appears that the Interim Award was issued before the discovery order in the arbitration matter. Given the complexities in the Sector Agreement this court wonders how a likelihood of success on the merits by the AAA panel could be made where discovery surrounding Base's membership in the Sector have not been determined. Equally, the Interim Award is not a final determination made after a full adjudication of the merits of this action. Counsel for the defendant informs this

[1] Judge Hopkins thoughtful and well articulated reasons for her decision were orally stated in court at hearing on September 13, 2019.

[2] The court notes the issues raised by counsel for the Intervenors and defendant as to the lack of partiality of the arbitrators. The court does not reach those issues.

[3] The court fully rejects the self-serving affidavit of Mr. Richard Canastra, a representative of BASE as to the value of the potential damages.

court, and it was not contested by the plaintiff, that at best there have been two to three telephone conferences with the arbitrators of a total duration of approximately four (4) hours. This court has reviewed at length the Sector Agreement, the various exhibits appended to the Motion and Opposition by both sides[4]. The issue of Base's ROFR has not been finally decided and is strenuously contested by the defendant and Intervenors in this action. The bare statement on the  "interim award" of a "likelihood of success", which is absent analysis does not establish to this court that the plaintiffs can establish a likelihood of success on the merits of this action that they had a right of first refusal.[5] The sound findings of Judge Hopkins as stated on the record in September 2019 are wholly applicable here and this court finds that the plaintiffs, even with this Interim Award, cannot establish a likelihood of success on the merits of their action.

Additionally, the plaintiff argues that if the injunction does not issue they will not have security for the final award they anticipate in the pending arbitration proceeding. Counsel argues that Judge Hopkins did not have the benefit of their client's economic analysis of the putative damages of over Forty Six Million ($46,000,000) Dollars and therefore this court must provide security in the form of a Preliminary Injunction to provide them security from the upcoming sale to Blue Harvest Fisheries. This court notes that the report attached by plaintiff's economist, dated January 28, 2020 clearly states it is a preliminary report, based solely on the "limited data available to me at this juncture[6]".  This report is incomplete and does not convince this court of the alleged damages claimed by the plaintiff. Further, even if the plaintiff prevails on the merits of its action, the remedy for the breach of the Sector Agreement is to declare the transaction "null and void", not to award any damages. As per the Sector Agreement, if the transaction is declared null and void, the matter would return to the Sector for a determination whether the exception applies or not. If it does not apply, then a right of first refusal would go out to all who were eligible, not just Base. It is of interest to note that the Interim Award which the plaintiff touts bears the language "null and void" as the remedy. Finally, plaintiffs fail to acknowledge that there is presently over Twenty Two Million ($22,000,000.) Dollars in an escrow account from the Quinn transaction, which provides security for any claims that the plaintiff may have in this case.

---

[4] The court also reviewed the briefing submitted by the parties before AAA as it relates to arguments vis-à-vis the sector agreement and Base's standing.

[5] Equally, it strains credulity that the plaintiff would claim it wants to continue to pursue litigation (arbitration) over an alleged ROFR for a deal alleged to be worth $46 million dollars where they backed out of a purchase and sales agreement made with the defendant due to lack of financing. That deal was worth approximately Nineteen Million ($19,000,000). See, letter from Base dated January 7, 2020.

[6] While qualified, it appears from the plaintiff's expert's CV that he has no experience in the valuation of fishing licenses/ permits.

For the aforementioned reasons, this court **DENIES** the Plaintiff's Second Motion for Preliminary Injunction.

Dated 2/7/2020

Elaine M. Buckley, Justice

# Exhibit E

NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION
UNITED STATES DEPARTMENT OF COMMERCE

SETTLEMENT AGREEMENT

Case No. NE1707582, Carlos Rafael, et al.

The National Oceanic and Atmospheric Administration (NOAA), United States Department of Commerce, issued a Notice of Violation and Assessment of Administrative Penalties, Notice of Permit Sanctions, and Notice of Intent to Deny Permits (hereinafter, referred to as the "Notice"), on September 10, 2018, to Carlos Rafael, his affiliated entities, and the operators of fishing vessels he owns or controls. The Notice alleges violations of the Magnuson-Stevens Fishery Conservation and Management Act and the High Seas Fishing Compliance Act, assesses civil penalties totaling $3,356,259, and seeks certain permit sanctions.

The persons listed in Attachment 1 to this Settlement Agreement are hereinafter referred to as the "Respondents." The persons listed in Attachment 2 to this Settlement Agreement are a subset of the Respondents and are hereinafter referred to as the "Rafaels." The persons listed in Attachment 3 are a separate subset of the Respondents and are hereinafter referred to as the "Operators." NOAA and the Respondents hereby enter into this Settlement Agreement (hereinafter, referred to as the "Agreement") in full settlement and compromise of all claims any party may have arising out of the events described in the Notice.

The parties hereby agree as follows:

1. Respondents release the United States, its agencies, officers, agents, employees, and servants, from any claims against the United States, its agencies, officers, agents, and employees related to the investigation and administrative proceedings associated with the Notice.

2. This Agreement, including attachments, sets forth the entire Agreement of the parties.

3. This Agreement shall be governed by and construed under Federal law.

4. Any interpretive rules that construe ambiguity in an agreement against the drafting party shall be inapplicable in any dispute concerning the terms, meaning, or interpretation of this Agreement.

5. Respondents understand that the violations described in the Notice and admitted to in this Agreement will be considered by NOAA in any penalty that NOAA may assess against a Respondent for any violation charged in the future.

6. This Agreement is signed by authorized representatives of the parties. The undersigned persons warrant that they have full authority to enter into this Agreement and by their

signatures bind to the terms of this Agreement the party or parties on whose behalf they have signed.

7. It is the intent of the parties that if it is determined that any portion of this Agreement is declared invalid, all other provisions shall remain in effect.

8. All parties agree that rights of appeal are hereby waived and each party shall bear its own fees and other expenses, including attorney's fees, incurred in connection with any of the proceedings pertaining to this matter.

9. Unless the context clearly indicates otherwise, in this Agreement, words used in the singular include the plural and the plural includes the singular.

10. Any terms used in this Agreement which are defined at 16 U.S.C. § 1802 or 50 C.F.R. § 648.2 shall have the same meaning under this Agreement.

11. The Respondents acknowledge that they have conferred with their attorneys regarding this Agreement and understand the rights they are waiving and the terms and conditions stated herein.

12. Respondents voluntarily agree to the terms and conditions of settlement as stated herein and enter into this Agreement without any degree of duress or compulsion.

13. The Agreement is effective on the date it is accepted on behalf of NOAA.

14. The parties agree to bring any suit to enforce this Agreement in the United States District Court for the District of Massachusetts, in Boston, MA.

TERMS APPLICABLE TO THE RAFAELS

NOAA and the Rafaels hereby agree as follows:

15. This Agreement shall be binding upon the Rafaels' successors, heirs, and assigns.

16. The Rafaels admit to the facts constituting the violations described in Counts 1-88 of the Notice and waive their rights to a hearing.

17. The Rafaels agree to pay $3,010,633, within 120 days from the date that NOAA executes this Agreement. A copy of this executed Agreement will be sent to the NOAA Finance Office. The NOAA Finance Office will then send the Rafaels bills and direct them where to send the payment.

18. NOAA releases the Rafaels from all civil administrative claims, charges, and complaints arising from the violations described in the Notice and all other civil administrative claims, charges, and complaints arising from violations of laws administered by NOAA that were known to NOAA on or before the date this Agreement is executed.

19. The Rafaels agree to enter into purchase and sales agreements to sell and divest themselves of all limited access system Federal fisheries permits and fishing vessels that they own or control, including but not limited to those vessels and permits listed in Attachment 4, by December 31, 2020. All transactions required by this paragraph shall be subject to the prior review and written approval of NOAA. NOAA agrees that it shall not unreasonably withhold or delay approval. No permit subject to the requirements of this paragraph will be transferred without the written consent of the NOAA Office of the General Counsel, Enforcement Section.

20. The Rafaels agree to include the following terms in any purchase and sales agreement for any transaction required by paragraph 19:

    Seller's permit was the subject of a NOAA enforcement action which has now been resolved. As part of that resolution, NOAA has the right to review this transaction before it is closed. NOAA's review includes, but is not limited to, confirming that this sale involves an arm's length transaction between the parties, ensuring that the buyer is not a person or entity controlled by Carlos Rafael, Conceicao Rafael or a member of their family, and assessing the buyer's compliance history. While NOAA has the right to review the transaction, NOAA has also agreed that it will not unreasonably withhold or delay its approval.

21. If the Rafaels fail to divest all permits and vessels subject to paragraph 19 through transactions approved by NOAA by December 31, 2020, then the Rafaels agree to convey permits and vessels they have failed to divest to the Rafael Settlement Trust, by January 15, 2021. The Rafaels agree that the Declaration of Trust Establishing Rafael Settlement Trust, which is included as Attachment 6, may not be amended or modified without the written consent of the NOAA Office of the General Counsel, Enforcement Section.

22. The Rafaels agree to surrender the dealer permit issued to Carlos Seafood, Inc. (#1385), on or before September 1, 2019, and further agree not to apply for any other dealer permit after surrendering permit #1385.

23. The Rafaels agree to permanently cease commercial fishing, selling fish, or receiving, auctioning, processing, importing or exporting fish for any commercial purpose, on or before December 31, 2019, except the Rafaels may continue fishing for Atlantic sea scallops until March 31, 2020.

24. The Rafaels agree not to have any financial, employment, or equity interest with any person engaged in the activities described in paragraph 23, after December 31, 2020, except the

Rafaels may have a financial interest in the Rafael Settlement Trust, provided that the Trust's only involvement in the commercial fishing industry is limited to:

a. Holding a promissory note and junior security interest financing the purchase of the following vessels and their permits: F/V Apollo, F/V Athena, F/V Ilha Brava, F/V Acores, F/V Hera II, F/V Perola do Corvo, F/V Zeus, F/V Vila Nova do Corvo I, F/V Vila Nova do Corvo II, F/V Tyler & Noah, and F/V Gypsy Girl; and

b. Divesting fishing vessels and permits in accordance with this Agreement.

25. The Rafaels agree not to act as an officer, director, manager, board member, paid consultant, or formal advisor to any person involved in any aspect of the commercial fishing industry, after December 31, 2020.

26. The Rafaels agree not to hold, apply for, or renew, directly or indirectly, any permits issued by NOAA, after December 31, 2020, except the Rafaels may renew permits that they currently hold in order to divest these permit in accordance with this Agreement.

27. If NOAA determines the Rafaels have breached any provision of paragraphs 19 through 26, in addition to exercising any other rights authorized by law, NOAA may, through the Department of Justice, file a civil action seeking injunctive relief. For the purpose of any such civil action, the Rafaels:

a. Waive the defenses of lack of personal jurisdiction, improper venue, waiver, laches, and estoppel;

b. Admit that NOAA will be irreparably harmed by a breach; that the balance of the equities weigh in NOAA's favor; and that it is in the public interest to issue an injunction; and

c. Expressly reserve the right to contest the occurrence of any alleged breach of paragraphs 19 through 26.

28. Nothing in this Agreement affects the terms of supervised release or probation which have been imposed, or may be imposed, by the U.S. District Court for the District of Massachusetts, *in United States v. Carlos Rafael*, 16-CR-10124-WGY (D. Mass. Oct. 25, 2017).

TERMS APPLICABLE TO THE OPERATORS

NOAA and the Operators hereby agree as follows:

29. Each Operator admits to the facts constituting the violation for each count in the Notice where he is named as a Respondent, and waives his rights to a hearing.

30. NOAA agrees to release each Operator from all civil administrative claims, charges, and complaints arising from the count(s) in the Notice where he is named as a Respondent.

31. Each Operator agrees to the operator permit sanction and probationary period pertaining to them, as set forth in the table included as Attachment 5 to this Agreement.

32. The probationary period for each Operator begins on the date NOAA signs the Agreement.

33. Each Operator whose operator permit is suspended pursuant to this Agreement, agrees that their operator permit shall include the following additional conditions during their probationary period:

   a. You shall not intentionally or recklessly violate any Federal natural resources law, including but not limited to the Lacey Act, the Magnuson-Stevens Fishery Conservation and Management Act, the Endangered Species Act, the Marine Mammal Protection Act, or any regulation implementing these acts. If you are found liable, either administratively or judicially, for violating this condition, then you agree to permanently surrender this permit, to never again apply for another operator permit issued under 50 C.F.R. § 648.5, as may be amended, and to not be aboard a federally permitted fishing vessel in any capacity while the vessel is at sea or engaged in offloading. A finding of liability under this condition includes, but is not limited to, the following circumstances:

      i. You are found liable for intentionally or recklessly violating this condition by an Administrative Law Judge, the NOAA Administrator, or a Federal court;

      ii. You default on a notice of violation that alleges an intentional or reckless violation of this condition; or

      iii. You admit to a notice of violation that alleges an intentional or reckless violation of this condition.

   Payment of a summary settlement offer, admitting to a notice of violation that assesses your culpability as negligent, unintentional, or is silent regarding your culpability, or acceptance of a written warning do not trigger the mandatory sanctions described in this condition. You may be charged with and found liable for a violation

of this condition after your probationary period expires, provided the underlying violation occurred during the probationary period.

b. For all fishing trips in Federal waters you shall:

   i. Notify the NOAA Office of Law Enforcement before the start of the trip at an email address or phone number approved by the NOAA Office of Law Enforcement. The required notification shall include your name, operator permit number, the vessel's name and permit number, the expected dates of the trip, and shall state whether you will serve as the operator or a crewmember for the trip.

   ii. Maintain a haul-by-haul log on forms approved by NOAA documenting the species and hail weights of fish caught and discarded on each haul, while operator.

   iii. Report electronically through the Vessel Monitoring System (VMS) the species and hail weights of fish caught every 12 hours on forms approved by NOAA, during all fishing trips where VMS is required, while operator.

   iv. Set the VMS for 15-minute polling during all fishing trips where VMS is required, while operator.

   v. Not act as an operator on a fishing trip when the person who owns or controls the fishing vessel, also owns or controls the Federally permitted seafood dealer where the fish from the trip will be sold, without prior written authorization from the NOAA Office of the General Counsel, Enforcement Section.

Accepted on behalf of the National Oceanic and Atmospheric Administration:

8/19/2019
Date

[signature]
Charles Green, Section Chief (acting)
NOAA Office of the General Counsel
Enforcement Section

Accepted on behalf of Carlos Rafael, Conceicao Rafael, and the persons listed in Attachment 2:

8·1·2019 Stephanie Rafael-DeMello
Date Carlos Rafael

8·1·2019 Stephanie Rafael-DeMello
Date Conceicao Rafael

Accepted on behalf of Luis Fidalgo:

8/6/19
Date

Luis Fidalgo

Accepted on behalf of Jose Janardo:

07/23/19
Date

Jose Janardo

Accepted on behalf of Rogerio Paulino:

8/1/19
Date

Rogerio Paulino by Kray [illegible] Espinola

Rogerio Paulino

Accepted on behalf of Paul Previty:

7/26/19
Date

Paul Previty

Accepted on behalf of Manuel Medeiros:

7/25/19
Date

Manuel Medeiros

Accepted on behalf of Amilcar Esteves:

August 7, 20 — Date

Amilcar Esteves

Accepted on behalf of Brian Jannelle:

August 12, 2019 — Date

Brian Jannelle

Accepted on behalf of Robert Scammon:

August 12, 2019 — Date

Robert Scammon

NE1707582, Carlos Rafael, et al., Settlement Agreement
Page 9 of 12

Accepted on behalf of Joao Abreu:

8/5/19 JOÃO ABREU

Date Joao Abreu

Accepted on behalf of Joao Oliveira:

8/6/19

Date Joao Oliveira

Accepted on behalf of Darren Quimby:

Darren Quimby by

Erin Quimby per

8/8/19 7/25/19 authorization attached

Date Darren Quimby

Accepted on behalf of Antonio Caneira:

8/8/19

Date Antonio Caneira

NE1707582, Carlos Rafael, et al., Settlement Agreement
Page 10 of 12

Accepted on behalf of Manuel Magalhaes:

8-12-19
Date

Manuel Magalhaes

Accepted on behalf of Virgilio Martins:

Date

Virgilio Martins
Virgilio Martins

Accepted on behalf of Manuel Pereira:

8/7/19
Date

Manuel Pereira

Accepted on behalf of Carlos Pereira:

8/7/19
Date

Carlos Pereira

Accepted on behalf of Thomas Simpson:

8/12/19
Date

Thomas Simpson

Accepted on behalf of Saverio Viola, III:

8/12/19

Date

Saverio Viola, III

**Attachment 1, Respondents**
**Case No. NE1707582, Carlos Rafael, et al.**

Joao Abreu

Gerald Bretal

Stephen Broy

Antonio Caneira

Amilcar Esteves

Luis Fidalgo

Jose Janardo

Brian Jannelle

Manuel Magalhaes

Virgilio Martins

Manuel Medeiros

Joao Oliveira

Rogerio Paulino

Manuel Pereira

Carlos Pereira

Paul Previty

Darren Quimby

Carlos Rafael

Conceicao Rafael

Robert Scammon

Thomas Simpson

Paul Tetrault

Saverio Viola, III

Randy Waycotte

Apollo Fishing, LLC

Athena Fishing Corp.

B & D Fishing Corp.

C & C Fishing Corp.

C & D Fishing Corp.

C & R Fishing, LLC

C & V Fishing Corp.

C Rafael, LLC

Carlos Seafood, Inc.

Corvo, LLC

F & C Fishing Corp.

Hera Fishing, LLC

Ivonilde Fishing Corp.

Lady Patricia, Inc.

Leeanne & Noah Fishing, LLC

Leeanne, LLC

My Way Fishing, LLC

Nemesis, LLC

Noah, LLC

Olivia & Rafaela Fishing, LLC

Orion Venture, LLC

Perseus, LLC

R & P Fishing Corp.

R and C Fishing Corp.

Rafaella, LLC

S & S Fishing, LLC

Sasha Fishing Corp.

Sasha Lee, Inc.

Stephanie Fishing Corp.

Titan Fishing, LLC

Tyler Fishing, LLC

Vila Fishing Corp.

Vila Nova Do Corvo II, Inc.

Vila Nova Fishing, Inc.

Attachment 2, Rafaels
Case No. NE1707582, Carlos Rafael, et al.

Carlos Rafael

Conceicao Rafael

Apollo Fishing, LLC

Athena Fishing Corp.

B & D Fishing Corp.

C & C Fishing Corp.

C & D Fishing Corp.

C & R Fishing, LLC

C & V Fishing Corp.

C Rafael, LLC

Carlos Seafood, Inc.

Corvo, LLC

F & C Fishing Corp.

Hera Fishing, LLC

Ivonilde Fishing Corp.

Lady Patricia, Inc.

Leeanne & Noah Fishing, LLC

Leeanne, LLC

My Way Fishing, LLC

Nemesis, LLC

Noah, LLC

Olivia & Rafaela Fishing, LLC

Orion Venture, LLC

Perseus, LLC

R & P Fishing Corp.

R and C Fishing Corp.

Rafaella, LLC

S & S Fishing, LLC

Sasha Fishing Corp.

Sasha Lee, Inc.

Stephanie Fishing Corp.

Titan Fishing, LLC

Tyler Fishing, LLC

Vila Fishing Corp.

Vila Nova Do Corvo II, Inc.

Vila Nova Fishing, Inc.

**Attachment 3, Operators**
**Case No. NE1707582, Carlos Rafael, et al.**

Joao Abreu

Gerald Bretal

Stephen Broy

Antonio Caneira

Amilcar Esteves

Luis Fidalgo

Jose Janardo

Brian Jannelle

Manuel Magalhaes

Virgilio Martins

Manuel Medeiros

Joao Oliveira

Rogerio Paulino

Manuel Pereira

Carlos Pereira

Paul Previty

Darren Quimby

Robert Scammon

Thomas Simpson

Paul Tetrault

Saverio Viola, III

Randy Waycotte

Attachment 4, Vessels & Permits
Case No. NE1707582, Carlos Rafael, et al.

| NOAA Permit Number | Permit or Vessel Name | Current or Former Vessel ID Number |
|---|---|---|
| 149999 | 2005 Johnson Sea Explorer | MS8124AY |
| 150372 | 2006 Water Tender | MS2620AR |
| 150656 | 2007 Johnson Joko0929h707 | MS3877AT |
| 150895 | 2009 Joko Jamie Leigh | MS8037AV |
| 410519 | Acores | 961198 |
| 410275 | Apollo | 614462 |
| 410604 | Athena | 1122803 |
| 150108 | Beira Litoral Skiff | MS4414AM |
| 410471 | Bulldog | 937040 |
| 150830 | Costa & Corvo I | MS7322AU |
| 150842 | Costa & Corvo II | MS7324AU |
| 330386 | Costa Da Gale | 612525 |
| 410335 | Cowboy | 602436 |
| 150090 | Crestliner Skiff | MS5674BG |
| 330764 | Destiny | 1031278 |
| 320244 | Dinah Jane | 538071 |
| 410246 | Drake | 618310 |
| 410194 | Edward L Moore | 597172 |
| 320311 | Green Acres | 521305 |
| 410501 | Hera | 945600 |
| 410612 | Hera II | 1113613 |
| 330552 | Hercules | 669933 |
| 410206 | Huntress I | 608248 |
| 410564 | Ilha Brava | 971262 |
| 330583 | Ilha Brava II | 693587 |
| 410104 | Ilha Do Corvo | 578725 |
| 151200 | Joko Skiff Northern Crusa | MS5752BA |
| 250176 | Just A Girl | 255203 |
| 320375 | Leeanne N Zachary | 507708 |
| 330309 | My Way | 603431 |
| 320903 | Nemesis | 942391 |
| 151622 | Oliver Skiff | MS5665BG |
| 330215 | Perola Do Corvo | 584692 |
| 320944 | Perseus | 944403 |
| 330379 | Poseidon | 613018 |

| NOAA Permit Number | Permit or Vessel Name | Current or Former Vessel ID Number |
|---|---|---|
| 410161 | Resolute | 597484 |
| 330795 | Sasha Lee | 909149 |
| 150829 | Skiff / Viola | MS4568AX |
| 330904 | Southern Crusader II | 1038917 |
| 150090 | Stars Of The Sea Skiff | MS9693BB |
| 330276 | Triunfo | 596397 |
| 410444 | Tyler N Noah | 930728 |
| 410590 | Vila Nova Do Corvo I | 1110463 |
| 410451 | Vila Nova Do Corvo II | 618384 |
| 550028 | Voyager | 1160897 |
| 410226 | Zeus | 613082 |

**Attachment 5, Operator Permit Sanctions**
**Case No. NE1707582, Carlos Rafael, et al.**

| Respondent | Permit | Permit Sanction | Dates of Suspension[1] | Probationary Period |
|---|---|---|---|---|
| Joao Abreu | 10001234 | Suspended for 80 days | -August 25, 2019 to September 23, 2019<br><br>-March 1, 2020 to March 20, 2020<br><br>-August 25, 2020 to September 23, 2020 | 24 Months |
| Amilcar Esteves | 10006182 | Suspended for 80 days | -80 consecutive days beginning on the date NOAA signs the Agreement | 24 Months |
| Luis Fidalgo | 10002784 | Suspended for 60 days | -40 consecutive days beginning the date NOAA signs the Agreement<br><br>-March 1, 2020 to March 20, 2020 | 18 Months |
| Jose Janardo | 10006190 | Suspended for 80 days | -August 24, 2019 to October 2, 2019<br><br>-December 15, 2019 to January 23, 2020 | 24 Months |
| Brian Jannelle | 10001269 | Suspended for 80 days | -October 15, 2019 to November 23, 2019<br><br>-December 25, 2019 to February 2, 2020 | 24 Months |

[1] The dates of suspension run through and include the final date of each suspension period.

| Respondent | Permit | Permit Sanction | Dates of Suspension[1] | Probationary Period |
|---|---|---|---|---|
| Manuel Magalhaes | 10006504 | Suspended for 120 days | -120 consecutive days beginning on the date NOAA signs the Agreement | 30 Months |
| Virgilio Martins | 10006267 | Suspended for 40 days | -40 consecutive days beginning on the date NOAA signs the Agreement | 16 Months |
| Manuel Medeiros | 10002900 | Suspended for 40 days | -40 consecutive days beginning on the date NOAA signs the Agreement | 16 Months |
| Joao Oliveira | 10008934 | Suspended for 40 days | -August 15, 2019 to September 3, 2019, unless NOAA signs the Agreement after August 15, 2019, then 20 consecutive days beginning on the date NOAA signs the Agreement<br>-September 15, 2019 to October 4, 2019 | 16 Months |
| Rogerio Paulino | 10005918 | Suspended for 40 days | -January 1, 2020 to February 9, 2020 | 16 Months |
| Manuel Pereira | 10002055 | Suspended for 160 days | -40 consecutive days beginning on the date NOAA signs the Agreement<br>-December 20, 2019 to January 8, 2020<br>-September 1, 2020 to December 9, 2020 | 34 Months |

| Respondent | Permit | Permit Sanction | Dates of Suspension[1] | Probationary Period |
|---|---|---|---|---|
| Carlos Pereira | 10002057 | Suspended for 100 days | -40 consecutive days beginning on the date NOAA signs the Agreement<br><br>-December 20, 2019 to January 8, 2020<br><br>-September 1, 2020 to October 10, 2020 | 28 Months |
| Paul Previty | 10012200 | Suspended for 20 days | -January 1, 2019 to January 20, 2019 | 12 Months |
| Darren Quimby | 10009167 | Suspended for 40 days | -August 15, 2019 to September 23, 2019, unless NOAA signs the Agreement after August 15, 2019, then 40 consecutive days beginning on the date NOAA signs the Agreement | 16 Months |
| Robert Scammon | 10000662 | Suspended for 140 days | -November 1, 2019 to March 19, 2020 | 32 Months |

| Respondent | Permit | Permit Sanction | Dates of Suspension[1] | Probationary Period |
|---|---|---|---|---|
| Thomas Simpson | 10004117 | Suspended for 200 days | -August 15, 2019 to September 3, 2019, unless NOAA signs the Agreement after August 15, 2019, then 20 consecutive days beginning on the date NOAA signs the Agreement.<br><br>-September 25, 2019 to October 14, 2019<br><br>-November 3, 2019 to November 22, 2019<br><br>-December 12, 2019 to December 31, 2019<br><br>-January 21, 2020 to February 9, 2020<br><br>-March 2, 2020 to March 22, 2020<br><br>-April 12, 2020 to May 1, 2020<br><br>-May 22, 2020 to June 10, 2020<br><br>-July 1, 2020 to July 21, 2020<br><br>-August 9, 2020 to August 29, 2020 | 36 Months |
| Saverio Viola, III | 10001318 | Suspended for 40 days | -September 4, 2019 to September 23, 2019<br><br>-October 14, 2019 to November 2, 2019 | 16 Months |

# EXHIBIT F

Sector Membership Agreement

This Sector Membership Agreement is entered into by and between Northeast Fishery Sector VII, a Massachusetts nonprofit corporation (the "Sector") and its members (each, a "Member" and together, the "Members") for Fishing Year 2019 (May 1, 2019-April 30, 2020) and Fishing Year 2020 (May 1, 2020-April 30, 2021).

Recitals

A. The Sector was formed to receive an allocation of groundfish pursuant to Amendment 16 to the Northeast Multispecies Fishery Management Plan ("Amendment 16"). To qualify the Sector to do so, the Members have entered into Adherence Agreements under which they agree to comply with the provisions of the "Northeast Fishery Sector VII Sector Operations Plan and Agreement" (as the same may be renewed or amendment from time to time, the "Sector Operations Plan").

B. Under Amendment 16, annual allocations of groundfish are made in the form of "annual catch entitlements" (or "ACE"), which are allocated to qualifying sectors based on the Potential Sector Contribution (or "PSC") of the "Limited Access Multispecies Permits" (as identified by their "Moratorium Rights Identifier") held by their members. The PSC associated with a Moratorium Rights Identifier is calculated annually by the National Marine Fisheries Service ("NMFS"). **No individual fisherman receives an allocation of Sector ACE, and no individual fisherman has a right to use or transfer Sector ACE other than as permitted by the Sector Operations Plan for the sector to which that fisherman belongs.**

C. Each sector is primarily responsible for causing its members conduct their fishing operations such that their aggregate catch does not exceed the Sector's ACE, and complies with the NMFS regulations implementing Amendment 16.

D. Amendment 16 imposes certain specific catch management and reporting obligations on each qualifying sector. A sector's failure to perform one or more of such obligations can give rise to joint liability among all sector members for related regulatory forfeitures and penalties. It is therefore in each Sector Member's best interests that the Sector holds an amount of ACE that is adequate for the Members to conduct their fishing operations on a profitable basis and to generate the revenues necessary to cover the costs associated with the Sector performing its obligations under Amendment 16.

E. The Northeast Seafood Coalition ("NSC") represents individual members of the Northeast Fishery Sectors on political and policy issues affecting their interests as participants in the Sector program in the Northeast multispecies groundfish fishery.

F. The Sector and certain other sectors have formed the "Northeast Sector Services Network" ("NESSN") which provides member Sectors with essential technical support and guidance relating to fulfilling their obligations under the sector program.

G. NSC and NESSN, while distinct in their roles and responsibilities, work together on the betterment of the sector management program and the Northeast multispecies groundfish fishery.

H. In consideration of the facts and circumstances described above, the Members wish to promote their mutual interests by supplementing the Sector Operations Plan with certain additional agreements with respect to Sector membership, and to impose certain mutual obligations on each other.

I. For the purpose of this Agreement "Member" is utilized to acknowledge the roles and responsibilities of all individuals enrolling MRI/Permits into the NESSN Member Sectors, while specific distinction between rights and obligations of Active and Non-Active Members as defined in Section 7 is utilized where appropriate throughout the document.

Agreement

Now, therefore, for and in consideration of the agreements, covenants, rights and obligations set forth herein and the mutual benefits anticipated by the Members under this Agreement, the receipt and sufficiency of which is hereby acknowledged, the Members and the Sector agree as follows:

1. Ratification of Sector Operations Plan; Defined Terms. By executing this Agreement, each Member hereby ratifies the Sector Operations Plan as approved by NMFS, confirms that it remains in effect in accordance with its terms, and confirms that such Member remains a Sector member as of the effective date of this Agreement. All capitalized terms in this Agreement that are not otherwise defined shall have the meaning given them in the Sector Operations Plan.

2. Governing Documents. Except as required by state law, in the event of a conflict between or among the Sector Operations Plan and the Sector's Articles of Incorporation, Bylaws or this Agreement, the Sector Operations Plan shall control, and the provision in the document or agreement that is in conflict with the Sector Operations Plan shall be deemed null and void to the extent necessary, and only to the extent necessary, to eliminate the conflict between that document or agreement and the Sector Operations Plan.

3. Restrictions on Transfer. Section 7.3 of the Sector Operations Plan prohibits each Member from transferring any portion of such Member's Harvest Share to any person other than another Sector Member unless the Board first authorizes such transfer in writing, and provides that any such transfer shall be subject to such terms and conditions as the Board may adopt from time to time to promote the harvest of the Sector's entire ACE allocation and ensure that the Sector's management and administrative costs can be recouped through reasonable Sector membership fees established by the Board. The Sector's Board of Directors has determined that the restrictions on transfer imposed on Harvest Shares and the Sector's ACE under this Section 3 of this Agreement are necessary to satisfy the intents and purposes of the foregoing provision.

Further, the Sector is expected and intended to continue its operations for a period of years, and it is therefore essential that transfers of the "Limited Access Multispecies Permits" (as identified by their

"Moratorium Rights Identifier") (together, the "Permits") that give rise to the Sector's annual allocation of ACE and the Sector Members' annual Harvest Shares be restricted as well, to provide the Sector with financial and operational stability over the term of its expected life.

In consideration of the foregoing facts and circumstances, each Member agrees that no Member shall be entitled to assign, convey, sell, lease or otherwise transfer (i) Harvest Share; (ii) any rights in or to Sector ACE; or (iii) a Permit, except in strict compliance with the terms of this Agreement. **Any purported transfer of any type whatsoever of a Member's Harvest Share, rights in or to the Sector's ACE or of a Member's Permit, other than transfers made in strict compliance with the provisions of this Section 3, shall be null and void.**

3.1 Transfers to Active Members. A Member may, to the extent permitted by law and the Sector Operations Plan and this Agreement, sell, lease, or transfer Harvest Share, a Member's interest in the Sector's ACE or a Member's Permit, to one or more Active Members of the Member's Sector on such terms and conditions as the transferor Member and the transferee Active Member(s) may agree. **No Member other than an Active Member may acquire Harvest Share, a Member's interest in the Sector's ACE or a Permit from another Member.**

3.2 Sector ACE Transfer Procedure. A Member may cause the Sector to transfer some or all of the ACE contributed to the Sector on the basis of the transferring Member's Sector membership to a third party, **subject to** (i) the restrictions on Harvest Share transfers adopted by the Sector's Board of Directors from time to time pursuant to Section 7.3 of the Sector Operations Plan and Agreement, and (ii) a right of first offer in favor of first, the Sector's Active Members, second, the Active Members of the other "NESSN Member Sectors" formed under Amendment 16, as provided in Section 3.3, below. All transfers of Sector ACE must be made through the Sector's Manager. Sector members do not have authority to transfer or cause the transfer of Sector ACE. Only the Sector's Manager, acting in accordance with the provisions of this Section, has the authority to cause the transfers of Sector ACE. Transfers of Sector ACE may only be initiated and consummated in strict compliance with the terms and conditions of this Section 3.2 and Section 3.3, below. All other purported transfers of Sector ACE shall be null and void.

3.2.1 A Member who wishes to initiate a transfer of Sector ACE (the "Transferring Member") from the Sector to another sector (the "Receiving Sector") must first reach agreement on all material transfer terms with the member of the Receiving Sector who is party to the proposed transaction. The material terms shall include but not be limited to the Moratorium Rights Identification (MRI) number that generated the Sector ACE that is the subject of the proposed transaction, poundage of the stock to be transferred from the Sector, identified by species and management area, and the consideration to be provided by the Receiving Sector in exchange, in cash or in pounds of stock, identified by species and management area. Upon reaching agreement with the member of the Receiving Sector on terms of the proposed transaction, the Transferring Member shall inform the Sector's Manager of the terms and conditions of the proposed transfer.

3.2.2 The Sector's Manager shall contact the Receiving Sector's manager, and shall verify that the transaction complies with the Sector's and the Receiving Sector's transfer rules and procedures then in effect, including but not limited to any provisions concerning retention of Harvest Share Reserves and payment of required transfer fees. If the Sector's Manager or the Receiving Sector's manager determine that the proposed transaction does not comply with the Sector's or the Receiving Sector's transfer rules or procedures, the Sector's Manager shall inform the Transferring Member and take no further action on the transfer.

3.2.3 If the Sector's Manager and the Manager of the Receiving Sector determine that the transfer complies with their respective transfer rules and procedures, the Sector's Manager shall contact the Receiving Sector's Manager to verify that consideration to be provided in exchange for Sector ACE is readily available for transfer or disbursement. Upon doing so, the Sector's Manager shall identify the Sector ACE that is proposed to be transferred, and verify that it is readily available for transfer.

3.3 Harvest Share and Sector ACE Rights of First Offer. Upon the completion of the steps identified in Sections 3.2.1, 3.2.2, and 3.2.3 above, the Sector's Manger shall provide written notice (the "Harvest Share/ACE Offer") to the parties with rights of first offer (as identified in this Section 3.3) with respect to the proposed transaction, with a copy to the Receiving Sector's Manager and the NESSN Program Director (at NESSN.ROFRo@gmail.com). The Harvest Share Offer shall specify the amount and specie(s) of the proposed transfer and shall specify all proposed transfer terms and conditions (including but not limited to the proposed transfer fee and/or the ACE exchange rate). **Such written notice shall constitute notice for purposes of measuring the time period during which each party with a right of first offer or right of first refusal must exercise their right. No other notice, no matter how or by whom it is given, shall have the effect of triggering the time period for rights of first offer or rights of first refusal under the Membership Agreement.**

3.3.1 The Sector's Manager shall first offer the Harvest Share that is the subject of the Harvest Share/ACE Offer to the Sector's Active Members. The Harvest Share/ACE Offer shall be delivered in writing by posting to all Active Members on the "Fishtrax" web site or through such other means as the Sector's Board of Directors may authorize from time to time. Each Active Member shall have one hundred forty four (144) hours from the date and time that Harvest Share/ACE Offer is posted on the Fishtrax website or otherwise delivered to such Active Member to accept such offer on the terms and conditions set forth therein. An Active Member that elects to do so shall notify the Transferring Member, the Sector's Manager and the other Active Members in writing within such 144 hour period. If more than one Active Member elects to accept the Harvest Share/ACE Offer, the Active Members doing so shall each have a right to acquire a pro rata interest in the offered Harvest Share, on the terms and conditions set forth in the Harvest Share/ACE Offer.

3.3.2 If the proposed acquiring party in the Harvest Share/ACE Offer is an active member of an NESSN Member Sector, and if none of the Sector's Active Members exercises his, her or its right of first offer concerning the related Harvest Share within 144 hours, the Sector ACE that is subject of the Harvest Share/ACE Offer may then be transferred to the Receiving NESSN Member Sector

for the benefit of the acquiring party , without being subject to further rights of first offer in favor of the members of other NESSN Member Sectors.

3.3.3  If the acquiring party under the Harvest Share/ACE Offer is a member of a sector other than an NESSN Member Sector and if none of the Sector's Active Members elect to exercise their right of first offer within the first 72 hours of the 144 hour time period described in Section 3.3.1, above, the Sector's Manager shall next deliver the Harvest Share/ACE Offer to the Managers, Active Members of all other Northeast Fishery Sectors (the "NEFS Managers" and the "NEFS Active Members", respectively) and the NESSN Program Director.   The Sector's Active Members and the NESSN Member SectorsActive Members exercise periods shall run simultaneously for an additional 72 hours, and each NEFS Active Member shall have seventy two (72) hours from the date and time that the Harvest Share/ACE Offer is delivered by the Transferring Sector's Manager to accept the Harvest Share/ACE Offer on the terms and conditions set forth therein.  An NESSN Member Sector Active Member that elects to do so shall notify the Transferring Member, the Sector's Manager and the other NESSN Member SectorActive Members in writing within the 72 hour time period set forth above.  If more than one NESSN Member SectorActive Member elects to accept the Harvest Share Offer, the NESSN Member SectorActive Members doing so shall each have a right to acquire a pro rata interest in the offered Harvest Share, on the terms and conditions set forth in the Harvest Share Offer.    If any of the Sector's Active members elects to exercise their right of first offer during the NESSN Member SectorActive Member time period (i.e., during the second 72 hour period of the 144 hour Sector Active Member exercise period), the Sector's Active Member's or Active Members' offer(s) shall supersede any and all NESSN Member SectorActive Member offers.

3.3.4  If a party or parties with rights of first offer under this Membership Agreement exercise their rights on a timely basis, the Sector Manager shall have the authority to cause the proposed ACE transfer to be made to that party or those parties in accordance with this Agreement, or in accordance with any rules adopted by the Sector Board of Directors that supersede this Agreement.  If no party with a right of first offer under this Agreement exercises their rights on a timely basis, the Sector Manager may then proceed with a transfer of Sector ACE that gives effect to the proposed transaction, subject to the terms and conditions of the Sector Operations Plan and the transferring Sector's Membership Agreement, including but not limited to obligations to pay Sector Operating Fees and Network Fees.  The Sector Manager may delay an ACE transfer until all obligations to pay Sector Operating Fees and Network Fees have been fulfilled, and may impose transfer procedures, including but not limited to transfers through an escrow agent, that the Sector Manager deems necessary or appropriate to protect the Sector's interests or to insure compliance with Sector transfer restrictions and rules.

3.3.5  To expedite trades of Harvest Share and ACE during the last two weeks of the fishing year, and during the NMFS reconciliation process proceeding the recently ended fishing year, the 144 hour Active Member exercise period set forth above shall be shortened to forty eight (48) hours, the Sector's Active Members shall have an initial exclusive 24 hour exercise period and a 48 hour total exercise period, and the NESSN Member SectorActive Members shall have a 24 hour concurrent exercise

period. All other Harvest Share and ACE transfer rules and procedures set forth herein shall remain in force.

3.3.6 In any dispute that arises in connection with a proposed transaction involving a transfer of a Sector's ACE, is exempted from the dispute resolution mechanism articulated in §18 of the NESSN Member Sectors FY 2019 & FY 2020 Operations Plan and Agreement, in so much as that the Board of Directors of the transferring Sector shall have the final authority to adjudicate the dispute. The decision of the transferring Sector's Board of Directors shall be final, and shall be as the Board of Directors deems appropriate in their sole discretion.

3.3.7 No transfer of Sector ACE may have duration in excess of the annual term of the Sector ACE allocation.

3.3.8 The Sector ACE amounts corresponding to each Member's interest in the Sector's Reserve are non-transferable unless and until the Sector Board of Directors explicitly releases them for transfer.

3.3.9 The Sector may adopt rules governing the distribution of ACE transfers it receives, so long as such rules are not inconsistent with the provisions of this document.

3.4 Permit Transfers. A Member may transfer a Permit to a party other than a Member, **subject to** a right of first refusal that is extended in accordance with the terms of this Section in favor of first, the Sector's Active Members, and second, the NESSN Member SectorActive Members. For purposes of this Section 3, transferring a fifty percent or greater interest in a Permit or in the entity that holds a Permit shall constitute a Permit transfer.

3.4.1 If a Member receives a third party offer to lease or purchase the Member's Permit that the Member desires to accept (a "Permit Offer"), the Member receiving the Permit Offer (the "Selling Member") shall provide all of the Sector's Active Members, the Sector Manager, and the NESSN Program Director, with a complete description, in writing, of all of the terms and conditions of the Permit Offer, including but not limited to Potential Sector Contribution/MRI of the permit, as well as all other material terms of the Permit Offer. The Sector's Active Members shall have thirty (30) days from receiving the Permit Offer to elect to purchase the assets that are the subject of the Permit Offer on the terms and conditions set forth in the Permit Offer. An Active Member that elects to do so shall notify the Selling Member, the Sector Manager and the other Active Members in writing within the 30 day time period set forth above. If more than one Active Member provides written notice of his or her or its intent to exercise its right of first refusal under this Section, the Active Member who responds first in time shall have the right to acquire the assets that are the subject of the Permit Offer, on the terms and conditions set forth in the Permit Offer.

3.4.2 If none of the Sector's Active Members elect to exercise their right of first refusal under Section 3.4.1 within the first fifteen (15) days of the 30 day time period set forth above, the Selling Member shall next provide the same description of the Permit Offer that was provided to the Sector's Active Members to the NEFS Managers, the NESSN Member SectorActive Members, and the

NESSN Program Director.   Each NESSN Member SectorActive Member receiving a description of the Permit Offer shall have fifteen (15) days from receiving the Permit Offer to elect to purchase the assets that are the subject of the Permit Offer on the terms and conditions set forth in the Offer.  Such 15 day period shall be simultaneous with and not additive to the last 15 days of the Sector's Active members' 30 day right of first refusal period.  A NESSN Member SectorActive Member that elects to purchase the assets that are the subject of the Permit Offer shall notify the Selling Member, the Sector Manager, the Sector's Active Members, NEFS Managers and the NESSN Member Sector Active Members in writing within the 15 day time period set forth above. If a Sector Active Member exercises their right of first refusal during the NESSN Member Sector Active Member time period (i.e., during the second 15 days period of the 30 day Sector Active Member exercise period), the Sector Active Member's offer shall supersede any and all NESSN Member Sector Active Member offers. If more than one Active Member and/or NESSN Member Sector Active Member provide written notice of their intent to exercise their right of first refusal under this Section, the Active Member who responds first in time shall have the right to acquire the assets that are the subject of the Permit Offer, on the terms and conditions set forth in the Permit Offer.  If more than one NESSN Member Sector Active Member provides written notice of his or her or its intent to exercise his/her right of first refusal under this Section, the NESSN Member SectorActive Member who responds first in time shall have the right to acquire the assets that are the subject of the Permit Offer, on the terms and conditions set forth in the Permit Offer. If the 'third party' purchaser is an NESSN Member Sector Active Member, the Permit Offer that initiated ROFR under Section 3.4 will constitute written notice of that NESSN Member Sector Active Members intent to exercise their ROFR and the Sector's Active Members will have 30 days to exercise their ROFR under Section 3.4.1. **Upon closing of the transaction contemplated under the Permit Offer, if the acquiring party is not already an "Active Member" of the Sector, the acquiring party shall be deemed a "non-Active Member" of the Sector, with no rights to harvest any Sector ACE, including but not limited to the ACE allocated to the Sector in connection with the assets acquired under the Permit Offer, unless and until such non-Active Member receives "Active Member" status in the Sector in accordance with the Sector Operations Plan.**

3.4.3  If none of the Sector's Active Members and none of the NESSN Member SectorActive Members elects to exercise their right of first refusal under this Section 3.4 within the 30 day time period set forth above, the Selling Member may accept the Permit Offer as described to the Sector's Active Members and NESSN Member Sector Active Members, on the conditions that (i) the Permit transfer is consummated within sixty (60) days of the expiration of the applicable right of first refusal election period(s), and (ii) if the Selling Member is a Sector Member at the time of the transfer, the transferee assumes all of the Member's obligations under the Sector Operations Plan then in effect and this Agreement, including but not limited to the restrictions on transfer set forth in this Agreement. If either of conditions (i) or (ii), above are not satisfied, the Selling Member shall not complete the Permit sale, and shall not accept any other offer to purchase a Permit without first providing the Sector's Active Members and NESSN Member Sector Active Members with another right of first refusal in accordance with Sections 3.4.1 and 3.4.2.  **If the Permit sale closes, the acquiring party shall be deemed a "non-Active Member" of the Sector, with no rights to harvest any Sector ACE, including but not limited to the ACE allocated to the Sector in connection with the assets acquired under the Permit**

Offer, unless and until such non-Active Member receives "Active Member" status in accordance with the Sector Operations Plan.

3.4.4 Notwithstanding the foregoing provisions of Section 3.4.1 and 3.4.2, the following Permit transfers shall be exempt from the restrictions on Permit transfers set forth in those Sections.

3.4.4.1 A transfer made as part of a Member's reorganization of his, her or its business, if as part of such reorganization the Permit is transferred to an entity in which the Member holds a "controlling interest", as defined in Section 3.4.4.5, below.

3.4.4.2 A transfer from a Member to one or more individuals in the Member's immediate family, provided that as a condition of Permit transfer, the transferee(s) agree to remain enrolled in the Sector for the remainder of the fishing year in which the Permit transfer takes place and for the following fishing year.

3.4.4.3 A transfer to an individual or entity that is, in the opinion of the Selling Member's Board of Directors, a broadly recognized member of the Sector's "local fishing community", as defined in Section 3.4.4.5, below, provided that as a condition of Permit transfer, the transferee agrees to enroll in the Sector for the remainder of the fishing year in which the Permit transfer takes place and for one additional fishing year. If the transferee is already a member of another sector, the transfer must also be conditioned on the transferee agreeing (i) to remain a non-Active Member of the Sector for the period of time that the transferee is an "Active Member" of another sector and (ii) to enroll all of the MRI permits in which the transferee holds a controlling interest in the Sector for the fishing year following the year during which the Permit transfer is made.

3.4.4.4 A transfer to an individual or entity that is not a member of a NESSN Member SectorS, provided that as a condition of Permit transfer, the transferee (i) submits a written notice to the Selling Member's Board of Directors that the transferee wishes to become a permanent member of the Sector's local fishing community, (ii) is approved as a Sector Member by the Selling Member's Board of Directors, and (iii) agrees to enroll in the Sector for the remainder of the fishing year during which the transfer takes place, plus an additional two (2) fishing years. If the transferee is already a member of another sector, the transfer must also be conditioned on the transferee agreeing (i) to remain a non-Active Member of the Sector for the period of time that the transferee is an "Active Member" of another sector and (ii) to enroll all of the MRI permits in which the transferee holds a controlling interest in the Sector for the two (2) fishing years following the year during which the Permit transfer is made.

3.4.4.5 For purposes of Sections 3.4.4.1 through 3.4.4.4, "controlling interest" shall mean a direct or indirect interest in a Permit or in an entity holding a Permit which gives the interest holder effective control over the Permit's disposition, including but not limited to whether the Permit is enrolled in a sector. For purposes of Sections 3.4.4.1 through 3.4.4.4, the Sector's "local fishing community" shall mean the geographic area within which a majority of the Members reside and conduct their fishing business.

3.4.5 Active Members and NESSN Member Sector Active Members respectively may waive their rights under Section 3.4.1 and 3.4.2 in writing. In the event that all Active Members and NESSN Member Sector Active Members waive their rights under those Sections in writing with respect to a specific Permit Offer, the related transaction may be completed in accordance with Section 3.4.3 without the Permit being made available under Sections 3.4.1 and 3.4.2.

3.5 Modification or Waiver of Transfer Restriction Rules. The Manager does not have authority to modify or waive any of the conditions imposed on transfers of Sector ACE under this Agreement. Any attempted modification or waiver of any such conditions by the Manager that is not explicitly approved by the Sector's Board of Directors in accordance with the Sector's Bylaws is null and void. If a Member wishes to propose a modification or waiver of the transfer rules set forth in this Membership Agreement, the Member shall propose the change to the Manager, and the Manager shall submit the proposed modification or waiver to the Sector's Board of Directors consideration. If the Board of Directors approves the modification or waiver, the Manager shall then notify the Managers of the remaining NEFS Sectors of the proposed modification or waiver. Each Manager shall then submit the proposed modification or waiver to the Board of Directors of that Manager's Sector. The modification to or waiver of Sector ACE transfer restrictions shall take effect only if and when it has been approved by the Boards of Directors of all NEFS Sectors.

4. Initial Membership Fee. Each Member that harvests Sector ACE (i.e., each Active Member) shall pay a membership fee of Two Thousand Five Hundred Dollars ($2,500.00) to the Sector, which in turn will pay NSC. Members that do not harvest Sector ACE (i.e., non-Active Members as defined in Section 7 below) shall not be obligated to pay a membership fee. Members who have provided financial support Northeast Seafood Coalition ("NSC") in connection with its support of sector formation shall receive annual refunds from the Sector until they have been reimbursed an amount equal to their contribution to NSC.

5. Relationship Among the Sector, the Sector's Members, NSC and NESSN.

5.1 Membership. The Member agrees to join NSC and authorizes the Sector to collect the Member's NSC dues and assessments and pay them to NSC; authorizes the Sector's Board to enroll the Sector in NESSN, and agrees to pay the Member's pro rata share of the Sector's NESSN fees, as calculated by the Sector Board from time to time; and authorizes the Sector Board to appoint NESSN as its agent for purposes of calculating and collecting the Member's NSC dues and assessments and the NESSN fees.

5.2 NSC and NESSN Fees. The Member acknowledges that NESSN will provide support and services to achieve optimal operational needs for its member Sector. Furthermore, the Members acknowledge that NSC will represent NESSN Member Sectors on political and policy matters. To offset the cost of these services, fees will be adopted by the NESSN Board of Directors, herein referred to as the "Network Fee". Each Member shall pay the Network Fee per landed pound of allocated species that such member harvests, or causes to be transferred to a sector that is not a member of the NESSN, from the Sector's ACE allocation. The ROFO written notice as articulated in Section 3.3 will serve as the only

written documentation utilized for purposes of determining whether a transfer between a Member Sector and a non-Member Sector will result in a modified application of the Network Fee for fish for fish transactions. Alternative methods of calculating Network Fee, such as a flat fee; percentage on gross value; fee per landed pound allocated may be utilized in lieu of the fee per landed pound harvested or transferred out of Network identified above. The Network Fee will be evaluated, by the current NESSN Board of Directors after the first quarter of each fishing year to determine whether it is meeting its targeted amount, and may be adjusted at that time. The Network Fee amount is located in Exhibit A, which may be amended from time to time in accordance with this agreement.

5.2.1 Network Fee on Carryover. The Member acknowledges that the Sector may withhold a certain percentage of Sector ACE, otherwise known as the Reserve, prior to distributing Harvest Share to Members at the start of the Fishing Year. After final reconciliation of the previous Fishing Years ACE usage has been completed by the Sector and NMFS a certain percentage of unutilized Sector ACE, as specified by NMFS, may be carryover into the next Fishing Year. The Sector may elect to distribute any carryover amount, as adjusted by in-season utilization during the previous fishing year to Members for utilization in the current Fishing Year. In the event, a Member enrolls in a non-NESSN Member Sectors the year following enrollment in a NESSN Member Sector, and the NESSN Member Sector receives a carryover that they intend to distribute back to contributing Members, any transfer of the previous NESSN Member Sector Member's contribution to the Reserve subsequently available as Carryover, leased by the NESSN Member Sector to the non-NESSN Member Sector Sector the Member is now enrolled in will not be subject to the Network Fee on Leasing out of Network conditioned on appropriate documentation of the transfer.

5.3 Sector Fees. To offset the cost of retaining the Sector's Manager and related cost of telephone services, internet access, office supplies, travel reimbursement and other general Sector administrative and overhead expenses, each Member shall pay an additional amount, as determined appropriate by the Sector's Board of Directors from time to time (the "Sectors Operations Fee"). Similar to the Network Fee, the Sector Fee may utilize alternative methods of calculating Sector Fee, which may or may not be based on a per pound basis.

5.4 Outstanding Network Fee's and/or Sector Fees by Member who does not re-enroll in NEFS VII. The Member acknowledges that their financial obligation to the Sector, NESSN and NSC are not absolved in the event the Member enrolls in another Sector in subsequent years. In order to ensure that the Sector, NESSN and/or NSC are made whole, it is imperative that the NEF Sectors work together to ensure that all debts accrued by a Member are reconciled in a timely fashion. The Member hereby is given notice that the NESSN Member Sectors will work collaboratively to develop appropriate mechanisms to ensure any outstanding debt is remedied as soon as possible. Such mechanism may include, **but are not limited to** transferring Member's debt to the Sector in which he/she is currently enrolled, or Sector's refusal to release Members interest in harvest share.

6. Use of Monitoring Services. The Members acknowledge that for the Sector to function efficiently, it is essential that the Active Members conduct their fishing operations such that monitoring service costs are kept as low as commercially practical. The Active Members therefore agree to act in

accordance with the various processes established by the Sector for monitoring requirements. Active Members who fail to comply with the provisions of this Section 6 may be assessed the excess cost of monitoring resulting from their failure to do so.

7. Active and Non-Active Members. Member acknowledges that each NESSN Member Sectors Board of Directors has adopted unique and specific annual application enrollment qualifications. Acknowledging that Active and Non-Active classifications come with specific rights and obligations; each NESSN Member Sector Board of Directors have the final authority, in so much as that to determine and specify Members enrollment as Active or Non-Active.   The NESSN Member Sector Board of Directors annual application and determination process for membership is final and   is exempted from the dispute resolution mechanism articulated in §18 of the NESSN Member Sector FY 2019 & FY 2020 Operations Plan and Agreement

7.1 Designation of Active and Non-Active Membership will be based on the signed Adherence Agreements completed by the Members, in accordance with designation process/list established by the NESSN Member Sectors Board of Directors and as submitted to NMFS for the purposes of annual sector authorization. The Sector will provide NESSN with copies of all completed adherence agreements and a list that identifies all Sector Members, their designation of Active or Non-Active, and any other information deemed necessary for roster enrollment within fifteen (15) days of the Sector's final Roster deadline, or within fifteen (15) days of the Sectors Board of Directors in-season adjustment of Members active/non-active status. In the event a question arises regarding a Member's status as it relates to rights and obligations identified in Section 3 of this agreement the list on file with NESSN shall control.

7.2 Active Members.  The Members acknowledge that Active Members are those individuals who intend to fish in Sector ACE accountable fisheries during the Fishing Year and have been approved to enroll as Active Members in accordance with the Sectors annual enrollment process as establish by each NESSN Member Sector's Board of Directors.  Active Members are responsible for ensuring all harvesting activity is in accordance with the Harvesting Rules of the NESSN Member Sectors Operations Plan as approved by NMFS.  Additionally Active Members are distinguished from non-Active Members as it relates to Rights of First Offer and Refusal in Section 3 of this Agreement and are responsible for ensuring all financial obligations are satisfied as specified in Section 5.2 of this Agreement.

7.3. Non-Active Members.  The Members acknowledge that Active Members are assuming certain costs and risks associated with harvesting the Sector's ACE on behalf of the non-Active Members, and that the Active Members are making certain financial contributions to the Sector that are not being made by non-Active Members. Obligations assumed by Active Members that are not imposed on non-Active Members include, but are not limited to payments of the Initial Membership Fee, and paying Network Fees and Sector Fees in connection with landings of catch harvested under the Sector's ACE. In consideration for the Active Members assuming these costs, risks and fee obligations, each non-Active Member shall:

7.3.1 Not fish in ACE-accountable fisheries;

7.3.2 Not receive Sector Harvest Share by transfer. However, a Non-Active member may act as a transferee through an inter-sector transfer of ACE, provided the transaction results in a net increase of the Sector's ACE.

7.3.3 Not have access to information on FishTrax, other than the information necessary to track the availability of such Member's Harvest Share, and specifically, shall not have access to Harvest Share/ACE offers or Permit offers posted on FishTrax, or through such other means as the Sector's Board of Directors may authorize from time to time, in accordance with Section 3 of this Agreement;

7.3.4 Not have the rights of first offer on Sector Harvest Share and the related Sector ACE extended to Active Members under Section 3, above, and shall not have a right of first refusal on Permits extended to Active Members under Section 3, above; and

7.3.5 Pay Sector Operating Fees on the net amount of Sector ACE transferred out of the Sector at such Member's request, and pay the Network Fee on the net amount of Sector ACE transferred out of the NESSN Member Sectors at such Member's request, in accordance with the provisions of this agreement.

7.3.6 A Non-Active Member, who wishes to change their designation to Active Member at a later date, may only do so by first receiving approval by their Sector's Board of Directors. If the Sector's Board of Directors approves the request, the requesting member must execute a new Adherence Agreement, documenting the designation change and attesting to the members understanding of all rights and obligations associated with Active Member designation. A copy of the executed Adherence Agreement and written documentation of the Sector's Board of Directors decision must be provided to NESSN within fifteen (15) days of the Boards decision. Once submitted, the individual's status will be updated in NESSN files and the Member will be deemed Active for the purposes of the Sector Operations Plan and this Agreement.

8. No Collective Marketing. The Members acknowledge that the Sector has not been formed or qualified as a fishermen's collective marketing association. The Members therefore agree that nothing in this Agreement shall be construed as permitting or obligating Members to collaborate regarding the processing, marketing or sales of the product produced from catch harvested under their Harvest Shares. Each Member shall conduct all sales of such catch in competition with the other Members, and shall hold ex-vessel price information as confidential from other Members until such information becomes public or until such price information is six months old, unless and until the Sector is properly qualified under State and Federal law as a fishermen's collective marketing association.

9. Dispute Resolution. Disputes arising in connection with this Agreement that are not settled through negotiation shall be resolved through binding arbitration in accordance with Section 18 of the Sector Operations Plan.

10. Hold Harmless and Indemnification. The provisions of Section 16 of the Sector Operations Plan holding harmless and indemnifying the Sector Manager shall extend to any actions taken by the Sector Manager under this Agreement.

Exhibit A

Fishing Year 2019 (May 1, 2019-April 30, 2020): The NESSN Board of Directors meet on **January 10, 2019** to review the establish the preliminary FY 2019 Network Fee, utilizing the FY 2019 budgets of the Northeast Sector Service Network and the Northeast Seafood Coalition, projected Annual Catch Limits, and Sector Roster enrollment based on FY 2018 enrollment. Based on this information, the preliminary Network Fee Fishing Year 2019 was set:

- Network Fee on Landings of Allocated Stocks: The Fishing Year 2019-2020 Network Fee will continue to be Two and a Quarter Cents ($0.0225) per landed pound of allocated stocks, excluding Redfish.

- Network Fee on Transfers of all allocated stocks to a Sector that is not a Member of NESSN: The Network Fee for Fishing Year 2019 on transfers of **all allocated stocks, including Redfish** to a sector that is not a member of NESSN, from the Sector's ACE allocation will continue to be Two and a Quarter Cents ($0.02250). The Network Fee will continue to be waived for ACE transfers between NESSN member sectors. The Network Fee will be invoiced based on live pounds.

- Network Membership Fee: Additionally, acknowledging that both NSC and NESSN have been operating in the red for the past few fishing years, the NESSN Board of Directors had a lengthy discussion on different ways to offset the budgetary shortfalls of both organizations. Ultimately, the NESSN Board of Directors voted to continue the Network Membership Fee established in FY 2018. The Network Membership Fee will be calculated by multiplying the number of permits/Moratorium Rights Identifier (MRI) enrolled in the Member Sector for the Fishing Year by $150.00. The Network Membership Fee will be billed at the start of each fishing year. Each Sector will be expected to make at minimum quarterly payments towards the invoiced amount, with payment of the full invoiced amount expected no later than April 1, 2020. *It will be at each Member Sector's sole discretion how they choose to generate the revenue from their members to satisfy this fee.*

Split of Network Fee & Sector Network Fee between NSC and NESSN:

- For the past few years income generated by the Network Fee has been split between NSC and NESSN 70/30%. The NESSN Board of Directors voted to adjust this split to 65/35% between NSC and NESSN starting in FY 2018. Therefore Network Fee is distributed as follows between NESSN & NSC:

| TOTAL FY 2019 Network Fee on Landings (excluding Redfish) and Transfers of Sector ACE out of Network | $0.0225 |
|---|---|
| Organization | Proportion of Network Fee: |
| TOTAL PORTION OF NETWORK FEE THAT GOES TO NESSN | $0.007875 |

| TOTAL PORTION OF NETWORK FEE THAT GOES TO NSC | $0.014625 |
| --- | --- |

- As with previous fishing years, the NESSN Board of Directors, may meet prior to or during the Fishing Year 2019 to reevaluate the Network Fee & Sector Network Membership Fee in light of final Sector Enrollment, Sector ACE Allocation, and the respective budgets of the Northeast Sector Service Network and Northeast Seafood Coalition.

Fishing Year 2020 (May 1, 2020-April 30, 2021): The NESSN Board of Directors will meet in the fall of 2020 or early in 2021to establish the Network Fee for FY 2020. Similar to previous years, the Board of Directors will review the budgets of the Northeast Sector Service Network and the Northeast Seafood Coalition, projected Annual Catch Limits, and Sector Roster enrollment based on FY 2019 enrollment. The FY 2020 Network Fee will provide as an addendum to this agreement and will be distributed to all Members via their Sector Managers prior to the start of FY 2020.

NORTHEAST FISHERY SECTOR VII

SECTOR MEMBERSHIP AGREEMENT

This Sector Membership Agreement is entered into by and between Northeast Fishery Sector VII, a Massachusetts nonprofit corporation (the "Sector") and its members (each, a "Member" and together, the "Members") as of ____________ **[insert date]**, for Fishing Year 2019 (May 1, 2019-April 30, 2020) **and** Fishing Year 2020(May 1, 2020-April 30, 2021), with respect to the following facts.

1. **Member has carefully reviewed the NEFS VII Sector Membership Agreement the "Agreement" and Operations Plan and Agreement the "Operations Plan", (as the same may be amended, or restated from time to time) and by executing this Adherence Agreement agrees to be bound by all provisions of both the "Agreement" and "Operations Plan".**

2. **Member acknowledges that both the NEFS VII Sector Membership Agreement the "Agreement" and Operations Plan and Agreement the "Operations Plan" (as the same may be amended, or restated from time to time) are for both Fishing Year 2019 (May 1, 2019-April 30, 2020) and Fishing Year 2020 (May 1, 2020-April 30, 2021).**

3. Upon execution of this Agreement by Member and the satisfaction of all other conditions precedent to Member's membership in the Sector, Member shall be deemed admitted as a Member of the Sector and such admittance shall be reflected on the Sector's records for **Fishing Year 2019**.

4. Furthermore, Member acknowledges that the NEFS VII Operations Plan establishes the process that must be followed for continued enrollment in NEFS VII for **Fishing Year 2020**. Upon satisfactory completion of all other condition precedent to Member's continued membership in the Sector for FY 2020, execution of this Agreement will be used to deem the Member admitted as a Member of the Sector and such admittance shall be reflected on the Sector's records for Fishing Year 2020.

EXECUTED as of the day and year first set forth above.

Signature of Authorized Representative:

x. ______________________________

Owner/Entity Name:

______________________________

Name of Authorized Representative (print):

______________________________

Title:

______________________________

# Exhibit G

# Contents

Recitals ..... 4

Agreement ..... 4

1. Sector Name ..... 4

2. Sector Eligibility and Membership ..... 4

2.1. Rule of Three Requirement ..... 5

3. Member and Vessel Permits ..... 5

4. Sector Allocation and Exemptions ..... 5

5. Distribution of Sector ACE ..... 5

6. Sector Manager and Registered Agent ..... 6

6.1. Communication with Sector ..... 6

7. Consolidation Plan ..... 7

7.1. Harvest Share Reserve ..... 7

7.2. Harvest Share Use ..... 7

7.3. Harvest Share Transfer ..... 9

7.4. Harvesting Rules and Fishing Plan ..... 9

7.5. Re-direction of Effort ..... 9

7.6. Sector Vessel Interactions with Allocated Species in Non-Amendment 16 Fisheries ..... 10

7.7. Consolidation and Redistribution of ACE ..... 10

8. Release of Catch Data ..... 10

9. Catch Monitoring and Reporting ..... 11

10. Breach and Remedies for Breach ..... 11

10.1. Liquidated Damages Schedule and Schedule Amendments ..... 12

10.2. Enforcement Committee ..... 12

10.3. Liquidated Damages Base Value and Multiplier Adoption ..... 12

10.4. Liquidated Damages Calculation ..... 13
10.5. Notice to Vessel Masters; Assumption of Liabilit ..... 13
10.6. Liquidated Damages Security ..... 13
10.7. Manager Action in Response to Apparent Br ..... 13
10.8. Member Appeals ..... 14
10.9. Voluntary Compliance ..... 15
10.10. Liquidated Damages Collection and Related Expenses ..... 15
10.11. Consequential Damages for Gross Negligence or Willful Misconduct ..... 16
10.12. Distribution of Damages ..... 16
11. Joint Liability and Indemnification ..... 16
12. Membership Termination ..... 17
13. Expulsion ..... 18
14. Stop Fishing Order; Injunctive Relief ..... 18
14.1. Issuance of Stop Fishing Order ..... 19
14.2. Failure to Comply with Stop Fishing Order. ..... 19
15. Permit Transfer/Sale ..... 20
16. Release and Waiver of All Claims against Sector Manager; Indemnification and Hold Harmless ..... 20
17. Sector Membership Fees ..... 21
18. Binding Arbitration ..... 21
19. No Collective Marketing ..... 22
20. Amendment and Incorporation by Reference ..... 22
EXHIBIT A: HARVESTING RULES FOR FY 2019 and FY 2020 ..... 23
Exhibit B: Additional Details Regarding Specific Approved Sector Exemptions ..... 36
Exhibit C: Sector Membership Fishing Year 2019 (May 1, 2019 to April 30, 2020) ..... 41
EXHIBIT D: Sector Member and Vessel Permits Amendment 16 Disclosure Requirements Fishing Year 2019 (May 1, 2019 to April 30, 2020) ..... 46

EXHIBIT E: Penalty Schedule ........ 51

Exhibit F: Administrative Provisions Addendum: ........ 53

Exhibit G: EXPLANATORY ADDENDUM ........ 57

Exhibit H: INFORMATIONAL ADDENDUM ........ 58

EXHIBIT I: FY 2020 (MAY 1, -APRIL 30, 2021) Operations Plan Updates ........ 59

Exhibit J: ASM Provisions ........ 60

SECTOR OPERATIONS PLAN AND AGREEMENT

This NORTHEAST FISHERY SECTOR OPERATIONS PLAN AND AGREEMENT (this "Agreement") is entered into as of **March 8, 2019** (the "Effective Date"), by and among VII Northeast Fishery Sector, Inc. ("NEFS VII") and each of the Sector members identified on the attached **Exhibit C**.

**Recitals**

A. Pursuant to "Amendment 16" to the Northeast Multispecies Fishery Management Plan and implementing regulations promulgated by the National Marine Fisheries Service ("NMFS"), a group of persons holding limited access multispecies vessel permits may form self-selecting voluntary sectors for fishery management. As a condition to forming a sector under Amendment 16, the persons wishing to do so must enter into a binding sector operations plan and agreement that contains the required elements.

B. The parties to this Agreement wish to form a self-selecting voluntary sector under Amendment 16 and to do so are voluntarily entering into this Agreement for **Fishing Year 2019 (May 1, 2019-April 30, 2020) and Fishing Year 2020 (May 1, 2020-April 30, 2021).**

**Agreement**

Now therefore, for and in consideration of the agreements, covenants, rights and obligations set forth herein and the mutual benefits anticipated by the Members under this Agreement, the receipt and sufficiency of which is hereby acknowledged, the Members and Sector hereby agree as follows:

1. Sector Name. The organization described under this Agreement shall be called the VII Northeast Fishery Sector, Inc. This is a non-profit organization incorporated in Massachusetts on May 26, 2009 and therefore may be held liable for violations committed by its members.

2. Sector Eligibility and Membership. To be eligible to be a member of the Sector, a person must hold a Limited Access Northeast multi-species permit and meet all other Sector eligibility requirements as established from time to time by the Sector's Board of Directors (the "Board"). Any person wishing to become a Sector member must submit an application no later than sixty (60) days prior to the annual deadline by which Sector contracts must be submitted to NMFS. Sector membership shall be effective upon admission of a member by the Board and acceptance by execution by such member of the Sector's Membership Agreement. Subject to the automatic renewal provisions of Section 12 below, and the disciplinary expulsion provisions of Section 13 below, Sector membership

SECTOR OPERATIONS PLAN AND AGREEMENT

This NORTHEAST FISHERY SECTOR OPERATIONS PLAN AND AGREEMENT (this "Agreement") is entered into as of **March 8, 2019** (the "Effective Date"), by and among VII Northeast Fishery Sector, Inc. ("NEFS VII") and each of the Sector members identified on the attached **Exhibit C**.

## Recitals

A. Pursuant to "Amendment 16" to the Northeast Multispecies Fishery Management Plan and implementing regulations promulgated by the National Marine Fisheries Service ("NMFS"), a group of persons holding limited access multispecies vessel permits may form self-selecting voluntary sectors for fishery management. As a condition to forming a sector under Amendment 16, the persons wishing to do so must enter into a binding sector operations plan and agreement that contains the required elements.

B. The parties to this Agreement wish to form a self-selecting voluntary sector under Amendment 16 and to do so are voluntarily entering into this Agreement for **Fishing Year 2019 (May 1, 2019-April 30, 2020) and Fishing Year 2020 (May 1, 2020-April 30, 2021).**

## Agreement

Now therefore, for and in consideration of the agreements, covenants, rights and obligations set forth herein and the mutual benefits anticipated by the Members under this Agreement, the receipt and sufficiency of which is hereby acknowledged, the Members and Sector hereby agree as follows:

1. Sector Name. The organization described under this Agreement shall be called the VII Northeast Fishery Sector, Inc. This is a non-profit organization incorporated in Massachusetts on May 26, 2009 and therefore may be held liable for violations committed by its members.

2. Sector Eligibility and Membership. To be eligible to be a member of the Sector, a person must hold a Limited Access Northeast multi-species permit and meet all other Sector eligibility requirements as established from time to time by the Sector's Board of Directors (the "Board"). Any person wishing to become a Sector member must submit an application no later than sixty (60) days prior to the annual deadline by which Sector contracts must be submitted to NMFS. Sector membership shall be effective upon admission of a member by the Board and acceptance by execution by such member of the Sector's Membership Agreement. Subject to the automatic renewal provisions of Section 12 below, and the disciplinary expulsion provisions of Section 13 below, Sector membership

shall expire at the conclusion of each fishing year, unless renewed by the Board in accordance with the Sector's Bylaws and this Agreement. The Sector's members (the "Members"), such Members' "Limited Access Multispecies Permit" (LA MS) as identified by its "Moratorium Rights Identifier" (MRI), and the vessels that will harvest the Sector's Amendment 16 allocations are identified on the attached **Exhibit C**, which may be amended from time to time in accordance with this Agreement and the Sector's Bylaws.

2.1. Rule of Three Requirement: Amendment 16 to the NE multispecies FMP defines a sector as a group of three or more persons, none of whom have an ownership interest in the other two persons in the sector. This criterion has been fulfilled for FY 2019 with permit # 147595 under the distinct ownership of Keith Laudeman, permit # 330172 under the distinct ownership of Neves & Son Fishing Corp., and permit # 150933 under the distinct ownership of Oliveira and Silva Fishing Corp.. Documentation of fulfillment of this criterion for FY 2020 will be located in **Exhibit I** of this Agreement and will be furnished by the Sector in accordance with NMFS guidance and schedule pertaining to bi-annual operation plan submission.

3. Member and Vessel Permits. The attached **Exhibit D** is provided in accordance with the requirements of Amendment 16 that all state and federal permits held by Members or assigned to Members' vessels be disclosed in each sector's annual operations plan. Documentation of fulfillment of this criterion for FY 2020 will be located in **Exhibit I** of this Agreement and will be furnished by the Sector in accordance with NMFS guidance and schedule pertaining to bi-annual operation plan submission.

4. Sector Allocation and Exemptions. Each Member shall take all actions and execute all documents necessary to obtain the Sector's Amendment 16 annual catch entitlement ("ACE"). The Sector shall request all universal exemptions granted to sectors under Amendment 16 and relating multispecies implementing regulations; and any special exemptions the Board deems appropriate. The special exemptions initially requested by the Sector are identified on the "Harvesting Rules" attached hereto as **Exhibit A**.

5. Distribution of Sector ACE. Each Member acknowledges that the Sector's ACE is composed of allocations for each species of Northeast multispecies groundfish allocated by Amendment 16 (each such species being an "Allocated Species"), and any subsequent Framework or Amendment. Subject to the terms and conditions of this Agreement, each Member shall be entitled to harvest or transfer an amount of the Sector's ACE, as adjusted by the Sector for retainages including but not

limited to the Reserve, for each Allocated Species proportionate to the amount of ACE for such species that the Sector receives as a result of such Member's membership in the Sector. The amount of Sector ACE a Member may harvest or transfer, as adjusted by transfers and Sector retainages including but not limited to the Reserve, made in accordance with this Agreement, is referred to hereafter as a Member's "Harvest Share." Each Member may harvest or transfer its Harvest Share only under the terms and conditions of this Agreement and in compliance with the restrictions imposed by the Manager (as defined below), the Enforcement Committee (as defined below) and the Board in accordance with this Agreement. Any other attempted harvest or transfer of a Member's Harvest Share shall be a breach of this Agreement.

6. Sector Manager and Registered Agent. The Board shall from time to time appoint a person to act as the Sector's authorized agent in all NMFS and New England Fishery Management Council matters (the "Manager"), and a person to serve as the registered agent for receiving service of process on behalf of the Sector (the "Registered Agent"). The procedures for appointing the Manager and the Registered Agent shall be as provided in the Sector's Bylaws, as the same may be amended from time to time. The Manager and the Registered Agent may be the same person. The Manager shall be responsible for preparing and filing all reports required of the Sector under Amendment 16 and the related implementing regulations. Cassie Canastra will serve as the registered agent for receiving service of process on behalf of the Sector. The Sector will notify NMFS prior to May 1, 2019 who will be acting as their Manager for FY 2019. Documentation of fulfillment of this criterion for FY 2020 will be located in **Exhibit I** of this Agreement and will be furnished by the Sector in accordance with NMFS guidance and schedule pertaining to bi-annual operation plan submission.

6.1. Communication with Sector. The Manager is the primary point of contact for all communications on behalf of the Sector and all communications regarding NEFS VII should be directed accordingly. In addition to the Sector Manager, Cassie Canastra & Elizabeth Etrie or the acting program director of Northeast Sector Service Network is authorized to act on behalf of the Sector. At the time in which this Agreement is entered into, the Board of Directors are as follows:

President: Virginia Martins
Treasurer: Tor Bendiksen
Clerk: Anne Jardin
Directors: Virginia Martins, Tor Bendiksen, Anne Jardin, Daniel Georgianna, John Reardon, Raymond Canastra, Richard Canastra

In the event that the Board of Directors is modified, the Sector will notify NMFS of such modifications. Additionally, a list of current Board members can also be located at the following link.

http://corp.sec.state.ma.us/corpweb/corpsearch/CorpSearch.aspx

7. Consolidation Plan. The Sector's ACE shall be harvested in accordance with the terms and conditions of this Section 7.

7.1. Harvest Share Reserve. Each Member acknowledges that under NMFS regulations, the Members' aggregate harvest of the Sector's ACE may not exceed the Sector's ACE allocation, as adjusted by transfers of ACE between the Sector and other sectors. Each Member further acknowledges that under NMFS regulations, each Member may be held jointly liable for fines, penalties and forfeitures related to the Sector's ACE being overharvested. Each Member therefore authorizes the Manager to annually establish a reserve of each Allocated Species in the amount the Manager deems necessary to insure the Sector's ACE is not over-harvested (the "Reserve"). The Reserve for each Allocated Species shall be established by assessing the Members' Harvest Shares for such Allocated Species on a pro rata basis, according to their Harvest Share percentages for each such species. The amount of each Member's Harvest Share available for harvest or transfer shall be net of the amount assessed for the Reserve. The Reserve shall be managed under a "Deemed Value System" ("DVS") by the Manager in accordance with the terms and conditions adopted by the Board from time to time. If the Board requires that Members pay for distributions from the Reserve, the DVS payments received by the Sector shall be distributed to the Members after the close of fishing for the year on a pro rata basis, such that each Member receives a share of the total amount paid for distributions of each Allocated Species from the Reserve proportionate to the amount of such Allocated Species each Member contributed to the Reserve.

7.2. Harvest Share Use. Only Members that notify the Manager in writing on or before March 8, 2019] (the "Notification Date"), and on or before any succeeding Notification Dates established by the Board for FY 2019 and FY 2020 thereafter of their intention to harvest Sector ACE (**"Active Members"**) may harvest Sector ACE. Each Member's notice that such Member intends to harvest Sector ACE shall identify the vessels which will be used for such harvest. **Non-Active Members** shall not harvest Sector ACE, including without limitation, their own Harvest Share. No **Active Member** shall harvest an amount of Sector ACE in excess of their Harvest Share. Harvest of each **Active Member's** Harvest Share shall be subject to all NMFS and other management regulations generally

applicable to the Sector's ACE (including but not limited to seasonal apportionments and area harvest restrictions) on a discreet, individual basis; i.e., no greater percentage of each Member's Harvest Share may be harvested in any season or area than the percentage of the related Sector ACE allocation permitted to be harvested in such season or area. The Manager may impose and enforce additional restrictions on each **Active Member's** harvest of Sector ACE authorized by this Agreement or adopted by the Board.

7.2.1. Non-Active Members. The Members acknowledge that **Active Members** are assuming certain costs and risks associated with harvesting the Sector's ACE on behalf of the **Non-Active Members**, and that the **Active Members** are making certain financial contributions to the Sector that are not made by **Non-Active Members**. Obligations assumed by **Active Members** that are not imposed on **Non-Active Members include**, but are not limited to payments of the initial Membership Fee, and paying Network and Sector fees in connection with landings of catch harvested under the Sector's ACE. In consideration for the **Active Members** assuming these costs, risks and fee obligations, each **Non-Active Member** shall:

A. Not fish in any ACE-accountable fisheries;

B. Participate only as a transferor with regards to transfer of such member's Harvest Share within the sector. However, a **Non-Active Member** may act as a transferee through an Inter-Sector transfer of ACE provided the transaction results in a net increase of this Sector's ACE.

C. Not have access to information on FishTrax, or other Sector specific tools, other than the information necessary to track the balance of such Member's Harvest Share, and specifically, shall not have access to Harvest Share Offers or Permit Offers posted on behalf of Members;

D. Not have the Rights of First Offer on Sector Harvest Share and the related Sector ACE extended to **Active Members**, which may be adopted or amended from time to time by the Board under Section 7.3, and shall not have a right of first refusal on Permits extended to **Active Members**, which may be adopted or amended from time to time by the Board under Section 15;

E. Pay Sector Operating Fees on the net amount of Sector ACE transferred out of the Sector by such Member, and pay the Network Fee on the net amount of Sector ACE transferred out of the NEFS Sectors by such Member.

7.3. Harvest Share Transfer. Subject to the terms and conditions of this Agreement, each Member may transfer some or all of such Member's Harvest Share to one or more **Active Member(s)** on such terms and conditions as the transferor Member and the transferee **Active Member(s)** may agree. No transfer of a Member's Harvest Share shall become effective until the Manager has received actual notice of such transfer. No Member may transfer any portion of such Member's Harvest Share, or interest in the Sector's ACE, to any person other than an **Active Member** unless the Board first authorizes such transfer in writing. Any such transfer shall be subject to such terms and conditions as the Board may adopt from time to time, including but not limited to establishment of procedures to implement a Right of First Offer (the "ROFO") that is extended to **Active Members of the Sector, Active Members** of other Northeast Fishery Sectors, and certain other parties in accordance with the terms and conditions established by the Board. Without limiting the foregoing, the Sector Board of Directors may condition, review, approve and restrict transfers of Harvest Shares to non-Members as it deems necessary to promote the harvest of the Sector's entire ACE allocation and ensure that the Sector's management and administrative costs can be recouped through reasonable Sector membership fees established by the Board.

7.4. Harvesting Rules and Fishing Plan. The Board may from time to time adopt such restrictions on harvest of the Sector's ACE as the Board deems necessary to ensure the Sector's compliance with Amendment 16 and related implementing regulations (such restrictions referred to hereafter as "Harvesting Rules"). The Harvesting Rules are set forth on **Exhibit A**. Each **Active Member** shall conduct their harvest of the Sector's ACE in strict compliance with the Harvesting Rules. Each Member shall exercise their best efforts to ensure such Member's Harvest Share is harvested in accordance with the Harvesting Rules. The Manager shall annually develop a Sector fishing plan that promotes harvest of the Sector's ACE in accordance with the Harvesting Rules and shall make the Fishing Plan available to Active Members prior to the commencement of the fishing season.

7.5. Re-direction of Effort. During FY 2017, NEFS VII vessels switched fishing efforts into the following fisheries:

- Fishery: None

During the first quarter of FY 2018, NEFS VII vessels switched effort into the following fisheries:

- Fishery: None

During FY 2019 & FY 2020, NEFS VII anticipates similar redirection of effort to the fisheries listed above,

7.6. Sector Vessel Interactions with Allocated Species in Non-Amendment 16 Fisheries. NMFS will account for Member harvests of Allocated Species as harvests of the Sector's ACE, regardless of whether such harvests are made during directed groundfish fishing trips or during other fishing trips, unless the Allocated Species harvest is managed under another management plan or as a sub-component annual catch limit ("ACL") of Amendment 16 Allocated Species. Each **Active Member** shall report every fishing trip by such Member to the Manager prior to sailing, for determination whether the related Allocated Species harvest must be accounted for to NMFS as harvest of the Sector's ACE.

7.7. Consolidation and Redistribution of ACE: Scientific recommendations and Magnuson requirements will influence the level of consolidation that will continue to take place in the groundfish fishery. The Sector members intend to utilize sector management to mitigate excessive consolidation that may occur in the effort controlled system where overall management measures are based upon the weakest stocks. In FY 2018, 1% of the permits enrolled in the NEFS VII for FYs 2019 and 2020 are attached to vessels actively fishing for NE multispecies. For FYs 2019 and 2020, the NEFS VII sector has 56 permits currently enrolled. Of those permits 1 are anticipated to actively fish for NE multispecies in FYs 2019 and 2020. While these numbers may change, the NEFS VII sector expects that, compared to FY 2018, there would be a net consolidation beyond what previously occurred among the NEFS VII as the share of ACE contributed by member permits is fished by fewer active vessels than in FY 2018. It can be anticipated that fewer active fishing vessels would result in job losses for fishing crews and the associated negative impacts could spread to fishing communities and industries reliant on commercial fishing. While fishers who remain in the fishery may experience a positive benefit, there would be fewer active fishers in the NE multispecies fishery.

8. Release of Catch Data. Pursuant to section 402(b)(1)(F) of the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §1881a(b)(1)(F), the undersigned hereby authorizes the release to the Manager of VII Northeast Fishery Sector, Inc.; Program Director of Northeast Sector Service Network, and the FishTrax Programmer, of information that may be or is

considered to be confidential or privileged by the Magnuson-Stevens Act or other federal law regarding the catch of various species of fish associated with the limited access Northeast multispecies permit with the Moratorium Right Identifiers (MRIs) enrolled in the sector submitted to the National Marine Fisheries Service that the undersigned has authority to access. This information includes data required to be submitted or collected by NMFS, including but not limited to days-at-sea allocation and usage, vessel trip reports, dealer reports, Northeast Fishery Observer Program data, information collected for conservation and management purposes, catch and landings history data, at-sea monitoring data, VMS information, and all other information associated with the vessel, MRI #, and/or permit records.

9. Catch Monitoring and Reporting. Each **Active Member** shall comply with all catch monitoring and reporting requirements established by the Manager, which may include but are not limited to maintaining and filing copies of accurate catch logs, carrying fishery observers, installing and operating electronic vessel and catch monitoring equipment, delivering fish only at pre-approved landing stations at pre-approved times, and completing and filing accurate delivery reports on a timely basis. Without limiting the foregoing, each **Active Member** shall submit on a timely basis all catch information as required by and necessary for the Manager to complete and file the Sector's weekly reports. Each **Active Member's** harvest of Sector ACE shall be calculated and tabulated in accordance with the catch accounting measures established by NMFS with respect to the Sector's ACE. Absent manifest error, the catch and delivery information produced by the Manager shall be presumed accurate, and absent manifest error, each Member's obligations under this Agreement and all related documents may be enforced to their fullest extent on the basis of such information.

10. Breach and Remedies for Breach. The benefits associated with Sector membership will only accrue to the Members if each of them strictly complies with this Agreement. Each Member will make significant operational and financial commitments based on this Agreement, and any Member's failure to fulfill any of its obligations under this Agreement could have significant adverse consequences for some or all other Members. Any failure by a Member to fulfill any of its obligations under this Agreement shall constitute a breach of this Agreement. Each Member shall be bound by the procedures set forth in this Section for determining whether a Member has breached this Agreement. The Sector shall be entitled to the remedies set forth in this Section if a Member is determined by the Sector to have breached this Agreement. Each Member shall take all actions and execute all documents the Manager deems necessary or convenient to give effect to the provisions of this Section.

10.1. Liquidated Damages Schedule and Schedule Amendments. The loss, costs and damages which may be suffered or incurred by Members as the result of any Member harvesting Sector ACE in excess of the amount such Member is authorized to harvest under this Agreement, or otherwise breaching this Agreement, will be difficult to calculate. The loss, costs and damages the Members and the Sector could suffer as the result of a Member harvesting more Sector ACE than its Harvest Share, or otherwise breaching this Agreement, are likely to substantially exceed the market value of the excess harvest. Consequently, the Sector may impose and assess upon any breaching Member the liquidated damages amounts as established under Section 10.3, below.

10.2. Enforcement Committee. Not less than one hundred twenty (120) days prior to each annual Northeast multispecies groundfish season opening date (the "Season Opening Date"), the Manager shall call a meeting of the Board to appoint the Enforcement Committee for the upcoming year, and to address any other matters of Sector business properly before the Board. The Board shall meet for those purposes not less than ninety (90) days prior to the Season Opening Date, and at such meeting shall appoint an Enforcement Committee composed of five (5) persons. If the Board fails to do so, the Manager shall appoint the Enforcement Committee. The Enforcement Committee shall assist the Manager in setting and updating the liquidated damages amounts for breaches of this Agreement and shall hear and decide Members' appeals of the Manager's contract breach determinations and liquidated damages assessments.

10.3. Liquidated Damages Base Value and Multiplier Adoption. Not less than sixty (60) days prior to each annual Season Opening Date, the Manager shall establish the market value of an unprocessed pound of each Allocated Species (each such value being a "Base Value"), and transmit such Base Values to the Enforcement Committee. In establishing such Base Values, the Manager may take into account both the direct costs and the opportunity costs associated with an over-harvest of the relevant species. Not less than thirty (30) days prior to each annual Season Opening Date, the Enforcement Committee, in consultation with the Manager, shall adopt Base Values and Base Value multipliers, and the liquidated damages amounts for breaches of this Agreement other than over-harvest of a Member's Harvest Share, which shall be based on the Enforcement Committee's estimate of the losses that the Sector and its Members could be expected to suffer as a result of such breaches. Because the damages suffered by one or more other Sector Members as the result of a Member harvesting an amount of Sector ACE in excess of its Harvest Share are likely to substantially exceed the market value of the excess harvest, the Base Value multipliers shall not be less than three (3). Upon the

Enforcement Committee's adoption of Base Values and Base Value multipliers, such Base Values and Base Value multipliers will be the basis for calculation of damages for unreconciled Harvest Share overages. The Enforcement Committee may adjust Base Values, Base Value multipliers and liquidated damanges during the Fishing Year with approval by the Sectors Board of Directors.  Any inseason adjustments will be communicated via email to all Members.

10.4. Liquidated Damages Calculation.  The liquidated damages amount for each pound by which a Member's harvest of an Allocated Species exceeds such Member's Harvest Share for such species shall be the relevant Base Value, multiplied by the relevant liquidated damages multiplier. The liquidated damages amounts for breaches of this Agreement, other than over-harvest of a Member's Harvest Share shall be as provided on **Exhibit E.**

10.5. Notice to Vessel Masters; Assumption of Liability.  Each vessel harvesting a Member's Harvest Share, or participating in a fishery that may require utilization of a Member's Harvest Share (i.e., non-exempt monkfish), will be under the day-to-day command of the vessel's master who will to a significant degree have control over whether the vessel is operated in compliance with this Agreement.  Each Member shall ensure that the master(s) of the vessel(s) harvesting such Member's Harvest Share are aware of the terms and conditions of this Agreement governing the harvest of such Member's Harvest Share, including without limitation the Harvesting Rules, and shall have confirmed their agreement to abide by such terms in writing.  Each Member assumes all liability under this Agreement arising out of or related to the actions of the master(s) operating such Member's vessel(s).

10.6. Liquidated Damages Security.  The Board may require that a Member that has two (2) or more NMFS fishing regulation violations, or which has breached this Agreement or another sector's operations plan on two (2) or more occasions, post a bond or obtain a letter of credit securing such Member's payment and performance obligations under this Agreement in such amounts as the Board deems appropriate, or may require such Member to personally guaranty, and/or have other Members or third parties personally guaranty, such Member's payment and performance obligations under this Agreement.

10.7. Manager Action in Response to Apparent Breach.  The Manager shall monitor the Members' compliance with the terms and conditions of this Agreement.  If the Manager becomes aware of an apparent breach of this Agreement by a Member, the Manager shall investigate the matter, and if the Manager concludes that a Member has breached this Agreement, the Manager

shall notify such Member of the apparent breach and (if such breach is reasonably susceptible of cure) provide such Member with an opportunity to cure the breach.  If such Member fails to demonstrate to the Manager, in the Manager's sole and absolute discretion, that no breach occurred, or to cure the breach within the time period directed by the Manager, taking into account the magnitude of the breach and the potential consequences of the breach for the Sector and the other Members, the Manager shall notify the Member in writing that the Manager is referring the alleged breach to the Enforcement Committee, and shall notify the Enforcement Committee in writing of the alleged breach and the proposed liquidated damages.  Pursuant to Section 14, below, if during the investigation, notice and cure period described above, the Manager concludes it is necessary for the protection of the interests of the Sector and its Members, the Manager may issue a "Stop Fishing Order" to the Member in apparent breach, and if such Member fails to cause the vessels harvesting its Harvest Share to immediately stop fishing , the sector manager may take any action he/she deems necessary including without limitation, self-help or court action which may include the seeking of injunctive relief.

10.8. Member Appeals.  A Member receiving notice of an alleged breach and proposed liquidated damages shall have five (5) days from the date that the Member receives the notice to request an appeal hearing before the Enforcement Committee. If a Member fails to request a hearing within such 5-day appeal period, the Member's right of appeal shall expire, the Member shall be deemed to have breached this Agreement in accordance with the Manager's determination, and the Member shall be obligated to pay the related liquidated damages.  If a Member timely requests an appeal hearing, the Manager shall consult with the Enforcement Committee and schedule an Enforcement Committee meeting for that purpose. The Enforcement Committee shall make reasonable efforts to schedule the meeting at a time and place such that the Member requesting the appeal is able to attend, and shall provide the Member with at least thirty (30) days advance written notice of the time and place of the meeting. At such meeting, the Enforcement Committee shall provide the Manager with an opportunity to present evidence of the apparent breach, and shall provide the Member in apparent breach with a reasonable opportunity to rebut such evidence.  Per Section 9, above, the catch and delivery data produced by the Manager shall be presumed accurate, and, absent manifest error, each Member's obligations under this Agreement and all related documents may be enforced to their fullest extent on the basis of such data.  If the Enforcement Committee determines that a Member breached this Agreement, the Sector shall have the right to collect from such Member the liquidated damages amount provided for such breach under this Agreement.

10.9. Voluntary Compliance. In connection with breaches of this Agreement for which a Member is liable to the Sector or other Sector Members for liquidated damages, the Sector shall provide the breaching Member fifteen (15) days prior notice of its intent to exercise its rights of collection, during which period the Member may propose an alternative method of compensating the Sector and other Sector Members for the damages suffered as the result of such Member's breach. The Enforcement Committee may approve or disapprove any alternative form of compensation in its sole discretion, provided that if the breach at issue is an overharvest of a Member's Harvest Share, there shall be no liquidated damages imposed if the Member in breach obtains sufficient Harvest Share from other Members to offset the overharvest, and tenders conclusive evidence to that effect to the Enforcement Committee. Such Member shall nevertheless remain liable for the costs and fees incurred by the Sector in connection with the alleged breach, and the Sector shall be entitled to collect such costs and fees if such Member fails to pay the same within ten (10) days of receiving the Sector's demand for payment.

10.10. Liquidated Damages Collection and Related Expenses. If a Member fails to resolve a breach of this Agreement through voluntary compliance measures approved by the Enforcement Committee and performed by such Member on a timely basis, the Member in breach shall pay the liquidated damages amount assessed by the Sector within ten (10) days of the end of the voluntary compliance period described in Section 10.9, above. Liquidated damages amounts not paid when due shall accrue interest at a rate of interest equal to the prime rate of interest announced by Bank of America, or such other bank as the Board may select from time to time, as of the last day of the voluntary compliance period plus twelve percent (12%). If a Member fails to pay the liquidated damages amount assessed by the Enforcement Committee with interest within thirty (30) days of the end of the voluntary compliance period described in Section 10.9, above, the Sector may pursue legal action to collect the liquidated damages. In addition, in connection with Member breaches resulting from an over-harvest of a Member's Harvest Share, the Sector (acting through the Enforcement Committee) may take possession of an amount of the Member in breach's Harvest Share for the overharvested species for the year in which the contract breach occurred and, if necessary, in subsequent years, in a total amount equal to three (3) times the amount of such over-harvest, provided that the amount of a Member's liability to the Sector for over-harvest shall be reduced proportionately to the extent that the Sector does so. In addition to liquidated damages, the Sector shall be entitled to all fees, costs and expenses, including attorney's fees, actually incurred by the Sector in connection with

any action to collect liquidated damages from a Member in breach of this Agreement, whether or not the Sector prevails in such action.

10.11. Consequential Damages for Gross Negligence or Willful Misconduct. In addition to the liquidated damages imposed under this Section 10, each Member shall be liable for consequential damages in connection with a breach of this Agreement resulting from the Member's gross negligence or willful misconduct. Each Active Member shall be liable for the consequential damages arising out of or related to the gross negligence or willful misconduct of the captain operating such Active Member's vessel(s).

10.12. Distribution of Damages. Where a Member's breach causes one or more other Members to harvest less than their Harvest Share, damages awarded to the Sector under this provision shall first be distributed *pro rata* among the Members whose harvest was reduced, with each Member receiving a fraction of such funds, the numerator of which is the amount by which such Member's catch was less than such Member's allocation or apportionment, and the denominator of which is the sum of the aggregate amount of by which all Members' allocations or apportionments were reduced as a result of the breach, up to the amount of loss suffered by each such Member as the result of the breach. Any damages awarded to the Sector in excess of those distributed to other Members under this Section, and any damages awarded in connection with a breach which does not cause any other Member's allocation or apportionment to be reduced, shall be retained by the Sector and applied to the costs of Sector operations.

11. Joint Liability and Indemnification. Each Member acknowledges that the Sector's Members may be held jointly liable for ACE overages, discarding of legal-sized fish and misreporting of catch landings or discards. Further, each Member acknowledges that should a hard total allowable catch ("TAC") allocated to the Sector be exceeded in a given fishing year, the Sector's allocation will be reduced by the overage in the following fishing year, and the Sector, each vessel participating in the Sector and each vessel operator and/or vessel owner participating in the Sector may be charged, as a result of said overages, jointly and severally for civil penalties and permit sanctions pursuant to 15 C.F.R. Part 904, and that if the Sector exceeds its TAC in more than one (1) fishing year, the Sector's ACE may be permanently reduced or the Sector's authorization to operate may be withdrawn.

In consideration of the foregoing, each Active Member agrees to indemnify, defend and hold the Sector and all other Members harmless from and against all liabilities, claims, fines, penalties and forfeitures of

any nature whatsoever arising out of or related to any breach of this Agreement related to such Active Member's harvest of Sector ACE, and each Member agrees to indemnify, defend and hold the Sector and the other Members harmless from and against all liabilities, claims, fines, penalties and forfeitures of any nature whatsoever arising out of or related to such Member's breach of this Agreement. Each Member's indemnification obligation under this Section 11 is separate from and in addition to each Member's liquidated damages and consequential damages obligations under Section 10, above. Each Member authorizes the Board to require that a Member's obligations under this Section 11 be secured by a surety.

12. Membership Termination. No Member may terminate its membership in the Sector other than in accordance with this Section 12. A Member that has agreed to join the Sector prior to the Effective Date may withdraw from Sector membership prior to the Effective Date without penalty or prejudice. Thereafter, only a Member that is not in breach of this Agreement and that has no outstanding Sector performance or payment obligations may terminate its membership in the Sector, and may do so only in compliance with the terms and conditions of this Section 12. Notwithstanding the foregoing, the Board may terminate the membership of a Member in breach of its payment or performance obligations under this Agreement, as the Board deems appropriate in its sole discretion.

Subject to the provisions of this Section 12 regarding withdrawal prior to the Effective Date, above, a Member that is eligible to terminate such Member's Sector membership may do so only by providing written notice to that effect to all other Members on or before March 8, 2019 or such date as the Board may from time to time establish for that purpose (the "Termination Date") each fishing year. A Member that fails to provide such notice by the Termination Date shall be deemed to have automatically renewed its Sector membership for the following year, and all other Members shall be entitled to act in reliance on such renewal accordingly. If any Member provides a membership termination notice by the Termination Date, each of the other Members shall have ten (10) days from the date they receive such notice to terminate their membership as well, notwithstanding the Termination Date notice deadline. Termination of membership in the Sector shall be effective as of the final day of the current fishing year.

If a Member is in breach of this Agreement or has outstanding Sector payment or performance obligations as of the Termination Date, unless the Board takes action to terminate such Member's membership, such Member's membership shall be deemed renewed for the following year, notwithstanding any notice of withdrawal such Member may give, and the Sector shall have the authority to file an application for a Sector allocation including such Member as a Member of the Sector.

Each Member hereby grants the Sector a power-of-attorney, coupled with an interest, for such purposes, and authorizes each of the Sector's officers to take any and all actions and execute any and all documents necessary or convenient to give effect to this provision.

Termination of membership shall not relieve a person or entity of any obligations under this Agreement related to the period during which such person or entity was a Member, including but not limited to liquidated damages obligations for breach of this Agreement, consequential damages obligations for breaches resulting from acts of gross negligence or willful misconduct, or indemnification obligations related to such person or entity's actions as a Member.

13. Expulsion.  A Member may be expelled from the Sector at any time for: (i) a knowing, willful breach of this Agreement; (ii) any alleged breach of this Agreement that is either not appealed pursuant to Section 10.8, or is upheld by the Enforcement Committee after being appealed, and which such Member fails to cure through voluntary compliance approved by the Enforcement Committee pursuant to Section 10.9, or by paying liquidated damages in accordance with Section 10.10; (iii) perpetrating a fishery regulation violation that exposes Sector Members to joint liability for such violation.  A Member shall be immediately and automatically expelled from the Sector if such Member ceases to be eligible to participate in the Sector or if such Member engages in conduct that exposes the Sector or other Sector Members to antitrust or unfair trade practice liability.  As of the date of expulsion, the expelled Member shall lose all rights to harvest any portion of the Sector's ACE unless the expelled Member is re-admitted.  Expulsion shall not relieve a Member of the obligation to pay fees that were levied prior to the date of expulsion, or to pay liquidated damages and costs and fees related to an action or omission by the expelled Member that preceded the date of expulsion.  The Sector shall notify NMFS immediately upon a Sector Member's expulsion; by electronic email, followed by posted mail.

14. Stop Fishing Order; Injunctive Relief.  Sector members may be held jointly and severally liable if (a) a Sector exceeds its ACE, (b) a Sector member discards legal-sized fish, or (c) a Sector member misreports landings or discards.  If a Sector exceeds its ACE in a given fishing year, the Sector's allocation may be reduced by the overage in the following fishing year, and the Sector, each vessel, and vessel operator and/or vessel owner participating in the Sector may be jointly and severally liable for civil penalties and permit sanctions pursuant to 15 C.F.R. Part 904 in connection with such overage.  In addition, if a Sector exceeds its ACE in more than one (1) fishing year, NMFS may permanently reduce the Sector's ACE or withdraw the Sector's authorization to operate.

The Sector will exceed its ACE only if one or more members overharvest their Harvest Share, as (subject to the provisions of Section 7.1, above) the Sector's ACE, less the Reserve, is fully distributed to the Members as their Harvest Shares. A Member's overharvest of its Harvest Share would be a breach of this Agreement for which a Member would be liable for damages. Because each incident of ACE overharvest would constitute a separate violation of the Amendment 16 regulations, and because each such incident would be treated as a prior violation by NMFS for purposes of determining appropriate fines, penalties and forfeitures in connection with a subsequent violation, the damages suffered by the Sector as a result of an overharvest by one or more Members that resulted in the Sector overharvesting its ACE would be consequential and irreparable.

In consideration of these circumstances, and in consideration for the Sector waiving its right to require each Member to obtain a security bond or pledge collateral to secure its obligation to the Sector to limit its harvest of Sector ACE to such Member's Harvest Share, which consideration each Member agrees it has received and is sufficient, the Members hereby agree as follows.

14.1. Issuance of Stop Fishing Order. The Sector, acting through the Manager, has the authority to issue to any Member that the Manager determines is in breach a Stop Fishing Order, and upon such issuance, such Member shall immediately cause all vessels harvesting its Harvest Share to cease doing so, and such Member shall not permit the vessels harvesting its Harvest Share to resume doing so unless and until the Manager rescinds the Stop Fishing Order. Each Member hereby releases the Sector, all other Members and the Manager from any and all liability of any nature whatsoever, including but not limited to both contractual and tort liability, for any direct or indirect, incidental or consequential losses or damages that a Member may suffer as a result of complying with a Stop Fishing Order.

14.2. Failure to Comply with Stop Fishing Order. If any vessel(s) harvesting a Members' Harvest Share does not immediately comply with a Stop Fishing Order in accordance with its terms, the Sector may exercise remedies of self help and take any and all other action as the Sector determines necessary to enforce the Stop Fishing Order and this Agreement, including injunctive relief. In seeking injunctive relief, the Sector Manager's burden of proof (if any) shall be satisfied by A. (production of a copy of the Stop Fishing Order) and B. (evidence that the vessel continued to fish thereafter).

The Member shall be liable to the Sector for all losses, costs, damages, fees and expenses incurred by the Sector in connection with enforcement, including but not limited to, the costs of obtaining any bond the Sector may be required to post, whether or not the Sector prevails.

15. Permit Transfer/Sale. A Member may transfer a Permit to a party other than a Member, subject to a Right of First Refusal (the "ROFR"), which may be adopted or amended from time to time by the Board, in favor of **Active Members** of the Sector, **Active Members** of other Northeast Fishery Sectors, and certain other parties. No Member may transfer such Member's "LA MS" permit or "MRI" permit to a person who is not an **Active Member** unless such person assumes all of the transferring Member's obligations under this Agreement as of the effective date of such transfer. A person other than a Member who receives a Member's "LA MS" permit or "MRI" permit from a Member in accordance with this Section 15 (a "Transferee") shall only be eligible to participate in the Sector for the balance of the fishing year during which the transfer occurs, and thereafter may only remain a Sector Member if such Transferee applies for and is admitted to Sector membership in accordance with Section 2, above.

15.1. The Transferee shall be deemed a **Non-Active Member** of the Sector, with no rights to harvest any Sector ACE, including but not limited to the ACE allocated to the Sector in connection with the assets acquired under the Permit Offer. A Transferee wishing to acquire **Active Member** status during the fishing year in which the permit transfer occurred must submit a written request to the Board for consideration. The Board will have the authority to approve, conditionally approve or deny such request.

16. Release and Waiver of All Claims against Sector Manager; Indemnification and Hold Harmless. Each Member acknowledges that the effectiveness of this Agreement depends on the Manager exercising reasonable independent business judgment in good faith in reviewing and approving or disapproving Members' fishing plans, monitoring harvest of the Sector's ACE, and enforcing the terms and conditions of this Agreement. Each Member hereby waives and releases any and all claims against the Manager arising out of or relating to Manager's performance under this Agreement, other than those arising solely from the gross negligence or willful misconduct by the Manager, as conclusively determined by a court of final and competent jurisdiction. The Sector and the Members agree to jointly and severally indemnify, defend and hold the Manager harmless from and against any third party claims, damages, fines, penalties and liabilities of any kind whatsoever asserted against the Manager in

connection with the Manager's performance under this Agreement, other than those arising out of gross negligence or willful misconduct by the Manager.

17. Sector Membership Fees. At least thirty (30) days prior to the Effective Date, and at least thirty (30) days prior to each annual Termination Date thereafter, the Board shall notify the Members in writing of the amount of Sector membership fees that the Board has adopted for the upcoming year of Sector operations.

18. Binding Arbitration. Each Member and the Sector agree to exercise their best good faith commercially reasonable efforts to resolve any disputes arising under this Agreement through direct negotiations. Breaches of this Agreement which are not resolved through direct negotiation shall be submitted to binding arbitration upon the request of any party at interest. Any person nominated as an arbitrator hereunder by any person shall be a person of mature, sound and reasonable business judgment and experience and either have (a) held a federal fishing master license for at least ten (10) years, or (b) been an attorney at law practicing in the area of fisheries for at least ten (10) years.

The party's written request for arbitration shall include the name of the arbitrator selected by the party requesting arbitration. The respondent party shall have ten (10) days to provide written notice of the name of the arbitrator it has selected, if any. If the other party timely selects a second arbitrator, the two arbitrators will jointly select a third arbitrator within ten (10) days. If the other party does not timely select the second arbitrator, there shall be only the one arbitrator. The single arbitrator or the three (3) arbitrators so selected will schedule the arbitration hearing as soon as possible thereafter. Any arbitrator must have no material ties to the Sector or any Member. The decision of the arbitrator (or in the case of a three (3) arbitrator panel, the decision of the majority) will be final and binding. The arbitration will be conducted under the rules of (but not by) the American Arbitration Association. The parties will be entitled to limited discovery as determined by the arbitrator(s) in his, her or their sole discretion. All costs of arbitration shall be borne by the party requesting the same. Each party shall bear its own costs of preparation and presentation, unless, in the case of the Sector, the Board determines to assess such costs to the applicable Member, which costs shall be immediately due and payable. In no event will arbitration be available pursuant to this paragraph after the date when commencement of such legal or equitable proceedings based on such claim, dispute, or other matter in question would be barred by an applicable statute of limitations.

The final decision of the Arbitrators shall not be subject to review or appeal by any other person, including any court, with the exception of NMFS in its oversight role for the purposes of statutory and regulatory compliance and consistency. Any right to any such appeal is hereby irrevocably waived and relinquished. Such final decision shall bind the parties and shall not require any further action of enforcement or collection once docketed with the records of the Sector. In breach by any Member of performance thereof, the Manager may *sua* sponte and without any notice or hearing issues a Stop Fishing Order or an Order of Expulsion respecting such Member in breach.

The Sector shall, without limiting the foregoing rights and procedure, also have the right to enforce any decision against any Member in breach by an action for specific performance, declaratory relief, *lis pendens* or any other action in a court of law having jurisdiction of the parties, it being understood and agreed that the Federal court for the District of Massachusetts and the Massachusetts Superior Court for the County where the registered office of the Sector is located shall be deemed to have such jurisdiction

19. No Collective Marketing. The Members acknowledge that the Sector has not been formed or qualified as a collective marketing association. The Members therefore agree that nothing in this Agreement shall be construed as permitting or obligating Members to collaborate regarding the processing, marketing or sales of the product produced from catch harvested under their Harvest Shares. Each Member shall conduct all sales of such catch in competition with the other Members, and shall hold ex-vessel price information as confidential from other Members until such information becomes public or until such price information is six months old, unless and until the Sector is properly qualified under State and Federal law as a collective marketing association

20. Amendment and Incorporation by Reference. The Exhibits hereto and the collateral documents referred to herein are and shall all be as the same may be amended from time to time. Any amendments thereto or hereto which are approved by the Board shall, as a condition of further membership of any Member in the Sector be deemed without any requirement of acceptance, consent or execution by any such Member to have been adopted, ratified and confirmed by such Member.

**EXHIBIT A: HARVESTING RULES FOR FY 2019 and FY 2020**

*The Members and the Participating Vessels of VII Northeast Fishery Sector, Inc. agree to be legally bound to follow the Harvesting Rules for the Fishing Year 2019 (May 1, 2019 to April 30, 2020) & Fishing Year 2020 (May 1, 2020 to April 30, 2021) as described herein, in accordance with all provisions of the Sectors Operations Plans and Agreement (herein "Agreement"), notwithstanding those rules and regulations applicable to the common pool Multispecies vessels. Members and the Participating Vessels of NEFS VII will fish in primarily in the [Inshore Georges Bank, Offshore Georges Bank, Southern New England/Mid Atlantic (SNE/MA), though fishing may also occur to a lesser extent in Gulf of Maine.*

1. ANNUAL CATCH ENTITLEMENT: The members agree that they will not collectively harvest more than the Sector ACE, as adjusted by transfers, for any allocated groundfish stocks. Furthermore, the members agree that once an annual ACE is reached no member will fish commercially with any fishing gear capable of catching any of the allocated groundfish stocks or other species managed under plan within the applicable area(s): except in those situations where a member is participating in an exempted fishery, or if a plan submitted by the Sector under §648.87(b)(2)(xiv) in this document has been approved by NMFS. The Sector members may resume fishing activities if additional ACE is secured through inter-sector ACE transfer. The Annual Catch Entitlement, allocated by NMFS to NEFS VII for FY 2019 is identified in the table below:

| Stock | Sector ACE: |
|---|---|
| GB Cod | |
| GB Cod East | 23592.8209 |
| GB Cod West | 332999.5596 |
| GOM Cod | 25913.8372 |
| GB Haddock | |
| GB Haddock East | 3627769.3245 |
| GB Haddock West | 6757557.5445 |
| GOM Haddock | 1356385.0897 |
| GB Yellowtail Flounder | 126676.4719 |
| SNE/MA Yellowtail Flounder | 5592.1365 |
| CC/GOM Yellowtail Flounder | 85965.9326 |
| Plaice | 303042.0514 |
| Witch Flounder | 171452.9549 |
| GB Winter Flounder | |

| | |
|---|---|
| | 171452.9549 |
| GOM Winter Flounder | 22486.0442 |
| SNE/MA Winter Flounder | 167484.8463 |
| Redfish | 2189589.7583 |
| White Hake | 383300.5364 |
| Pollock | 5189645.5818 |

The Annual Catch Entitlement, allocated by NMFS to NEFS VII for FY 2020 will be identified in **Exhibit I** of this Agreement in accordance with NMFS guidance and schedule pertaining to bi-annual operation plan submission.

2. **QUOTA MANAGEMENT:** Sector vessels, the dealers to which they are delivering fish and monitors will use a PC based software for collecting data, reporting catch, landings and discards, and reporting catch area information for logbook and stock attribution purposes. The Sector will utilize a quota release program that sets forth overall sector quota (ACE) release targets by species and individual member Harvest Share targets as they relate to the Sector targets. Interim and annual targets will be considered in the development of the Sector's Fishing Plan. The Sector Manager will monitor the trajectories to interim and annual targets for the Sectors ACE's as well as for the individual members Harvest Shares. The Sector expects to utilize ACE Transfers to balance the Sector's ACE during the fishing year to prevent exceeding Sector ACE and to assist Members Harvest Share management.

3. **RESERVE:** For each stock held by the Sector, the quota release program will utilize an initial target trajectory that is not to exceed **90%** of the current quota held by the Sector as adjusted by ACE transfers. The remaining **10%** is the minimum aggregate total of the Reserve which will be set aside prior to Harvest Share distribution to Members. The Sector, through their Board, may modify the RESERVE holdback percentages for any or all stocks held by the Sector to prevent under or over harvest of the Sector's ACE. Specifications in this section for FY 2020 will be documented in **Exhibit I** in accordance with NMFS guidance and schedule pertaining to bi-annual operation plan submissions.

4. **SLOWING CATCH:** The quota release program will incorporate a list of thresholds for both Sector ACE and member Harvest Shares, for the purposes of alerting the Sector Manager and members. Thresholds to "Slow Catch", "Initiate Trading" and "Cease Fishing" will be incorporated into the Sector quota monitoring system. Members Harvest Shares are net from the Reserve. Therefore, Harvest Shares trajectories will be set to the Harvest Share. Once **85 %** of any Sector ACE is attained, slowing mechanisms such as tiered landing limits that apply differential counting of quota or service fees to each tier in excess of agreed landing limits may be utilized. When such slowing

mechanisms are triggered or at any time during the fishing year, the Board may direct the Sector Manager to seek additional ACE through an ACE transfer with other sectors.

5. FULL RETENTION OF LEGAL SIZED FISH: All legal sized fish of allocated stocks harvested during the fishing operations must be retained and counted against the Sector's ACE allocation, unless otherwise exempted.

6. DAYS AT SEA: Each participating permit and participating vessel will be allocated Days-At-Sea (DAS) by the Regional Administrator. Sector Member permits will not be subject to the DAS reduction in Amendment 16 for common pool vessels. Members will be required to use a DAS, as specified in controlling FMPs, when conducting fishing operations that are not exempted from DAS usage, for example, when fishing under a monkfish DAS.

7. **STOCK AREA DECLARATION:** Prior to leaving port, sector vessels will declare one or more than one of the four Broad Stock Areas (BSA) as identified in Amendment 16 and relating implementing regulations.

**7.1** Inshore Gulf of Maine Declaration: For the purpose of providing the Sector and its Manager with a greater understanding of the fishing patterns conducted by their members, the following reporting requirements have been crafted and adopted by the Sector in collaboration with all Northeast Groundfish Sectors in the region. These provisions afford Sectors an administrative tool to track fishing activity west of the 70:15. The implementation of the following requirements is conditioned on the adoption by all Northeast Groundfish Sectors in their FY 2019 & 2020 Operations Plans. In the event this provision is not adopted by all Northeast Groundfish Sectors the specifications below will not be implemented by this Sector.

**7.1.1** For the purpose of Section 7.1 of the Harvesting Rules, the portion of BSA 1 west of 70:15 to the shoreline north to the Maine Coast and South to Cape Cod would be defined as **Inshore GOM.**

**7.1.2** When an Observer/Monitor is onboard. The Sector Vessel may declare and fish in all Broad Stock Areas, including the portion of BSA 1 defined as the Inshore GOM defined in this section.

**7.1.3** When an Observer/Monitor is NOT onboard:

**A.** If the Sector Vessels intends to fish West of the 70:15 in the area described in Section 7.1.1 of these Harvesting Rules as the Inshore GOM, at any time during a trip, the vessel must declare BSA 1 only and the Sector Vessel may not conduct any fishing activity outside of the area defined as BSA 1 for the entire trip.

**B.** If the vessel declares more than one Broad Stock Area on a trip, the vessel is prohibited from conducting fishing activity west of the 70:15 in the area described in Section 7.1.1 of Exhibit A: Harvesting Rules as the inshore GOM.

C. If the Member declares more than one BSA on the trip, the Member is prohibited from conducting fishing activity West of the 70:15 in the area described above as the Inshore GOM.

D. The Member must indicate acknowledgement of this restriction by transmitting a Trip Start Hail, through their VMS unit or third party software, and check the "b. Inshore Gulf of Maine" from the list of Sector Ops Plan Provisions in the Trip Start Hail.

**7.1.4** VII, Northeast Fishery Sector Board of Directors reserves the right to remove and/or modify this Inshore GOM Declaration provision at any time during the FY 2019 or FY2020 Fishing Years.

**7.1.5** Continuation of H.R. §7.1 in FY 2020 will be documented accordingly in **Exhibit I**

**8.** **TRIP HAIL**: Sector vessels will comply with any Hail requirements established by the Sector and/or Agency.

**8.1** **METHOD OF TRANSMISSION HAILS**: The sector vessels will be transmitting HAILS (Trip Start and Trip End) electronically via the email messaging component of their VMS units. All data necessary to the requirements will be sent in compressed formats to minimize characters and maximize message capacity directly to the Sector's Server which will collect, store, convert and relay all data elements necessary to meet various requirements. The Sector will relay required HAILS (Trip State and Trip End) to NMFS, immediately upon receipt. In the event that the primary system is unavailable, Sector Vessels will utilize a backup system, including but not limited to, direct cell phone or radio transmission between the vessel and NMFS OR a relay through the Sector Manager.

**8.2** **TRIP START HAIL**: Prior to leaving port on a trip in which the catch of allocated stocks will count against the Sectors ACE i.e. a sector trip, each Active Vessel must notify their Sector Manager that the vessel is departing on a sector trip by completing a Trip Start Hail. The Trip Start Hail ("TSH") must include:

**8.2.1** Operator's Permit Number

**8.2.2** Vessel Trip Report (VTR) serial number

**8.2.3** Whether an Observer (NEFOP) or At-Sea Monitor (ASM) is onboard

**8.2.4** Usage of specific sector exemptions which require identification in the TSH

**8.2.5** Usage of specific sector plan provisions which require identification in the TSH

**8.2.6** Landing Port City

**8.2.7** Landing State (abbreviation)

**8.2.8** Estimated time and date of arrival in port

**8.2.9** Estimated time and date of offloading (required only for trips less than 6 hours in duration or if fishing within 6 hours of the offload port)

**8.2.10** Any comments as directed by the Sector Manager or NMFS Regional Administrator

8.3 **TSH FOR TRIPS LESS THAN SIX HOURS OR OCCURRING WITHIN SIX HOURS OF PORT:** For trips less than six hours in length or occurring within six hours of port, the estimated time of arrival to port, offload location and estimated offload time will be provided in the Trip Start Hail (TSH). The Trip End Hail (TEH) will be sent upon completion of the last tow with required updated information. An alternative timing for the TEH may be implemented during FY 2019 or 2020 if agreed upon by the Sector, and NMFS.

8.4 **TSH FOR TRIPS LESS THAN SIX HOURS OR OCCURRING WITHIN SIX HOURS OF PORT:** For trips less than six hours in length or occurring within six hours of port, the estimated time of arrival to port, offload location and estimated offload time will be provided in the Trip Start Hail (TSH). The Trip End Hail (TEH) will be sent upon completion of the last tow with required updated information. An alternative timing for the TEH may be implemented during FY 2019 or 2020 if agreed upon by the Sector, and NMFS.

8.5 **TRIP END HAIL**: The trip-end hail report must be submitted at least 6 hours in advance of landing for all trips at least 6 hours in duration or occurring more than 6 hours from port. For shorter trips, the trip-end hail reports must be submitted within sufficient in consultation with NMFS Office of Law Enforcement. An alternative timing for the trip end hail may be implemented during FY 2019 or 2020 if agreed upon by the sector, the monitoring provider, and NMFS. The trip end hail must include the following:

8.5.1 Operator's Permit Number
8.5.2 Vessel Trip Report (VTR) serial number
8.5.3 First landing port city
8.5.4 First landing State (abbreviation)
8.5.5 Dealer/Offload Location
8.5.6 Estimated time and date of arrival
8.5.7 Estimated time and date of offload
8.5.8 Second offload port city
8.5.9 Second offload State (Abbreviation)
8.5.10 Total Groundfish Kept in pounds
8.5.11 Total non-Groundfish kept in pounds
8.5.12 Any comments as directed by the Sector Manager or NMFS Regional Administrator

9. **VESSELS FISHING MULTIPLE STOCK AREAS**: If a vessel declares into multiple stock areas the vessel will complete a catch report each time the vessel changes areas.

10. **FISHING IN US/CA AREAS**: When fishing in the US/CA area, a sector vessel that fishes in more than one US/CA area or more than one of the four stock areas will complete a catch report each time the vessel changes areas. Sector vessels will track their Eastern US/CA sub-ACE for Cod and Haddock separately while fishing in the Eastern Area. Sector vessels may fish in all US/CA areas as well as

Open areas in the same trip. In addition to VMS declaration requirements, the vessel will declare the stock areas (of the Four A16 reporting areas) intended to be fished prior to starting a trip.

**11.** **CLOSED AREAS:** Participating vessels may fish in closed areas to the extent authorized by NMFS.

**12.** **CATCH REPORTS:** All Active Member vessels fishing groundfish will be required to submit complete catch records to the Sector Manager electronically via VMS email or other electronic means prior to entering port to end a trip. Catch reports will include, at a minimum, all data elements of a fully compliant VTR logbook record/s. The Sector Manager may modify, at his/her discretion, the frequency of reporting transmissions to meet programmatic needs, such as, but not limited to, participation in a SAP, or internal quota management requirements. In the event a Member vessel is unable to submit his catch records electronically, the Member, will have no more than twenty-four (24) hours to provide such reports to the Sector Manager, upon completion of vessel offload.

**13.** **VESSEL LOGBOOKS (VTRs/e-VTR):** All sector members will comply with applicable reporting requirements including submission of Vessel Trip Reports (VTRs). If Electronic Vessel Trip Reports (e-VTRs) are approved by the Regional Administrator, Sector Members will submit e-VTRs in the format required by NERO. Sector Members will execute all documents necessary to meet legal requirements for the purpose of facilitating e-VTR service.

**14.** **WEEKLY/DAILY REPORTS:** The Sector Manager, or his/her designated representative, will submit weekly or daily Sector Reports of all landings and discards by sector vessels, to NMFS. The Sector will submit required reports, using the format and procedures prescribed by NMFS. The reports required by NMFS are the *Sector Manager ACE Status Report, Sector Manager Detailed Report, and Sector Manager Trip Issue Report* as codified in §648.87(b)(1)(vi)(B). Specifically, the *Sector Manager Detailed Report* provides information down to the sub-trip level about each sector trip for a given week, regardless of completeness of the data. The information includes stock, gear, mesh categories, landing amounts, discards and total catch. The *Sector Manager Trip Issue Report* provides information about the sector trips for a given week that have enforcement or other issues. The *Trip Issue Report* allows the sector to briefly describe to NMFS any enforcement or reporting compliance issues, violations of the Sectors operations plan and regulation, and general problems with monitoring or sector operations during the reporting period. One *Trip Issue Report* is submitted per reporting period. The *Sector Manager ACE Status Report* documents the ACE status calculations, which allows NMFS to cross check totals as stipulated in Amendment 16. In the event that the Sector triggers daily reporting for a specific allocated stock, the *Sector Manager Daily ACE Status will* provide the mean for a sector manager to report their Sectors ACE status calculations on a daily basis if the "trigger point" i.e. thresholds specified in 14.1 have been reached during the current Fishing Year. These reports are cumulative in nature from the start of the fishing year until the current reporting week and are adjusted retroactively as data becomes available or issues

documented in JIRA are resolved. JIRA is an issue tracking application implemented by NMFS, which should be used to report all data quality issues to the appropriate people for research and correction process.

**14.1** REPORTING THRESHOLDS THAT TRIGGER DAILY REPORTING: The reporting frequency for the sector manager's ACE Status Report will be increased to daily when 90% of any of the sector's ACEs is reached. The Sector Manager, or a designated representative, must notify NMFS immediately by email if the threshold that triggers daily reporting has been reached. During the period when a sector has reached or exceeded 90% of any of its ACEs, daily ACE Status and Detailed Reports must be submitted only on a day when a member vessel lands, or when the sector engages in an ACE transfer of a stock that is exceeding the 90% threshold.

An alternative threshold for triggering daily reporting may be implemented during FY 2019 or FY 2020 if agreed upon by the sector and NMFS.

**14.2** **ENFORCEMENT ISSUES:** The Members acknowledge that the Sector Manager ***must*** include any enforcement or reporting compliance issues, including violations of Operations Plan (excluding those sections identified as administrative provisions in this document as identified in **Exhibit F**); violations of regulations, or general problems with monitoring or sectors operations in their *Trip Issue Report* which is submitted to NMFS weekly.

**15.** **ANNUAL REPORT**: Within sixty (60) days of the end of the fishing year the Sector Manager will submit an annual report to NMFS that summarizes: fishing activities of Members, including harvest levels of all species by sector vessels (landings and discards by gear types); enforcement actions; and any other relevant information required to evaluate the performance of the Sector. The actual date of submission will be specified by NMFS, which has been previously based in part on completeness of various data sets including but not limited to final reconciliation of ACE usage and availability of final fishing year data generated by NMFS. In addition, the Annual Report will report the number of sector vessels that fished for regulated groundfish and their permit numbers (when such disclosure does not violate protection of confidentiality); number of vessels that fished for other species; method used to estimate discards; landing port used by sector vessels while landing groundfish; and any other additional information requested by the Regional Administrator for inclusion in the Annual Report. The Sector will submit required reports using the format and procedures prescribed by NMFS.

**16.** **STOCK ATTRIBUTION:** The Sector Manager will utilize landings information from each trip and apply logbook area information to calculate stock attribution ratios for all applicable species.

17. DISCARD RATES AND IN-SEASON DISCARD ESTIMATES: The Sector manager (or his/her designated representative) will derive stock specific discards for each trip. If the trip is observed by either an at-sea monitor or a Northeast Fisheries Observer Program (NEFOP) observer, discards will be derived based on data collected during that trip and will account for all hauls (observed and unobserved) on that trip. If the trip is not observed, discards will be derived using the NMFS-provided discard rate resulting from the NMFS method to estimate 'in-season' discard rates, which may not include data from research trips or sector trips using certain exemptions.

18. **RESERVED FOR FUTURE USE:**

19. **DATA MANAGEMENT**: The sector vessels will be transmitting catch data electronically via the email messaging component of their VMS units. All data necessary for sector ACE management, including all elements of VTR logbook and daily / weekly reporting requirements will be sent in compressed formats to minimize characters and maximize message capacity. Notwithstanding reporting requirements that cannot be altered by a sectors operations plan, the **Sector's server** will be capable of collecting, storing, converting and relay all data elements necessary to meet all reporting requirements in the formats required by the recipients

The Sector, acting through its Manager, will maintain database(s) of vessel trip reports (VTR), dealer, At-Sea (ASM), and NEFOP Observer reports. In addition, the Sector will maintain any other database it determines necessary for its operations. NMFS will maintain a NEFOP/ASM database and will provide the Sector with data from NEFOP and the ASM program.

20. PROOF OF SECTOR MEMBERSHIP: Upon approval of the Sector, each active sector vessel will be issued a Letter of Authorization ("LOA"), which will specify the exemptions that have been approved for the Sector. Each Member agrees that its sector vessels ***must*** comply with all requirements stipulated in the LOA and all applicable federal regulations and laws not specifically exempted in the LOA.

Furthermore, Member agrees that its sector vessels shall maintain the LOA, and a copy of the Sector Agreement and Harvesting Rules on-board at all times while fishing on a 'sector-trip'.

21. SECTOR SPECIFIC EXEMPTIONS: As referenced in §4.0 of this Agreement all Sectors are granted the following **Universal Exemptions**.

- Exemption from groundfish DAS requirements, including DAS reductions, differential groundfish DAS counting, the 3/15 rule for gillnets, and 24-hour DAS counting.
- Exemption from trip limits on stocks for which a sector receives an allocation, except for the following:

- Halibut: Trip limit would continue to be one fish per trip
  - No vessel, whether in the Common Pool or in any sector, would be allowed to possess any windowpane flounder (both stocks), ocean pout, or wolffish on board at any time. When caught, these species must be discarded.
- Exemption from additional mortality controls adopted by Amendment 16, including additional seasonal or year-round closures, gear requirements, DAS reductions, differential DAS counting, and/or restricted gear areas.
- The Gulf of Maine Cod Protection Closures IV and V.
- Exemption from the requirement to use 6.5-inch mesh in the codend in haddock separator trawl/Ruhle trawl when targeting haddock in the Georges Bank Regulated Mesh Area to use 6-inch mesh in the codend.
- Exemption from all or a portion of ASM coverage if the vessel is fishing with extra-large mesh gillnets (10-inch or greater mesh) exclusively in Inshore GB or SNE.

In addition to the Universal Exemptions granted to all Sectors, as referenced above and in §4.0 of this Agreement, **Members agree to abide by the following obligations as specified and authorized in their LOA, in order to utilize these Sector Specific Exemptions. Furthermore, Members acknowledge that specific details pertaining to certain exemptions are located in Exhibit B as required by NMFS:**

**21.1** NOT REQUESTED:
**21.2** 20 Day Spawning Block:
**21.3** NOT REQUESTED:
**21.4** NOT REQUESTED
**21.5** NOT REQUESTED
**21.6** NOT REQUESTED:
**21.7** DAS Leasing Program Length and Horsepower Restrictions
**21.8** NOT REQUESTED
**21.9** Gear requirements in the Eastern U.S./Canada Area
**21.10** NOT REQUESTED
21.11 Requirement to declare intent to fish in the Eastern US/CA SAP and CA II YT/Haddock SAP from the dock
**21.12** Seasonal Restrictions for the Eastern US/CA Haddock SAP
**21.13** Seasonal Restrictions for the CA II YT/Haddock SAP
**21.14** NOT REQUESTED
**21.15** Minimum codend mesh size for directed redfish trips*
**21.16** Prohibition on Combining Small Mesh Exempted Fishery & Sector Trips. *
**21.17** NOT REQUESTED
**21.18** NOT REQUESTED
**21.19** NOT REQUESTED

22. **MONITORING**. The Sector is proposing their preferred At-Sea Monitoring (ASM) Program for consideration by NMFS in Exhibit J Section 1. It is the Sectors hope that the Agency will work collaboratively with the Sector over the fall and winter to resolve any and all concerns the Agency may have with this program. In the event that the Sectors designed ASM program is not approved by NMFS the Sector will use the NMFS designed ASM Program as documented in **Exhibit J Section 2**. Where appropriate, documentation of fulfillment of this criterion for FY 2020 will be located in **Exhibit I** of this Agreement and will be furnished by the Sector in accordance with NMFS guidance and schedule pertaining to bi-annual operation plan submission.

**22.1** **USE OF MONITORING SERVICES**. The Members acknowledge that for the Sector to function efficiently, it is essential that the Active Members conduct their fishing operations such that at-sea monitoring service costs are kept as low as commercially practical amount. The Active Members therefore agree to provide accurate landing time projections, to make landings expeditiously, and to choose landing locations based in part on the efficiency and responsiveness of the buyer receiving catch harvested under the Sector's ACE. Active Members who fail to comply with the provision of this Section may be assessed the excess cost of monitoring resulting from their failure to do so. Furthermore, the Sector BOD may opt from time to time to modify provisions such as authorized landing ports in order to ensure that the cost associated with these required programs do not become cost prohibitive.

**22.2** **COVERAGE RATES**: NEFS VII will deploy at-sea monitors in a way to achieve coverage of 31% of trips that is random and representative of the fishing activities of the sector. A monitored trip must be a sector trip, including those taken in which a NE multispecies day-at-sea is used to target other species such as monkfish or skates, unless exempted by NMFS.

**22.3** **ADDITIONAL COVERAGE**: In addition to ensuring that the coverage rates specified by NMFS are meet by the ASM program the Sector may from time to time opt to have additional coverage in order to fully utilize specific approved exemptions or to address specific needs of the Sector.

**22.4** **AT-SEA MONITORING PROVIDER:** The Sector will contract with one or more of the companies approved by NMFS to provide At-Sea Monitoring and will notify NMFS of its selection no later than May 1, 2019 via electronic mail or written mail. If a vendor in which the Sector has a contractual arrangement with is decertified during the fishing year, the Sector will negotiate a new contractual arrangement with another certified vendor(s) and notify NMFS of these new agreements.

23. AT SEA MONITORING PROGRAM GOALS AND OBJECTIVES: The Sector acknowledges that they have been informed that the current goals and objectives of At-Sea Monitoring ("ASM") as codified by NMFS in 50 C.F.R 648.11(1) are:

| Goal | Objectives |
|---|---|
| Improving Documentation of Catch | • Determine total catch and effort (for all sectors and the common pool) as accurately as possible. Leads to better understanding of how well the target or regulated species are faring.<br>• Determine how much observer coverage is needed in order to minimize effects of potential "monitoring bias."<br>• Maintain monitoring program flexibility in order to improve fleet viability. |
| Reducing Monitoring Costs | • Streamline data management operations and eliminate redundancies.<br>• Explore options for cost-sharing with and deferment of cost to industry<br>• Recognize the opportunity costs of insufficient monitoring. |
| Reducing Discards | • Determine discard rate by using the smallest possible strata while simultaneously maintaining cost-effectiveness.<br>• Collect information by gear type in order to accurately calculate discard rates. |
| Getting More Data Sources to Better Assess Stocks | • Reduce management and/or biological uncertainty.<br>• Perform biological sampling. That is, perform sampling if it can be used to improve the accuracy of mortality or recruitment calculations. |
| Improving Safety of Monitoring Program | • Improve the safety of the ASM program as necessary. |
| Performing Periodic Review Of Monitoring Program to Assess Effectiveness | • Periodically review the performance of the ASM program to ensure it is meeting these goals and objectives. |

24. SECTOR AT-SEA MONITORING PROGRAM: The Sector plans on working collaboratively with certified At-Sea Monitoring Provider(s) ("Provider") to ensure that implementation of the at-sea monitoring program adheres to applicable NMFS requirements, as well as any internal needs that the Sector deems necessary. Specific details of the Sector's proposed At-Sea Monitoring Program are located in **Exhibit J Section 1**.

24.1 In the event the Sectors proposed ASM Program is denied by NMFS the Sector will use the NOAA Fisheries designed ASM program as specified in **Exhibit J Section 2**.

25. RESERVED FOR FUTURE USE:

26. OFFLOADING PORTS: The following list represents those ports where sector vessels are authorized to offload. Additionally, sector vessels are authorized to land fish to trucks within these same locations.

| Primary Port(s) of Landing | Secondary Port(s) of Landing |
|---|---|
| New Bedford, MA | Boston, MA<br>Gloucester, MA |

27. SAFE HARBOR PROTOCOL: To promote safety at sea, the Sector sets forth the following protocol for variance from the landing ports listed. If for reasons beyond a vessel operators control such as severe weather, mechanical failures, compromised hull integrity, instances of pump failures and danger of sinking, crew injury or life threatening illness and any other emergency situations that may arise, a sector vessel may enter a port other than those listed as "Landing Ports" to ensure the safety of the vessel and its crew. In the event that a Sector Vessel must utilize this safe harbor protocol, they must notify their Manager and NMFS OLE of when and where they had to seek safe harbor within 6 hours of this entering the port.

28. SECTOR UNDERSTANDING AND ACKNOWLEDGMENTS: Sector Members understand and acknowledge that the following provisions have been interpreted by NMFS as applicable to all operating sectors. Sector Members acknowledge this applicability and where appropriate utilize these universal interpretations within their sector management and operations:

28.1 INTRA-SECTOR DAYS AT SEA (DAS) LEASING: Days at Sea may be leased intra-sector (between members) within the guidelines and procedures contained in the FMP and as amended by Amendment 16. The Sector would accept any future relief in the length and horsepower constraints of the program that may be authorized by the RA in the future.

28.2 INTER-SECTOR DAYS AT SEA (DAS) LEASING: Members who wish to lease Days-at-Sea (DAS) outside of the Sector are authorized under this provision to do so, only with Members of other Sectors whom are similarly exempt. Members acknowledge that such DAS leasing would not be exempted from existing length and horsepower constraints as currently contained in applicable regulations.

28.3 PAPER VTR: Members acknowledge that they are bound to all applicable reporting requirements. Sector vessels shall continue using paper VTRs for FY 2019 & 2020, as required by regulations. However, electronic vessel trip reporting (e-VTR) systems for transmission and submission of required VTR reports have been authorized by the Regional Administrator using a phased implementation process. The Sector and its Members may utilize e-VTR in accordance with the phased implementation process.

28.4 ADDITIONAL EXEMPTIONS: Members note that NMFS is generating one Environmental Assessment for all sectors seeking authorization for Fishing Year 2019 & 2020, and that

NMFS communication has stated that if an exemption is approved for one Sector, all other authorized Sectors can be similarly approved for that specific exemption based on the terms and conditions of the originally requesting sector. In light of this understanding, NEFS VII will request authorization for such exemptions it deems beneficial for its operations, prior to the publication of the final authorizing rule.

**28.4.1** Furthermore, NMFS has indicated that Sectors will be afforded the opportunity to request additional exemptions for the 2nd year of operations i.e. FY 2020 in accordance with a supplemental schedule to be established by NMFS.

**29.** MODIFICATION OF HARVESTING RULES: Members acknowledge that from time to time, the Sector Manager in collaboration with Board of Directors, and at times Membership, may adopt additional requirements or restrictions on the internal reporting requirements or fishing activities of all members in order to ensure effective utilization and management of the Sector's ACE. These modifications may include, but are not limited to, additional notification of planned fishing activity to the Manager, additional internal reporting requirements, gear requirements, and restrictions on locations where fishing may occur during specific times of the year or with specific gear. When such modifications are implemented, all Members will be notified in writing.

Exhibit B: Additional Details Regarding Specific Approved Sector Exemptions

Minimum codend mesh size for directed redfish trips

This exemption allows a sector vessel to fish for Acadian redfish in the designated Redfish Exemption Area, described below, using nets with codend mesh no smaller than 5.5 inches. When fishing inside the Redfish Exemption Area all other restrictions applicable to trawl nets still apply. In order to use this exemption, a vessel must strictly adhere to the following conditions and restrictions:

1. The vessel must declare its trip in PTNS under standard requirements, there is no additional at-sea monitoring coverage required above the target coverage level for the sectors (i.e., ~15% in fishing year 2018).

2. Prior to leaving the dock, the vessel must declare its intent to use the redfish exemption on the trip through the VMS trip start hail by checking the box "Redfish Trip" under sector exemptions.

3. The vessel must submit a Multispecies Catch Report through its VMS system, each day for the **entire trip**, including Parts 1 and 2 of the trip as described below, even if the vessel has declared the exemption, but does not target redfish. The vessel must submit Multispecies Catch Reports through VMS in 24-hr intervals for each day of the fishing trip. The report must be submitted by 0900 hr (9:00 a.m.) on the date following the date the fish were caught. The report must provide a good faith estimate of the amount each regulated species caught on each day of the trip.

4. In accordance with the restriction stated herein, the vessel may use a codend with 5.5-inch mesh and greater within the Redfish Exemption Area. The northern boundary ensures that the exemption is used in deeper water (i.e., greater than 50 fathoms). Vessels cannot use the exemption in the "cod closure" (block 131) during February and March.

The Redfish Exemption Area is bounded on the east by the U.S.-Canada Maritime Boundary, and bounded on the north, west, and south by the following coordinates, connected by straight lines in the order listed:

| Point | N. Lat. | W. Long. |
|---|---|---|
| A | 44°27.25' | 67°02.75' |
| B | 44°16.25' | 67°30.00' |
| C | 44°04.50' | 68°00.00' |
| D | 43°52.25' | 68°30.00' |
| E | 43°40.25' | 69°00.00' |
| F | 43°28.25' | 69°30.00' |
| G | 43°00.00' | 69°30.00' |
| H | 43°00.00' | 70°00.00' |
| I | 42°00.00' | 70°00.00' |
| J | 42°00.00' | 67°00.63'[1] |

[1]The intersection of 42°00' N. latitude and the U.S.-Canada Maritime Boundary, approximate longitude in parentheses.

Due to concerns about GOM cod, block 131 is closed for February and March. The area is bounded on the east, north, west, and south by the following coordinates, connected by straight lines in the order listed:

| Point | N. Lat. | W. Long. |
|---|---|---|
| G | 43°00.00' | 69°30.00' |
| H | 43°00.00' | 70°00.00' |
| K | 42°30.00' | 70°00.00' |
| L | 42°30.00' | 69°30.00' |
| G | 43°00.00' | 69°30.00' |

5. During a Redfish Exemption Trip, any codend that is only authorized on a Redfish Exemption Trip must be stowed below deck and can only be retrieved after completing the requirements identified in paragraph 8 below.

Part 1 of Redfish Exemption Trip

6. When a vessel declares a "Redfish Trip" via VMS, it may fish outside the Redfish Exemption Area during Part 1 of the Redfish Exemption Trip in accordance with otherwise applicable regulations and sector exemptions. However, fishing outside of the Redfish Exemption Area first is optional. A vessel may choose to immediately transit to the Redfish Exemption Area and begin fishing.

7. Any catch thresholds do not apply for Part 1 of the trip.

Part 2 of Redfish Exemption Trip: Switching Codends

8. When the vessel plans to target redfish, it must travel to the Redfish Exemption Area. Once the vessel is in the Redfish Exemption Area, immediately before switching codends, it must send a Multispecies Catch Report via VMS. This report is in addition to the daily Multispecies Catch Reports that are required when utilizing this exemption. The Multispecies Catch Report a vessel must send before switching codends must provide a good faith estimate of all fish caught by the vessel that day between 12:01 AM and the time of the report, and must fill out Step 5 indicating that it intends to use the exemption immediately after sending the report. After the vessel is in the Redfish Exemption Area and submits the required catch report, it may retrieve the 5.5-inch mesh codend from below deck and begin using it. The vessel may use a 5.5-inch mesh codend (or greater) for the remainder of the trip in Redfish Exemption Area.

9. Once a vessel sends the Multispecies Catch Report via VMS indicating that it is switching to the smaller mesh codend (Step 5), it is prohibited from fishing outside the Redfish Exemption Area.

10. The vessel must submit a final Multispecies Catch Report, in addition to other required Multispecies Catch Reports, and a Trip End Hail via VMS once it stops fishing and begins its return to port.

<u>Summary Of All Redfish Exemption Trip Reporting Requirements</u>

1. Submit a trip start hail declaring a redfish trip
2. Submit VTRs when switching chart area, gear, and/or mesh size.
3. Submit daily catch reports of all kept fish by 9 AM the following day.
4. Send a catch report of all kept fish since 12:01 AM of that day, with Step 5 completed.
5. Submit a final catch report and Trip End Hail at the end of the trip.

<u>Monitoring Catch Thresholds</u>

For all trips declaring the redfish exemption and targeting redfish under Part 2 of the trip, at least 50% of the total groundfish kept must be redfish. For observed trips (NEFOP/ASM) declaring the redfish exemption and targeting redfish under Part 2 of the trip, total groundfish discards (including redfish) may not exceed 5% of all kept fish. If after at least one month, it is determined that the sector is not meeting one of these two thresholds, NMFS will notify the sector and be given 30 days to modify fishing behavior in order to meet both thresholds. NMFS retains the authority to rescind the exemption if either threshold is not being met.

<u>Prohibition on combining small-mesh exempted fishery and sector trips</u>

The exemption applies to sector trips only and is intended to allow a vessel to catch small-mesh species after targeting groundfish. Under this exemption, a sector vessel must fish with trawl nets that meet current regulatory requirements and sector exemptions during the first part of the trip, but may switch to modified small-mesh gear for the second portion of the trip. The small-mesh portion of the trip must be fished in the Sector Small-Mesh Fishery Exemption Area, described below, and must use the modified small-mesh gear described below. A vessel may land whiting, longfin squid, mackerel, herring and other species permitted for retention in small-mesh exempted fisheries, provided the vessel still meets the

requirements of those fisheries. For more information on small-mesh fishery exemptions and permitted species see: https://www.greateratlantic.fisheries.noaa.gov/regs/infodocs/small_mesh_exemption.pdf Vessels may not fish the small-mesh portion of their trip using this exemption in Southern Windowpane Accountability Measure Areas, where they overlap with the exemption area.

As shown above, the Sector Small-Mesh Fishery Exemption Area is comprised of Statistical Areas 537, 539, and 613, and is defined as the waters bounded by the following points, connected in the order listed by rhumb lines, except where otherwise noted:

| POINT | W LONGITUDE | N LATITUDE | NOTE |
|---|---|---|---|
| A | 70° 00' | 41° 14.45' | (1) |
| B | 70° 00' | 39° 50' | |
| C | 71° 40' | 39° 50' | |
| D | 71° 40' | 40° 00' | |
| E | 73° 00' | 40° 00' | |
| F | 73° 00' | 40° 44.9' | (2)(3) |
| G | 72° 1.8' | 41° 00' | (3)(4) |
| H | 71° 40' | 41° 00' | |
| I | 71° 40' | 41° 21' | (5)(6) |
| J | 71° 10' | 41° 23.3' | (6)(7) |
| K | 71° 10' | 41° 20' | |
| L | 70° 49.5' | 41° 20' | (8)(9) |
| M | 70° 26.96' | 41° 21.05' | (9)(10) |
| N | 70° 18.82' | 41° 20.14' | (11)(12) |
| O | 70° 18.30' | 41° 19.76' | (12)(13) |
| P | 70° 16.65' | 41° 18.73' | (14)(15) |
| Q | 70° 15.31' | 41° 17.32' | (15)(16) |
| R | 70° 14' | 41° 17' | (17)(18) |
| A | 70° 00' | 41° 14.45' | (18)(1) |

(1) Point A represents the intersection of 70°00'W longitude and the south coast of Nantucket, MA
(2) Point F represents the intersection of 73°00'W longitude and the south coast of mainland Long Island, NY
(3) From Point F to Point G along the south coast of mainland Long Island, New York (inclusive of bays)
(4) Point G represents the intersection of 41°00'N latitude and the southeast coast of Long Island, NY
(5) Point I represents the intersection of 71°40'W longitude and the coast of Rhode Island
(6) From Point I to J along the coast of Rhode Island, inclusive of Narraganset Bay
(7) Point J represents the intersection of 71°10'W longitude and the coast of Rhode Island
(8) Point L represents the intersection of 41°20'N latitude and the west coast of Martha's Vineyard, MA
(9) From Point L to Point M along the south coast of Martha's Vineyard
(10) Point M represents Wasque Point, Martha's Vineyard, MA
(11) Point N represents the west coast of Muskeget Island, Nantucket, MA
(12) From Point N to Point O along the southwest coast of Muskeget Island, Nantucket, MA
(13) Point O represents the south coast of Muskeget Island, Nantucket, MA
(14) Point P represents the northwest coast of Tuckernuck Island, Nantucket, MA
(15) From Point P to Point Q along the southwest coast of Tuckernuck Island, Nantucket, MA
(16) Point Q represents Smith Point on the southwest coast of Tuckernuck Island, Nantucket, MA
(17) Point R represents Esther Island, Nantucket, MA
(18) From Point R back to Point A along the south coast of Nantucket, MA

**The modified small mesh gear must contain either:**

- A drop chain sweep with a minimum drop of 12 inches (30.48 cm) in length, with a 24-inch headrope setback; or
- a large mesh belly panel with a minimum mesh size of 32 inches (81.28 cm), with the meshes hung on the half (a hanging ratio of 2:1); or
- an excluder grate secured forward of the codend with an outlet hole forward of the grate with bar spacing of no more than 1.97 inches (5.00 cm) wide.

**In order to use this exemption, the following additional conditions and restrictions apply:**

1. Prior to leaving the dock, the vessel must declare a small-mesh trip through the VMS trip start hail by checking the box next to "Other Exemption (when directed by NMFS)" under sector exemptions.
2. A vessel declaring this exemption must render its small-mesh gear not available for immediate use, as defined by 50 C.F.R. § 648.2, when using large-mesh gear during the first portion of the trip.
3. Upon completing the large-mesh portion of the trip, the vessel must submit a Multispecies Catch Report via VMS with a good faith estimate of all catch on board and indicate that it intends to fish with smaller mesh (i.e. with Step 5 completed).
4. The date-time stamp of the Multispecies Catch Report indicates to Enforcement that the vessel is <u>now</u> in the second portion of the trip and is prohibited from redeploying its large-mesh gear.
5. Following submission of the Multispecies Catch Report, the vessel may deploy its modified small mesh gear in the areas described above and is prohibited from fishing outside of the small mesh exemption area. All other applicable regulations apply to this portion of the trip.

6. No fishing may occur under this exemption in areas overlapping the Southern Windowpane Flounder Accountability Measure Areas, regardless of whether or not accountability measures have been triggered.
7. The vessel must comply with the remaining requirements of a sector trip, including the submission of VTRs, a trip end hail, and a final Multispecies Catch Report.
8. A vessel fishing with this exemption must retain and land all legal-sized groundfish on both the regulated mesh and small-mesh portions of the trip.

**Exhibit C: Sector Membership Fishing Year 2019 (May 1, 2019 to April 30, 2020)**

**SECTOR MEMBERS: The following table identifies The NEFS VII Members:**

| MRI | Vessel Permit No. | Vessel Name | Owner Name |
|---|---|---|---|
| 321 | 151622 | OLIVER SKIFF | PERSEUS LLC. |
| 579 | 320244 | DINAH JANE | LEEANNE & NOAH FISHING LLC. |
| 601 | 150090 | CRESTLINER SKIFF | PERSEUS LLC. |
| 608 | 320375 | LEEANNE & ZACHARY | S & S FISHING LLC. |
| 609 | 150656 | 2007 JOHNSON JOKO 0929H707 | TYLER FISHING LLC. |
| 644 | 320903 | NEMESIS | NEMESIS LLC. |
| 685 | 150090 | CORVO II SKIFF | NEMESIS LLC. |
| 688 | 320944 | PERSEUS | PERSEUS LLC. |
| 700 | 410590 | VILA NOVA DO CORVO I | VILA FISHING CORP. |
| 702 | 150842 | COSTA & CORVO II | R & P FISHING CORP. |
| 711 | 320311 | GREEN ACRES | C & D FISHING CORP. |
| 729 | 151200 | JOKO SKIFF NORTHERN CRUSADER | R & C FISHING CORP. |
| 736 | 150895 | 2009 JOKO JAMIE LEIGH | R & P FISHING CORP. |
| 754 | 410564 | ILHA BRAVA | C & C FISHING CORP. |
| 762 | 330552 | HERCULES | LEEANNE LLC. |
| 775 | 330276 | TRIUNFO | TYLER FISHING LLC. |
| 791 | 330309 | MY WAY | MY WAY FISHING LLC. |
| 800 | 330795 | SASHA LEE | SASHA LEE INC. |
| 823 | 330379 | POSEIDON | HERA FISHING CORP. |
| 827 | 149999 | SEA EXPLORER | TYLER FISHING LLC. |
| 845 | 330764 | DESTINY | NOAH LLC. |
| 847 | 150830 | COSTA & CORVO I | R & P FISHING CORP. |
| 856 | 330904 | SOUTHERN CRUSADER II | R & C FISHING CORP. |
| 897 | 150090 | STAR OF THE SEA | CORVO LLC. |
| 961 | 330583 | ILHA BRAVA II | OLIVIA & RAFAELA FISHING LLC. |

| | | | |
|---|---|---|---|
| 964 | 410104 | ILHA DO CORVO | C & V FISHING CORP. |
| 984 | 410161 | RESOLUTE | TYLER FISHING LLC. |
| 1007 | 410194 | EDWARD L MOORE | RAFAELLA LLC. |
| 1016 | 410206 | HUNTRESS I | C. RAFAEL LLC. |
| 1026 | 410501 | HERA | CORVO LLC. |
| 1029 | 410604 | ATHENA | ATHENA FISHING CORP. |
| 1041 | 150108 | BEIRA LITORAL SKIFF | F & C FISHING LLC. |
| 1063 | 410275 | APOLLO | APOLLO FISHING CORP. |
| 1088 | 410335 | COWBOY | R & P FISHING CORP. |
| 1125 | 150829 | SKIFF/ VIOLA | R & P FISHING CORP. |
| 1143 | 410612 | HERA II | S & S FISHING CORP. |
| 1154 | 410471 | BULLDOG | B & D FISHING CORP. |
| 2182 | 150372 | 2006 WATER TENDER | F & C FISHING LLC. |
| 2295 | 410246 | DRAKE | RAFAELLA LLC. |
| 828 | 330386 | Costa Da Gale | F/V Costa Da Gale Inc. |
| 597 | 330326 | SAO JACINTO | KAREN MARIA TRAWLING CORP. |
| 836 | 151269 | DESTINY | BASE, INC. |
| 731 | 150933 | SANDRA | OLIVEIRA AND SILVA FISHING CORP. |
| 1016 | 410545 | NORDIC EXPLORER | NORDIC EXPLORER, LLC |
| 732 | 330172 | NEVES | NEVES & SON FISHING CORP. |
| 546 | 147595 | ROSIE-L | KEITH N LAUDEMAN |
| 597 | 330326 | SAO JACINTO | KAREN MARIA TRAWLING CORP. |
| 789 | 330303 | NORDIC VIKING | NORDIC VIKING INC. |
| 793 | 330314 | LAURA J | LAURA J FISHERIES INC. |
| 887 | 330535 | SUSAN MARIE II | F/V SUSAN MARIE INC. |
| 891 | 330810 | MAIZEY JAMES | JIM MAIZING FISHING LLC. |
| 900 | 330561 | BLUE SEAS II | P & A FISHING CORP. |
| 969 | 410129 | CHRISMAR | CHRISMAR INC. |
| 1081 | 330908 | GROWLER | COVE FISHING CORP. |
| 1325 | 330781 | FREEDOM | NEW FREEDOM FISHING CORP. |
| 770 | 215016 | Can Do | Bay Fuels Inc. |
| 2272 | 320655 | Atlantic Warrior | Atlantic Warrior Inc. |

ACTIVE MEMBERS: The following table identifies the Vessels that are authorized to harvest Sector ACE:

| MRI | Vessel Permit No. | Vessel Name | Owner Name |
|---|---|---|---|
| 597 | 330326 | SAO JACINTO | KAREN MARIA TRAWLING CORP. |

INACTIVE MEMBERS WITH RESTRICTIONS:

Consistent with the authority contained in NEFS VII FY 2019 & 2020 Operations Plan the following permits (Table X) have been accepted for enrollment in FY 2019 under the following terms and conditions:

a. Entity will be enrolling as a non-active member and will not be authorized to fish in any Sector ACE accountable fishery during FY 2019 and member acknowledges that no Letter of Authorization (LOA) will be furnished to them by the Sector

b. Furthermore, it is acknowledged that the National Marine Fisheries Service (NMFS) will issue Non-Active LOAs and Active LOAs to NEFS VII based on roster enrollment, and may issue Active LOAs for the permits identified below upon a sufficiently documented and valid determination by the NEFS VII BOD that the permit identified has been sold to an independent 3rd party.

c. In the event a permit held by an entity identified in Table 1 is sold to an independent 3rd party, the Board may reconsider non-active status and grant active status to the new member upon written request after finding the transfer or sale was an arms-length sale to an independent 3rd parry. In evaluating whether a transfer or sale of a permit appears to be between separate legal entities NEFS VII will evaluate several factors, including but not limited to: Whether the transfer appears to be an "arm's length" transaction to an independent person or entity in which the current owner, subsidiary, partner, officer, director, trustee, shareholder or any of their family members does not have any financial interest or any control; whether the transferor/seller derive any financial benefits from the operations of the vessel after it is transferred; whether the transferor/seller exercises any control over the activities or operation of the vessel after it is transferred; and whether there are any common shareholders, partners, or investors with significant overlapping ownership interests in both the transferor/seller and the transferee/buyer.

d. If the NEFS VII Board of Directors determines that the permit has been acquired by an independent 3rd party and affirmatively votes to designate the new owner as an Active Member, they will communicate the basis for such decision in writing to NMFS and request that an Active Member LOA be issued for the permit specified.

**Table X**

| MRI | Vessel Permit No. | Vessel Name | Owner Name |
|---|---|---|---|
| 321 | 151622 | OLIVER SKIFF | PERSEUS LLC. |
| 579 | 320244 | DINAH JANE | LEEANNE & NOAH FISHING LLC. |
| 601 | 150090 | CRESTLINER SKIFF | PERSEUS LLC. |
| 608 | 320375 | LEEANNE & ZACHARY | S & S FISHING LLC. |
| 609 | 150656 | 2007 JOHNSON JOKO 0929H707 | TYLER FISHING LLC. |

| MRI | Vessel Permit No. | Vessel Name | Owner Name |
|---|---|---|---|
| 644 | 320903 | NEMESIS | NEMESIS LLC. |
| 685 | 150090 | CORVO II SKIFF | NEMESIS LLC. |
| 688 | 320944 | PERSEUS | PERSEUS LLC. |
| 700 | 410590 | VILA NOVA DO CORVO I | VILA FISHING CORP. |
| 702 | 150842 | COSTA & CORVO II | R & P FISHING CORP. |
| 711 | 320311 | GREEN ACRES | C & D FISHING CORP. |
| 729 | 151200 | JOKO SKIFF NORTHERN CRUSADER | R & C FISHING CORP. |
| 736 | 150895 | 2009 JOKO JAMIE LEIGH | R & P FISHING CORP. |
| 754 | 410564 | ILHA BRAVA | C & C FISHING CORP. |
| 762 | 330552 | HERCULES | LEEANNE LLC. |
| 775 | 330276 | TRIUNFO | TYLER FISHING LLC. |
| 791 | 330309 | MY WAY | MY WAY FISHING LLC. |
| 800 | 330795 | SASHA LEE | SASHA LEE INC. |
| 823 | 330379 | POSEIDON | HERA FISHING CORP. |
| 827 | 149999 | SEA EXPLORER | TYLER FISHING LLC. |
| 845 | 330764 | DESTINY | NOAH LLC. |
| 847 | 150830 | COSTA & CORVO I | R & P FISHING CORP. |
| 856 | 330904 | SOUTHERN CRUSADER II | R & C FISHING CORP. |
| 897 | 150090 | STAR OF THE SEA | CORVO LLC. |
| 961 | 330583 | ILHA BRAVA II | OLIVIA & RAFAELA FISHING LLC. |
| 964 | 410104 | ILHA DO CORVO | C & V FISHING CORP. |
| 984 | 410161 | RESOLUTE | TYLER FISHING LLC. |
| 1007 | 410194 | EDWARD L MOORE | RAFAELLA LLC. |
| 1016 | 410206 | HUNTRESS I | C. RAFAEL LLC. |
| 1026 | 410501 | HERA | CORVO LLC. |
| 1029 | 410604 | ATHENA | ATHENA FISHING CORP. |
| 1041 | 150108 | BEIRA LITORAL SKIFF | F & C FISHING LLC. |
| 1063 | 410275 | APOLLO | APOLLO FISHING CORP. |
| 1088 | 410335 | COWBOY | R & P FISHING CORP. |
| 1125 | 150829 | SKIFF/ VIOLA | R & P FISHING CORP. |
| 1143 | 410612 | HERA II | S & S FISHING CORP. |
| 1154 | 410471 | BULLDOG | B & D FISHING CORP. |
| 2182 | 150372 | 2006 WATER TENDER | F & C FISHING LLC. |
| 2295 | 410246 | DRAKE | RAFAELLA LLC. |
| 828 | 330386 | Costa Da Gale | F/V Costa Da Gale Inc. |
| | | | |

INACTIVE MEMBERS WITHOUT RESTRICTIONS:

Consistent with the authority contained in NEFS VII FY 2019 & 2020 Operations Plan the following permits (Table XX)  have been accepted for enrollment in FY 2019 as Active & Non-Active Members.  The permits identified in Table 2 are not subjected to the terms and conditions outlined above, and do not need to be sold to become Active Members.  Members below may at any time submit a written request to the NEFS 7 Board of Directors requesting re-classification to Active Member status.  If the Board approves the member to become active, NMFS will furnish them with an Active Member Letter of Authorization

| MRI | Vessel Permit No. | Vessel Name | Owner Name |
|---|---|---|---|
| 836 | 151269 | DESTINY | BASE, INC. |
| 731 | 150933 | SANDRA | OLIVEIRA AND SILVA FISHING CORP. |
| 732 | 330172 | NEVES | NEVES & SON FISHING CORP. |
| 546 | 147595 | ROSIE-L | KEITH N LAUDEMAN |
| 789 | 330303 | NORDIC VIKING | NORDIC VIKING INC. |
| 793 | 330314 | LAURA J | LAURA J FISHERIES INC. |
| 887 | 330535 | SUSAN MARIE II | F/V SUSAN MARIE INC. |
| 891 | 330810 | MAIZEY JAMES | JIM MAIZING FISHING LLC. |
| 900 | 330561 | BLUE SEAS II | P & A FISHING CORP. |
| 969 | 410129 | CHRISMAR | CHRISMAR INC. |
| 1081 | 330908 | GROWLER | COVE FISHING CORP. |
| 1016 | 410545 | NORDIC EXPLORER | NORDIC EXPLORER, LLC |
| 1325 | 330781 | FREEDOM | NEW FREEDOM FISHING CORP. |
| 770 | 215016 | Can Do | Bay Fuels Inc. |
| 2272 | 320655 | Atlantic Warrior | Atlantic Warrior Inc. |
| | | | |

**EXHIBIT D: Sector Member and Vessel Permits Amendment 16 Disclosure Requirements Fishing Year 2019 (May 1, 2019 to April 30, 2020)**

Sector Members have enrolled all eligible Limited Access Multispecies Permits into a Sector.

Additional Information on federal & State permits associated with Sector Vessels and Sector Members:

| PERMIT | VESSEL NAME | OWNER NAME | BLUEFISH | BLACK SEA | SPINY | SUMMER | INCIDENTAL | HERRING | GENERAL | AMERICAN LOBSTER | MONKFISH | NORTHEAST | OCEAN | ATLANTIC | SCALLOP - | SCUP | SURF CLAM | SKATE | SQUID/MAC | TILEFISH | State Permit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 410275 | APOLLO | APOLLO FISHING LLC | 1 | 1 | 1 | 1 | | D | C | 1 | D | E | | A | 2 | 1 | | 1 | 1,3,4 | 1 | MA Lobster |
| 410604 | ATHENA | ATHENA FISHING CORP | 1 | | 1 | 1 | | A | C | 1 | C | E | 6 | A | 2 | | 1 | 1 | 3,4 | 1 | MA Lobster |
| 320655 | ATLANTIC WARRIOR | ATLANTIC WARRIOR INC. | 1 | 1 | 1 | 1 | | D | C | | E | A | 6 | A | 2 | 1 | 1 | 1 | 1,4 | 1 | |
| 410471 | BULLDOG | B & D FISHING CORP | 1 | 1 | 1 | 1 | 1 | D | C | 1 | C | A | 6 | A | | 1 | 1 | 1 | 1,4,5 | 1 | MA Lobster |
| 215016 | CAN-DO | BAY FUELS INC | 1 | | 1 | | | D | | 1,A2,AOC | E | A | | A | | 1 | | 1 | 1,4 | 1 | |
| 330386 | COSTA DA GALE | CARLOS RAFAEL | | | | 1 | | | | | | A | | | | | 1 | | 1 | | |
| 330309 | MY WAY | BRAVA FISHING CORP | 1 | | 1 | 1 | | D | A | 1 | C | A | 6 | A | | | 1 | 1 | 3,4 | 1 | MA Lobster |
| 410564 | ILHA BRAVA | C & C FISHING CORP | 1 | | 1 | | | D | C | 1 | E | E | 6 | A | 2 | | 1 | 1 | 3,4 | 1 | MA Lobster |
| 320311 | GREEN ACRES | C & D FISHING CORP | 1 | 1 | 1 | 1 | | D | A | 1 | C | A | 6 | A | | 1 | 1 | 1 | 3,4 | 1 | MA Lobster |
| 4101 | ILHA DO CORVO | C & V FISHING | 1 | | 1 | 1 | | D | A | 1 | D | A | 6 | A | | | 1 | 1 | 3 | 1 | MA Lob |

# EXHIBIT H

#21.3

COMMONWEALTH OF MASSACHUSETTS

Bristol, ss.

Superior Court
Docket No. 1973-CV-0839

BASE, INC.

Plaintiff

v.

CARLOS RAFAEL, CONCEICAO RAFAEL, APOLLO FISHING, LLC, ATHENA FISHING CORP., C&C FISHING CORP., INVONILDE FISHING CORP., S&S FISHING, LLC TYLER FISHING, LLC, VILA NOVA DO CORVO II, INC.

Defendants

and

C&D Fishing Corp., C&V Fishing Corp. F&C Fishing Corp., Hera Fishing, LLC Leanne, LLC, Leanne & Noah, LLC My Way Fishing, LLC, Nemesis, LLC Noah, LLC, Olivia & Rafaella Fishing, LLC, Perseus, LLC, R&C Fishing Corp. R&P Fishing Corp., Rafaella, LLC S&S Fishing, LLC, Sasha Lee, Inc.

Reach and Apply Defendants

and

MICHAEL QUINN, CHARLIE QUINN, STANDARD MARINE OUTFITTERS, QUINN FISHERIES, INC.

Intervenors

BRISTOL, SS SUPERIOR COURT
FILED

FEB 4 2020

MARC J SANTOS, ESQ.
CLERK/MAGISTRATE

AFFIDAVIT OF STEPHANIE RAFAEL-DEMELLO

I, STEPHANIE RAFAEL-DEMELLO, hereby depose and swear as follows:

**Background**

1. My name is Stephanie Rafael-DeMello. I am the daughter of Carlos Rafael and Conceicao Rafael. My parents and our extended family live in Greater New Bedford.

2. My parents worked their entire adult lives on New Bedford's Working Waterfront. Fifty years of their hard work and investment resulted in their creating hundreds of jobs and ultimately owning the largest commercial fishing fleet in the Port of New Bedford.

3. In 2016, my father was arrested and charged criminally for certain fisheries violations. At the same time, NOAA's Office of General Counsel initiated a Civil Enforcement Action against my parents and their corporations – including all of the Defendants in this case.

**Sector VII Background**

4. In order to conduct fishing business, my parents elected to have their corporations and LLCs become members of Northeast Fishery Sector VII by enrolling their fishing permits in Sector VII.

5. Sector VII is a Nonprofit Corporation formed in accordance with Massachusetts General Laws Chapter 180. Its membership consists of a group of federal limited access groundfish permit holders that have voluntarily entered into a contract known as the Sector Membership Agreement and a separate document called the Sector Operations Plan which is approved by the National Marine Fisheries Service.

6. The Sector VII Membership Agreement includes a section addressing permit transfers by Sector VII Members. The Agreement provides a Right of First Refusal for transfers and it sets forth a number of exemptions that shall be exempt from the ROFR.

**Efforts to Sell Assets to BASE, Inc.**

7. From the time of my father's arrest through the present, my family has worked diligently to try to keep my parents' scallop and groundfish vessels and their associated permits as part of the New Bedford fishing community.

8. In our attempt to keep the vessels and permits in New Bedford, we engaged in many conversations about a potential sale with the owners of BASE, Inc., Richard Canastra and Raymond Canastra (collectively "BASE"). Our goal in those talks was to achieve a timely sale to BASE which would keep the City, settlement houses, gear suppliers, fuel suppliers, insurance providers, and fishermen from being needlessly harmed.

9. In early 2017, we worked with BASE in a good faith attempt to sell to them. At that time, my parents offered to finance the majority of a deal with BASE because BASE explained that they were not in a position to obtain financing for the purchase of the vessels and permits.

10. My father spent months leading up to his sentencing and the six week period granted to him by the Court after his sentencing and before his confinement engaged in nearly daily talks with BASE trying to craft a deal for the entire fleet.

11. After months of allowing BASE every opportunity to purchase the assets, they ultimately indicated they were not interested in purchasing the assets, explaining that they believed the vessels and permits were overpriced. [1]

12. During those negotiations, my parents' attorneys informed NOAA about the potential for a sale of the fleet to BASE. At that time, NOAA expressed serious concern about BASE purchasing the fleet because the violations which led to my father's arrest and the civil charges took place at the unloading facility on the BASE property. NOAA stated that they would need to look very carefully at any transaction involving the principals of BASE before they would allow BASE to purchase the vessels and permits.

13. In 2018, while my father was in prison, I was again contacted by BASE. At that time, they made an attempt to acquire my family's assets with a partner. At the time, they brought a large Canadian company involved in the fishing industry to the table. I met with BASE and representatives from that company in good faith. We presented them with detailed financial information that they requested and our accountant spent hours preparing reports for them. During our last meeting with BASE and their partner, BASE claimed the assets were overpriced and they walked away from the potential transaction.

14. At another point in 2018, BASE visited my father in prison and put forth a new idea. BASE proposed acquiring the fleet with a Native American tribe as a co-buyer explaining that there would be favorable tax benefits for all of the parties.

15. Thereafter, I engaged in multiple conversations with BASE, providing them with even more detailed permit and financial information. After waiting several weeks for the Native American tribe to present the proposal to their chairperson and board, we were informed by BASE that they were not going to do the deal due to financing issues.

16. On multiple occasions in 2019, I was contacted by Cassie Canastra on behalf of BASE. In those talks, she inquired about our progress and we discussed which vessels were available for purchase and which were under contingent agreement. During this period, Cassie informed me that BASE was no longer interested in the scallopers since the scallopers were much more expensive than the groundfish vessels. During this period, BASE did express an interest in groundfish vessels and permits and I continued to

---

[1] The sale price that was offered to the Canastras was more than Five Million ($5,000,000) Dollars lower than the price actually obtained from purchasers in the subsequent transactions.

provide Cassie with a list of the groundfish vessels and permits which were available. She told me she expected that BASE would be looking to purchase 4, 6, or potentially 8 groundfish vessels. However, no offer was forthcoming.

**Contract to Sell to The Quinns**

17. Following BASE's repeated false starts and their evident inability to structure a deal to purchase the assets, we engaged with Charles Quinn and Michael Quinn. They expressed a serious interest in purchasing the scallop vessels and their permits. By the middle of 2019, after a negotiation which included our permitting vessel haul-outs for comprehensive surveys – a courtesy that we provided to all interested purchasers at their own cost - the Quinns entered into a contingent agreement with my family for the scallop vessels and permits. The key contingency to the transaction was my parents needed to reach a settlement agreement with NOAA. My parents finally achieved that Settlement Agreement on August 19, 2019.

18. The Settlement Agreement with NOAA required that my parents sell all of their commercial fishing vessels and permits by December 31, 2020. The Settlement Agreement also grants NOAA the authority to review any potential sale of the vessels and permits so that NOAA can ensure itself that both the transaction (as structured) and the Buyer are acceptable to the agency.

19. In late August / early September, we decided that we would pursue the "local fishing community" ROFR exemption to complete the Rafael – Quinn transaction. That ROFR exemption is clearly set forth in Section 3.4.4.3 of the Sector Membership Agreement, which states in relevant part:

> **A transfer to an individual or entity, that is in the opinion of the Selling Member's Board of Director's, a broadly recognized member of the sector's "local, fishing community", as defined in Section 3.4.4.5 below, provided that as a condition of permit transfer, the transferee agrees to enroll in the sector for the remainder of the fishing year in which the permit transfer takes place and for one additional fishing year.**

20. We reviewed Section 3.4.4.5 which defines the sector's "local fishing community" as "the geographic area which a majority of the members reside and conduct their fishing business." I also reviewed Section 3.4.1 which defines the "Selling Member" as "the member receiving the permit offer", which in this case were my parents and their associated corporations.

21. I have known of the Quinn Family since I was a child. The Quinns are widely recognized (and well respected) members of the "local fishing community". Charles Quinn was a local fishermen for many years. He operates his vessels out of the Port of

New Bedford. He and his son Michael Quinn live in Dartmouth and they own a marine outfitting retail store in New Bedford.

22. The Quinns agreed that we could pursue the ROFR exemption by committing to keeping the permits in Sector VII for the remainder of the current fishing year and for at least one more year. On September 3, 2019, the Quinns provided me with a signed copy of a letter making that commitment to Sector VII.

23. On September 9, 2019, I attended a meeting of the Sector VII Board of Directors and informed the Board that the corporations that were selling the vessels and permits to the Quinns had made the determination that the ROFR Exemption described in Section 3.4.4.3 applied to the Rafael – Quinn transaction and that we would be proceeding to close on the transaction.

24. The Quinns attended the same Sector VII Board meeting and asked to be welcomed into Sector VII by the Board and restating their commitment to keep all of the permits and the fishing quota in Sector VII for the remainder of the current fishing year and at least one more year. After the Quinns made their presentation, the Sector VII Board directed me and the Quinns to leave the room for their deliberations.

25. The following day, the attorney who then represented the Sector VII Board sent a letter stating that the Quinns request to join Sector VII had been rejected – without any legal justification or factual explanation.

26. By that time, I had worked with the Quinns for many months to get the deal together. Both parties had spent substantial resources to get the deal ready to close. We had acted in good faith over the prior several years with BASE and with any other parties who expressed an interest in my parents' vessels and permits and we planned to proceed with the transaction that we had committed to with the Quinns.

27. On September 11, 2019, BASE, Inc. filed the Original Complaint in this case against my parents and their corporations claiming that we did not follow the requirements of the Sector Membership Agreement – seeking to stop the sale to the Quinns. At the time, Judge Hopkins granted an *ex parte* Temporary Restraining Order prohibiting the sale.

28. On September 13, 2019, both parties presented to Judge Hopkins during a two-hour Hearing to review the Sector Membership Agreement and the legal arguments of the parties. Judge Hopkins ruled against BASE, Inc. and found in favor of my family – specifically ruling that BASE, Inc. was not likely to succeed on the merits of its claim based upon the plain language of Section 3.4.4.3 of the Sector Membership Agreement.

29. On September 24, 2019, we closed the transaction with the Quinns. Money from the sale of the scallopers was used to pay a fine to NOAA; pay off obligations to mortgage holders; and pay other obligations to creditors.

30. On September 25, 2019, BASE, Inc. filed an Emergency Motion with the American Arbitration Association seeking to undo the transaction and seeking to revisit Judge Hopkins determination.

**Sector VII - Actions**

31. The events of late August / Early September caused my parents to become concerned that the Sector VII Board of Directors was not fairly representing all members' interests and further that the Board was unfairly and unreasonably interpreting the Sector Membership Agreement. My parents were particularly concerned that the Sector VII Board was applying the rules in a manner which favored one Sector VII member BASE over other members. During this period, BASE, Inc.'s two shareholders (Richard Canastra and Raymond Canastra) sat on the Sector VII Board.

32. Presumably based upon instructions from the former Sector VII Board (which included Richard Canastra and Raymond Canastra - the two principals from BASE), the former counsel for Sector VII spent Sector VII resources participating in litigation favoring one Sector Member (BASE) at the expense of another Sector Member (my family) even after Judge Hopkins had ruled that BASE, Inc. was not likely to succeed on the merits of the case based upon the plain language of Section 3.4.4.3 of the Sector Membership Agreement.

33. In November, to address this issue, I contacted two other individual Sector VII Members Lars Vinjerud and Antonio Pereira to explain my concerns. They agreed that the Board's actions merited a Membership Meeting to discuss the composition of the Sector VII Board going forward. On November 18, 2019, in accordance with Article III, Section 3 of the Bylaws, the three of us signed a letter and delivered it to the Sector VII Board President Virginia Martins requesting a Membership Meeting.

34. A Membership Meeting was scheduled and noticed for Tuesday December 3rd. At the Membership Meeting, I reviewed the timeline of events set forth above expressing my concern about the Board's independence and the Board's judgment. Thereafter, I made a motion in accordance with Article IV, Section 3 to elect three additional Directors. (Attorney Walter Smith, Scott Bode of Pier Fish, and Corbin Pettway of C.P. Brodeur) My motion was seconded and discussion occurred. I then called for a vote on the motion and a dispute arose between the existing Board Members who argued that each *person* could cast one vote regardless of how many permits they owned and regardless of how many members they controlled. I respectfully disagreed explaining that according to the plain language of Article III, Section 6 of the Bylaws, each *member* was entitled to one vote. The parties reached an impasse and a motion to adjourn was made while my motion to add the three new Directors was on the table.

35. On or about December 13, former counsel for the Sector VII Board informed me (and presumably the Sector VII Board) that my interpretation of the voting procedure was correct. Before I was able to send a written request to the President of the Board to ask

them to reconvene the Membership Meeting, the entire Sector VII Board of Directors – without notice – resigned from their positions as both Directors and Officers – leaving the Nonprofit Corporation with no Directors and no Officers.

36. Initially, I tried to call a meeting of the Members to elect a new Sector VII Board. In response, counsel for BASE stated that it would only recognize a meeting if we first went to the Superior Court and filed a Petition for a Special Meeting.

**Related Litigation**

37. As a result of this position of BASE's attorney, I was forced to petition the Superior Court, in accordance with Massachusetts General Law Chapter 180, Section 6A to grant me permission to Notice a Meeting of the Sector VII Members to consider the pending Motion related to the appointment new Directors and to further consider the composition of the Sector VII Board going forward.

38. After obtaining permission from the Superior Court, a Sector VII Membership Meeting was held on December 30, 2020. At that meeting, a new five member Sector VII Board was elected to fill the vacant board positions. The new board includes: Attorney Walter Smith, Scott Bode of Pier Fish, and Corbin Pettway of C.P. Brodeur, Inc., Antonio Pereira of P&A Fishing Corp., and Lars Vinjerud of Cove Fishing Corp.

39. In addition to the instant litigation, the pending Arbitration and the Sector Petition, there is pending litigation regarding the same transaction involving the Quinns and BASE which was filed by the Quinns in the Business Litigation Session of the Suffolk County Superior Court and removed by BASE to the United States District Court for the District of Massachusetts.

40. It is noteworthy that this Bristol County case is the only forum which involves and has jurisdiction over all of the business parties to the dispute: BASE, Inc., the Rafael corporations, and the Quinns.

41. My parents are working against the clock as it relates to our Settlement Agreement with NOAA which requires that we sell all of the vessels and permits this year.

42. For the past several years, I have been working extremely hard for my family, the City of New Bedford, shore side businesses, fishermen to get people back to work. I am now tasked with complying with the forced sale term in the Settlement Agreement with NOAA.

Signed under the pains and penalties of perjury, this 4th day of February, 2020

Stephanie Rafael-DeMello

# Exhibit I



UNITED STATES DEPARTMENT OF COMMERCE
National Oceanic and Atmospheric Administration
NATIONAL MARINE FISHERIES SERVICE
GREATER ATLANTIC REGIONAL FISHERIES OFFICE
55 Great Republic Drive
Gloucester, MA 01930-2276

December 20, 2019

Cassie Canastra
Northeast Fishery Sector VII
62 Hassey Street
New Bedford, MA 02740

Dear Ms. Canastra:

Per your request on December 9, 2019, we have appended the Northeast Fishery Sector VII
operations plan to add two vessels to the active members list, and to add additional secondary
landing ports.

Enclosed is a copy of the amendment, which you should append to your copies of the approved
operations plans. We will send you additional instructions regarding distributing updated sector
letters of authorization to your members. If you have any questions, please contact Kyle Molton
at 978-281-9236.

Sincerely,

Sarah Heil
Assistant Regional Administrator
for Sustainable Fisheries

cc. Tom Nies, Executive Director, New England Fishery Management Council

Enclosure



# Exhibit J

Affidavit of Peter Medeiros

I, PETER MEDEIROS, hereby depose and swear as follows:

1. I am an individual who resides at 7 Hanover Court in Dartmouth, Massachusetts.

2. From 2006 – 2018, I worked as the General Manager and over saw the unloading of vessels and the Shipping and Receiving Department at the New Bedford Seafood Auction which I understand to be owned and operated by BASE, Inc. (hereinafter "the Auction")

3. During the time that I worked for the Auction, I took instructions from the owners of the Auction, Richard Canastra and Raymond Canastra. Generally speaking, Raymond Canastra played a more active role in managing me and in overseeing the day to day operations in the Shipping and Receiving Department. But, both owners had conversations with me about the business operation and Carlos Rafael

4. Beginning in approximately 2010 and continuing until early 2016, I was instructed by the owners to handle the unloading and pack out of many of trips on Carlos Rafael's groundfish boats in a manner that was different from all other groundfish boats.

5. The normal process for unloading and packing out fish from a vessel was to pack out and [illegible] bill of lading / packing slip setting forth the [illegible] associated with the fishing trip that was being unloaded. [illegible] were sold through the [illegible] followed this normal procedure.

6. However, when the fish from one of Mr. Rafael's vessels was being sold directly to Carlos Seafood – and not through the auction – we followed an entirely different procedure. In those cases, I was instructed by Raymond Canastra and Carlos Rafael to [illegible] bill of lading / packing slip setting forth the weight of the [illegible] That bill of lading / packing slip was kept at the auction [illegible] the fish to Carlos Seafood.

that particular trip was successfully unloaded and delivered to Carlos Rafael without being intercepted or inspected by any government enforcement [illegible] (NOAA / USCG / Mass Environmental Police), I was told by Raymond Canastra that I should expect a call from Mr. Rafael with instructions to shred / destroy the accurate bill of lading / packing slip. I was told by Raymond Canastra that once that call was made and each transaction was completed that "there should be no paperwork and nothing else left to show what happened".

8. I was also told by Raymond Canastra that upon receiving the call from Mr. Rafael, I should create a new bill of lading / packing slip with accurate weights but with different and inaccurate species of fish eliminating any reference to the actual fish for which Mr Rafael had limited quota and replacing it with a reference to a species of fish for which Mr. Rafael owned more quota on the new inaccurate bill of lading / packing slip.

9. All of the bills of lading / packing slips were in triplicate. After the inaccurate bills of lading / packing slips were created, I was instructed by Raymond Canastra to: provide one copy of the new inaccurate slip to Mr. Rafael; place one copy of the new inaccurate slip in the vessel's file; and keep the final copy of the new inaccurate slip in my desk drawer in a special file for delivery to Raymond Canastra upon his request as a group of slips – which normally occurred once every thirty to ninety days.

Sworn under the pains and penalties of perjury, this 23rd day of September, 2020.

Peter C [signature]

[illegible]

Affidavit of Nelson Couto

I, NELSON COUTO, hereby depose and swear as follows

1. I am an individual who resides at 1 Costa Drive in Fairhaven, Massachusetts

2. For more than twenty (20) years - from 1994 - 2015 - I worked as a Foreman on the floor overseeing the unloading of vessels at the New Bedford Seafood Auction which I understand to be owned and operated by BASE, Inc. (hereinafter "the Auction")

3. The owners of the Auction, Richard Canastra and Raymond Canastra were my bosses. I answered to them and to my direct supervisor Peter Medeiros. In regard to the owners, I more often interacted with Raymond Canastra who was more regularly on the [illegible] the day to day operations than was his brother [illegible] [illegible] the Auction.

4. [illegible]

[illegible] fish boats.

5. As the working foreman, I was in charge of overseeing the offloading of the [illegible] directing the 1-5 Auction employees who worked with the [illegible]

6. The normal process for unloading and packing our fish from a vessel was to pack out the fish in totes; to weigh the fish; and to prepare a bill of lading / packing slip which described both the species of the fish and the weight of each species of fish associated with the fishing trip.

7. In cases where the catch from Mr. Rafael's boats were sold through the auction – or in cases where the Environmental Police (state or federal) were present for the unloading, something which occurred approximately 10 % to 20% of the time, Carlos Rafael's catch followed the normal procedure.

8. In the fish was being sold to Carlos Seafood, but where the Environmental Police observed the unloading, I was instructed to place a small check mark on the BASE Packing Slip / Bill of Lading so that the owners would know that they could not alter the numbers on that document after the fact.

9. When one of Mr. Rafael's vessels was being unloaded and sold directly to Carlos Seafood – and not through the auction – and where the Environmental Police (state or federal) did not appear – we were told to follow a different procedure. In those cases, I was instructed by Raymond Canastra, Carlos Rafael, and Peter Medeiros to first complete an accurate Packing Slip / Bill of Lading setting forth the weight of the fish and the species of the fish. That Packing Slip / Bill of Lading was kept at the Auction and a copy was sent along with the fish to Carlos Seafood.

10. If the trip was successfully delivered to Carlos Seafood, without being [illegible] inspected by the Environmental Police (state or federal), I was told to [illegible] accurate Packing Slip / Bill of Lading. I was then told that [illegible] should be prepared with the same weights but with [illegible] species of fish. Once that new paperwork was [illegible] [illegible] Packing Slip [illegible]

Sworn under the pains and penalties of perjury [illegible] day of September, 2020

Nelson Couto

# Exhibit K

Libby Etrie

From: Libby Etrie
Sent: Monday, December 9, 2019 3:40 PM
To: kyle.molton@noaa.gov
Cc: 'Cassie'; 'Katherine McArdle NOAA Federal'
Subject: Letter from NEFS 7 re. LOAs and Additional Ports
Attachments: 7 NEFS_Letter_Req_LOA_AdditionalPorts_1209201912092019.pdf

Hi Kyle,

Attached is a letter from NEFS 7 requesting LOAs for three vessels as well as an amendment to the Sector Ops Plan for additional secondary ports.

I've cc'd KB just because I know these additional vessels plus AIS will need to be added in on the PTNS side so I wanted to loop her in as well.

Thanks
Libby

--------------------------------------------><((((º>
Elizabeth 'Libby' Etrie
E: Libby.Etrie@gmail.com
T: +1 (978) 491-1848
F: +1 (800) 736-1378
Skype: Libby.Etrie

Notices: This communication, together with any attachments hereto or links contained herein, is for the sole use of the intended recipient(s) and may contain information that is confidential or legally protected. If you are not the intended recipient, you are hereby notified that any review, disclosure, copying, dissemination, distribution or use of this communication and any attachments is STRICTLY PROHIBITED. If you have received this communication in error, please notify Northeast Sector Service Network Inc. immediately by return e-mail message and delete the original and all copies of the communication, along with any attachments hereto or links herein, from your system.

--------------------------------------------><((((º>

**From:** Cassie [mailto:cassie@baseseafood.com]
**Sent:** Monday, December 9, 2019 3:33 PM
**To:** Libby.Etrie@gmail.com
**Subject:**

Cassie A. Canastra
*Director of Operations*
BASE New England/ Whaling City Seafood Display Auction
62 Hassey St. New Bedford, Ma 02740
508.717.7214
www.baseseafood.com ><((((º>

**From:** Kyle Molton - NOAA Federal <kyle.molton@noaa.gov>
**Sent:** Thursday, September 12, 2019 3:02 PM
**To:** Minkiewicz, Andrew <AMinkiewicz@KelleyDrye.com>
**Cc:** Liz Sullivan - NOAA Federal <liz.sullivan@noaa.gov>
**Subject:** Re: Active Sector Members

Hi Drew,

To date we have not processed any addenda to the NEFS 7 Operations Plan so that would be correct.

Kyle

*****************************************

On Thu, Sep 12, 2019 at 2:38 PM Minkiewicz, Andrew <AMinkiewicz@kelleydrye.com> wrote:

Kyle,

It was great to talk to you. Can you please confirm our conversation, that Sector VII has one active member, the Sao Jacinto, and there have been no amendments to change an inactive member to active member status.

Thank you,

Drew

Libby Etrie

| | |
|---|---|
| From: | Libby Etrie |
| Sent: | Thursday, December 19, 2019 1:55 PM |
| To: | 'Kyle Molton NOAA Federal' |
| Subject: | RE: LOA's |

Even if we can get the LOAs available this week that would be huge. Especially for base for the other non-fishing reasons we discussed.

------------------------------------------><(((º>

Elizabeth 'Libby' Etrie
E: Libby.Etrie@gmail.com
T: +1 (978) 491-1848
F: +1 (800) 736-1378
Skype: Libby.Etrie

Notices: This communication, together with any attachments hereto or links contained herein, is for the sole use of the intended recipient(s) and may contain information that is confidential or legally protected. If you are not the intended recipient, you are hereby notified that any review, disclosure, copying, dissemination, distribution or use of this communication and any attachments is STRICTLY PROHIBITED. If you have received this communication in error, please notify Northeast Sector Service Network Inc. immediately by return e-mail message and delete the original and all copies of the communication, along with any attachments hereto or links herein, from your system.

------------------------------------------><(((º>

**From:** Kyle Molton - NOAA Federal [mailto:kyle.molton@noaa.gov]
**Sent:** Thursday, December 19, 2019 12:56 PM
**To:** Elizabeth Etrie
**Subject:** Re: LOA's

ok, sounds good I will take a look

Kyle

Kyle Molton
Fishery Management Specialist
(he/him/his)

National Marine Fisheries Service
Greater Atlantic Regional Fisheries Office
55 Great Republic Drive
Gloucester, MA 01930
978.281.9236

On Thu, Dec 19, 2019 at 12:54 PM Elizabeth Etrie <libby.etrie@gmail.com> wrote:

Manny just heard that his permit got issued this morning. Can you double check on the Hera again?

**Kyle Molton - NOAA Federal**

---

| | |
|---|---|
| From: | Kyle Molton NOAA Federal |
| Sent: | Friday, December 20, 2019 4:22 PM |
| To: | Cassie; Elizabeth Etrie |
| Subject: | NEFS 7 Ops Plan Addenda Approved |
| Attachments: | NEFS 7_Addendum 1.pdf; 191220_letter confirming addendum.pdf |

Cassie, Libby,

Please find attached the NEFS 7 ops plan addenda that was approved today and associated cover letter. This addenda is based on your revised request. I will follow up shortly with LOA's for the impacted vessels.

Let me know if you have any questions.

Kyle

--

**Kyle Molton**

Fishery Management Specialist

(he/him/his)

National Marine Fisheries Service

Greater Atlantic Regional Fisheries Office
55 Great Republic Drive

Gloucester, MA 01930

978.281.9236



UNITED STATES DEPARTMENT OF COMMERCE
National Oceanic and Atmospheric Administration
NATIONAL MARINE FISHERIES SERVICE
GREATER ATLANTIC REGIONAL FISHERIES OFFICE
55 Great Republic Drive
Gloucester, MA 01930-2276

December 20, 2019

DEC 2 0 2019

Cassie Canastra
Northeast Fishery Sector VII
62 Hassey Street
New Bedford, MA 02740

Dear Ms. Canastra:

Per your request on December 9, 2019, we have appended the Northeast Fishery Sector VII operations plan to add two vessels to the active members list, and to add additional secondary landing ports.

Enclosed is a copy of the amendment, which you should append to your copies of the approved operations plans. We will send you additional instructions regarding distributing updated sector letters of authorization to your members. If you have any questions, please contact Kyle Molton at 978-281-9236.

Sincerely,

Sarah Heil
Assistant Regional Administrator
for Sustainable Fisheries

cc.  Tom Nies, Executive Director, New England Fishery Management Council

Enclosure



# AMENDMENT 1 TO THE VII NORTHEAST FISHERY SECTOR OPERATIONS PLAN

APPROVED BY NOAA'S NATIONAL MARINE FISHERIES SERVICE DECEMBER 20, 2019

EFFECTIVE DECEMBER 20, 2019, THROUGH APRIL 30, 2021

This document amends Exhibit C of this operations plan by:

Striking the following from the table under the section "SECTOR MEMBERS":

| | | | |
|---|---|---|---|
| *1026* | *410501* | *HERA* | *CORVO LLC.* |
| *836* | *151269* | *DESTINY* | *BASE, INC.* |

And, adding the following to the table under the section "SECTOR MEMBERS":

| | | | |
|---|---|---|---|
| *836* | *410253* | *MARGUERITE C* | *BASE, INC.* |
| *1026* | *410501* | *HERA* | *M & B FISHING CORP* |

And, adding the following to the table under the section "ACTIVE MEMBERS":

| | | | |
|---|---|---|---|
| *836* | *410253* | *MARGUERITE C* | *BASE, INC.* |
| *1026* | *410501* | *HERA* | *M & B FISHING CORP* |

And, striking the following from Table X under the section entitled "INACTIVE MEMBERS WITH RESTRICTIONS":

| | | | |
|---|---|---|---|
| *1026* | *410501* | *HERA* | *CORVO LLC* |

And, striking the following from Table XX under the section entitled "INACTIVE MEMBERS WITHOUT RESTRICTIONS":

| | | | |
|---|---|---|---|
| *836* | *151269* | *DESTINY* | *BASE, INC* |

This document also amends section 26 (OFFLOADING PORTS) under Exhibit A of this operations plan by adding the following to the table in this section under "Secondary Port(s) of Landing":

*Provincetown, MA*
*Nantucket, MA*

This document also amends the entirety of this operations plan by striking the watermark label "DRAFT" from all places it appears in the operations plan document.

# Exhibit L

12

Volume: 1 of 1
Pages: 1-9
Exhibits: 0

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

BASE, INC.

v.

CARLOS RAFAEL, et al

Docket No. 1973CV00839

PRELIMINARY INJUNCTION (EXCERPT)
BEFORE THE HONORABLE MERITA A. HOPKINS

APPEARANCES:

For the Plaintiff:
Farrell Smith O'Connell LLP
27 Congress Street
Suite 109
Salem, Massachusetts 01970
By: David Sherman Smith, Esq.

For the Defendants:
Moses Smith Markey & Walsh, LLC
50 Homers Wharf
New Bedford, Massachusetts 02740
By: John Allen Markey, Esq.

Taunton, Massachusetts
Courtroom 1
September 13, 2019

Barbara A. Reardon, CET
Approved Court Transcriber

(Court in session.)

(Parties present.)

(EXCERPT.)

(4:20 p.m.)

THE CLERK: Turning to 1973CV839.

THE COURT: All right. Thank you, everyone, for your arguments today and the paperwork that you submitted ahead of time so that I could do my best to familiarize myself with the subject matter that required review and familiarity with particularly the sector and the agreements relating to the sector.

At issue are several Fishing Permits that are enrolled in a sector, which is a group of commercial Groundfish Permit holders that voluntarily contract with one another to consolidate their aggregate fishing histories and permits for purposes of receiving fishing quota from the National Marine Fisheries Services. Is that a fair statement, everyone?

MR. SMITH: Yes, Judge.

THE COURT: Okay. And an ex parte motion came in for temporary relief on Wednesday, and in the allegation for relief or restraining order the focus was that Mr. Rafael, one of the defendants, was selling his permit to a nonmember without first providing a right of first refusal to a member of the sector.

The further argument was that Mr. Rafael was threatening to voluntarily relinquish his several Northeast Multispecies Permits

in order to avoid the right of first refusal, and the argument was that if those permits were voluntarily relinquished, the representation was going back to NOAA, it would permanently cause irreparable harm to the plaintiff and would have a significant impact on the sector.

It was also highlighted and requested and the relief sought was for a temporary injunction so that the dispute could be resolved through mandatory and binding arbitration under the agreement.

At the time -- and then there was an affidavit, and it's the same affidavit that the motion relies on today, from Mr. Canastra, and in the affidavit he said that at a meeting, the September 9th meeting that has been discussed today, that Mr. Canastra understood that an attorney for the Quinns stated that the Quinns and Carlos Rafael were pursuing the abandonment of the Multispecies Permits for purposes of avoiding the right of first refusal procedures. It's been represented in court today that that is not the case as far as the Quinns are concerned.

Correct?

MR. MARKEY: Correct.

THE COURT: They have no intention of doing that, correct?

MR. MARKEY: Correct.

THE COURT: And there is no further representation that Mr. Rafael intends to do that. In fact, what is before the Court today persuades the Court that Mr. Rafael, working through his

daughter -- correct -- is pursuing the sale of the vessels, as has been agreed to with NOAA and a consent decree -- or settlement agreement, settlement agreement. Sorry.

So based on what I outlined, the temporary injunction issued with the intent of at least maintaining the status quo regarding relinquishment of any of the permits. The right of first refusal and arbitration was something that didn't necessarily call for an immediate ex parte order, but the argument regarding relinquishment in my opinion did, and that's why it issued.

After arguments today and having a fuller discussion of the Sector Membership Agreement, a fuller understanding of the Northeast Fishing Sector 7 Operation Plan and Agreement, and after reviewing the affidavit of Stephanie Rafael-DeMello and reviewing the complaint again and some of the attachments, I'm persuaded that I cannot make a finding of likelihood of success on the merits.

And in doing so, I am -- to explain my reasoning on it, I'm relying on the memo that was attached as Exhibit 4 to the complaint from Kelley Drye & Warren. It was dated September 3, 2009, and the memo was regarding the permit transfer from Sector Membership Agreement and it was to the Northeast Fisheries Sector 7 Board. And I think it's pretty succinct in capsulating the reason why I cannot find a likelihood of success on the merits.

Briefly stated, it's because I am persuaded that there is an

option under the agreement for the sale under exemptions, and this memo discusses that. And I know you're all familiar with it, but I'd like to read it into the record for clarity.

This is what the memo says: "As you know, Sector 7 member Carlos Rafael has reached an agreement to sell seven of his scallop vessels to Charlie and Michael Quinn and their associated corporate entities. Of those seven vessels, six have Groundfish Permits and associated ACE that are currently enrolled in Sector 7."

I'm going to say that that is not relevant to my discussion.

"However, the Board has informed the seller, Carlos Rafael, through his attorney that the proposed sale is subject to a right of first refusal, according to the Sector Membership Agreement. We" -- being Kelley Drye & Warren -- "have since taken a moment to review the Sector Membership Agreement thoroughly and have noted there are several exemptions to the right of first refusal requirement. One exception is a sale to an individual or entity that the Board recognizes as a member of the local fishing community.

"This memorandum supports the Quinns' request for the Board to recognize this proposed sale as a sale to a member of the local fishing community. Charlie and Michael Quinn are both well-known to all of you. Both currently reside in the town of Dartmouth on Russells Mills Road, same town as the sellers, Carlos and" -- and I don't know how to pronounce the middle name,

but -- "Rafael.

"Charlie Quinn was born and raised in New Bedford and has fished commercially for scallops, monkfish, and groundfish out of the Port of New Bedford for four decades.

"Michael was born in New Bedford and raised in the town of Dartmouth. Michael has fished his boats out of New Bedford and he currently runs several shoreside commercial fishing businesses that are located in New Bedford on Popes Island in addition to managing their current fleet of fishing vessels. All of the Quinns' current fishing vessels are homeported in the Port of New Bedford.

"If the purchase of the seven vessels is finalized, the Quinns pledge to remain in Sector 7 for the remainder of the fishing year and for at least one additional fishing year."

And it says, "See attached letter signed by the Quinns," of which has been put into the record today and I've reviewed and I'm relying on in my decision.

"If your Sector Membership -- in your Sector Membership Agreement, Section 3.4.4 states: Notwithstanding the foregoing provisions of Sections 3.4.1 and 3.4.2, the right of first refusal provisions, the following permit transfers shall be exempt from the restrictions set forth in those sections.

"Section 3:4.3 allows a transfer of a permit without a right of first refusal under the following conditions, colon" -- and it says: "A transfer to an individual or entity that is, in the

opinion of the selling member's Board of Directors, a broadly recognized member of the sector's local fishing community as defined in Section 3.4.4.5 below, provided that, as a condition of permit transfer, the transferee agrees to enroll in the sector for the remainder of the fishing year in which the permit transfer takes place and for one additional fishing year.

"Section 3.4.4.5 defines local fishing community as the geographic area within which a majority of the members reside and conduct their fishing business.

"In the case of Sector 7, the majority of members reside in New Bedford and its adjacent towns of Dartmouth and Fairhaven and they conduct their fishing business in the Port of New Bedford.

"Therefore, for this section to apply you need, one, there must be a finding that the buyer is widely recognized as a member of the New Bedford fishing community who resides in the New Bedford area and, two, the buyer must agree to remain in Sector 7 for the remainder of this fishing year and for one additional fishing year.

"If those two conditions are met by the clear language of the Sector Membership Agreement, no right of first refusal is required for the parties to finalize the transaction.

"From the background information above and the attached letter from Charlie and Michael Quinn and their associated corporate entities, it fits squarely within the requirements and definitions of Section 3.4.4.3. The Quinns are widely recognized

members of the same fishing community as the majority of Sector 7 members, New Bedford, and they reside in the adjacent town of Dartmouth. The Quinns have pledged in the attached letter to remain members of Sector 7 for this year and for at least one additional year."

So based on that memorandum, which -- and the remaining of the memorandum I'm not reading. I don't need to. It's a recommendation to the Board. I'm not getting into that. But that is the basis of my reason of not being able to find a likelihood of success on the merits, given the clear exemption and the language that I think is clear and has been repeated in the document intentionally carving out exemptions. And the specific reference to -- forgive me for a moment -- the selling member's Board of Directors.

So, based on that, I am vacating the temporary restraining order.

Thank you, everyone.

MR. SMITH: Thank you very much, Judge.

MR. MARKEY: Thank you.

(Hearing concluded at 4:34 p.m.)

C E R T I F I C A T E

I, Barbara A. Reardon, CET, Approved Court Transcriber, do hereby certify that the foregoing is a true and accurate transcript from the digital audio recording provided to me of the proceedings in the matter of Base, Inc. v. Carlos Rafael, et al, held on September 13, 2019.

I, Barbara A. Reardon, further certify that the foregoing is in compliance with the Administrative Office of the Trial Court Directive on Transcript Format.

I, Barbara A. Reardon, further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

Barbara A. Reardon (Signature)
Name of the Approved Court Transcriber

September 18, 2019
Date

157 Shea Road, West Brookfield, MA 01585
Business Address

(508) 637-1181
Business Telephone

barbarareardon89@gmail.com
E-mail Address

# Exhibit M



COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS

SUPERIOR COURT

CIVIL ACTION NO:

BASE, INC.,
Plaintiff,

VS.

CARLOS RAFAEL, CONCEICAO RAFAEL, APOLLO FISHING, LLC, ATHENA FISHING CORP., C&C FISHING CORP., IVONILDE FISHING CORP., S&S FISHING, LLC, TYLER FISHING, LLC, VILA FISHING CORP., and VILA NOVA DO CORVO II, INC.
Defendants.

## COMPLAINT

Plaintiff, BASE, Inc. ("BASE"), alleges:

## PARTIES

1. **BASE** was and is a corporation duly organized under the laws of the Commonwealth of Massachusetts, with a principal place of business of 62 Hassey Street, New Bedford, MA 02740.

2. On information and belief, Defendant, **Carlos Rafael**, is an individual residing in the Commonwealth of Massachusetts, who is presently incarcerated at the Fort Devens Federal Prison, 42 Patton Road, Devens, MA 01434.

3. On information and belief, Defendant, **Conceicao Rafael**, is an individual residing in the Commonwealth of Massachusetts, with a residential address at 77 Tucker Lane, Dartmouth, MA 02747.[1]

[1] Conceicao Rafel and Carlos Rafael are collectively referred to herein as the "**Rafaels**".

4. On information and belief, Defendant **Apollo Fishing, LLC ("Apollo")** is a limited liability company organized under the laws of the Commonwealth of Massachusetts, with a principal place of business of 24 Centre Street, New Bedford, MA 02740. At all material times **Apollo** was and is the owner of the fishing vessel **APOLLO (O.N. 614462)** together with its federal fishing permit and fishing history associated with Northeast Federal Permit No. **410275 (hereinafter the "Apollo Permit").**

5. On information and belief, Defendant **Athena Fishing Corp. ("Athena")** is a corporation organized under the laws of the Commonwealth of Massachusetts, with a principal place of business of 24 Centre Street, New Bedford, MA 02740. At all material times **Athena** was and is the owner of the fishing vessel **ATHENA (O.N. 1122803)** together with its federal fishing permit and fishing history associated with Northeast Federal Permit No. **410604 (hereinafter the "Athena Permit").**

6. On information and belief, Defendant **C&C Fishing Corp. ("C&C")** is a corporation organized under the laws of the Commonwealth of Massachusetts, with a principal place of business of 24 Centre Street, New Bedford, MA 02740. At all material times **C&C** was and is the owner of the fishing vessel **ILHA BRAVA (O.N. 971262)** together with its federal fishing permit and fishing history associated with Northeast Federal Permit No. **410564 (hereinafter the "Ilha Brava Permit").**

7. On information and belief, Defendant **Ivonilde Fishing Corp. ("Ivonilde")** is a corporation organized under the laws of the Commonwealth of Massachusetts, with a principal place of business of 24 Centre Street, New Bedford, MA 02740. At all material times **Ivonilde** was and is the owner of the fishing vessel **ACORES (O.N.**

**961198)** together with its federal fishing permit and fishing history associated with Northeast Federal Permit No. **410519 (hereinafter the "Acores Permit").**

8. On information and belief, Defendant **S&S Fishing, LLC ("S&S")** is a limited liability company organized under the laws of the Commonwealth of Massachusetts, with a principal place of business of 24 Centre Street, New Bedford, MA 02740. At all material times **S&S** was and is the owner of the fishing vessel **HERA II (O.N. 1113613)** together with its federal fishing permit and fishing history associated with Northeast Federal Permit No. **410612 (hereinafter the "Hera II Permit").**

9. On information and belief, Defendant **Tyler Fishing, LLC ("Tyler")** is a limited liability company organized under the laws of the Commonwealth of Massachusetts, with a principal place of business of 24 Centre Street, New Bedford, MA 02740. At all material times **Tyler** was and is the owner of the fishing vessel **RESOLUTE (O.N. 597484)** together with its federal fishing permit and fishing history associated with Northeast Federal Permit No. **410161 (hereinafter the "Resolute Permit").**

10. On information and belief, Defendant **Vila Fishing Corp. ("Vila")** is a corporation organized under the laws of the Commonwealth of Massachusetts, with a principal place of business of 24 Centre Street, New Bedford, MA 02740. At all material times **Vila** was and is the owner of the fishing vessel **VILA NOVA DO CORVO I (O.N. 1110463)** together with its federal fishing permit and fishing history associated with Northeast Federal Permit No. **410590 (hereinafter the "VNDC1 Permit").**

11. On information and belief, Defendant **Vila Nova Do Corvo II, Inc. ("Vila Nova")** is a corporation organized under the laws of the Commonwealth of Massachusetts, with

a principal place of business of 24 Centre Street, New Bedford, MA 02740.[2] At all material times **Vila Nova** was and is the owner of the fishing vessel **VILA NOVA DO CORVO II (O.N. 618384)**[3] together with its federal fishing permit and fishing history associated with Northeast Federal Permit No. **410451 (hereinafter the "VNDC2 Permit")**.[4]

12. On information and belief, the **Rafaels**, as their interests appear, and where applicable, own, manage, are officers, members and/or directors of, are affiliated with, and/or are otherwise authorized to act on behalf of the **Rafael Companies.**

**SECTORS AND FEDERAL GROUNDFISH MANAGEMENT**

13. Pursuant to Federal Regulations set forth in 50 C.F.R. Part 648, Subpart F, the National Marine Fisheries Service ("NMFS") manages the Northeast multispecies (also known as "groundfish") fishery through the use of, *inter alia*, what are known as "Sectors."

14. A Sector is a group of Federal limited access groundfish permit holders that voluntarily enter into a contract and Operations Plan approved by NMFS and agree to certain fishing restrictions for a specified period of time. NMFS grants quota (i.e. the

[2] The eight [8] entities identified in Paragraphs 4 through 11 above, **Apollo, Athena, C&C, Ivonilde, S&S, Tyler, Vila and Vila Nova**, are hereinafter referred to collectively as the **"Rafael Companies."**

[3] The eight [8] fishing vessels identified in Paragraphs 4 through 11 above, the **APOLLO, ATHENA, ILHA BRAVA, ACORES, HERA II, RESOLUTE, VILA NOVA DO CORVO I**, and **VILA NOVA DO CORVO II**, are hereinafter referred to collectively as the **"Rafael Vessels."**

[4] The eight [8] fishing permits and fishing histories identified in Paragraphs 4 through 11 above, the **Apollo Permit, Athena Permit, Ilha Brava Permit, Acores Permit, Hera II Permit, Resolute Permit, VNDC1 Permit**, and **VNDC2 Permit**, are hereinafter referred to as the **"Rafael Permits."**

right to harvest certain amounts of fish) or what is known as Annual Catch Entitlement ("ACE") to Sectors for each fishing year based on the aggregate fishing permits and fishing history of the vessels enrolled in each Sector.

15. Federal groundfish permit holders enrolled in a Sector can buy and sell both their federal fishing permits and vessel fishing history and ACE associated with their permit, subject to conditions in their Sector membership and/or operating agreements.

16. At all material times, **BASE** was and is an active member of Northeast Fishery Sector VII (hereinafter "Sector 7").

17. At all material times, the Defendants also were and are members of Sector 7.

18. At all material times, Sector 7 members, including, *inter alia*, **BASE** and the Defendants are parties to both the Sector 7 Membership Agreement (the "Membership Agreement") and Sector 7 Operations Plan (the "Operations Agreement") copies of which are attached hereto as ***Exhibits 1 and 2*** respectively.

19. Accordingly, at all material times the **Rafael Vessels** together with the **Rafael Permits** were enrolled in Sector 7 and subject to the Sector 7 Membership Agreement and Operations Plan.

20. Section 3 of the of the Sector 7 Membership Agreement prohibits the transfer of any fishing permit and fishing history and/or quota (a.k.a. "ACE" or "harvest share"), "other than transfers made in strict compliance" with the Membership Agreement.

21. Section 3.4 of the Membership Agreement provides, *inter alia*, a Right of First Offer ("ROFO") and Right of First Refusal ("ROFR") first to active members of Sector 7 before a Sector 7 member can transfer its fishing permit/history to a non-member.

22. There are strict procedures set forth in the Membership Agreement that Sector 7 members are required to follow before they can transfer their fishing permits/history to a non-member, which include, without limitation the following:

i. The prospective transferor must provide "a complete description, in writing, of all of the terms and conditions of the Permit Offer," to all active members of Sector 7;

ii. The active members shall have thirty [30] days to provide written notice of its intent to exercise its right of first refusal; whoever responds first in time shall have the right to acquire the permit subject to the same terms and conditions offered by the non-member.

23. Likewise, Section 7.3 of the Operations Plan prohibits the transfer of quota and permits without Sector 7 Board Approval and compliance with any ROFO/ROFR procedures.

24. The foregoing transfer restrictions are enacted "to provide financial and operational stability over the term of [the sector's] life."

25. Per Section 9 of the Membership Agreement and Section 18 of the Operations Plan, disputes between Sector 7 members that cannot be resolved through negotiation are subject to mandatory and binding arbitration.

**FACTS**

26. On or about August 19, 2019, NOAA settled several pending administrative claims against **Carlos Rafael** and the **Rafael Companies** associated with **Carols Rafael's**

several and notorious criminal activities made in connection with his commercial fishing operations (hereinafter the "NOAA Settlement").

27. Part of the terms of the NOAA Settlement requires that Defendants sell all limited access federal fishing permits and fishing vessels controlled by Defendants by December 31, 2020, through transactions reviewed and approved by NOAA.

28. Prior to on or about August 29, 2019, the Defendants received an offer to purchase the **Rafael Vessels** and the **Rafael Permits** from outside of the Sector 7 membership, to wit: certain companies owned and/or controlled by individuals named Charles and Michael Quinn (collectively, the "Quinns"), who are not parties to the above-captioned Civil Action.

29. On information and belief, and prior to on or about August 29, 2019, the Defendants entered into a purchase and sale agreement with the Quinns that is yet to be disclosed to the Sector 7 membership.

30. On or about August 29, 2019, the Defendants provided to the Sector 7 manager what they identified as "Right of First Refusal forms," disclosing a "Vessel Purchase and Sale Agreement," whereby the **Rafael Vessels** together with the **Rafael Permits** are to be sold for $45,950,000.00 to an unnamed buyer. A copy of the proposed Vessel Purchase and Sale Agreement is attached hereto as ***Exhibit 3*** and incorporated herein by reference.

31. On or about September 3, 2019, the Defendants withdrew their purported notice of right of first refusal and petitioned the Sector 7 Board of Directors to allow the sale of the **Rafael Vessels** and **Rafael Permits** notwithstanding noncompliance with the

ROFO/ROFR procedures on the grounds that the Quinns are members of the "local fishing community." A true copy of this petition is attached hereto as ***Exhibit 4.***

32. On or about September 9, 2019, the Sector 7 Board of Directors held a meeting and, after deliberation, denied the Defendants' requests to permit the transfer of the **Rafael Vessels** and **Rafael Permits** to the Quinns without first complying with the ROFO/ROFR procedure.

33. On or about September 9, 2019, the Defendants, either themselves or through counsel, made the following representations to the Sector 7 Board of Directors:

   i. The proposed Purchase and Sale Agreement provided to the Sector 7 Manager on August 29, 2019 was not the same Purchase and Sale Agreement made by and between the Defendants and the Quinns;

   ii. The Defendants, despite repeated requests, declined to provide a copy of the Purchase and Sale Agreement by and between themselves and the Quinns;

   iii. The Defendants will pursue voluntarily relinquishing their Northeast Multispecies Permits in order to leave Sector 7 and thereby transfer the remainder of the **Rafael Permits** without the ROFR/ROFO restriction on sale.[5]

[5] Federal fishing permits typically contain fishing rights pertaining to several different species. Federal regulations prohibit the "splitting" of Federal Fishing Permits, i.e. one cannot sell his fishing rights associated with one species and retain his rights to other species. A permit sale must always be a "package deal" in this sense. The **Rafael Permits** contain limited access fishing rights pertaining to both Northeast Multispecies and other various species, most notably scallops. Because Defendants' potential buyers outside of Sector 7 are primarily seeking to acquire the more lucrative limited access scallop rights, Defendants have advised that they will improperly pursue voluntarily and permanently relinquishing their multispecies fishing rights to free them of the Sector 7 requirements. Only multispecies permits are subject to the NMFS' sector program.

34. Should the Defendants voluntarily relinquish their Northeast Multispecies permits, then the ACE associated therewith will be permanently distributed to the common pool and will no longer be an asset of Sector 7, and by extension, **BASE.** Likewise, it will improperly and permanently revoke **BASE** of its genuine right of first refusal. Further, it will be in violation and material breach of both the Membership Agreement and Operations Plan. The foregoing will cause permanent and irreparable damage to **BASE** in addition to other members of Sector 7.

**COUNT I:**
**COMPEL ARBITRATION**

35. **BASE** reiterates and realleges its allegations contained in Paragraph Nos. 1-32 inclusive and incorporates same as if fully set forth herein.

36. The Membership Agreement and Operations Plan manifest valid and binding agreements to arbitrate pursuant to M.G.L. c. 251, § 1.

37. Accordingly, **BASE** demands arbitration, seeking declaratory and injunctive relief as follows:

i. That the Defendants must sell the **Rafael Vessels** and **Rafael Permits** only in compliance with the ROFO/ROFR procedures set forth in the Membership Agreement and Operations Plan;

ii. That the Defendants cannot voluntarily relinquish their Northeast Multispecies Permits;

iii. That Defendants must disclose the terms and conditions of their purchase and sale agreement with the Quinns; and

iv. Any such further relief that is just and proper.

WHEREFORE, **BASE** respectfully prays that the Honorable Court enter Judgment in its favor on Count I, compel all Defendants to submit to Arbitration in accordance with the Membership Agreement and Operations Plan, and issue any such further relief it deems just and proper.

**COUNT II**
**INJUNCTIVE RELIEF**

38. **BASE** reiterates and realleges its allegations contained in Paragraph Nos. 1-32 inclusive and incorporates same as if fully set forth herein.

39. For the reasons stated above, relinquishment of the Northeast Multispecies Permits contained in the **Rafael Permits** and/or transfer thereof outside of the Sector 7 membership will manifest irreparable harm to **BASE** in addition to other members of the sector.

WHEREFORE, **BASE** respectfully prays that the Honorable Court enter Judgment in its favor on Count II and issue the following preliminary and injunctive relief:

(a) Enter a temporary restraining order and preliminary injunction preventing transfer and/or relinquishment of the **Rafael Permits** (both in whole and in part) during the pendency of the demanded arbitration; and

(b) Enter any such further relief the Court deems just and proper.

**COUNT III:**
**M.G.L. c. 93A, § 11**

40. **BASE** reiterates and realleges its allegations contained in Paragraph Nos. 1-32 inclusive and incorporates same as if fully set forth herein.

41. Defendants' ongoing and continuing attempts to circumvent the ROFO/ROFR procedures set forth in the Membership Agreement and the Operations Plan manifest unfair and deceptive acts and practices in violation of M.G.L. c. 93A, § 2.

42. Defendants' aforesaid unfair and deceptive acts and practices were made knowingly, willfully and intentionally at all material times.

43. Defendants' aforesaid unfair and deceptive acts and practices all substantially occurred within the Commonwealth of Massachusetts.

44. As a direct and proximate result of Defendants' ongoing and continuing unfair and deceptive acts and practices, **BASE** has been and will damaged in an amount to be proven at trial.

WHEREFORE, **BASE** respectfully prays that the Honorable Court enter judgment on Count III in favor of **BASE** and against Defendants, award **BASE** its damages, together with costs, prejudgment interest, treble damages pursuant to M.G.L. c. 93A, and reasonable attorneys' fees, and enter any such further relief this Honorable Court deems just and proper.

**PLAINTIFF, BASE, INC.**

**DEMANDS TRIAL BY JURY ON ALL COUNTS IN THE COMPLAINT**

DATED at Salem, Massachusetts, this 11th day of September, 2019.

Plaintiff,
BASE, INC.

By its attorneys,
**FARRELL SMITH O'CONNELL, LLP**

**David S. Smith, Esq.**
**BBO No.: 634865**
**Olaf Aprans**
**BBO NO. 670434**
27 Congress St., Suite 109
Salem, MA 01970
(978) 744-8918
Fax: (978) 666-0383
Email: dsmith@fsofirm.com
olaf@fsofirm.com

# Exhibit N

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS

SUPERIOR COURT

CIVIL ACTION
NO:

BASE, INC.,
Plaintiff,

VS.

CARLOS RAFAEL, CONCEICAO RAFAEL, APOLLO FISHING, LLC, ATHENA FISHING CORP., C&C FISHING CORP., IVONILDE FISHING CORP., S&S FISHING, LLC, TYLER FISHING, LLC, VILA FISHING CORP., and VILA NOVA DO CORVO II, INC.
Defendants.

**EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION**

Now Comes the Plaintiff, BASE, Inc. ("BASE"), by and through its undersigned counsel Farrell Smith O'Connell, LLP, and respectfully submits its Ex Parte Motion for Temporary Restraining Order and Preliminary Injunction.

**INTRODUCTION**

This Civil Action is brought in the wake of Carlos Rafael's sentence and requirement by the National Oceanic and Atmospheric Administration ("NOAA") together with its subagency, the National Marine Fisheries Service ("NMFS"), that Mr. Rafael sell all of his commercial fishing permits and vessels by December 31, 2020. At issue are several fishing permits that are enrolled in a "Sector", which is a group of commercial groundfish permit holders that voluntarily contract with one another to consolidate their aggregate fishing histories and permits for purposes of receiving fishing quota from NMFS. Mr. Rafael's vessels and permits are enrolled in Northeast Fishery Sector VII ("Sector 7"). Plaintiff BASE is also a member of Sector 7.

To enroll in Sector 7, Mr. Rafael agreed that he cannot sell his permits to a non-member without first providing a right of first refusal ("ROFR") to the other members of Sector 7.  Mr. Rafael has nonetheless entered into an agreement to sell several of his fishing permits to a non-member for $45,950,000.00 and seeks to improperly avoid the ROFR requirements. Specifically, it has been threatened that Mr. Rafael will voluntarily relinquish his several Northeast Multispecies Permits (while retaining his more coveted and lucrative limited access scallop permits that are not subject to the sector) in order to avoid the ROFR requirements, unless the Sector 7 Board of Directors provide him with an exemption.  If the multispecies permits are voluntarily relinquished, this will be permanent, and will cause irreparable harm to BASE, both in that BASE will not have the opportunity to exercise its genuine right of first refusal and in that Sector 7 will lose a significant amount of quota associated with Mr. Rafael's multispecies permits.

This threatened "end run" around the ROFR procedure is in direct breach of both the Sector 7 Membership Agreement and Operations Plan, both of which call for mandatory and binding arbitration.  In this motion, BASE respectfully seeks a Temporary Restraining Order and Preliminary Injunction to maintain the status quo and prevent Carlos Rafael and his several companies from relinquishing or otherwise transferring his several fishing permits enrolled in Sector 7 during the pendency of arbitration. The arbitrator(s) will ultimately determine how the permits should be transferred, but a prompt temporary restraining order and injunction is required at this time to prevent permanent damage to BASE pending the outcome of such anticipated arbitration.

Time is of the essence and a temporary restraining order must issue immediately to prevent Carlos Rafael and his several companies from permanently relinquishing their multispecies permits, which only requires the submission of a letter to the National Marine Fisheries Service.

## FACTS

### I. BACKGROUND OF COMMERCIAL FISHING PERMITS, FISHING HISTORY AND THE SECTOR SYSTEM.

BASE owns a Federal "limited access" Northeast Multispecies Permit,[1] which is issued pursuant to the historical landings of the fishing vessel DESTINY. ***Canastra Aff.***, ¶ *2*. The historical landings of this vessel, or what is commonly referred to in the industry as its "Fishing History" or "Permit" are recognized intangible property rights that are appurtenant to the vessel. *See Gowen, Inc. v. F/V QUALITY ONE*, 244 F.3d 64, 65 at n. 1 (1st Cir. 2001) ("the fishing or catch history is a record of fish caught by the vessel over time . . . It is used to determine whether the vessel qualifies for a permit and what the vessel's permit allows."). Each "fishing history" is unique to the vessel and manifests a ***permanent*** intangible property right under applicable law. *Id.*

BASE is presently a member of Northeast Fishery Sector VII ("Sector 7"). A "Sector" is a machination created by the National Oceanic and Atmospheric Administration ("NOAA") together with its subagency, the National Marine Fisheries Service ("NMFS"). Sectors are used to consolidate quota and manage the Northeast multispecies or "groundfish" fishery. 50 CFR

[1] "Multispecies" is another term for "groundfish," the most popular being cod and haddock.

648.87 (federal regulation detailing Sector requirements).[2]  A Sector is basically a group of three

or more holders of Federal "limited access"[3] multispecies permits.  *Id.*  NMFS will allocate

quota or what it labels an Annual Catch Entitlement ("ACE") (i.e. the amount of fish a Sector's

members are permitted to harvest in a fishing year)[4] to each Sector and the members of the

Sector will utilize that ACE pursuant to the terms of their Sector Membership Agreement and/or

Operations Plan.  *Id.*  These Membership Agreements and Operations Plans are very similar to

an Operating Agreement of a Limited Liability Company or Bylaws of a corporation, with the

exception that the agreements, together with each permit holder's membership in a particular

sector, must be approved by NMFS every year.  *Id.*  The annual approval and requirements of

Operating Plans are set forth with specificity in 50 CFR 648.87(b)(2).

Presently, only multispecies permits are subject to the NMFS sector system.  Sectors do

not apply to other fisheries, such as scallops.  However, rarely does a vessel have a fishing

history that is limited to only a single species.  More often, and as is the case here, a single

fishing vessel will have a fishing history for several different species, and NMFS will

accordingly issue a fishing permit for those several species.  In this case, all of Mr. Rafael's

fishing permits at issue are based on fishing history for both multispecies and scallops, in

addition to several others.

---

[2] *See also NMFS Greater Atlantic Region General Information about Sectors, available at* https://www.greateratlantic.fisheries.noaa.gov/sustainable/species/multispecies/

[3] A "limited access" fishing permit is one that it not open to the general population.  The only way to acquire a limited access permit is to purchase one from another commercial fisherman or fishing company that already has one.  In other words, NMFS does not issue "new" limited access fishing permits.

[4] ACE and quota are used herein interchangeably.

This is important because NMFS regulations prevent the practice of what is colloquially referred to as "permit splitting," which is the theoretical practice of transferring the permit/history associated with one fishery, while retaining the permit/history of others. For example, by operation of NMFS regulations, one cannot transfer his scallop permit to another vessel, while retaining the multispecies permit, or vice versa. *See* 50 CFR § 648.4(a)(1)(L). In other words, the transfer of a vessel's entire fishing history must be a "package deal" and one can only sell his scallop history if he likewise sells his multispecies history (and the histories of all other species associated with the vessel).

## II. SECTOR 7 RESTRICTIONS ON TRANSFER.

Limited access fishing permits are often traded between commercial fishermen and fishing companies. Purchasing and selling a limited access multispecies permit (and all other permits associated with that history, because permit splitting is prohibited) requires particular consideration of Sector rules and regulations, as Sector membership agreements often contain "Rights of First Offer" ("ROFO") and "Rights of First Refusal" ("ROFR") that apply when a member seeks to sell his permit to someone outside of the Sector.

In this case, the sale of Carlos Rafael's permits enrolled in Sector 7 are subject to such ROFO/ROFR provisions which are set forth in Section 3.4 of the Sector 7 Membership Agreement. ***See Membership Agreement, Section 3.4, attached as Exhibit 1 to the Complaint.*** The Sector 7 Membership Agreement provides a tiered ROFO and ROFR first to active Members of Sector 7.

This tiered ROFO/ROFR system creates a "derby-style" bid on any permit that a Sector 7 member wishes to sell to a non-member. *Id.* Active Sector 7 members, such as BASE, have a

30 day ROFR period after receiving notice of ROFO. *Id.* The first member to exercise such an ROFR receives the permit on the same terms and conditions offered to the prospective seller. ***Id.*** The notice provisions require that the member-seller provide "a complete description, in writing, of all of the terms and conditions of the Permit Offer," to all active members of Sector 7 so that the Sector 7 members know exactly what they are agreeing to purchase when they exercise their ROFR. ***Id.***

In this case, Mr. Rafael, and his several companies at issue (all of which are defendants in this case) were ordered by NOAA to sell all interest in commercial fishing by December 31, 2020.[5] Thereafter, on August 29, 2019, Rafael, through his daughter, provided what was described as "Right of First Refusal forms" to the manager of Sector 7. ***Canastra Aff. ¶ 5; see also Exhibit 3 to the Complaint.*** This purported notice of right of first refusal was limited to a "Vessel Purchase and Sale Agreement" to an unnamed buyer for the several permits at issue for the purchase price of $45,950,000.00. ***Complaint, Exhibit 3.***

Thereafter, on September 3, 2019, Rafael withdrew the purported notice of right of first refusal and petitioned the Sector 7 Board of Directors for an exemption from the ROFR procedures. Specifically, Rafael sought a Board vote to allow him to sell his several permits enrolled in Sector 7 to companies owned and controlled by Charles and Michael Quinn ("Quinn").

---

[5] *See* NOAA Press Release, Details of the Settlement of the Government's Civil Case against Carlos Rafael (August 19, 2019) *available at* https://www.fisheries.noaa.gov/new-england-mid-atlantic/enforcement/details-settlement-governments-civil-case-against-carlos.

A board meeting was held on September 9, 2019. At this meeting, Rafael, through his representatives advised that the Purchase and Sale Agreement with the Quinns contained different terms and conditions than that provided to the Sector 7 membership on August 29, 2019. ***Canastra Aff.*, ¶ *7.*** Rafael's representatives declined to provide this agreement. ***Id.***

It was further stated at the September 9, 2019 Board Meeting by Quinn's counsel that Rafael in concert with the Quinns were exploring the option of voluntarily relinquishing Rafael's several multispecies permits to thereby avoid the ROFR procedures required by Sector 7. Doing so only requires submission of a letter to NMFS acknowledging permanent abandonment of the permits.

Should Rafael improperly bypass the ROFR procedures required by the Sector 7 Membership Agreement, then this will cause irreparable harm to BASE. BASE is entitled to exercise is valid ROFR as an active member of Sector 7. Relinquishing the permit to avoid this process is a direct breach of the Sector Membership Agreement. Moreover, it will deprive and irreparably damage Sector 7 by removing Rafael's groundfish history from the sector permanently. ***Canastra Aff.* ¶ *8-9.***

**ARGUMENT**

A preliminary injunction and/or temporary restraining order is warranted when the moving party shows that the balance of the following factors are in its favor: (I) a likelihood of success on the merits, (II) the risk of irreparable harm in the event the injunction is denied, balanced with (III) the risk of irreparable harm to the opposing party in the event the injunction is granted, and, in appropriate cases (IV) the value to the public interest. *Packaging Industries*

*Group, Inc. v. Cheney,* 380 Mass. 609, 616-17 (1980); *Planned Parenthood League of Massachusetts, Inc. v. Operation Rescue,* 406 Mass. 701, 710, 550 (1990).

## I. BASE WILL SUCCEED ON THE MERITS.

The interpretation of a contract is ordinarily a question of law. *James B. Nutter & Company v. Estate of Murphy,* 478 Mass. 664, 667 (2018). Under traditional rules of contract interpretation, contracts are construed in accordance with their plain and ordinary meaning, unless the terms are ambiguous. *Id.* Contractual language is ambiguous "'if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.'" *Id.* (quoting *Citation Ins. Co. v. Gomez,* 426 Mass. 379, 381 (1998)).

Here, the Membership Agreement states without equivocation that "[a]ny purported transfer of any type whatsoever of a Member's Harvest Share, rights in or to the Sector's ACE or of a Member's Permit, other than transfers made in strict compliance with the provisions of this Section 3 shall be null and void." **See Exhibit 1 to the Complaint at p. 3.** Rafael seeks to "abandon" his multispecies permit, making the technical argument that this is not a "transfer" prohibited by the Membership Agreement. This is not true. By abandoning the permit, Rafael would essentially be transferring all quota or ACE associated therewith away from Sector 7 to be redistributed to the "common pool," i.e. other sectors and non-sector participants. This is expressly prohibited by the Membership Agreement.

Further, abandoning the permit to avoid the ROFR procedures obviates the intent of the Membership Agreement, which is to allow sector members the opportunity to keep fishing permits within the sector to ensure "financial and operational stability over the term of the [sector's] expected life." ***Ex. 3 to Complaint at p. 3.***

Abandoning the multispecies permit, moreover, manifests an event of gross negligence and willful misconduct for which Rafael will be liable pursuant to Section 12 of the Operation Plans, which also provides that termination of membership is not effective until the final day of the fishing year. ***Ex. 2 to Complaint at p. 17-18.***

Accordingly, there is exceptionally strong evidence that BASE will prevail on the merits when the matter proceeds to mandatory arbitration.

## II. THERE IS A SUBSTANTIAL RISK OF IRREPERABLE HARM TO BASE

There is overwhelming evidence of substantial irreparable harm should the permits be abandoned or transferred to a non-member, which is supported by the Affidavit submitted herewith. Should BASE be deprived of its opportunity to exercise its ROFR, it will be permanently deprived of this asset with no reasonable expectation of acquiring similar fishing permits at any time in the future. This will not only affect BASE in the immediate future, as it, but it will affect generations. No award of money damage could adequately compensate BASE for the permanent loss of these exceptionally unique assets and the improper conveyance of the permits to a non-member or outright destruction of the permits. This will almost certainly create an unrecoverable loss that no money award could adequately redress, both for BASE and for Sector 7.

## III. THERE IS NO RISK OF IRREPERABLE HARM TO RAFAEL AND HIS COMPANIES.

There will be no irreparable harm to Carlos Rafael and his several companies should the status quo be enforced pending arbitration. In essence, Carlos Rafael, for reasons that have been unexplained, is reluctant to provide the details of his agreement with the Quinns. Should the

ROFR procedures be honored, BASE will simply have the opportunity to provide Rafael the same terms offered by the Quinns: no more and no less.

**IV. PUBLIC INTEREST FAVORS INJUNCTION IN FAVOR OF BASE.**

There is a public interest in maintaining the sector system, which NMFS has implemented to serve the overall good. Sector 7 and BASE will be substantially damaged should Rafael's multispecies permits be abandoned solely for the purposes of avoiding the ROFR procedures set forth in the Membership Agreement and Operations Plan. This permits will simply disappear, resulting in even further damage to the New Bedford working waterfront as a result of Mr. Rafael's activity.

The historical, aesthetic and cultural value of an active commercial fishery within the Commonwealth is significant. It should not be traded away or abandoned to accommodate secretive and monied interests.

**CONCLUSION**

WHEREFORE, BASE respectfully moves for a Temporary Restraining Order and Preliminary Injunction preventing transfer and/or abandonment of Rafael's several fishing permits enrolled in Sector 7 pending forthcoming arbitration.

Respectfully Submitted, Plaintiff,
BASE, INC.

By its attorneys,
FARRELL SMITH O'CONNELL, LLP

David S. Smith, Esq.
**BBO No.:** 634865
**Olaf Aprans**
**BBO NO. 670434**
27 Congress St., Suite 109
Salem, MA 01970
(978) 744-8918
Fax: (978) 666-0383
Email: dsmith@fsofirm.com
olaf@fsofirm.com

Dated: September 11, 2019

# Exhibit O

BASE, INC.,
Claimant,

vs.

CARLOS RAFAEL, CONCEICAO RAFAEL, APOLLO FISHING, LLC, ATHENA FISHING CORP., C&C FISHING CORP., IVONILDE FISHING CORP., S&S FISHING, LLC, TYLER FISHING, LLC, VILA FISHING CORP., and VILA NOVA DO CORVO II, INC.
Respondents

and

VII NORTHEAST FISHERY SECTOR, INC.,
Respondent

## DEMAND FOR ARBITRATION

Claimant, BASE, Inc. ("BASE"), hereby demands Arbitration as follows:

## PARTIES

### Claimant, BASE, Inc.

1. BASE was and is a corporation duly organized under the laws of the Commonwealth of Massachusetts, with a principal place of business of 62 Hassey Street, New Bedford, MA 02740.

2. BASE is represented by the undersigned counsel, David S. Smith, Esq. and Olaf Aprans, Esq. both of Farrell Smith O'Connell, LLP, 27 Congress Street, Suite 109, Salem, MA 01970, 978-744-8918, dsmith@fsofirm.com, olaf@fsofirm.com.

### Respondents, Carlos and Conceicao Rafael and Holdings

3. On information and belief, Respondent, Carlos Rafael, is an individual residing in the Commonwealth of Massachusetts, who is presently incarcerated at the Fort Devens Federal Prison, 42 Patton Road, Devens, MA 01434.

4. On information and belief. Respondent. Conceicao Rafael. is an individual residing in the Commonwealth of Massachusetts. with a residential address at 77 Tucker Lane. Dartmouth. MA 02747.[1]

5. On information and belief, Respondent Apollo Fishing, LLC ("Apollo") is a limited liability company organized under the laws of the Commonwealth of Massachusetts, with a principal place of business of 24 Centre Street, New Bedford, MA 02740. At all material times Apollo was and is the owner of the fishing vessel APOLLO (O.N. 614462) together with its federal fishing permit and fishing history associated with Northeast Federal Permit No. 410275 (hereinafter the "Apollo Permit").

6. On information and belief, Respondent Athena Fishing Corp. ("Athena") is a corporation organized under the laws of the Commonwealth of Massachusetts, with a principal place of business of 24 Centre Street, New Bedford, MA 02740. At all material times Athena was and is the owner of the fishing vessel ATHENA (O.N. 1122803) together with its federal fishing permit and fishing history associated with Northeast Federal Permit No. 410604 (hereinafter the "Athena Permit").

7. On information and belief, Respondent C&C Fishing Corp. ("C&C") is a corporation organized under the laws of the Commonwealth of Massachusetts. with a principal place of business of 24 Centre Street, New Bedford, MA 02740. At all material times C&C was and is the owner of the fishing vessel ILHA BRAVA (O.N. 971262)

[1] Conceicao Rafel and Carlos Rafael are collectively referred to herein as the "Rafaels".

together with its federal fishing permit and fishing history associated with Northeast Federal Permit No. 410564 (hereinafter the "Ilha Brava Permit").

8.  On information and belief, Respondent Ivonilde Fishing Corp. ("Ivonilde") is a corporation organized under the laws of the Commonwealth of Massachusetts, with a principal place of business of 24 Centre Street, New Bedford, MA 02740.  At all material times Ivonilde was and is the owner of the fishing vessel ACORES (O.N. 961198) together with its federal fishing permit and fishing history associated with Northeast Federal Permit No. 410519 (hereinafter the "Acores Permit").

9.  On information and belief, Respondent S&S Fishing, LLC ("S&S") is a limited liability company organized under the laws of the Commonwealth of Massachusetts, with a principal place of business of 24 Centre Street, New Bedford, MA 02740.  At all material times S&S was and is the owner of the fishing vessel HERA II (O.N. 1113613) together with its federal fishing permit and fishing history associated with Northeast Federal Permit No. 410612 (hereinafter the "Hera II Permit").

10. On information and belief, Respondent Tyler Fishing, LLC ("Tyler") is a limited liability company organized under the laws of the Commonwealth of Massachusetts, with a principal place of business of 24 Centre Street, New Bedford, MA 02740.  At all material times Tyler was and is the owner of the fishing vessel RESOLUTE (O.N. 597484) together with its federal fishing permit and fishing history associated with Northeast Federal Permit No. 410161 (hereinafter the "Resolute Permit").

11. On information and belief, Respondent Vila Fishing Corp. ("Vila") is a corporation organized under the laws of the Commonwealth of Massachusetts, with a principal

place of business of 24 Centre Street. New Bedford. MA 02740. At all material times Vila was and is the owner of the fishing vessel VILA NOVA DO CORVO I (O.N. 1110463) together with its federal fishing permit and fishing history associated with Northeast Federal Permit No. 410590 (hereinafter the "VNDC1 Permit").

12. On information and belief, Respondent Vila Nova Do Corvo II, Inc. ("Vila Nova") is a corporation organized under the laws of the Commonwealth of Massachusetts, with a principal place of business of 24 Centre Street, New Bedford, MA 02740.[2] At all material times Vila Nova was and is the owner of the fishing vessel VILA NOVA DO CORVO II (O.N. 618384)[3] together with its federal fishing permit and fishing history associated with Northeast Federal Permit No. 410451 (hereinafter the "VNDC2 Permit").[4]

13. On information and belief. the Rafaels, as their interests appear, and where applicable. own. manage. are officers, members and/or directors of, are affiliated with. and/or are otherwise authorized to act on behalf of the Rafael Companies.

[2] The eight [8] entities identified in Paragraphs 4 through 11 above. Apollo. Athena. C&C. Ivonilde. S&S. Tyler. Vila and Vila Nova, are hereinafter referred to collectively as the "Rafael Companies." The Rafael Companies, together with the Rafaels. are hereinafter referred to collectively as the "Rafael Respondents."

[3] The eight [8] fishing vessels identified in Paragraphs 4 through 11 above, the APOLLO, ATHENA, ILHA BRAVA. ACORES. HERA II. RESOLUTE. VILA NOVA DO CORVO I. and VILA NOVA DO CORVO II, are hereinafter referred to collectively as the "Rafael Vessels."

[4] The eight [8] fishing permits and fishing histories identified in Paragraphs 4 through 11 above, the Apollo Permit. Athena Permit. Ilha Brava Permit. Acores Permit. Hera II Permit. Resolute Permit. VNDC1 Permit. and VNDC2 Permit. are hereinafter referred to as the "Rafael Permits."

14. On information and belief. the Rafaels and the Rafael Companies are represented by John Markey, Esq. of Moses Smith Markey & Walsh, 50 Homers Wharf. New Bedford. MA. 508-993-9711, jmarkey@msmw-law.com.

**VII Northeast Fishery Sector, Inc.**

15. VII Northeast Fishery Sector, Inc. ("Sector 7"), is and was at all material times a "sector" approved by the National Oceanic and Atmospheric Administration ("NOAA") within the meaning of 50 C.F.R. Part 648, Subpart F.

16. BASE and all Rafael Respondents herein are and were members of Sector 7 at all material times.

17. On information and belief, Sector 7 is represented by Stephen M. Ouellette, Esq., Law Office of Stephen M. Ouellette, 127 Eastern Ave., Ste. 1, Gloucester, MA 01930, 978-281-7788, stephen.ouellette@fishlaw.com.

**ARBITRATION AGREEMENT**

18. At all material times, BASE, Rafael Respondents. and Sector 7 are and were parties to a certain Arbitration Agreement set forth in the Sector 7 Membership Agreement and Operations Plan. specifically Section 18 of the Operations Plan and Section 9 of the Membership Agreement. The Membership Agreement and Operations Plan are attached hereto as ***Exhibits 1 and 2*** respectively.

**SECTORS AND FEDERAL GROUNDFISH MANAGEMENT**

19. Pursuant to Federal Regulations set forth in 50 C.F.R. Part 648. Subpart F. NOAA and its subagency, the National Marine Fisheries Service ("NMFS") manages the

Northeast multispecies (also known as "groundfish") fishery through the use of, *inter alia*, what are known as "Sectors."

20. A Sector is a group of Federal limited access groundfish permit holders that voluntarily enter into a contract and Operations Plan approved by NMFS and agree to certain fishing restrictions for a specified period of time. NMFS grants quota (i.e. the right to harvest certain amounts of fish) or what is known as Annual Catch Entitlement ("ACE") to Sectors for each fishing year based on the aggregate fishing permits and fishing history of the vessels enrolled in each Sector.

21. Federal groundfish permit holders enrolled in a Sector can buy and sell both their federal fishing permits and vessel fishing history and ACE associated with their permit, subject to conditions in their Sector membership and/or operating agreements.

22. Because Rafael Respondents were members of Sector 7 at all material times the Rafael Vessels together with the Rafael Permits were enrolled in Sector 7 and subject to the Sector 7 Membership Agreement and Operations Plan.

**RIGHT OF FIRST REFUSAL IN MEMBERSHIP AGREEMENT**

23. Section 3 of the of the Sector 7 Membership Agreement and Section 15 of the Operations Plan prohibits the transfer of any fishing permit and fishing history and/or quota (a.k.a. "ACE" or "harvest share"), "other than transfers made in strict compliance" with the Membership Agreement and Board approved procedures.

24. Section 3.4 of the Membership Agreement and Section 15 of the Operations Plan provides, *inter alia*, a Right of First Refusal ("ROFR") first to active members of

Sector 7 before a Sector 7 member can transfer its fishing permit/history to a non-member.

25.    There are strict procedures set forth in the Membership Agreement and Operations Plan that Sector 7 members are required to follow before they can transfer their fishing permits/history to a non-member, which include, without limitation the following:

     i.    The prospective transferor must provide "a complete description, in writing, of all of the terms and conditions of the Permit Offer," to all active members of Sector 7;

    ii.    The active members shall have thirty [30] days to provide written notice of its intent to exercise its right of first refusal; whoever responds first in time shall have the right to acquire the permit subject to the same terms and conditions offered by the non-member.

26.    The foregoing transfer restrictions are enacted "to provide financial and operational stability over the term of [the sector's] life."

## FACTS

27.    On or about August 19, 2019, NOAA settled several pending administrative claims against Carlos Rafael and the Rafael Companies associated with Carols Rafael's several and notorious criminal activities made in connection with his commercial fishing operations (hereinafter the "NOAA Settlement").

28.    Part of the terms of the NOAA Settlement requires that Rafael Respondents sell all limited access federal fishing permits and fishing vessels controlled by Rafael

Respondents by December 31, 2020, through transactions reviewed and approved by NOAA.

29. Prior to on or about August 29, 2019, the Rafael Respondents received an offer to purchase the Rafael Vessels and the Rafael Permits from outside of the Sector 7 membership, to wit: certain companies owned and/or controlled by individuals named Charles and Michael Quinn (collectively, the "Quinns"), who are not parties to this Arbitration.

30. On information and belief, and prior to on or about August 29, 2019, the Rafael Respondents entered into a purchase and sale agreement with the Quinns that is yet to be disclosed to the Sector 7 membership.

31. On August 28, 2019, Rafael Respondents were advised that the Rafael Permits were subject to a right of first refusal, and were instructed to either (1) submit the Quinn offer to the Sector 7 ROFR process or (2) provide an explanation as to why the proposed transaction was not subject to the ROFR process.

32. On or about August 29, 2019, the Rafael Respondents provided to the Sector 7 manager what they identified as "Right of First Refusal forms," disclosing a "Vessel Purchase and Sale Agreement," whereby the Rafael Vessels together with the Rafael Permits are to be sold for $45,950,000.00 to an unnamed buyer. A copy of the proposed Vessel Purchase and Sale Agreement is attached hereto as *Exhibit 3* and incorporated herein by reference.

33. On or about September 3, 2019, the Rafael Respondents withdrew their purported notice of right of first refusal and petitioned the Sector 7 Board of Directors to allow

the sale of the Rafael Vessels and Rafael Permits notwithstanding noncompliance with the ROFR procedures on the grounds that the Quinns are members of the "local fishing community." A true copy of this petition is attached hereto as *Exhibit 4*.

34. On or about September 9, 2019, the Sector 7 Board of Directors held a meeting and, after deliberation, denied the Rafael Respondents' requests to permit the transfer of the Rafael Vessels and Rafael Permits to the Quinns without first complying with the ROFR procedure.

35. On or about September 9, 2019, the Rafael Respondents, either themselves or through counsel, made the following representations to the Sector 7 Board of Directors:

i. The proposed Purchase and Sale Agreement provided to the Sector 7 Manager on August 29, 2019 was not the same Purchase and Sale Agreement made by and between the Rafael Respondents and the Quinns;

ii. The Rafael Respondents. despite repeated requests. declined to provide a copy of the Purchase and Sale Agreement by and between themselves and the Quinns:

iii. The Rafael Respondents may pursue voluntarily relinquishing their Northeast Multispecies Permits in order to leave Sector 7 and thereby transfer the remainder of the Rafael Permits without the ROFR/ROFO restriction on sale.[5]

[5] Federal fishing permits typically contain fishing rights pertaining to several different species. Federal regulations prohibit the "splitting" of Federal Fishing Permits. i.e. one cannot sell his fishing rights associated with one species and retain his rights to other species. A permit sale must always be a "package deal" in this sense. The **Rafael Permits** contain limited access fishing rights pertaining to both Northeast Multispecies and other various species. most notably scallops. Because Respondents' potential buyers outside of Sector 7 are primarily seeking to acquire the more lucrative limited access scallop rights. Respondents have advised that they will improperly pursue

36. Should the Rafael Respondents voluntarily relinquish their Northeast Multispecies permits, then the ACE associated therewith will be permanently distributed to the common pool and will no longer be an asset of Sector 7, and by extension. BASE. Likewise, it will improperly and permanently revoke BASE of its genuine right of first refusal. Further, it will be in violation and material breach of both the Membership Agreement and Operations Plan. The forcgoing will cause permanent and irreparable damage to BASE in addition to other members of Sector 7.

37. Likewise, should the Rafael Permits transfer to a non-member without first undergoing the ROFR procedure, then BASE will suffer permanent and irreparable damage by losing its opportunity to acquire these fishing rights.

**COUNT I:**
**BREACH OF CONTRACT**

38. BASE reiterates and realleges its allegations contained in Paragraph Nos. 1-37 inclusive and incorporates same as if fully set forth herein.

39. Rafael Respondents cannot sell the Rafael Vessels and Rafael Permits to the Quinns without first complying with the ROFR procedure required by the Membership Agreement.

40. Rafael Respondents are in material breach of the Membership Agreement by refusing to adhere to this ROFR procedure.

---

voluntarily and permanently relinquishing their multispecies fishing rights to free them of the Sector 7 requirements. Only multispecies permits are subject to the NMFS' sector program.

41. As a direct and proximate result of the foregoing breach, BASE has been and will be irreparably damaged by not being able to exercise its valid right of first refusal to purchase the Rafael Vessels and Rafael Permits on the same terms and conditions as the Quinns.

WHEREFORE, BASE respectfully prays that the Arbitration Panel enter an award in BASE's favor on Count I, and issue the following relief:

1. Issue a Declaratory Award that the Rafael Vessels and Rafael Permits must be sold in strict accordance with the ROFR procedure set forth in Section 3.4 of the Membership Agreement;
2. Issue a Declaratory Award that any transfer of the Rafael Permits to anyone outside of Sector 7 without first providing Sector 7 Members, including BASE, a ROFR is null and void;
3. Issue a Declaratory Award confirming the Sector 7 Board's denial of the Quinn's request to enter Sector 7.
4. Issue a preliminary injunction preventing the transfer, hypothecation and/or relinquishment of the Rafael Permits (in whole or in part) during the pendency of this Arbitration;
5. Enter a permanent injunction preventing the transfer, hypothecation and/or relinquishment of the Rafael Permits (in whole or in part) without compliance with the ROFR procedure set forth in the Membership Agreement;
6. Award BASE its damages together with costs and attorneys' fees;
7. Award any such further relief the Arbitration Panel deems just and proper.

## COUNT II
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

42. BASE reiterates and realleges its allegations contained in Paragraph Nos. 1-37 inclusive and incorporates same as if fully set forth herein.

43. Rafael Respondents, as participating members in Sector 7, have a fiduciary duty similar to partners in a partnership with other members of Sector 7, including BASE.

44. Included in this fiduciary duty and the terms of both the Membership Agreement and Operations Plan is the obligation of good faith and fair dealing.

45. Rafael Respondents, by failing to comply with the ROFR procedure and by actively seeking to circumvent it, have breached their obligation of good faith and fair dealing to BASE and all other Sector 7 members.

WHEREFORE, BASE respectfully prays that the Arbitration Panel enter an award in BASE's favor on Count II, and issue the following relief:

1. Issue a Declaratory Award that the Rafael Vessels and Rafael Permits must be sold in strict accordance with the ROFR procedure set forth in Section 3.4 of the Membership Agreement;
2. Issue a Declaratory Award that any transfer of the Rafael Permits to anyone outside of Sector 7 without first providing Sector 7 Members, including BASE, a ROFR is null and void;
3. Issue a Declaratory Award confirming the Sector 7 Board's denial of the Quinn's request to enter to Sector 7.

4. Issue a preliminary injunction preventing the transfer, hypothecation and/or relinquishment of the Rafael Permits (in whole or in part) during the pendency of this Arbitration;
5. Enter a permanent injunction preventing the transfer, hypothecation and/or relinquishment of the Rafael Permits (in whole or in part) without compliance with the ROFR procedure set forth in the Membership Agreement;
6. Award BASE its damages together with costs and attorneys' fees;
7. Award any such further relief the Arbitration Panel deems just and proper.

**COUNT III:**
**UNJUST ENRICHMENT**

46. BASE reiterates and realleges its allegations contained in Paragraph Nos. 1-37 inclusive and incorporates same as if fully set forth herein.

47. Rafael Respondents will be unjustly enriched to the detriment of BASE if they sell, relinquish or otherwise dispose of the Rafael Permits in contravention with the ROFR process.

WHEREFORE, BASE respectfully prays that the Arbitration Panel enter an award in BASE's favor on Count III, and issue the following relief:

1. Issue a Declaratory Award that the Rafael Vessels and Rafael Permits must be sold in strict accordance with the ROFR procedure set forth in Section 3.4 of the Membership Agreement;

2. Issue a Declaratory Award that any transfer of the Rafael Permits to anyone outside of Sector 7 without first providing Sector 7 Members, including BASE, a ROFR is null and void;

3. Issue a Declaratory Award confirming the Sector 7 Board's denial of the Quinn's request to enter Sector 7.

4. Issue a preliminary injunction preventing the transfer, hypothecation and/or relinquishment of the Rafael Permits (in whole or in part) during the pendency of this Arbitration;

5. Enter a permanent injunction preventing the transfer, hypothecation and/or relinquishment of the Rafael Permits (in whole or in part) without compliance with the ROFR procedure set forth in the Membership Agreement;

6. Award BASE its damages together with costs and attorneys' fees;

7. Award any such further relief the Arbitration Panel deems just and proper.

**CLAIMANT BASE, INC. SELECTS THE FOLLOWING ARBITRATOR PURSUANT TO SECTION 18 OF THE SECTOR 7 OPERATIONS PLAN:**

**Robert J. Bocko, Esq.**
**Holmes, Weddle & Barcott, PC**
**999 3rd Ave., Ste. 2600**
**Seattle, WA 98104**
**206-292-8008**
**rbocko@hwb-law.com**

DATED at Salem, Massachusetts, this 18th day of September, 2019.

Plaintiff,
BASE, INC.

By its attorneys,
**FARRELL SMITH O'CONNELL, LLP**

*/s/ Olaf Aprans*

**David S. Smith, Esq.**
**BBO No.: 634865**
**Olaf Aprans**
**BBO NO. 670434**
27 Congress St., Suite 109
Salem, MA 01970
(978) 744-8918
Fax: (978) 666-0383
Email: dsmith@fsofirm.com
olaf@fsofirm.com

**Certificate of Service**

I hereby certify that I caused the foregoing document to be served upon the following via email on September 18, 2019:

**Robert J. Bocko, Esq.**

**VII Northeast Fishery Sector, Inc., c/o Stephen M. Ouellette, Esq.**

**The Raphael Respondents, c/o John Markey, Esq.**

*/s/ Olaf Aprans*

# Exhibit P

**From:** Lloyd Macdonald <dlmacdonald@mac.com>
**Sent:** Wednesday, April 14, 2021 4:05 PM
**To:** Paul Muniz <[illegible]>
**Subject:** Re: Substitution of Collateral/Panel Orders

Paul: Enclosed is the letter dated March 4, 2021 from Attorney John Markey, which was prepared and communicated to me per the order of the Arbitration Panel, which letter enclosed as Exhibits A and B the Panel's orders of February 25, 2021 and October 25, 2020, respectively. It was the February 25th order that I quoted in my email yesterday with regard to my inability as trustee to act on the proposed substitution of collateral. It is my further understanding that the Panel issued an emergency order yesterday to the parties relating to the proposed transaction obliging the parties to report as to the status. Lloyd Macdonald

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS. CIVIL ACTION NO. 2173CV00292

---

**SHAMROCK FISHERIES LLC,
KINEO FISHERIES LLC,
MARINER FISHERIES LLC, SEAFARER FISHERIES LLC, CYNBEL FISHERIES LLC, TORBAY FISHERIES LLC,
GALWAY FISHERIES LLC,
QUINN FISHERIES, INC.,
BLUE HARVEST FISHERIES, LLC,**

Plaintiffs,

**v.**

**MARK C. MANNING
ROBERT J. BOCKO
STEVENSON L. WEEKS
as PANELIST**

Defendants, and

**HON. LLOYD MACDONALD, as TRUSTEE of the RAFAEL SETTLEMENT TRUST**

Nominal Defendant

---

**PLAINTIFFS' EX PARTE EMERGENCY MOTION FOR A SHORT ORDER OF NOTICE, TO APPOINT SPECIAL PROCESS SERVER, AND TO SCHEDULE EXPEDITED HEARING ON PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

NOW COME. Shamrock Fisheries LLC. Kineo Fisheries LLC. Mariner Fisheries LLC. Seafarer Fisheries LLC, Cynbel Fisheries LLC. Torbay Fisheries LLC. Galway Fisheries LLC. Quinn Fisheries. Inc. (the "Quinn Entities"). Blue Harvest Fisheries. LLC and certain of its

affiliates ("Blue Harvest"). (collectively. the "Plaintiffs"), by and through their undersigned counsel, and respectfully submit their Emergency Motion to 1) Appoint a Special Process Server, 2) for a Short Order of Notice, and 3) to Schedule an Expedited Hearing on Plaintiffs' Motion for a Preliminary Injunction.

Plaintiffs filed their Verified Complaint on April 20, 2021. As outlined therein, the Plaintiffs are on the verge of consummating a multimillion-dollar commercial transaction which has been held up by the actions of an Arbitration Panel (made up of Defendants Manning, Bocko and Weeks) that has no jurisdiction over either the Plaintiffs or the Nominal Defendant Trustee, Honorable Lloyd MacDonald. The accompanying motion requests that this Court issue a temporary restraining order and preliminary injunction that (1) prohibits the AAA Arbitration Panel, Carlos Rafael and his affiliated entities ("the Rafaels") and BASE, Inc. from interfering with the Nominal Defendant Trustee's exercise of his fiduciary duties or from issuing any Order or Award that interferes with the transfer of vessels and permits or the substitution of collateral by the Plaintiffs. The motion also asks the Court to instruct the Trustee that he is authorized to execute any documents necessary to affect the sale of vessels and permits described in the Verified Complaint. The Plaintiffs require a prompt hearing in order to close on the pending transaction. which involves the transfer of fishing vessels and permits for fishing seasons that are imminently approaching. Accordingly, the Plaintiffs request a Short Order of Notice requiring the Defendants attendance at an expedited hearing.

To expedite service of the Short Order of Notice, the Plaintiffs additionally move that Dewsnap & Associates. LLC be appointed special process servers pursuant to Mass.R.Civ.P 4(c) to serve a Short Order of Notice requiring Defendant's attendance at the hearing. Hank Dewsnap

has many years of experience in the service of process, and is a disinterested person over the age of eighteen (18) years old.

WHEREFORE, the Plaintiffs respectfully move that the Court 1) schedule an expedited hearing, 2) issue a Short Order of Notice requiring the Defendant's attendance at this hearing, and 3) appoint Hank Dewsnap of Dewsnap & Associates, LLC as special process server pursuant to Mass.R.Civ.P.4(c).

Respectfully submitted,
SHAMROCK FISHERIES LLC, KINEOS
FISHERIES LLC, MARINER FISHERIES LLC,
SEAFARER FISHERIES LLC, CYNBEL
FISHERIES LLC, TORBAY FISHERIES LLC,
GALWAY FISHERIES LLC, QUINN FISHERIES,
Inc., and BLUE HARVEST FISHERIES, LLC.
By their attorneys,

Paul T. Muniz (BBO No.: 564786)
pmuniz@donovanhatem.com
**DONOVAN HATEM LLP**
53 State Street, 8th Floor
Boston, MA  02109
(617) 406-4500 *tel*
(617) 406-4500 *fax*

Andrew E. Minkiewicz (BBO No.: 651209)
aminkiewicz@kelleydrye.com
**KELLEY DRYE & WARREN**
Washington Harbour, Suite 400
3050 K Street, NW
Washington, DC 20007
(202) 342-8400 *tel*
(202) 342-8451 *fax*

Date: April 21, 2021

**CERTIFICATE OF SERVICE**

I, Paul T. Muniz, hereby certify that on April 21, 2021, I served a copy of the foregoing document, via electronic mail, on all parties or their representatives in the above captioned action.

Paul T, Muniz

4826-7084-5670, v. 1

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS. CIVIL ACTION NO. 2173CV00292

**SHAMROCK FISHERIES LLC, KINEO FISHERIES LLC, MARINER FISHERIES LLC, SEAFARER FISHERIES LLC, CYNBEL FISHERIES LLC, TORBAY FISHERIES LLC, GALWAY FISHERIES LLC, QUINN FISHERIES, INC., BLUE HARVEST FISHERIES, LLC,**

Plaintiffs,

**v.**

**MARK C. MANNING
ROBERT J. BOCKO
STEVENSON L. WEEKS
as PANELIST**

Defendants, and

**HON. LLOYD MACDONALD, as TRUSTEE of the RAFAEL SETTLEMENT TRUST**

Nominal Defendant

**(Proposed) Order**

THIS MATTER having been brought before the Court for an Order and having heard the arguments of counsel, and exceptional circumstances having been shown, it is hereby Ordered that:

1. The Defendants are hereby prohibited from interfering with the Trustee's exercise of his fiduciary duties or issuing any Order or Award that interferes with the transfer of vessels and permits or the substitution of collateral by the Plaintiffs; and
2. The Trustee is hereby authorized to execute any documents necessary to affect the sale of vessels and permits described in the Verified Complaint.

So Ordered, ________________, J.

4841-3144-6246, v. 1

## CIVIL TRACKING ORDER
**(STANDING ORDER 1- 88)**

DOCKET NUMBER
**2173CV00292**

**Trial Court of Massachusetts**
**The Superior Court**

CASE NAME:
Shamrock Fisheries LLC et al vs. Mark C Manning Member of Arbitration Panel et al

Marc J. Santos, Clerk of Court
Bristol County

TO: Paul Thomas Muniz, Esq.
Donovan and Hatem LLP
53 State St 8th Floor
Boston, MA 02109

COURT NAME & ADDRESS
Bristol County Superior Court - New Bedford
441 County Street, 1st floor
New Bedford, MA 02740

### TRACKING ORDER - F - Fast Track

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

**STAGES OF LITIGATION** **DEADLINE**

| | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court | | 07/19/2021 | |
| Response to the complaint filed (also see MRCP 12) | | 08/19/2021 | |
| All motions under MRCP 12, 19, and 20 | 08/19/2021 | 09/20/2021 | 10/18/2021 |
| All motions under MRCP 15 | 08/19/2021 | 09/20/2021 | 10/18/2021 |
| All discovery requests **and depositions** served and non-expert depositions completed | 02/15/2022 | | |
| All motions under MRCP 56 | 03/17/2022 | 04/18/2022 | |
| Final pre-trial conference held and/or firm trial date set | | | 08/15/2022 |
| Case shall be resolved and judgment shall issue by | | | 04/21/2023 |

**The final pre-trial deadline is <u>not the scheduled date of the conference</u>.** You will be notified of that date at a later time.

**Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**

This case is assigned to

| DATE ISSUED | ASSISTANT CLERK | PHONE |
|---|---|---|
| **04/21/2021** | **Dina Swanson** | **(508)996-2051** |